UNITED STATES of America

v.

Willie DECOSTER, Jr., (Decoster III), Appellant.

No. 72–1283.

United States Court of Appeals, District of Columbia Circuit.

Oct. 19, 1976.

As Amended Oct. 21, Nov. 16 and 24, 1976.

Argued En Banc May 26, 1977.

Judgment Filed May 14, 1979.*

Opinions Filed July 10, 1979.

MacKinnon, Circuit Judge, filed opinion concurring in result, in which Tamm and Robb, Circuit Judges, joined.

Spottswood W. Robinson, III, Circuit Judge, filed opinion concurring in result.

Bazelon, Circuit Judge, dissented and filed opinion in which J. Skelly Wright, Chief Judge, joined.

J. Skelly Wright, Chief Judge, filed statement in which Bazelon and Spottswood W. Robinson, III, Circuit Judges, joined.

197

Calvin Davison, Washington, D. C. (appointed by this Court), for appellant.

Earl J. Silbert, U. S. Atty., Washington, D. C., at the time of oral argument, with whom Carl S. Rauh, Principal Asst. U. S. Atty., Henry F. Greene, Executive Asst. U. S. Atty., and John A. Terry and Larry C. Willey, Asst. U. S. Attys., Washington, D. C., were on the brief for appellee.

John Townsend Rich and Mark W. Foster, Washington, D. C., were on the brief for amicus curiae Division V of the District of Columbia Bar.

Leon E. Irish, Washington, D. C., was on the brief for amicus curiae Division IV of the District of Columbia Bar.

Robert J. Paul, Washington, D. C., was on the brief for amicus curiae National Legal Aid and Defender Association.

Before WRIGHT, Chief Judge, and BAZELON, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.

Opinion in which McGOWAN, TAMM, and WILKEY, Circuit Judges, join filed by LEVENTHAL, Circuit Judge.

Opinion in which TAMM and ROBB, Circuit Judges, join filed by MacKINNON, Circuit Judge.

Opinion concurring in the result filed by SPOTTSWOOD W. ROBINSON, III, Circuit Judge.

Dissenting opinion in which J. SKELLY WRIGHT, Chief Judge, joins filed by BAZELON, Circuit Judge.

Statement in which BAZELON and SPOTTSWOOD W. ROBINSON, III, Circuit Judges, join filed by J. SKELLY WRIGHT, Chief Judge.

LEVENTHAL, Circuit Judge, who is joined in this opinion by McGOWAN, TAMM and WILKEY, Circuit Judges:

This case gives the court en banc the opportunity to present its views on the requirement of effective assistance of counsel in criminal prosecutions, with principal focus on the duty of counsel to make due investigation prior to trial. We conclude that appellant has not made the showing requisite for reversal of his conviction.

## A. *Proof at Trial*

At trial, Roger Crump, a soldier, testified that he was accosted by three men at about 6 p. m. on May 29, 1970, on the sidewalk at 8th and K Streets, N.W., near the parking lot of the Golden Gate Bar. He was yoked from behind by one man, threatened with a razor by another, while a third rifled his pockets and took his wallet which contained over $100 in cash.

Two plainclothes policemen cruising in an unmarked car saw the robbery in progress, alighted and gave chase. One officer followed the man later identified as Fred Eley. Officer Box testified that he followed appellant Decoster—whom he identified as the robber who went through Crump's pockets—from the scene to and into the

D.C. Annex Hotel, found him at the lobby desk and arrested him. He testified that the chase lasted two to three minutes, that he did not lose sight of appellant and that Crump, who had been following along, immediately identified Decoster as one of the robbers. Crump was unable to identify Decoster at trial, because in the meanwhile his sight had been impaired in an accident, but he testified that he had been positive of his identification when he made it in the hotel. A search of appellant's pockets did not turn up any money, and the wallet was never recovered.

Appellant testified he had met and had a few drinks with Crump at the Golden Gate Club bar, but had left Crump in the bar, walked back to the hotel about a block away, and was getting his key from the desk clerk when he was arrested.

The defense called Eley. He (as well as the other codefendant, Taylor) had already pleaded guilty at a time when Decoster, having jumped bail, was a fugitive from justice. Eley corroborated that Decoster had met Crump in the bar (a point on which Crump was unsure). However, he also testified that he had seen appellant fighting with Crump in the parking lot across from the bar—and as to this contradicted appellant.

Decoster's conviction for aiding and abetting an armed robbery, which resulted in a 2–8 year sentence, is on appeal to this court.

### B. *Subsequent Proceedings*

When the appeal was first before this court, the panel, while rejecting the contentions presented by appellate counsel, remanded for a hearing on the issue of ineffective assistance of counsel, an issue that it raised *sua sponte* and directed be presented to the district court on motion for a new trial.[1] The panel ruled that a defendant is entitled to the reasonably competent assistance of an attorney acting as his diligent conscientious advocate. Giving content to

this standard, the panel adopted duties owed by counsel to his client derived in large part from the guidelines for the defense function promulgated by the American Bar Association Project on Standards for Criminal Justice.[2] The panel then held that once the appellant had shown a substantial violation of a duty owed to him by counsel, the burden was on the government to demonstrate lack of prejudice.

Pursuant to the remand, the motion for new trial was filed November 1, 1973. In February, 1974, District Judge Joseph Waddy held three days of supplementary hearings on the adequacy of trial counsel. On April 23, 1975, with findings of fact and conclusions of law, he entered an order denying the motion for a new trial.

On October 19, 1976, the panel of this court, one member dissenting, reversed the judgment of conviction, holding that appellant had been denied the effective assistance of counsel. Essentially, the panel opinion (referred to as *Decoster II*) concluded that trial counsel had violated his duty to conduct a factual investigation. On March 17, 1977, the court granted the government's motion for rehearing en banc, vacated the panel opinion, and provided for supplemental briefs and oral argument.

### C. *Guiding Principles*

The Sixth Amendment guarantees that "in all criminal prosecutions, the accused shall . . . have the Assistance of Counsel for his defense." In giving content to this provision, the courts have recognized the need for differing approaches depending on the nature of the particular claim of denial of assistance in each case. These differences stem from the courts' perceptions of the exactness with which a denial can be identified and remedied, as well as their views of the need for a showing of prejudice.

---

1. *United States v. DeCoster,* 159 U.S.App.D.C. 326, 487 F.2d 1197 (1973) [hereafter referred to as *DeCoster I*].

2. American Bar Association, Project on Standards for Criminal Justice, Standards Relating to the Defense Function (App.Draft 1971) [hereafter referred to as ABA Standards].

■ The cases present a continuum. At one end are cases of structural or procedural impediments by the state that prevent the accused from receiving the benefits of the constitutional guarantee. The most obvious example is, of course, the failure of the state to provide any counsel whatever. The Supreme Court long ago held that the Sixth Amendment requires that the federal courts provide counsel for indigent defendants charged with felonies under federal law.[3] As to the states, the Court first defined the right to counsel as an aspect of a fair trial,[4] with the eventual result that the right was restricted to less than that provided in the federal courts.[5] *Gideon*[6] made the Sixth Amendment applicable to the states by incorporation into the Fourteenth Amendment. Today the Sixth Amendment requires that counsel be provided not only in all felony prosecutions,[7] but also in all prosecutions for misdemeanors that result in imprisonment.[8]

■ The right to have counsel provided is so fundamental that, like the admission in evidence of a coerced confession,[9] or trial before an interested judge,[10] the violation of the constitutional right mandates reversal "even if no particular prejudice is shown and even if the defendant was clearly guilty."[11] In this area, the doctrine applied is more stringent than that applicable to most denials of constitutional rights—permitting affirmance when the government shows beyond a reasonable doubt that the violation did not affect the conviction.[12]

"Effective" assistance of counsel[13] is denied by a statute that, while permitting a defendant to make an unsworn statement, bars the defendant from having his testimony elicited by counsel through direct examination;[14] by a statute that restricts counsel in deciding when to put the defendant on the stand;[15] by a statute that gives the judge in a non-jury trial the power to deny defense counsel closing summation;[16] and by a trial court order directing a defendant not to consult with his attorney during an overnight recess that falls between direct and cross examination.[17] These state-created procedures impair the accused's enjoyment of the Sixth Amendment guarantee by disabling his counsel from fully assisting and representing him. Because these impediments constitute direct state interference with the exercise of a fundamental right, and because they are susceptible to easy correction by prophylactic rules, a categorical approach is appropriate.

3. *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

4. *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932).

5. *Betts v. Brady,* 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595 (1942).

6. *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

7. *Id.*

8. *Scott v. Illinois,* 440 U.S. 367, 99 S.Ct. 1158, 59 L.Ed.2d 383 (1979); *Argersinger v. Hamlin,* 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972).

9. *Payne v. Arkansas,* 356 U.S. 560, 567–68, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958).

10. *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927).

11. *Chapman v. California,* 386 U.S. 18, 43, 87 S.Ct. 824, 837, 17 L.Ed.2d 705 (1967) (Stewart, J., concurring).

12. *Id.* at 22–24, 87 S.Ct. 824; *Fahy v. Connecticut,* 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963).

13. The term originated in *Powell v. Alabama, supra,* where the Court held that the trial judge's failure to make an "effective appointment of counsel," 287 U.S. at 71, 53 S.Ct. 55, had resulted in the "denial of effective and substantial aid" of counsel, *id.* at 53, 53 S.Ct. at 58, thereby depriving defendant of due process of law.

14. *Ferguson v. Georgia,* 365 U.S. 570, 81 S.Ct. 756, 5 L.Ed.2d 783 (1961).

15. *Brooks v. Tennessee,* 406 U.S. 605, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972).

16. *Herring v. New York,* 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975).

17. *Geders v. United States,* 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976).

A less clearcut rule emerges from the cases on multiple representation. The principle is stated categorically—to require an attorney to represent co-defendants whose interests may conflict denies the right to effective assistance of counsel.[18] No showing of prejudice is necessary. However, because there is no absolute requirement that every defendant have his own attorney,[19] the application of the rule requires some factual analysis to determine whether divergent interests that justify separate counsel may in fact exist. The factual analysis will not be exhaustive. As the Supreme Court has recently indicated, the courts must rely, by and large, on the representations of defense counsel that potential conflicts exist, since a thorough scrutiny might require the attorney to reveal the confidences of his client.[20]

The problem of late appointment moves us farther along the continuum. The Supreme Court has long recognized that sufficient time to prepare a defense is a vital element of effective assistance.[21] Late appointment of counsel resembles the state-created restrictions on counsel's ability to assist and represent his client. Yet in its 1970 *Chambers* opinion,[22] the Supreme Court indicated categorical rules were not appropriate in this area. Although the Court's treatment was cursory, it made clear that determining whether counsel was ineffective due to late appointment turned on the facts of the case. The Court emphasized, "we are not disposed to fashion a *per se* rule requiring reversal of every conviction following tardy appointment of counsel."[23]

At the other end of the continuum are cases, including the present one, in which the issue is counsel's performance when he is "untrammelled and unimpaired"[24] by state action. The Supreme Court has never addressed this issue frontally, though it has indicated—albeit in abbreviated fashion—that it does not contemplate simplistic or categorical approaches.

The Court has twice held that reliance on the erroneous advice of counsel does not negate an intelligent and voluntary guilty plea, so long as the advice fell " 'within the range of competence demanded of attorneys in criminal cases.' "[25] The Court recognized the "inherent uncertainty in guilty-plea advice" and rejected any requirement of a *per se* rule invalidating guilty pleas. It emphasized that to undo a guilty plea, the defendant must show "serious derelictions on the part of counsel."[26] In the 1976 *Agurs* case,[27] the Court ruled that defense counsel's failure to request the criminal record of a murder victim did not demonstrate

---

**18.** *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); *Glasser v. United States,* 315 U.S. 60, 69–76, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

**19.** *Holloway v. Arkansas, supra,* 435 U.S. at 482, 98 S.Ct. 1173. Indeed, joint representation may afford economies and even enhance the presentation of a defense. *See Glasser v. United States, supra,* 315 U.S. at 92, 62 S.Ct. at 475 (Frankfurter, J., dissenting) ("Joint representation is a means of insuring against reciprocal recrimination. A common defense often gives strength against a common attack."), *quoted in Holloway v. Arkansas, supra,* 435 U.S. at 482–83, 98 S.Ct. 1173. After all, many cases of multiple defendants (even where each has his own counsel) may involve situations where each would rather be tried alone. But severance is a matter of judicial discretion under Fed.R.Crim.P. 14.

**20.** *Holloway v. Arkansas, supra,* 435 U.S. at 484–87, 98 S.Ct. 1173.

**21.** *See Powell v. Alabama, supra,* 287 U.S. at 71, 53 S.Ct. 55.

**22.** *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

**23.** *Id.* at 54, 90 S.Ct. at 1982–1983.

**24.** *Holloway v. Arkansas, supra,* 435 U.S. at 482, 98 S.Ct. 1173, *quoting Glasser v. United States, supra,* 315 U.S. at 70, 62 S.Ct. 457.

**25.** *Tollett v. Henderson,* 411 U.S. 258, 264, 93 S.Ct. 1602, 1606, 36 L.Ed.2d 235 (1973); *McMann v. Richardson,* 397 U.S. 759, 771, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970).

**26.** *McMann v. Richardson, supra,* 397 U.S. at 774, 90 S.Ct. at 1450.

**27.** *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

ineffective assistance.[28] The Court's opinion is without explication but is significant, since what was apparently involved was a failure of defense counsel to pursue potential sources of aid to the defense available without inordinate effort—and yet the Court abruptly negatived the possibility of a constitutional claim.

■ While the reasons for a non-categorical approach were not developed in *Agurs,* they are not difficult to discern. The defense attorney's function consists, in large part, of the application of professional judgment to an infinite variety of decisions in the development and prosecution of the case. A determination whether any given action or omission by counsel amounted to ineffective assistance cannot be divorced from consideration of the peculiar facts and circumstances that influenced counsel's judgment. In this fact-laden atmosphere, categorical rules are not appropriate.

Over and above—or should one say below—the Supreme Court opinions, there has emerged a considerable body of circuit and state court law on the issue of ineffective assistance. Several reflective judges have recognized that differing approaches are pertinent where different aspects of the assistance of counsel are involved. Judge Bright, writing for the Eighth Circuit, has noted that while the total absence of counsel cannot but be harmful, when a defendant is represented by counsel and the performance of counsel has fallen below the accepted standard, "the seriousness of this constitutional violation must be judged in terms of the particular factual circumstances of that case." [29]

Recently, Judge Browning, writing for the Ninth Circuit en banc in *Cooper v. Fitzharris,*[30] pointed out that the rulings that a defendant need not show prejudice involved an absolute denial of counsel or a structural impediment to counsel's effective performance. In a case involving the quality of performance, as reflected in acts or omissions at trial, the accused must prove not mere errors but "serious derelictions" [31] and that counsel's errors prejudiced the defense. Judge Hufstedler's dissent put it that a defendant with a "totally inept counsel" would not also have to show "precisely" how he was affected,[32] but this opinion acknowledged that courts consider "prejudicial impact of attorney behavior" in determining whether the attorney was constitutionally competent,[33] and further recognized that in many cases the outcome would be the same under both majority and dissenting approaches.

The task remains of delineating the non-categorical criteria that are to be applied in evaluating claims of inadequate performance by counsel. It is now clear that the courts will not abstain completely from some oversight of counsel's performance. At one time this court came close to abstention, in the 1945 *Diggs* case [34] adopting the "farce and mockery" standard. Even under that standard counsel's performance was on occasion found so delinquent as to prompt judicial correction,[35] but the occasions were rare. In the 1958 *Mitchell* opinion,[36] Judge Prettyman in effect defended an approach of nonintrusion into the attorney/client relationship. Some of his observations still have merit, but they survive today as reasons for limiting the degree of judicial intrusion, not as a brief for abstention.

**28.** *Id.* at 102 n.5, 96 S.Ct. 2392.

**29.** *McQueen v. Swenson,* 498 F.2d 207, 218 (8th Cir. 1974), *on remand,* 560 F.2d 959 (8th Cir. 1977).

**30.** 586 F.2d 1325 (9th Cir. 1978).

**31.** *Id.* at 1330, *quoting McMann v. Richardson, supra,* 397 U.S. at 774, 90 S.Ct. 1441.

**32.** *Id.* at 1340 (Hufstedler, J., concurring and dissenting).

**33.** *Id.* at 1336–37.

**34.** *Diggs v. Welch,* 80 U.S.App.D.C. 5, 7, 148 F.2d 667, 669 (1945).

**35.** *See Jones v. Huff,* 80 U.S.App.D.C. 254, 152 F.2d 14 (1945).

**36.** *Mitchell v. United States,* 104 U.S.App.D.C. 57, 259 F.2d 787, *cert. denied,* 358 U.S. 850, 79 S.Ct. 81, 3 L.Ed.2d 86 (1958).

Judge Fahy dissented, on the ground that a hearing was required on the ultimate question whether the conviction "rests in substantial degree" upon a course reflecting a lack of professional skill.[37]

Our 1967 *Bruce* opinion,[38] which Judge Bazelon joined as to this issue, laid down a standard that recognized the need for more judicial oversight. It was put that "ineffective assistance" was established where "there has been gross incompetence of counsel and . . . this has in effect blotted out the essence of a substantial defense."[39] *Bruce* thus departed from *Diggs* and *Mitchell,* as has been recognized by this court[40] and others.[41] Although not stated explicitly, the *Bruce* departure was obviously away from Fifth Amendment due process concepts to a Sixth Amendment approach to the problem of ineffective assistance.[42] And *Bruce* went beyond that to state that a less powerful showing of ineffectiveness was required on direct appeal

than that necessary to support a collateral attack.

We pause to take note of the formulations adopted by the other circuits. As Justice White has put it, the circuits are in "disarray."[43]

One prominent formulation appears in the Third Circuit's 1970 *Moore* opinion as a standard of "normal competency:" "the exercise of the customary skill and knowledge which normally prevails at the time and place."[44] This is essentially a negligence standard. Indeed the Third Circuit cited the American Law Institute's formulation of the standard for civil liability of an attorney.[45] However, as the ALI points out, the mere fact that performance falls below average does not equal negligence. Thus, the question remains of what departures from a potential "norm" are so egregious as to call for judicial interposition.

Other circuits have adopted variations on a notion of "reasonable" competence,[46] us-

37. *Id.* 104 U.S.App.D.C. at 65–66, 259 F.2d at 795–96 (Fahy, J., dissenting).

38. *Bruce v. United States,* 126 U.S.App.D.C. 336, 379 F.2d 113 (1967).

39. 126 U.S.App.D.C. at 339–40, 379 F.2d at 116–17.

40. *Scott v. United States,* 138 U.S.App.D.C. 339, 427 F.2d 609 (1970); *United States v. Hammonds,* 138 U.S.App.D.C. 166, 425 F.2d 597 (1970).

41. *E. g., Beasley v. United States,* 491 F.2d 687, 694 (6th Cir. 1974).

42. As it happens, the author of *Bruce* had previously, as appointed counsel in *Mitchell,* sought to persuade the court to move from Fifth Amendment to Sixth Amendment analysis. *See* 104 U.S.App.D.C. at 66, 259 F.2d at 796 (Fahy, J., dissenting).

43. *Maryland v. Marzullo,* 435 U.S. 1011, 1011, 98 S.Ct. 1885, 56 L.Ed.2d 394 (1978) (White, J., dissenting).

44. *Moore v. United States,* 432 F.2d 730, 736 (3d Cir. 1970). *See also Marzullo v. Maryland,* 561 F.2d 540, 543–44 (4th Cir. 1977), *cert. denied,* 435 U.S. 1011, 98 S.Ct. 1885, 56 L.Ed.2d 394 (1978) ("range of competence demanded of attorneys in criminal cases").

45. Restatement (Second) of Torts § 299A & comment e (1965), *cited in Moore v. United States, supra,* 432 F.2d at 736 n.24.

46. *See, e. g., Cooper v. Fitzharris,* 586 F.2d 1325, 1330 (9th Cir. 1978) ("reasonably competent attorney acting as a diligent conscientious advocate"); *United States v. Easter,* 539 F.2d 663, 666 (8th Cir. 1976) ("customary skills and diligence that a reasonably competent attorney would perform under similar circumstances"); *MacKenna v. Ellis,* 280 F.2d 592, 599 (5th Cir. 1960) ("counsel reasonably likely to render *and rendering* reasonably effective assistance"). The *MacKenna* test has been adopted by the Sixth Circuit. *Beasley v. United States, supra,* 491 F.2d at 696.

Three circuits continue to adhere to the "farce and mockery" standard. *See, e. g., Gillihan v. Rodriguez,* 551 F.2d 1182, 1187 (10th Cir.), *cert. denied,* 434 U.S. 845, 98 S.Ct. 148, 54 L.Ed.2d 111 (1977); *Rickenbacker v. Warden,* 550 F.2d 62 (2d Cir. 1976), *cert. denied,* 434 U.S. 826, 98 S.Ct. 103, 54 L.Ed.2d 85 (1977); *United States v. Madrid Ramirez,* 535 F.2d 125, 129 (1st Cir. 1976). The First and Second Circuits, while formally adhering to the "farce and mockery" standard, have in many recent cases concluded that a reevaluation of that test is not necessary because counsel's alleged deficiencies did not amount to ineffectiveness even under the standard of "reasonable competency." *See, e. g., Rickenbacker v. Warden, supra,* 550 F.2d at 66; *United States v. Madrid Ramirez, supra,* 535 F.2d at 129–30.

ing tests that suffer from the same uncertainties as the Third Circuit's. The Seventh Circuit has held that a defendant is entitled to assistance of counsel that meets a "minimum professional standard." [47] In the last analysis, all the circuits recognize that the performance of counsel must fall below a minimum, not just an abstract "norm." There must be "serious derelictions." [48]

Some circuits have attempted to give content to their standards by adopting, explicitly or by implication, specific duties the violation of which amounts to ineffective assistance. The panel of this court that wrote *DeCoster I* employed—with some embellishment—the standards for the defense function promulgated by the American Bar Association.[49] In *Decoster II* the panel referred to these *DeCoster I* requirements as "the minimal components of 'reasonably competent assistance,' " [50] although in both opinions the panel qualified these duties by requiring a "substantial" violation.[51]

The ABA Standards, however, were not put forward by the ABA as either exclusively "minimum" standards or as "a set of per se rules applicable to post-conviction procedures." [52] Rather, they constitute a "blend of description of function, functional guidelines, ethical guidelines and recommended techniques," [53] a mixture of the aspirational and the obligatory.

Even those circuits that formulated an apparently categorical approach to these problems have shown restraint in actual application to the specific facts presented. While in *Coles v. Peyton* [54] the Fourth Circuit laid down duties of defense counsel, including an unqualified duty to investigate, in *Jackson v. Cox*,[55] the court apparently limited *Coles,* by distinguishing it as a case of virtually complete lack of investigation that was not controlling in a case where there were shortfalls in investigation, yet counsel had performed more than a "perfunctory" investigation. Similarly, the Third Circuit's 1971 *Green* opinion [56] has tempered any implication of *Moore* that it sufficed to identify specific aspects of incompetency. The District Court had granted habeas corpus because of unfairness due to the consolidation of rape and assault indictments arising out of unrelated events.[57] In reversing, the Third Circuit stressed that the acquiescence of defense counsel in the consolidation was based on information furnished by the client that suggested a connection between the events. This course was accepted as not outside "the range of normally competent representation," even though defense counsel acknowledged that he was not aware that the police version of the events differed significantly from that of his client.[58]

Finally, we find support in the recent 1979 decision of the California Supreme

**47.** *United States ex rel. Williams v. Twomey,* 510 F.2d 634, 640 (7th Cir.) (Wyzanski, J.), cert. denied, 423 U.S. 876, 96 S.Ct. 148, 46 L.Ed.2d 109 (1975).

**48.** *Cooper v. Fitzharris, supra,* 586 F.2d at 1330, *quoting McMann v. Richardson, supra,* 397 U.S. at 774, 90 S.Ct. 1441.

**49.** 159 U.S.App.D.C. at 332–33, 487 F.2d at 1203–04.

**50.** 199 U.S.App.D.C. at ——, 624 F.2d at 203.

**51.** *DeCoster I,* 159 U.S.App.D.C. at 333, 487 F.2d at 1204; *Decoster II,* 199 U.S.App.D.C. at ——, 624 F.2d at 203.

**52.** ABA Standards, *supra* note 2, at 11. That the ABA Standards were not conceived as "minimum" standards is highlighted by the fact that both the Special Committee on Standards for the Administration of Justice and the

Project on Standards for Criminal Justice originally included the term "Minimum Standards" in their titles. These designations were dropped by vote of the ABA House of Delegates in August 1969. *Id.* at v.

**53.** *Id.* at —— of 199 U.S.App.D.C., at 203 of 624 F.2d.

**54.** 389 F.2d 224 (4th Cir. 1968).

**55.** 435 F.2d 1089 (4th Cir. 1970).

**56.** *United States ex rel. Green v. Rundle,* 452 F.2d 232 (3d Cir. 1971).

**57.** *United States ex rel. Green v. Rundle,* 303 F.Supp. 972 (E.D.Pa.1969), *reversed,* 452 F.2d 232 (3d Cir. 1971).

**58.** 452 F.2d at 235.

Court in the *Pope*[59] case. As we have already noted, both majority and dissenting opinions of the Ninth Circuit's 1978 en banc decision in *Cooper v. Fitzharris* acknowledged that the determination of lack of competence requires an assessment of both materiality and likely prejudice, with the opinions differing only as to the rule applicable to a defendant with a "totally inept counsel."[60] The California state court in *Pope* also disclaimed a categorical approach. In discarding the "farce or sham" standard, the court articulated "basic duties" of defense counsel that it characterized as "constitutional obligations," using the *DeCoster I* approach of the "reasonably competent attorney acting as a diligent, conscientious advocate." However, after establishing that defense counsel had failed to perform in accordance with that standard, defendant still had the additional burden of establishing that "counsel's acts or omissions related in the withdrawal of a potentially meritorious defense."[61] This differs in degree but not in kind from *Bruce* ("blott[ing] out the essence of a substantial defense"), and requires a showing of likely effect on outcome.

■ This brief survey underscores that generalized standards may be little more than a "semantic merry-go-round."[62] Our *Bruce* opinion was one formulation and other courts have used others—but in the last analysis they are necessarily limited efforts to describe that courts will condemn only a performance that is egregious and probably prejudicial. As put by Justice Kaplan in the Massachusetts *Saferian* case:

Whatever the attempted formulation of a standard in general terms, what is required in the actual process of decision of claims of ineffective assistance of counsel, and what our own decisions have sought to afford, is a discerning examination and appraisal of the specific circumstances of the given case to see whether there has been serious incompetency, inefficiency, or inattention of counsel—behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer—and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defence.[63]

■ For the first condition of judicial intervention, *Saferian* speaks of "serious incompetency, inefficiency or inattention of counsel—behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer." This may fairly be regarded as a refinement of the "gross incompetence" language of *Bruce.* The other condition is more important. *Bruce* required that the accused show that the deficiency "blotted out the essence of a substantial defense." But *Saferian* requires only that the accused show that counsel's deficiency "likely" deprived him "of an otherwise available, substantial ground of defense." This is an appropriate modification of *Bruce.*[64] Overarching concepts of justice tug on the court whenever it is seriously troubled by likelihood of injustice, even though there is no concrete establishment of injustice as a fact.

59. *People v. Pope,* 23 Cal.3d 412, 152 Cal.Rptr. 732, 590 P.2d 859 (Feb. 22, 1979).

60. *See* text accompanying notes 30–33 *supra.*

61. 23 Cal.3d at 424–25 & n.14, 152 Cal.Rptr. at 738–39 & n.14, 590 P.2d at 865–66 & n.14.

62. *Cooper v. Fitzharris,* 551 F.2d 1162, 1166 (9th Cir. 1977) (Duniway, J., concurring), *vacated, see* 586 F.2d 1325 (1978) (en banc).

63. *Commonwealth v. Saferian,* 366 Mass. 89, 96, 315 N.E.2d 878, 883 (1974).

64. In our decision to modify *Bruce,* we have taken into account that the District of Columbia Court of Appeals uses the *Bruce* standard and language. *See, e. g., Fernandez v. United States,* 375 A.2d 484, 486–87 (D.C.App.1977); *Cooper v. United States,* 248 A.2d 826, 827 (D.C.App.1969). However, the change is only from a requirement that defendant show actual effect, required by *Bruce,* to the "likelihood" test of *Saferian,* that is in turn subject to prosecution rebuttal to negative prejudice in fact.

As to the content of the effect that defendant must show is likely, whether it be characterized as "blott[ing] out the essence of a substantial defense" or "deprivation of an otherwise available, substantial defense" is a matter of form more than substance.

■ In effect this consideration was identified in *Bruce,* where the court noted that on direct appeal the accused would be held to a lesser showing than that required for collateral attack. *Bruce* was in harmony with a similar observation by Judge Fahy, dissenting in *Mitchell.*[65] In general, including matters totally unrelated to performance of counsel, a federal appellate court has statutory authority to reverse convictions when this is "just under the circumstances." [66] Exercise of this authority may depend in some measure on a concern over the way the case was handled. It does not depend on a determination that there has been a lack of "effective assistance of counsel" in the constitutional sense. Indeed, in the *Dyer* case,[67] cited in *Bruce,*[68] the court noted counsel's general competence and the difficulties of "trying circumstances" and "an uncooperative client." Nonetheless, the court had "misgivings" as to the adequacy of the defense "in net result" that caused it to reverse, on direct appeal, without any statement that the defendant had been denied effective assistance of counsel. On direct appeal the appellate court has latitude to exercise its supervisory function over the administration of justice in the court(s) subject to its review.[69] That latitude is not fully available when a challenge is presented on collateral attack.[70]

Collateral attack requires a showing of violation of constitutional rights—save for the "exceptional circumstance" of a claim that both could not have been raised on appeal and that constituted a "fundamental defect which inherently results in a complete miscarriage of justice." [71] It may also be noted, without now attempting any doctrinal declarations, that the availability of collateral attack is also affected by concerns such as respect for finality of judgments and conservation of judicial resources, concerns that emerged in *Stone v. Powell.*[72] Although the distinction between direct appeal and collateral attack, in terms of scope of cognizable problems, was not made the subject of separate discussion and justification in *Bruce,* it has been reaffirmed[73] and has current vitality.

■ Although direct appeal gives more latitude to the court, the difference is likely

65. *Mitchell v. United States, supra,* 104 U.S.App.D.C. at 65, 259 F.2d at 795 (Fahy, J., dissenting).

66. 28 U.S.C. § 2106 (1976); *see Scott v. United States, supra,* 138 U.S.App.D.C. at 340, 427 F.2d at 610.

67. *Dyer v. United States,* 126 U.S.App.D.C. 312, 379 F.2d 89 (1967).

68. 126 U.S.App.D.C. at 340, 379 F.2d at 117.

69. *See, e. g., McNabb v. United States,* 318 U.S. 332, 340–41, 63 S.Ct. 608, 87 L.Ed. 819 (1947).

70. *See Boyd v. Henderson,* 555 F.2d 56, 62 n.8 (2d Cir. 1977).

71. *United States v. Timmreck,* 441 U.S. 780, 99 S.Ct. 2085, 2087, 60 L.Ed.2d 634 (1979) (formal violation of Fed.R.Crim.P. 11 provides no basis for collateral attack of conviction based on guilty plea); *Davis v. United States,* 417 U.S. 333, 345–46 & n.15, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974) (intervening change in law of circuit at as what constitutes a lawful draft induction order is cognizable under 28 U.S.C. § 2255; conviction for an act the law does not make criminal presents one of the "exceptional circumstances" that "inherently results in a complete miscarriage of justice"); *Hill v. United*

States, 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962) (failure to permit allocution at sentencing not a "fundamental defect"); *see Stone v. Powell,* 428 U.S. 465, 477 n.10, 96 S.Ct. 3037, 3044, 49 L.Ed.2d 1067 (1976) (reiterating the "established rule" that "non-constitutional claims that could have been raised on appeal, but were not, may not be asserted in collateral proceedings"); *Sunal v. Large,* 332 U.S. 174, 178, 67 S.Ct. 1588, 91 L.Ed. 1982 (1947) (collateral attack may not "do service for an appeal").

72. 428 U.S. 465, 491 n.31, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); *see also United States v. Timmreck,* 441 U.S. 780, 99 S.Ct. 2085, 2087, 60 L.Ed.2d 634 (1979); *Henderson v. Kibbe,* 431 U.S. 145, 154 n.13, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977); *Schneckloth v. Bustamonte,* 412 U.S. 218, 259–63, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (Powell, J., concurring). In *Stone v. Powell,* those concerns were heightened by the special problem of federalism raised by federal challenges to state court judgments. The combination led to denial of collateral relief even for a constitutional claim.

73. *Scott v. United States, supra,* 138 U.S.App. D.C. at 340, 427 F.2d at 610; *United States v. Hammonds, supra,* 138 U.S.App.D.C. at 169, 425 F.2d at 600.

one of application rather than formulation of standards. On direct appeal, as on collateral attack, the court is still concerned with the two considerations focused in *Saferian*. The claimed inadequacy must be a serious incompetency that falls measurably below the performance ordinarily expected of fallible lawyers. And the accused must bear the initial burden of demonstrating a likelihood that counsel's inadequacy affected the outcome of the trial. Once the appellant has made this initial showing, the burden passes to the government, and the conviction cannot survive unless the government demonstrates that it is not tainted by the deficiency, and that in fact no prejudice resulted.[74]

The need for a criterion that requires defendant to show at least probable effect on outcome has been identified even by judges seeking to liberalize Sixth Amendment protection.[75] Such a criterion achieves a realistic resolution of the pertinent legal tensions.

■ The court's appraisal requires a judgmental rather than a categorical approach. It must be wary lest its inquiry and standards undercut the sensitive relationship between attorney and client and tear the fabric of the adversary system. A defense counsel's representation of a client encompasses an almost infinite variety of situations that call for the exercise of professional judgment. A shortfall by defense counsel that is perceptible but is modest rather than egregious is no basis for judicial inter-

position—as appears from *Agurs, Bruce, Saferian* and the other cases cited. This limitation preserves the freedom of counsel to make quick judgments, and avoids the possibility that there will be frequent and wide-ranging inquiries into the information and reasoning that prompted counsel to pursue a given course. The problem is complicated by the fact that these decisions often derive from the information supplied by the client.

For the law to encourage a wide-ranging inquiry, even after trial, into the conduct of defense counsel would undercut the fundamental premises of the trial process and transform its essential nature.[76] The resulting upheaval in the role of the trial judge, widely recognized as a serious difficulty,[77] would in itself call into question any broad doctrine of ineffective assistance. And the prosecution in a criminal case would in turn ask to oversee defense counsel's conduct at trial—to ensure against reversal.

An even more difficult problem would be posed by the supervision of defense counsel's development of the case before trial. Even if we had the authority, it would be unwise to embark upon a doctrine that would open the door to a fundamental reordering of the adversary system into a system more inquisitorial in nature. The adversary system, warts and all, has worked to provide salutary protection for the rights of the accused. Efforts to improve the

---

74. *See McQueen v. Swenson, supra,* 498 F.2d at 220. As to the nature of the government's burden there may be a distinction depending on the court's appraisal of the showing by accused. If the court concludes that a constitutional violation has been established, then there is doctrine indicating that the government must show beyond a reasonable doubt that there has been no prejudice in fact. *Chapman v. California, supra, Fahy v. Connecticut, supra. See* text accompanying notes 11–12 *supra.* If the showing by the accused causes the court serious misgivings notwithstanding the absence of a constitutional violation, *see* discussion at text accompanying notes 65–70, *supra,* the court may be satisfied with a response by the government, that there has not in fact been any injustice, even though this response falls short of a "beyond a reasonable doubt" standard.

75. *E. g., Mitchell v. United States, supra,* 104 U.S.App.D.C. at 65–66, 259 F.2d at 795–96 (Fahy, J., dissenting) (ultimate question is whether the conviction "rests in substantial degree" upon lack of professional skill); *Cooper v. Fitzharris, supra,* 586 F.2d at 1136–40 (Hufstedler, J., concurring and dissenting); *People v. Pope, supra,* 23 Cal.3d at 425, 152 Cal.Rptr. at 739, 590 P.2d at 866.

76. *See Mitchell v. United States, supra,* 104 U.S.App.D.C. at 63, 259 F.2d at 793; discussed at text accompanying note 36 *supra.*

77. *See* Bines, *Remedying Ineffective Assistance in Criminal Cases: Departures from Habeas Corpus,* 59 Va.L.Rev. 927, 961 (1973).

performance of defense counsel should not imperil that protection.

The approach we have outlined is congruent with most of the decisions of this court, including *United States v. Pinkney.*[78] An exception should be noted for *DeCoster I*—not for the result, but some of the broad observations.

### D. The Duty To Investigate

■ The duty to investigate is a subset of the overall duty of defense counsel. A conscientious defense attorney will naturally investigate possible defenses. As part of this process, witnesses who may have information relevant to the case should be identified and interviewed. However, any claim of ineffectiveness must turn not on abstractions as to duty, but on an appraisal of consequences. And the development of the case before trial is an area of peculiar sensitivity in the attorney/client relationship.

Some failures to investigate may be so egregious as to command judicial correction without more. In *McQueen v. Swenson,*[79] the defense counsel had adopted a blanket policy which he adhered to even in the face of requests by the defendant that certain persons be interviewed. This was held "an absurd and dangerous policy which can only

be viewed as an abdication—not an exercise—of his professional judgment."[80] Counsel's defect was subject to a simple, workable remedy and thus was a proper subject for judicial intervention.

■ Most claims of failure to investigate will not involve such clearcut situations. They must be appraised in light of the information available to the attorney. A claim of failure to interview a witness may sound impressive in the abstract, but it cannot establish ineffective assistance when the person's account is otherwise fairly known to defense counsel. This is the teaching of our 1974 *Clayborne* opinion.[81] As Judge MacKinnon, joined by Judge McGowan, and writing over Judge Bazelon's dissent, pointed out: "[T]rial counsel had their own clients as sources of information."[82]

■ Realistically, a defense attorney develops his case in large part from information supplied by his client. As the Third Circuit indicated in *Green,*[83] choices based on such information should not later provide the basis for a claim of ineffectiveness even though that basis would have been undercut by inquiry of others. Judicial intervention to require that a lawyer run beyond, or around, his client, would raise ticklish questions of intrusion into the at-

**78.** 177 U.S.App.D.C. 423, 543 F.2d 908 (1976). In *Pinkney,* appellant claimed denial of effective assistance of counsel at a sentencing hearing because counsel failed, first, to discuss with him the content of the government's allocution memorandum and, second, to object to the government's allegation in the memorandum that appellant participated in drug traffic in the District of Columbia. We emphasized that appellant had failed to present an affidavit disclosing "evidence portraying the movant's claim materially and resolutely, and *evincing a capability of mounting a serious challenge.*" 177 U.S.App.D.C. at 431, 543 F.2d at 916 (emphasis supplied). It was acknowledged that "once a substantial violation of counsel's duties is shown, the Government's burden is to demonstrate lack of prejudice therefrom." *Id.* 177 U.S.App.D.C. at 431–32 n.59, 543 F.2d at 916–917 n.59. But the court said:

Only if the evidentiary elements of [appellant's claim that counsel's failure to inform him deprived him of the opportunity to contest the allegations of the government's memorandum] had appeared in appellant's motion

would he have been entitled to a hearing, and only if evidence offered at a hearing tended to establish the elements would the Government have been summoned to disestablish prejudice.

*Id.* In short, the defendant must show that counsel's alleged deficiencies would probably have affected the outcome before the government has the burden of demonstrating that, in fact, the result would not have been affected.

**79.** 498 F.2d 207 (8th Cir. 1974), *on remand,* 560 F.2d 959 (8th Cir. 1977).

**80.** *Id.* at 216.

**81.** *United States v. Clayborne,* 166 U.S.App. D.C. 140, 509 F.2d 473 (1974).

**82.** *Id.* 166 U.S.App.D.C. at 144, 509 F.2d at 477.

**83.** *United States ex rel. Green v. Rundle,* 452 F.2d 232, 235 (3d Cir. 1971); discussed at text accompanying notes 56–58 *supra.*

torney/client relationship, and should be reserved for extreme cases where an effect on the outcome can be demonstrated. And so in *Matthews v. United States,*[84] involving a claim that counsel was ineffective in failing to introduce evidence or call witnesses, then Circuit Judge Stevens focused on the failure to allege that such witnesses or evidence existed, adding:

> Petitioners have not told us what was said in their conference with counsel. Perhaps, for all we know, they merely explained that they had indeed forged the 35 ballot applications which were placed in evidence by the government and that they were indeed guilty as charged. Surely, if that were the case, counsel had no duty to search for witnesses, expert or otherwise, who might falsely testify to the contrary.[85]

◼ Our reflections on this point are congruent with the standard applicable when counsel for an indigent defendant seeks funds to obtain investigative services to assist in the preparation of the defense. While in general effective assistance of counsel embraces such an allowance it is far from automatic and "depends on the facts and circumstances of a particular case," with funds provided when counsel makes a showing of necessity of the specific subjects to be explored and of their likely materiality.[86]

◼ Finally, claims based on a duty to investigate must be considered in light of the strength of the government's case. "When, . . . the prosecution has an overwhelming case based on documents and the testimony of disinterested witnesses, there is not too much the best defense attorney can do."[87] It is all well and good for a millionaire to retain counsel with the instruction to "leave not the smallest stone unturned." But it goes too far to insist that such a course is a general constitutional mandate.

### E. *Appellant's Claims*

We turn from general questions of principle and approach to the matter of application to the case at hand. As focused in the remand proceedings, appellant makes some seven allegations of defective performance by his counsel.[88] Following three days of

---

**84.** 518 F.2d 1245 (7th Cir. 1975).

**85.** *Id.* at 1246.

**86.** 18 U.S.C. § 3006A(e) (1976) (contemplating ex parte proceeding); *United States v. Harris,* 542 F.2d 1283, 1314–16 (7th Cir. 1976), *cert. denied,* 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779 (1977); *Mason v. Arizona,* 504 F.2d 1345 (9th Cir. 1974), *cert. denied,* 420 U.S. 936, 95 S.Ct. 1145, 43 L.Ed.2d 412 (1975); Report of the Committee to Implement the Criminal Justice Act, 36 F.R.D. 285, 290 (1965).

**87.** *United States v. Katz,* 425 F.2d 928, 930 (2d Cir. 1970). Judge Friendly's comment, although directed to the choice of tactics at trial, has more general application. He said:
> Determination of the effectiveness of counsel cannot be divorced from the factual situation with which he is confronted. When, as here, the prosecution has an overwhelming case based on documents and the testimony of disinterested witnesses, there is not too much the best defense attorney can do. If he simply puts the prosecution to its proof and argues its burden to convince the jury beyond a reasonable doubt, the defendant may think him lacking in aggressiveness, and surely will if conviction occurs. If he decides to flail around and raise a considerable amount of dust, with the inevitable risk that some may settle on his client, the defendant will blame him if the tactic fails, although in the rare event of success the client will rank him with leaders of the bar who have used such methods in some celebrated trials of the past.

**88.** Listed in order of the proceedings in appellant's case, they are:
> (1) Counsel was dilatory in seeking a bond review while appellant was incarcerated for almost five months following his arrest on May 29, 1970;
> (2) Counsel failed to obtain a transcript of appellant's preliminary hearing and failed to employ that transcript to impeach prosecution witnesses at trial;
> (3) Counsel failed to interview any potential witnesses prior to trial;
> (4) Counsel announced "ready" for trial at a time when he did not know whether or not he would present alibi witnesses and before he had fully developed his defense;
> (5) Counsel offered to waive jury trial and to permit appellant to be tried before the court when the court had heard a part of the evidence in connection with the guilty pleas of the two co-defendants;

hearings, Judge Waddy found that appellant had not been denied the effective assistance of counsel. We affirm. While we do not commend counsel's performance, we have no serious misgivings that would lead us to reverse in the interest of justice.

### 1. *Failure To Interview Potential Witnesses*

■ We turn first to the claim that defense counsel failed to interview potential witnesses prior to trial. This is the claim that is most vigorously pressed on appeal, and by its nature requires somewhat detailed development.

Admittedly, defense counsel did not attempt prior to trial to interview the three prosecution witnesses—complainant Crump, and Officers Box and Ehler. However, at appellant's preliminary hearing counsel did hear Officer Ehler testify that he and Officer Box were together when they witnessed the crime, and that Box pursued appellant to the hotel where he was apprehended. Ehler further testified that within minutes after the assault, Crump had identified appellant in the hotel lobby—a point appellant has never contested. Defense counsel was aware, therefore, of the main points of the likely testimony of the witnesses at trial.

Appellant attacks defense counsel's failure to interview the desk clerk at the D.C. Annex Hotel, and his failure to make an effort to locate and interview potential eyewitnesses that might have been in the hotel at the time appellant entered and was apprehended. These are abstractions without context. Appellant himself testified at trial that he had just entered the lobby when he was arrested. Counsel was aware that there would be, as indeed there was, testimony of the police officer that he had not lost sight of appellant from the time of the robbery to the time of his apprehension.

(6) Counsel failed to make an opening statement; and
(7) Counsel failed to see that appellant's sentence was properly executed, in that he failed to see that appellant was given credit for time served.
Appellant also alleges that he was denied the effective assistance of counsel because of counsel's failure to object to appellant's appearing

Appellant makes no claim that he advised counsel of any occurrence that would generate a significant issue as to his entry into the hotel.

■ If given an unrestricted budget and freed of any constraints as to probable materiality or accountability, a lawyer might have cheerfully logged in many hours looking for the legal equivalent of a needle in a haystack. As already noted, a millionaire might have retained counsel to leave not a single stone unturned. However, a defendant is not entitled to perfection but to basic fairness.[89] In the real world, expenditure of time and effort is dependent on a reasonable indication of materiality. In the circumstances of this case, appellant has singularly failed to make a meaningful demonstration that counsel's omission probably affected the outcome of the trial. It is argued that potential witnesses might have testified to appellant's demeanor as he entered the lobby. This abstract possibility is not only speculative but remote in the extreme. It cannot fairly be said to undercut materially the positive police testimony.

Appellant goes on to challenge counsel's failure to seek out and interview potential witnesses in the Golden Gate Club. It would be extravagant to require counsel to seek out the anonymous patrons of a bar in order to testify that two persons were having a drink—a point that is, incidentally, undisputed as far as appellant and Crump are concerned. Appellant makes no offer as to what more could have been learned.

We turn next to the failure of defense counsel to interview appellant's co-defendants, Eley and Taylor, prior to trial, and his belated interview of Eley shortly before Eley testified on the second day of trial.

before the jury in prison clothing. This objection was not asserted below, and therefore is not properly before this court.

**89.** *See Lutwak v. United States,* 344 U.S. 604, 619, 73 S.Ct. 481, 97 L.Ed. 593 (1953); *United States v. Liddy,* 166 U.S.App.D.C. 95, 109, 509 F.2d 428, 442 (1974).

The record reveals that appellant consistently maintained to his attorney that his defense was alibi[90]—that he had not been present at the scene of the crime, but rather had returned directly to the hotel from the bar where he had had a drink with Crump. This was the essence of appellant's eventual testimony at trial.

We may assume for present purposes that appellant's lawyer should have made some timely effort prior to trial to learn of the accounts of the co-defendants, beginning with consultation with their counsel. However, counsel subsequently did interview Eley and called him to the stand. At this time, be it noted, appellant had recently written to his counsel and raised a possible self-defense claim, altering his previous account (that he had left Crump in the bar) to claim that outside the bar Crump had assaulted him, and that Eley and Taylor would testify that they had come to his aid in fighting off Crump.

At the insistence of appellant, Eley was subpoenaed to appear at trial.[91] Eley, who was in jail, was brought to the courthouse in the same bus as Decoster and placed in the cellblock behind the courtroom with Decoster. At the remand hearing, defense trial counsel testified that he had interviewed Eley, and that Eley had told him Decoster was not present at the scene of the crime. This narrative was consistent with Decoster's trial testimony, and defense counsel called Eley as a witness. On the stand, however, Eley gave a different account, testifying that he had seen Crump and Decoster fighting. At the remand hearing Decoster and Eley both admitted that counsel had visited the cellblock prior to calling Eley as a witness. Decoster stated that he could not recall whether counsel had interviewed Eley, and Eley denied that he had spoken to counsel. The District

Court found Eley's testimony "incredible" and credited the testimony of defense counsel as to his interview of Eley.

As already indicated, we do not approve the belated effort to interview the co-defendants. However, appellant has not demonstrated a likelihood that counsel's omission affected the outcome of trial. Counsel did interview Eley, and at a time when Eley could at least be asked to exculpate appellant without fear of self-injury, for by this time Eley's own fate was set, following the plea of guilty he had made during the period appellant had eloped. Appellant was insisting that Eley be called, and Eley's interview provided a glimmer of hope of corroborating appellant against a phalanx of credible prosecution witness. Neither appellant nor his counsel was in an enviable position at any time. Although appellant now claims ineffective assistance of counsel, what this conviction reflects is the clear-cut prosecution evidence, appellant's weak contradiction, and Eley's turnabout.

As a variant on the claim of failure to investigate, appellant points to counsel's apparent confusion at the beginning of the trial. After defense counsel had announced "ready" for trial, the government demanded the names of alibi witnesses. Counsel stated that he might present alibi witnesses, but he sought the full twenty day period permitted by local rules to respond to such a demand. When this was denied, defense counsel announced he would proceed without alibi witnesses.

The effort of defense counsel to keep his options open was hardly unusual, but even if this indicated uncertainty as to theory of defense, some degree of confusion would not be unexpected in view of appellant's shifting accounts and demands. In any event, there is no indication of likely effect on outcome. Counsel's responses came be-

**90.** While incarcerated after his arrest, appellant did allege, in a letter to Judge Waddy protesting his continued confinement and the failure of counsel to file a bond review motion, that he had been defending himself from an assault by Crump. This claim is consistent with that he made in a letter to his attorney shortly before trial. There is no indication that the attorney

was ever aware of the contents of this letter, or that appellant made similar representations to him prior to the letter to counsel mentioned above. At the remand hearing, appellant admitted this latter self-defense claim was a fabrication.

**91.** Taylor could not be located.

fore the jury was impanelled. At the trial, counsel did call Eley as a witness he understood would support defendant's alibi defense.

### 2. Other Claims of Ineffective Assistance

As to appellant's other claims, the District Court's findings, while framed in response to the *Decoster I* mandate, are generally in accord with the principles we have developed in this opinion.

█ a. *The Bond Review Motion.* Appellant was arrested on May 29, 1970. A judge of the District of Columbia Court of General Sessions set bond at $5,000. Appellant could not meet that figure and remained incarcerated. On October 12, 1970, the Black Man's Development Center accepted third-party custody. On November 9, 1970, counsel filed a motion for bond review in the District Court. The issue was disputed at the remand hearing, but Judge Waddy apparently found that this motion had included the condition of third-party custody. However, it was not until December 8, 1970, that defense counsel filed in the correct court (General Sessions) a motion for bond review explicitly reflecting the third-party custody condition.[92] Appellant was eventually released on January 14, 1971.

The District Court found that counsel's deficiencies did not affect the result of the trial in the slightest degree, did not "limit defendant's ability to contact witnesses and inform his counsel of them if there were any; nor did it frustrate his defense, nor affect his guilt or innocence." While lack of diligence in obtaining a criminal defendant's pretrial release cannot be condoned, reversal of a conviction is not the appropriate remedy where the trial itself was not affected by the default.[93]

█ b. *Failure To Obtain Transcript.* Defense counsel did not obtain a copy of the transcript of the preliminary hearing. At the remand hearing, he testified that it was his normal practice to read the prosecutor's copy. This practice, and their cooperation, was substantiated by the prosecutors' testimony. We cannot say that counsel's practice was impermissible. He had not only access to a transcript, but his own memory of the preliminary hearing that he had attended. Appellant argues that Officer Ehler's testimony at trial differed from his testimony at the preliminary hearing on the exact role of each of the defendants in the robbery. These variations were not "substantial"—Judge Waddy's term—insofar as the alibi defense was concerned. There is no showing of likely impact on the trial result.

█ c. *Offer To Waive Jury Trial.* Appellant's effort to condemn defense counsel for the offer to waive jury trial is frivolous. Appellant was in fact tried by a jury. Moreover, as the District Court found, appellant himself demanded that his attorney offer to waive jury trial, and appellant persisted in this demand even after the court advised him of his constitutional rights and explained that the court had heard part of the evidence against him.

We are moved to add a word. The trial judge, the late Honorable Joseph Waddy, had a distinguished record at the bar as a compassionate and effective defense counsel, and on the bench as a patient, fair and conscientious judge. Appellant's wish for a trial by him was neither unusual nor such as to require conscientious counsel to set himself in opposition to his client.

█ d. *Waiver of Opening Statement and Failure To See Sentence Properly Executed.* As the District Court found, there is no merit in the claims of ineffectiveness on

---

92. Appellant attacks counsel's filing of the bond review motion in an incorrect court, the District Court, rather than the correct court, General Sessions. While we do not commend this error, some confusion was "understandable," as the government's lawyer commented at the remand hearing.

93. *See Dillane v. United States,* 121 U.S.App. D.C. 354, 350 F.2d 732 (1965) (ineffectiveness in filing notice of appeal warrants only remedy of opportunity to file appeal).

the ground of waiver of opening statement and failure to see that appellant's sentence was properly executed. Waiver of an opening statement is a tactical decision. There was no effort to demonstrate that the waiver had, or was likely to have had, a substantial effect on the outcome. As to the sentencing issue, defense trial counsel had withdrawn from the case before the issue had arisen, an appeal had been taken, and appellate counsel had been appointed. And of course an omission would justify at most a reconsideration of sentence, not a reversal of the conviction.[94]

## F. Conclusion

The several claims, both seriatim and in combination, do not raise in our minds serious misgivings as to whether justice was done. We certainly do not commend counsel's performance as ideal. Yet some of the complaints border on the frivolous. And ultimately there was a total failure of appellant to show that it was likely that counsel's deficiencies had any effect on the outcome of this trial. As the District Court found:

> While it may be that defense counsel herein was lax in his duty to conduct as thorough a factual investigation as possible, we find that counsel did raise the only defense available to him, which defense was putting the government to its proof.

■ In the absence of a governmental impediment to effective assistance of counsel, the court cannot lightly vacate a conviction on the basis of its own appraisal of the performance of defense counsel. The door is open, but only for cases of grievous deficiency and where the court has serious misgivings that justice has not been done. Our adversary system will be tortured out of shape if defense counsel must contemplate from the beginning that the judge will subsequently retrace his conversations with his client, and his evolving perceptions of the problems and possibilities presented by the assignment.

We support efforts to upgrade performance of defense trial counsel. We commend the programs of the last decade in clinical education for law students. We approve the American Bar Association's efforts to clarify the defense and prosecution functions. More should be done. But more is not better if it undercuts the adversary system.

So far as the present case is concerned, ultimately dispositive of the appeal are the strength of the government's case and failure of appellant to demonstrate a likelihood of effect on the outcome.

\*  \*  \*  \*  \*  \*

As Jan Deutsch has recently noted, it is often in the nature of a dissent to present a political statement.[95]

Judge Bazelon's characteristic eloquence destines his remarks to stand as an oft-quoted expression of aspirations for the legal system. In our view, that eloquence is not matched by tenable standards.

■ 1. Starting from the ABA Standards Relating to the Defense Function,[96] Judge Bazelon propounds a list of "duties owed by counsel to client" as representing the "minimum requirements of competent performance." [97] The ABA issued its standards—dropping the term "minimum"—as a "blend of description of function, functional guidelines, ethical guidelines and recommended techniques." [98] They were not designed as a hard and fast checklist of duties for defense counsel. In application there must be room for judgment, and for consideration of context.

Our analytic structure permits reversal in the interest of justice, but without inappropriate rigidity. The claimed deficiency

---

**94.** *See* note 93 and accompanying text *supra.*

**95.** Deutsch, *Law as Metaphor: A Structural Analysis of Legal Process,* 66 Geo.L.J. 1339, 1342 (1978).

**96.** *See* note 2 *supra.*

**97.** Dissenting opinion of Bazelon, J., at —— of 199 U.S.App.D.C., at 276 of 624 F.2d.

**98.** ABA Standards, *supra* note 2, at 11; *see* text accompanying notes 52–53 *supra.*

must fall measurably below accepted standards. To be "below average" is not enough, for that is self-evidently the case half the time. The standard of shortfall is necessarily subjective, but it cannot be established merely by showing that counsel's acts or omissions deviated from a checklist of standards.

What is all-important is significance in terms of context. This has been understood by virtually every court and judge that has spoken to the issue.[99] We resolve the problem of taking context into account without imposing an undue burden on the defense. We do not require that defendant bear the burden of proving actual prejudice.[100] What defendant must demonstrate is a likelihood of effect on the outcome. In that event, the government would have the burden of showing that there was in fact no prejudice in the particular case.

Judge Bazelon qualifies his formulation by asserting that his "checklist" does not compel automatic reversal, as it applies only if the violation is "substantial." In *DeCoster I*, the meaning of "substantial" was left ambiguous, but a fair reading of the opinion suggests that it referred to the magnitude of the violation, either in terms of egregiousness or frequency, rather than to the violation's impact or likely impact. In Judge Bazelon's panel opinion in *Decoster II*—later vacated by the en banc order—

the defendant's burden was expanded to include a reference to impact. Judge Bazelon stated that *Pinkney*[101] made clear that "for a violation to be substantial, it must [have been] 'consequential,' that is, it in some way must have impaired the defense."[102] Judge Bazelon's dissent now appears to recede from the concept of burden on defendant to show impairment of the defense. While Judge Bazelon's dissent acknowledges that "the 'reasonably competent' attorney must tailor his actions to fit the unique circumstances presented by a given case,"[103] defendant's nominal burden to show "substantiality" is structured so that, realistically, deviation from the checklist makes out a prima facie case, leaving the actual burden on the government (or defense trial counsel) to show that the departure was "excusable" or "justifiable." Judge Bazelon's difficulties with the substantiality concept suggest that it is unsound to make this the analytical cutting edge.

Judge Bazelon recognizes that the government can always defend by showing beyond a reasonable doubt that the violation was harmless—a rule prescribed by *Chapman*[104] even for established constitutional violations. The realistic thrust of Judge Bazelon's approach, however, is a rule structured toward a conclusion of prejudice from any deviation from the checklist of standards concerning preparation, what-

---

**99.** Although Judge Hufstedler dissented from the imposition of a strict prejudice requirement in *Cooper v. Fitzharris*, 586 F.2d 1325 (9th Cir. 1978), she recognized that considerations of effect on outcome where pertinent to determining whether a defendant had been denied the effective assistance of counsel. *Id.* at 1340; *see* text accompanying notes 32–33 *supra*. And the Supreme Court of California, while adopting a standard similar to that of *DeCoster I*, still imposed on defendant the burden of showing that counsel's failures had resulted "in the withdrawal of a potentially meritorious defense." *People v. Pope*, 23 Cal.3d 412, 425, 152 Cal.Rptr. 732, 739, 590 P.2d 859, 866 (1979); *see* text accompanying notes 59–61 *supra*.

**100.** *See* dissenting opinion of Bazelon, J., at ——————— of 199 U.S.App.D.C., at 288–289 of 624 F.2d.

**101.** *United States v. Pinkney*, 177 U.S.App.D.C. 423, 543 F.2d 908 (1976).

**102.** *Decoster II*, 199 U.S.App.D.C. at ————, 624 F.2d at 308–309. He observed, 199 U.S.App.D.C. at ————, 624 F.2d at 309–310, that impairment could be presumed where "acts or omissions of [defense] counsel are . . . likely to have impaired the defense" and yet consequence would be difficult to prove. These words could be viewed as suggesting an approach not unlike our own opinion, except that the likely effect is based not on an inquiry in context, but is established by the nature of the violation (described as a "total failure to conduct factual investigations," 199 U.S.App.D.C. at ——, 624 F.2d at 310).

**103.** Dissenting opinion of Bazelon, J., at —— of 199 U.S.App.D.C., at 282 of 624 F.2d.

**104.** *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

ever the likely or actual consequence. Omissions of investigation lead to new trials on the rationale that one can never be certain what might have happened had counsel performed better. A new trial is needed if exculpatory information might have been turned up (obviously), and also if the fruits of the investigation would have proved neutral or even inculpatory, for defense counsel could have been in a stronger position to lead his client to plead guilty. This kind of speculation renders no error harmless.

3. The crucial difference between our views of this case is not the shortfall of counsel so much as the analysis of effect on outcome. The critical point is the duty to investigate. Since the defendant's account to his counsel of his entry into the hotel was so close to that of the police, the speculation that something might have been turned up by interviewing the hotel clerk is tantamount to an obligation to turn over each and every stone. This is even clearer for the extreme suggestion that defense counsel should have made inquiries, of persons unknown, at the bar where defendant and the victim were drinking.

There is more force to the objection that counsel rested with the preliminary hearing, and did not interview the policemen or the victim. However, a notably conscientious trial judge has found that there was no effect on outcome. Finally, co-defendant Eley was interviewed prior to trial. Eley's damaging testimony on the witness stand was a turnabout, defense trial counsel submitted. When one also factors in the reality of the turnabout in defendant's own statements to counsel, the notion that counsel's shortfall contributed to the outcome is comminuted.

■ 4. Judge Bazelon's premise is that the Sixth Amendment dictates an inevitable

progression toward categorical rules governing the assistance of counsel. The Supreme Court decisions, however, establish a variable and judgmental approach depending on the nature of the claimed deprivation of the right. In particular, *Chambers v. Maroney*[105] clearly, if briefly, rejected the proposition that *per se* rules were appropriate, and implicitly accepted an outcome requirement. In the cases where the Court rejected any kind of prejudice requirement,[106] the violation could easily be remedied by a categorical prohibition of a state-erected impediment to effective assistance. Those cases did not involve intrusion into the more sensitive area of pretrial preparation. We are constrained by *Chambers* and the signals in *Agurs*.[107] In the law, "leadership requires lieutenants as well as captains."[108] On an intermediate court we have some latitude to initiate approaches and to interpret Supreme Court decisions, but we must abide by their constraints.

5. Judge Bazelon is animated by a view of the adversary system as so impaired in practice as to warrant a thorough reordering, with extensive supervision by the trial judge through a pretrial "checklist" to ensure that counsel has met his duties of preparation, and oversight of the conduct of the trial. The manifest consequence would be inevitable and increasing intrusion into the development and presentation of the defense case by the trial judge, and (out of self-protection) by the prosecution.

The adversary system is neither sacrosanct nor impervious to change. But Judge Bazelon has not pointed to any system—let alone the inquisitorial system of the Continent—that guarantees better protection against injustice. We do not think he has made a case for the drastic overhaul of a system that historically has heightened pro-

---

**105.** 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *see* text accompanying notes 22–23 *supra*.

**106.** *See* dissenting opinion of Bazelon, J., at ——–—— of 199 U.S.App.D.C., at 289–290 of 624 F.2d, *citing Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); *Geders v. United States*, 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976).

**107.** *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *see* text accompanying notes 27–28 *supra*.

**108.** W. Hurst, Law and Social Process in United States History 165 (1972) (1959 Cooley Lectures, U. Michigan).

tection of the accused. Perhaps the spectre of disruption will lead to increased appropriations to the criminal justice system, but such a tactical approach to the judicial function would be perilous.

6. Starting with *Bruce*[109] in 1967, this circuit has evolved and refined Sixth Amendment protections against the ineffectiveness of counsel. Judge Bazelon fashioned an important advance in the ruling of *DeCoster I*[110] that established a procedure by which the trial court could take a fresh look within the structure of a direct appeal.[111] This opinion modifies the *Bruce* requirement of a showing that a substantial defense has in fact been "blotted out" by requiring only a showing of a likelihood of effect on outcome. We cannot accept the more radical departure outlined in the *Decoster II* panel opinion and reiterated in the dissent.

\*     \*     \*     \*     \*     \*

The concurring opinion subsequently received from Judge Robinson is subject to the comments addressed to Judge Bazelon's dissenting opinion insofar as those two opinions are congruent. In key aspects the concurring opinion differs from Judge Bazelon's dissent, notably Judge Robinson's appraisal[112] of the limited utility of the checklist approach of *DeCoster I*, and basically his assessment of the particular case before us.

\*     \*     \*     \*     \*     \*

The judges of this court are emphatically not indifferent to the plight of the poor in the criminal justice system. Certainly there is need for the allocation of additional resources. Certainly there is need to cull out incompetent counsel or to call them to account. Responses are primarily required from the bodies that can supply resources—the legislature and the bar. Judge Bazelon's bold but single-valued approach would tolerate disruption of the administration of justice and a reordering of the adversary system, with little guarantee of improved performance and impassivity as to the uncharted and likely noxious consequences.

Our approach toward the minimum legal obligations of our democratic society to ward off injustice may be more earthbound, but in our view it is more salutary.

*Affirmed.*

MacKINNON, Circuit Judge, with whom TAMM and ROBB, Circuit Judges, join, concurring.

This case has a tortuous history. It started with a *sua sponte* remand from this Court to the District Court for determination of issues that were not raised on appeal and which were not apparent in the record. *United States v. DeCoster,* 159 U.S.App. D.C. 326, 487 F.2d 1197 (1973) [*DeCoster I*]. I dissented in part. On remand, the trial judge (Waddy, J.) held an extensive hearing. His findings and conclusions did not support the preconceived fears of the majority of the appellate panel that counsel had been ineffective. However, on appeal in a far reaching opinion that attempted to write new law the majority of the panel set aside Judge Waddy's findings and conclusions and reversed the conviction. *United States v. Decoster,* 199 U.S.App.D.C. ——, 624 F.2d 196 (1976), [*Decoster II*]. The factual and legal deficiencies of the reversal of Decoster's conviction by the panel were set forth at length in my dissent, 199 U.S. App.D.C. ——, 624 F.2d 196, and that opinion covers a number of points that need not be covered here. The full court subsequently ordered *en banc* rehearing of the case. Now the court *en banc* affirms the conviction.

In Judge Leventhal's plurality opinion, which was prepared after my earlier origi-

---

**109.** *Bruce v. United States,* 126 U.S.App.D.C. 336, 379 F.2d 113 (1967).

**110.** *United States v. DeCoster,* 159 U.S.App. D.C. 326, 487 F.2d 1197 (1973).

**111.** This flexibility in remedies on direct appeal found its roots in *Bruce's* recognition, building on the case of *Dyer v. United States,* 126 U.S.

App.D.C. 312, 379 F.2d 89 (1967), that relief may be justified by a lesser showing on direct appeal than on collateral attack. *See* text accompanying notes 65–73 *supra*.

**112.** Opinion of Robinson, J., at —— n.44, of 199 U.S.App.D.C., at 250 n.44 of 624 F.2d.

nal draft, many issues raised by the earlier panel majority are now subordinated to a discussion of more general law, and the specific factual issues of this case, which support the finding of guilt and the effectiveness of counsel, receive less attention. I reach the same result as the opinions by Judges Leventhal and Robinson, but on several issues those opinions do not make as complete and conclusive a case against the theories and analysis of the dissent as the record supports, and, in some respects, I differ from their analysis. However, since such theories are now relegated to a dissent from an *en banc* opinion the need for an opinion to completely refute them is diminished. Thus, to avoid repetition, I have withdrawn a large portion of my original opinion and instead will make a few observations with respect to the dissent beyond those of Judge Leventhal's opinion, and discuss the issues surrounding the burden of proof which I believe should be set forth with greater clarity and precision. I stand by my earlier statements which are accurately quoted in the dissent. I vote to affirm the conviction.

# I. THE BURDEN OF PROOF IN SIXTH AMENDMENT RIGHT TO COUNSEL CASES

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall

. . . have the Assistance of Counsel for his defence."[1] In addition to the right to not be *actually* denied the "Assistance of Counsel" it has long been recognized that a defendant has a right to the *effective* assistance of counsel, for courts have understood that a defense may be so ineffective as to constitute a *constructive* denial of the assistance of counsel. Obviously, the two types of cases are composed of radically different essential elements. This case turns on the nature of the showing that must be made in order to reverse a conviction because of alleged *ineffective* representation. I believe that *a defendant who alleges that his counsel was ineffective must show that substantial prejudice to his defense resulted from the alleged violation of duty owed him by counsel.*[2] I base my conclusion on four considerations: (1) precedent in this Circuit; (2) the Supreme Court's approach in the analogous Fifth Amendment area; (3) traditional common law principles governing the burden of proof; and (4) respect for the adversary system.

## A. *Precedent*

### 1. *Before DeCoster I*

The early cases in this Circuit held that the Sixth Amendment only established a

1. *See, e. g., Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932); *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); *Betts v. Brady,* 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595 (1942); *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Argersinger v. Hamlin,* 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972); *Faretta v. California,* 422 U.S. 806, 807, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). The importance of counsel's function to the effective operation of our adversary system is unquestioned. The Supreme Court stated in *Geders v. United States,* 425 U.S. 80, 88, 96 S.Ct. 1330, 1335, 47 L.Ed.2d 592 (1976):

Our cases recognize that the role of counsel is important precisely because [the ordinary] defendant is ill-equipped to understand and deal with the trial process without a lawyer's guidance.

*Glasser v. United States,* 315 U.S. 60, 69–70, 62 S.Ct. 457, 464, 86 L.Ed. 680 (1942), is to the same effect:

The guarantees of the Bill of Rights are the protecting bulwarks against the reach of arbitrary power. Among those guarantees is the right granted by the Sixth Amendment to an accused in a criminal proceeding in a federal court "to have the Assistance of Counsel for his defense." "This is one of the safeguards * * * deemed necessary to insure fundamental human rights of life and liberty," and a federal court cannot constitutionally deprive an accused, whose life or liberty is at stake, of the assistance of counsel. *Johnson v. Zerbst,* 304 U.S. 458, 462, 463, 58 S.Ct. 1019, 82 L.Ed. 1461 [(1938)].

2. This rule applies in almost every case. Exceptions may perhaps be in order in the few cases in which the prosecutor somehow has easier access than the defendant to relevant information. *See* I.C., *infra.*

defendant's right to appointment of competent counsel. Subsequent negligence of that counsel did not implicate the Sixth Amendment. However, the Fifth Amendment's due process clause guarantees the accused a fair trial, and the early cases recognized that the performance of counsel might have been so inept that the defendant did not receive a fair trial. Thus, initially, the adequacy of counsel was considered to involve a Fifth Amendment question.[3]

The Sixth Amendment, however, guarantees more than the appointment of competent counsel. By its terms, one has a right to "Assistance of Counsel in his defence." Assistance begins with the appointment of counsel, it does not end there. In some cases the performance of counsel may be so inadequate that, in effect, no assistance of counsel is provided. Clearly, in such cases, the defendant's Sixth Amendment right to "have Assistance of Counsel" is denied. Thus, in *Scott v. United States,* 138 U.S. App.D.C. 339, 340, 427 F.2d 609, 610 (1970) we recognized that the right to adequate

assistance of counsel is derived from the Sixth Amendment as well as from the Fifth.[4]

In addition to applying the Sixth Amendment to the adequate assistance of counsel area, the pre-*DeCoster I* cases established two principles. First, they delineated a constitutional standard by which the adequacy of attorney representation can be tested. Second, they clearly allocated the burden of proof in adequacy of representation cases.

(a) *The Standard.* In our earliest decisions on the subject, we stated that a defendant's constitutional right to adequate representation is violated when counsel is shown to be so inept that the trial is a "farce and a mockery of justice."[5] Later cases stated that the "farce and mockery of justice" test was meant as an example of a constitutional violation; it was not intended to restrict the Sixth Amendment's application to only those cases in which the trial could be called a "farce." *See Mitchell v. United States,* 104 U.S.App.D.C. 57, 63, 259 F.2d 787, 793 (1958).[6]

---

**3.** *See, e. g., Diggs v. Welch,* 80 U.S.App.D.C. 5, 6–7, 148 F.2d 667, 668–69 (1945); *Jones v. Huff,* 80 U.S.App.D.C. 254, 255, 152 F.2d 14, 15 (1945).

**4.** The panel was composed of Chief Judge Bazelon and Judge Leventhal and issued *per curiam.*

**5.** *See* cases cited at note 3 *supra.*

**6.** In addition to this circuit, seven other circuits—the Third, Fourth, Fifth, Sixth, Seventh, Eighth, and Ninth—have rejected the farce and mockery test as a standard that must be met in determining inadequate assistance of counsel. In *Moore v. United States,* 432 F.2d 730, 736 (3d Cir. 1970), the Third Circuit stated:

> [T]he standard of adequacy of legal services as in other professions is the exercise of the customary skill and knowledge which normally prevails at the time and place.

This standard was reaffirmed in *United States v. Johnson,* 531 F.2d 169, 174 (3d Cir. 1976), where the court added:

> [I]t is clear from our decisions that it is the particular facts of each case which determine whether the attorney in question has provided the constitutionally required effective assistance of counsel.

In *Marzullo v. Maryland,* 561 F.2d 540, 543 (4th Cir. 1977), *cert. denied,* 435 U.S. 1011, 98 S.Ct. 1885, 56 L.Ed.2d 394 (1978) the Fourth Circuit expressly rejected the farce and mockery test and adopted a normal competence standard: "Was the defense counsel's representation within the range of competence demanded of attorneys in criminal cases?" The Fifth Circuit has adopted the following standard: whether the attorney was "reasonably likely to render and [rendering] reasonably effective [assistance.]" *United States v. Gray,* 565 F.2d 881, 887 (5th Cir. 1978); *Mason v. Balcom,* 531 F.2d 717, 724 (5th Cir. 1976); *Burston v. Caldwell,* 506 F.2d 24 (5th Cir.), *cert. denied,* 421 U.S. 990, 95 S.Ct. 1995, 44 L.Ed.2d 480 (1975). The Sixth Circuit has adopted the same standard as the Fifth Circuit. *United States v. Toney,* 527 F.2d 716, 720 (6th Cir. 1975), *cert. denied,* 429 U.S. 838, 97 S.Ct. 107, 50 L.Ed.2d 104 (1976); *Maglaya v. Buchkoe,* 515 F.2d 265, 269 (6th Cir. 1975); *Beasley v. United States,* 491 F.2d 687, 696 (6th Cir. 1974). In *United States v. Sielaff,* 542 F.2d 377, 379 (7th Cir. 1976), *cert. denied sub nom. Sielaff v. Williams,* 423 U.S. 876, 96 S.Ct. 148, 46 L.Ed.2d 109, the Seventh Circuit stated:

> In this Circuit a petitioner asserting a lack of effective assistance of counsel in a criminal case must prove that his counsel's performance did not meet "a minimum stan-

Once the ambiguity surrounding the "farce and mockery of justice" test was cleared up, this court consistently held that a defendant's right to assistance of counsel is violated when his attorney's ineptness substantially prejudiced defendant's ability to receive a fair trial. In *United States v. Hammonds,* 138 U.S.App.D.C. 166, 169, 425 F.2d 597, 600 (1970) we stated that " '[t]he question * * * is whether [counsel's] representation was so ineffective that Appellant was denied a fair trial.' " Similarly, in *Scott v. United States,* 138 U.S.App.D.C. 339, 340, 427 F.2d 609, 610 (1970) the court held that the "appropriate standard for ineffective assistance of counsel . . . is whether gross incompetence blotted out the essence of a substantial defense."

(b) *Burden of Proof.* The pre-*DeCoster I* cases also established that the burden rests on the defendant to show that he did not receive a fair trial. In *Bruce v. United States,* 126 U.S.App.D.C. 336, 339–40, 379

> dard of professional representation." [citations omitted].

This standard was reaffirmed in *United States v. Brugger,* 549 F.2d 2, 4 (7th Cir.), *cert. denied,* 431 U.S. 919, 97 S.Ct. 919, 53 L.Ed.2d 231 (1977), and in *United States v. Krohn,* 560 F.2d 293, 297 (7th Cir.), *cert. denied,* 434 U.S. 895, 98 S.Ct. 275, 54 L.Ed.2d 185 (1977). The Eight Circuit in *United States v. Malone,* 558 F.2d 435, 438 (8th Cir. 1977), articulated its standard this way:

> It is established in this Circuit that a defendant is denied effective assistance of counsel if his trial counsel "does not exercise the customary skills and diligence that a reasonably competent attorney would perform under similar circumstances." *United States v. Easter,* 539 F.2d 663, 666 (8th Cir. 1976); *Pinnell v. Cauthron,* 540 F.2d 938, 939 (8th Cir. 1976).

The Ninth Circuit has adopted a "reasonably competent and effective representation" standard similar to that approved in the Fifth and Sixth Circuits. *Cooper v. Fitzharris,* 586 F.2d 1325, 1328 (9th Cir. 1978) (en banc).

Thus, a majority of the circuits have rejected the farce and mockery test as a minimal standard.

Three circuits—the First, Second, and Tenth—have retained the farce and mockery test. In *United States v. Ramirez,* 535 F.2d 125, 129–30 (1st Cir. 1976), the First Circuit stated:

> Ineffective counsel in this circuit means representation such as to make a mockery, a sham or a farce of the trial. . . .

F.2d 113, 116–17, 121 (1967) (emphasis added) Judge Leventhal wrote for the Court:

> In earlier cases it was said that a claim based on counsel's incompetence cannot prevail unless the trial has been rendered a mockery and a farce. These words are not to be taken literally, but rather as a vivid description of the principle that *the accused has a heavy burden in showing requisite unfairness.* Although the cases are rare and extraordinary, it appears that an accused may obtain relief under 28 U.S.C. § 2255 *if he shows that there has been gross incompetence of counsel and that this has in effect blotted out the essence of a substantial defense either in the District Court or on appeal.*
>
> .          .          .          .          .
>
> A claim of ineffective assistance of counsel might be made out if the wishes of the appellant were in fact diverted by clearly erroneous legal advice and he was substantially prejudiced thereby.

> While we have considered adopting a more lenient standard requiring "reasonably competent assistance of counsel", [citations omitted], . . . appellant's contentions do not approach a violation of either standard.

Thus, the First Circuit leaves open the possibility of adopting a different standard. *See also Dunker v. Vinzant,* 505 F.2d 503 (1st Cir. 1974). The Second Circuit has been more certain in its support of the farce and mockery test. In *United States v. Yanishefsky,* 500 F.2d 1327, 1333 (2d Cir. 1974), the court stated:

> The current standard of ineffective assistance of counsel in this circuit is that in order to be of constitutional dimensions the representation [must] be so "woefully inadequate 'as to shock the conscience of the Court and make the proceedings a farce and mockery of justice.' " [citations omitted].

The court explicitly declined to adopt any other standard. 500 F.2d at 1333 n. 2. Similarly, the Second Circuit declined to reconsider its position in *Rickenbacker v. Warden, Auburn Correctional Facility,* 550 F.2d 62, 66 (2d Cir. 1976), *cert. denied,* 434 U.S. 826, 98 S.Ct. 103, 54 L.Ed.2d 85 (1977), and it reaffirmed directly the farce and mockery test in *LiPuma v. Commissioner, Department of Corrections,* 560 F.2d 84, 90–91 (2d Cir.), *cert. denied,* 434 U.S. 861, 98 S.Ct. 189, 54 L.Ed.2d 135 (1977). The Tenth Circuit also continues to apply the farce and mockery test. *United States v. Larsen,* 525 F.2d 444, 449 (10th Cir. 1975), *cert. denied,* 423 U.S. 1075, 96 S.Ct. 859, 47 L.Ed.2d 85 (1976).

The defendant in *Bruce* was seeking habeas corpus release. Since his constitutional claim was made as a collateral attack on his conviction, Judge Leventhal acknowledged that a "more powerful" factual showing was necessary than would have been required were defendant seeking a new trial on direct appeal.[7] But the fact that *Bruce* was a collateral attack case does not denigrate the relevance of its holding that *the defendant bears the burden of showing prejudice.*[8]

Judge Leventhal in a concurring opinion filed on petition for rehearing in *Matthews v. United States,* 145 U.S.App.D.C. 323, 449 F.2d 985 (1971) reiterated that the defendant must show prejudice. He wrote:

> I have taken the trouble of outlining the prejudice I think occurred, because I am by no means of the view, as suggested in the Petition for Rehearing, that in these cases no possibility of prejudice need be shown. Where defendant has not been provided with counsel, that fact in and of itself establishes the need for reversal without regard to any other possibility of prejudice. *Glasser v. United States,* 315 U.S. 60, 76, 62 S.Ct. 457, 86 L.Ed. 680 (1942), but when the claim is posed in terms of ineffective assistance of counsel, then I think the ineffectiveness has to be measured in terms of whether the attorney has in effect blotted out the substance of a defense, *Bruce v. United States,* 126 U.S.App.D.C. 336, 340, 379 F.2d 113, 117 (1967).

145 U.S.App.D.C. at 332, 449 F.2d at 994. This excerpt expresses the basic difference between those cases in which the defendant was *actually* denied counsel and those in which it is asserted that his counsel was ineffective: in the ineffectiveness types of claims the burden of proving prejudice rests on the defendant.

Judge Fahy's majority opinion in *Matthews,* joined by Judge Wright, rested explicitly on *United States v. Hammonds,* 138 U.S.App.D.C. 166, 425 F.2d 597 (1970). *Hammonds,* which involved a direct appeal, reaffirmed the earlier case law in this circuit that required the defendant to show prejudice. 138 U.S.App.D.C. at 169, 425 F.2d at 600. *Hammonds* was decided in favor of the defendant. But this was because "[a]ppellant ha[d] sustained *his burden* of establishing his claim that he was deprived of his constitutional right to effective assistance of counsel." 138 U.S.App. D.C. at 173, 425 F.2d at 604 (emphasis added).[9]

---

7. Judge Leventhal stated:
> [A] more powerful showing of inadequacy is necessary to sustain a collateral attack than to warrant an order for new trial either by the District Court or by this court on direct appeal.

126 U.S.App.D.C. at 340, 379 F.2d at 117.

8. The context in which the challenge is raised may affect the *factual showing* that is required to satisfy the standard.

9. The quality of the defense in *Hammonds* presents an interesting contrast to the representation involved here. In *Hammonds,* the efforts of defense counsel were grossly inadequate. The court delineated an array of failures:

> appellant specifies trial counsel's failure to (1) appear at the arraignment, (2) conduct any voir dire examination of the jury, (3) make any opening statement to the jury, (4) cross-examine two of the four Government witnesses, with only slight cross-examination of the other two witnesses (a total of five questions) and (5) request any jury instructions, including in particular an instruction

on lesser-included offenses. In addition to counsel's alleged deficiencies in the trial itself, appellant refers to counsel's failure to make any pretrial motions, including a motion for pretrial release, and his declining at the court's invitation to speak to the question of bond after conviction or to speak on appellant's behalf at the sentencing.

> Counsel for appellant in this court suggests that trial counsel in his closing argument should at least have mentioned the presumption of innocence and the requirement that all essential elements of the offenses be proved beyond a reasonable doubt; that he should have pointed out to the jury the evidence which could lead to a conclusion that appellant lacked the requisite intent and also the absence of evidence establishing that a person was present in the house at the time of appellant's entry. Appellant's counsel suggests further that while admitting that appellant could not provide the jury with a complete explanation of his presence in the house, trial counsel could have offered one or more hypotheses of what might have happened . . . . . .

*Hammonds* relied heavily on then Judge (now Chief Justice) Burger's opinion for the court in *Harried v. United States,* 128 U.S. App.D.C. 330, 389 F.2d 281 (1967). Though *Harried* involved a direct appeal, the court relied on *Bruce, supra,* and *Mitchell, supra,* and explicitly stated that the

> burden on the Appellant to establish his claim of ineffective assistance of counsel is heavy. The question . . . is whether his representation was so ineffective that appellant was denied a fair trial.

128 U.S.App.D.C. at 333–34, 389 F.2d at 284–85 (citations omitted) (emphasis added).

Finally, in *Scott v. United States,* 138 U.S.App.D.C. 339, 340, 427 F.2d 609, 610 (1970) the court held that the District of Columbia Court of Appeals properly applied the "standard in *Bruce*" in a direct appeal case. *Scott* is significant both because it is a direct appeal case and because it was the first case to acknowledge that inadequate assistance of counsel claims have Sixth Amendment underpinnings. By relying on *Bruce,* the *Scott* court held that in the Sixth Amendment context, as well as under the Fifth Amendment, the *burden is on the defendant* to show prejudice from the acts or omissions of his counsel.

> 138 U.S.App.D.C. at 172, 425 F.2d at 603. Here, on the other hand, counsel's major shortcoming was supposedly his failure to investigate alibis and defenses that he had good reason to believe were untrue.

**10.** The dissent relies heavily on *DeCoster I,* which it acknowledges "shifted the focus of judicial inquiry away from the prejudice to the defendant . . . and toward the task of articulating basic duties counsel owes his client." Dissent —— of 199 U.S.App.D.C., 267 of 624 F.2d. While conceding that the precedential value of *DeCoster I* is "in question" (dissent n. 62), the dissent contends that it is more relevant than the pre-*DeCoster I* case because those cases are grounded in the Fifth rather than the Sixth Amendment. Dissent n. 121. The dissent's distinction is erroneous. *Scott, supra* at —— of 199 U.S.App.D.C., at 222 of 624 F.2d, was explicitly decided under the Sixth rather than the Fifth Amendment. The court stated:

> What is involved here is the Sixth Amendment. The Sixth Amendment has overlapping but more stringent standards than the Fifth Amendment as is clear from other contexts. Compare, for example, *United States*

To recapitulate, both the Fifth and the Sixth Amendments are implicated in cases involving alleged ineffectiveness of counsel. The Fifth Amendment is violated if counsel's performance is so inadequate that defendant is denied a fair trial. The Sixth Amendment is violated when the performance of counsel is so inadequate that, in effect, the required "Assistance of Counsel" in his behalf has not been afforded. Under either Amendment, the pre-*DeCoster I* cases indicate that *the defendant has the burden of showing that he was prejudiced by his counsel's inadequacy.* The *DeCoster I* opinion and subsequent cases in this Circuit do not abandon—nor do they provide a basis for abandoning—the decisions in this Circuit as to the burden of proof.[10]

### 2. *DeCoster I*

*DeCoster I* stated that under the Sixth Amendment an attorney has a duty to his client to be a diligent and conscientious advocate and to provide reasonably competent assistance. This standard of conduct is almost self evident. The court gave this general duty more specific content by listing some of counsel's responsibilities toward his client.[11]

> *v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) with *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). The appropriate standard for ineffective assistance of counsel, set forth in *Bruce, supra,* is whether gross incompetence blotted out the essence of a substantial defense. 138 U.S.App.D.C. at 340, 427 F.2d at 610.

**11.** The *DeCoster I* guidelines were as follows: *In General*—Counsel should be guided by the American Bar Association Standards for the Defense Function. They represent the legal profession's own articulation of guidelines for the defense of criminal cases.
*Specifically*—(1) Counsel should confer with his client without delay and as often as necessary to elicit matters of defense, or to ascertain that potential defenses are unavailable. Counsel should discuss fully potential strategies and tactical choices with his client. (2) Counsel should promptly advise his client of his rights and take all actions necessary to preserve them. Many rights can only be protected by prompt legal action. The Supreme Court has, for example, recognized the attorney's role in protecting the client's privilege

No itemization of general duties, however, can serve as a check-off list of absolute, hard and fast rules such that the slightest deviation will constitute a constitutional error.[12] It would be wrong to construe *DeCoster I* as establishing such rigid guidelines. The duties listed in *DeCoster I* were phrased generally,[13] and most of them require the exercise of considerable judgment, discretion and adjustment to the widely varying facts of criminal cases. The

borderline between the adequate assistance (required by the Constitution) and inadequate assistance may vary greatly with the factual circumstances of each case.[14] In recognition of this, the American Bar Association Standards for the Defense Function, which the *DeCoster I* guidelines incorporate by reference, explicitly provide that they are *not* intended "as criteria for judicial evaluation of the effectiveness of counsel to determine the validity of a conviction." [15]

against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, [86 S.Ct. 1602, 16 L.Ed.2d 694] (1966), and rights at a line-up, *United States v. Wade*, 388 U.S. 218, 227, [87 S.Ct. 1926, 18 L.Ed.2d 1149] (1967). Counsel should also be concerned with the accused's right to be released from custody pending trial, and be prepared, where appropriate, to make motions for a pre-trial psychiatric examination or for the suppression of evidence. (3) Counsel must conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed. The Supreme Court has noted that the adversary system requires that "all available defenses are raised" so that the government is put to its proof. This means that in most cases a defense attorney, or his agent, should interview not only his own witnesses but also those that the government intends to call, when they are accessible. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. And, of course, the duty to investigate also requires adequate legal research.
159 U.S.App.D.C. at 332–33, 487 F.2d at 1203–04.

**12.** In *Marzullo v. Maryland*, 561 F.2d 540 (4th Cir. 1977), *cert. denied*, 435 U.S. 1011, 98 S.Ct. 1885, 56 L.Ed.2d 394 (1978), the Fourth Circuit recently came to the same conclusion. *Coles v. Peyton*, 389 F.2d 224 (4th Cir. 1968), had imposed specific requirements for counsel's preparation of his client's defense. In adopting a "normal competency" approach, *see* note 6 *supra*, the court stated:

While the normal competency standard does not purport to list the things counsel should or should not do, it does not preclude resorting to specifics for ascertaining the "range of competence demanded of attorneys in criminal cases." . . . We adhere to [the list of duties in *Coles*] for it is a definitive, objective description of the competency normally demanded of counsel in certain aspects of their service.

The normal competency standard is necessarily broad and flexible because it is designed to encompass many different factual situations and circumstances. Consequently,

its fair and effective administration rests primarily on the district judges. . . .

In exercising its discretion, a trial court may refer to other sources to determine the normal competency of the bar. Among these are precedent from state and federal courts, state bar canons, the American Bar Association Standards Relating to the Defense Function [App. Draft 1971], and in some instances, expert testimony on the particular conduct at issue. These, of course, do not supplant the test that we have prescribed, but they can aid in objectively ascertaining the range of competency normally expected of attorneys practicing criminal law.
561 F.2d at 544–45.

**13.** For example, *DeCoster I* stated, *inter alia*, that "[c]ounsel must conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed." 159 U.S.App.D.C. at 333, 487 F.2d at 1204. Obviously, what is an "appropriate investigation" varies with each particular case. The range of this responsibility to determine what investigation was necessary varies greatly from case to case; but whatever that duty might be, it must be a reflection of the general duty—to render reasonably competent assistance when acting as a diligent, conscientious advocate—as applied to the particular case.

**14.** Thus, when the accused admits his guilt to his attorney, or when the lawyer knows from other evidence that the evidence of guilt is overwhelming, or that his client is telling an untruthful story, a more limited investigation may be sufficient, whereas in another case it would not.

**15.** These standards are intended as guides for conduct of lawyers and as the basis for disciplinary action, *not as criteria for judicial evaluation of the effectiveness of counsel to determine the validity of a conviction*; they may or may not be relevant in such judicial evaluation of the effectiveness of counsel, *depending upon all the circumstances.*
American Bar Association Project on Standards for Criminal Justice, *Standards Relating*

Thus, while counsel has certain general duties to his client, the exact nature of these duties varies with the case, and counsel's competent judgment exercised in the best interests of his client should be afforded great weight, as should that of the trial judge with his first hand knowledge of the proceedings. In short, whether counsel has breached his duty depends upon the facts in each case.

> to the *Prosecution Function and the Defense Function* 11 (Approved Draft, 1971), § 1.1(f).
>
> As to the danger of using the guidelines as mandatory standards to be applied in determining the validity of criminal convictions, note the chambers opinion of Justice Blackmun in *Nebraska Press Assn. v. Stuart*, 432 U.S. 1327, 96 S.Ct. 251, 46 L.Ed.2d 237 (1975), where the Justice commented on the Nebraska trial court's adoption of the Nebraska Bar-Press Guidelines for Disclosure and Reporting of Information Relating to Imminent or Pending Criminal Litigation:
>
>> Without rehearsing the description of those Guidelines set forth in my prior opinion, it is evident that they constitute a "voluntary code" which was not intended to be mandatory. Indeed, the word "guidelines" itself so indicates. They are merely suggestive and, accordingly, are necessarily vague.
>
> 432 U.S. at 1330, 96 S.Ct. at 254. The ABA Standards contain the same caveat.
>
> Consider also the statement of Judge Harold Medina of the Second Circuit, which was made on November 20, 1976 and concerned the use by some judges of the American Bar Association's guidelines on fair trial and free press: "Judge after judge and court after court took these voluntary guidelines and turned them into a piece of concrete." New York Times, Nov. 21, 1976, p. 62, c. 3. Courts and lawyers should not make that error with respect to the American Bar Association Standards for the Defense Function referred to in *DeCoster I*. Mere failure to adhere to such guidelines does not amount to a constitutional violation.
>
> Justice Kaplan of the Supreme Judicial Court of Massachusetts made this point quite well in his oft-quoted opinion in *Commonwealth v. Saferian*, 366 Mass. 89, 95, 315 N.E.2d 878, 882–83 (1974):
>
>> The decided cases try to express or approximate in varying forms of words a general standard for determining whether "assistance of counsel" has been provided an accused person within the meaning of the Sixth Amendment. It has been said that the standard is not met where inadequacy of counsel has turned the proceedings into "a farce and a mockery," or has created

Once a defendant establishes a breach of duty by his counsel, *DeCoster I, supra*, still requires that the defendant demonstrate that this breach constitutes a "substantial violation."

If a defendant shows a *substantial violation* of any of these requirements he has been denied effective representation unless the government, "on which is cast the burden of proof once a violation of these

>> "an apparency instead of the reality of contest and trial." Some cases call for "counsel reasonably likely to render *and rendering* reasonably effective assistance." Still others speak of situations where "the attorney has in effect blotted out the substance of a defense." But whatever the attempted formulation of a standard in general terms, what is required in the actual process of decision of claims of ineffective assistance of counsel, and what our own decisions have sought to afford, is *a discerning examination and appraisal of the specific circumstances of the given case* to see whether there has been *serious incompetency, inefficiency, or inattention* of counsel—behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer—and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defence. [emphasis added.]

This well states my view that the failure to comply with the duty must be a "*substantial violation*" as *DeCoster I* noted, or *gross incompetence* with substantial prejudice as set forth in *Bruce* and *Scott*. Thus, in Sixth Amendment cases, the defendant must produce evidence showing a *direct* inference of substantial prejudice to the constitutional right of the accused to the assistance of counsel, or such prejudice to his Sixth Amendment right may be shown *indirectly* by evidence that he was denied the essence of a fair trial, *i. e.*, prejudice actual or inherent. Thus the mere showing of some inadequacy in complying with any list of duties, *i. e.*, as stated by *DeCoster I*, does not necessarily satisfy the requirement to show prejudice and thereby shift the burden of proceeding. The inadequacy of counsel must, by proof of "gross incompetence" (*Bruce* and *Scott*) in his performance or substantial impact on the result, be shown to constitute a "substantial violation." *See DeCoster I*. What is required is a showing that the violation itself, or the violation when added to the consequences, was so prejudicial to defendant's constitutional *right*, as to effectively deny him the assistance of counsel that the constitution requires.

precepts is shown, can establish lack of prejudice thereby." *Coles v. Peyton,* 389 F.2d 224, 226 (4th Cir. 1968).

159 U.S.App.D.C. at 333, 487 F.2d at 1204 (emphasis added). The deficiencies in this formulation are set out in the plurality opinion. In addition, what was meant by "substantial violation" is not clearly articulated in *DeCoster I. United States v. Pinkney,* 177 U.S.App.D.C. 423, 543 F.2d 908 (1976), decided subsequently, indicates that "substantial violation" contemplates a showing that counsel's duty to the defendant was breached substantially and that this prejudiced the defendant.

In *Pinkney,* appellant alleged inadequate assistance of counsel. The court rejected Pinkney's claim, holding that a *DeCoster I* motion is one for a new trial in which the defendant bears the same obligation to show prejudice to his cause as in any other new trial motion:

The vehicle [for raising an inadequate assistance of counsel claim], we said [in *DeCoster I*], was a motion for a new trial, obviously one presenting new evidence in the sense of evidence outside the record—in other words, a new-trial motion based on newly discovered evidence. An essential characteristic of such a motion is a disclosure of evidence portraying the movant's claim materially and resolutely, and evincing a capability of mounting a serious challenge. By the same token, *a motion charging ineffective assistance of counsel must set forth evidence upon which the elements of a constitutionally deficient performance might properly be found.*

177 U.S.App.D.C. at 431, 543 F.2d at 916 [footnote omitted] (emphasis added). The court then cited several cases, each of which unambiguously states that a defendant must show prejudice to sustain his new trial motion.[16] According to *Pinkney,* therefore,

---

**16.** Judge Robinson's footnote 58 in *Pinkney* cited four cases: *Newsome v. Smyth,* 261 F.2d 452 (4th Cir. 1958), *cert. denied,* 359 U.S. 969, 79 S.Ct. 883, 3 L.Ed.2d 837 (1959); *United States v. Frame,* 454 F.2d 1136 (9th Cir.), *cert. denied,* 406 U.S. 925, 92 S.Ct. 1794, 32 L.Ed.2d 126 (1972); *United States v. Norman,* 402 F.2d 73 (9th Cir.), *cert. denied,* 397 U.S. 938, 90 S.Ct. 949, 25 L.Ed.2d 119 (1970); and *Dansby v. United States,* 291 F.Supp. 790 (S.D.N.Y.1968).

While *Newsome* was based in part on an application of the farce and mockery test, which we reject as other than an expression that substantial unfair prejudice must be shown, that decision clearly reflects the view that the defendant is expected to demonstrate some sort of prejudice:

[Petitioner] attacks the sufficiency of his personally selected counsel, who conducted his defense in the original trial, principally because his counsel failed to have the prisoner take the witness stand and did not specify the grounds of his motion to set aside the verdict. He also contends that he should have been granted additional time, after the verdict, in which to produce additional witnesses in his behalf, but he did not identify the prospective witnesses or suggest the nature of the testimony he hoped to obtain. Clearly these contentions are without merit. . . . Obviously, it cannot be said that counsel's determination as a matter of trial tactics, not to put his client upon the witness stand, under these circumstances, converts the trial into a farce or a mockery of justice. Indeed, it may be the wise, or even the only prudent,

course to take. Having had a full trial, the defendant clearly is not entitled to a retrial upon the basis of an *unsupported statement that he would like additional time to produce unidentified witnesses whose possible testimony was not disclosed.*

261 F.2d at 454 (emphasis added).

*Frame* flatly states:

Turning to the merits, we hold that the motion for new trial was properly denied. *No showing was made of possible prejudice from the alleged conflict. See Davidson v. Cupp,* 446 F.2d 642 (9th Cir. 1971), and cases cited.

454 F.2d at 1138 (emphasis added).

*Norman* states that the facts there alleged for a new trial were insufficient because "that fact would not have undermined the Government's case in the least." 402 F.2d at 78. In other words, the defendant failed to sustain his burden of demonstrating prejudice.

*Dansby* is perhaps the most explicit of all these cases in its statement:

Motions for a new trial are not favored and should be granted only with great caution. *The burden of proving the necessity for a new trial is on the petitioner. He must satisfy the court that the jury might have reached a different result without the challenged testimony, or that had the subsequent testimony been presented at the trial it would have "probably" produced a different result.*

291 F.Supp. at 794.

prejudice to the accused is a necessary element of a claim of a "constitutionally deficient performance" by counsel.[17]

In summary, under *DeCoster I* and our prior decisions, the defendant lacks a substantial claim unless he makes out a *prima facie* case showing (1) that counsel's constitutional duty toward him was breached and (2) that he suffered unfair prejudice as a result of that breach. The burden of proof to make this showing falls squarely on the defendant.[18]

### B. *Fifth Amendment Analysis*

A defendant's right to adequate assistance of counsel is derived from both the Fifth and the Sixth Amendments. Therefore, the Supreme Court's treatment of cases involving purported violations of the Fifth Amendment is relevant. In such cases the Court has required that defendants prove prejudice.[19]

**17.** 177 U.S.App.D.C. at 431, 543 F.2d at 916; *quoted supra* at 17.

**18.** While all the circuits have addressed the question of the standard for the duty owed by counsel to the criminal defendant, *see* note 6 *supra*, fewer circuits have addressed the question of the proper procedure for determining when a violation occurs, *cf.* note 24 *infra*. Yet the circuits seem to be in accord that the burden to show inadequacy of counsel rests upon the defendant.

For example, the Seventh Circuit, in an opinion by then-Judge Stevens, in *Matthews v. United States*, 518 F.2d 1245, 1246 (7th Cir. 1975) stated:

> Whenever we are asked to consider a charge that counsel has failed to discharge his professional responsibilities, we start with a presumption that he was conscious of his duties to his clients and that he sought conscientiously to discharge those duties. *The burden of demonstrating the contrary is on his former clients.* [emphasis added.]

*Accord, United States v. Sielaff*, 542 F.2d 377, 379 (7th Cir. 1976) ("a petitioner . . . *must prove*" (emphasis added; *see* note 6 *supra*)).

The Third Circuit stated in *United States v. Johnson*, 531 F.2d 169, 174 (3d Cir. 1976):

> The burden is on petitioner to demonstrate that the representation provided him by counsel was constitutionally inadequate. *United States v. Hines*, 470 F.2d 225, 231 (3d Cir. 1972); *United States v. Varga*, 449 F.2d 1280, 1281 (3d Cir. 1971).

The Tenth Circuit still follows the farce and mockery test, and that Circuit places the burden on the defendant as well. In *United States v. Baca*, 451 F.2d 1112, 1114 (10th Cir. 1971), the court stated:

> *The burden on an appellant* to establish a claim of ineffective assistance of counsel is a heavy one; *he must show* that due to his lawyer's ineptness the trial was a farce, a sham, or a mockery of justice. [emphasis added.]

The Eighth Circuit stated in *Brown v. Swenson*, 487 F.2d 1236, 1240 (8th Cir. 1973) as follows:

> It is well established that in order to show a basis for relief on the ground of ineffective assistance of counsel *the appellant must show* actions of his lawyer which would constitute such conscious conduct as to render pretextual the attorney's legal obligation to fairly represent the appellant and circumstances which demonstrate that which amounts to a lawyer's deliberate abdication of his ethical duty to his client. [emphasis added.]

*McQueen v. Swenson*, 498 F.2d 207, 216 (8th Cir. 1974) agreed in different terms:

> We recognize that there is and should be a presumption that counsel is competent, *which must be overcome by the petitioner* in order for an ineffective assistance of counsel claim to lie. [emphasis added].

The Second Circuit, still follows a farce and mockery standard and clearly places a heavy burden upon the appellant. *United States v. Yanishefsky*, 500 F.2d 1327, 1334 (2d Cir. 1974):

> Upon careful examination of the record reflecting the character of the "resultant proceedings," . . . and of appellant's specific allegations, we find that taken individually and collectively, . . . they fail to meet the "stringent standards to be met to show inadequacy of counsel" . . ..

The Fifth Circuit stated in *Burston v. Caldwell*, 506 F.2d 24, 28 (5th Cir. 1975), quoting *Tyler v. Beto*, 391 F.2d 993 (5th Cir. 1973), *cert. denied*, 393 U.S. 1030, 89 S.Ct. 642, 21 L.Ed.2d 574, that the petitioner has a "heavy burden" to establish ineffective assistance of counsel. The Ninth Circuit also appears to be in accord with these decisions, *Cooper v. Fitzharris*, 586 F.2d 1325, 1331, 1333 (9th Cir. 1978) (en banc), *see* n. 29, *infra*.

Thus it appears that our approach is consistent with the predominant view in the other circuits.

**19.** *See Estes v. State of Texas*, 381 U.S. 532, 542, 85 S.Ct. 1628, 1632–1633, 14 L.Ed.2d 543 (1965) ("in most cases involving claims of due process deprivations we require a showing of identifiable prejudice to the accused.")

In *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), for example, petitioner claimed that his rights were violated when members of the jury heard news accounts about his case. The Supreme Court found no violation of his constitutional right:

> *Petitioner* has failed to show that the setting of the trial was inherently prejudicial or that the jury-selection process of which he complains permits an inference of actual prejudice.

421 U.S. at 803, 95 S.Ct. at 2038 (emphasis added). The court thus refers to the two types of prejudice that must be shown—inherent and actual prejudice. In *Murphy*, the Court refused to presume that the trial was unfair. The defendant was required to bear the initial burden of showing prejudice; only after such proof would the government be required to show the lack of prejudice or harmless error.

Similarly, in *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), which emanated from this court, defendant claimed that her rights were violated by prosecutor's failure to inform her of her victim's criminal record. The Supreme Court rejected this argument even though she had not been so informed:

> [T]he prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial. . . .
> *If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial.*

427 U.S. at 108, 112–13, 96 S.Ct. at 2400, 2402 (emphasis added). Since the victim's criminal activities did not cast doubt on the verdict, the defendant's conviction was upheld—obviously because of the defendant's failure to prove prejudice.

While *Agurs* does not explicitly deal with the burden of proof issue, it strongly indicates that the Supreme Court would be reluctant to presume the existence of a constitutional violation from the mere failure to comply with a single guideline where "there is no reasonable doubt about guilt." The *Agurs* court indicated that it was concerned with the "justice of the finding of guilt." 427 U.S. at 112, 96 S.Ct. at 2401.[20] If the logic of the dissent here had been followed in *Agurs*, once it was shown that the government had not disclosed the victim's criminal record, the government would have been required to bear the burden of proving lack of prejudice to the defendant. The Supreme Court refused to impose such a completely impractical burden.

There will be a few cases in which, because of the inadequacy of counsel, exculpatory evidence is lost. But in light of Fifth Amendment cases like *Murphy* and *Agurs*, courts should be wary of declaring certain acts or omissions of counsel, without proof of prejudice, to be *per se* constitutional violations that in the absence of refutation are sufficient to negate a criminal conviction. Where the Sixth Amendment is relied upon, the defendant must always show by direct or indirect evidence that the complained of acts or omissions by counsel were the legal equivalent of the denial of his right "to have the Assistance of Counsel for his defence." That is what the Sixth Amendment is all about.

### C. Common Law Principles

The dissent argues that once a violation of any duty is demonstrated, even though no prejudice is shown, the government has the burden of showing that the defendant was not prejudiced. This shifting of the burden of proof from the proponent to the Government is inconsistent with common law principles.[21] In *Nader v. Allegheny Airlines, Inc.*, 167 U.S.App.D.C. 350, 361, 512 F.2d 527, 538 (1975), *rev'd on other*

---

**20.** *Accord: Stone v. Powell*, 428 U.S. 465, 490, 96 S.Ct. 3037, 3050, 49 L.Ed.2d 1067 (1976) ("the ultimate question of guilt or innocence . . . should be the central concern in a criminal proceeding.").

**21.** *Cf.* IX Wigmore on Evidence § 2486, at 274–76 (3d ed.1940):

> It is often said that the burden is upon the *party having in form* the affirmative allegation. But this is not an invariable test. . . .

*grounds,* 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976) we delineated two criteria for allocating the burden of persuasion. [1] Although a plaintiff generally carries the burden of persuasion on each element of his cause of action, special circumstances may lead a court to shift the burden of persuasion to the defendant on some part of the claim. [2] One special circumstance commonly accepted is that the burden will be shifted where the material necessary to prove or disprove an element "lies particularly within the knowledge" of the defendant.

167 U.S.App.D.C. at 361, 512 F.2d at 538. Thus, normally the burden should lie on the person pressing the claim;[22] an exception may be made when the other party has sole access to the facts.

In the instant case, Decoster has the primary access to the relevant facts; the government is highly restricted in its ability to discover them because of the attorney-client privilege and the Fifth Amendment privilege against self-incrimination. Moreover, normally it is the defendant who raises the inadequate assistance of counsel claim (here it was raised by the appellate court *sua sponte* ). Therefore, the twin policies of placing the burden of proof on the person pressing the claim and placing the burden on the person with access to the facts are both satisfied by holding that Decoster bears the burden of proving a *prima facie* Sixth Amendment violation which includes a showing of prejudice.

> It is sometimes said that it is upon the party *to whose case the fact is essential*
> . . . .
> [In other cases] the burden of proving a fact is said to be put on the *party who presumably has peculiar means of knowledge* enabling him to prove its falsity if it is false.
> . . .
> The truth is that there is not and cannot be any one general solvent for all cases. It is merely a question of policy and fairness based on experience in the different situations. . . .
> There are merely specific rules for specific classes of cases, resting for their ultimate basis upon broad reasons of experience and fairness.

**22.** *Decoster* is a criminal appeal case, but, as we have held, it is not a denial of due process

## D. Attorney-Client Relationship and the Adversary System

The formula suggested by the dissent for determining when a defendant has not received effective assistance of counsel—*presuming* prejudice from scanty evidence and then shifting the normal burden of proof to the Government to disprove the existence of prejudice—would have very detrimental consequences to the adversary system. The Government would be forced to attempt to produce proof entirely from the acts and privileged discussions of the accused and his counsel and to make its showing long after the trial, when memories have faded—as they have here.[23] In addition to creating an almost impenetrable obstacle to sustaining convictions in many cases, such requirement would lead to highly objectional intrusions into the adversary system in most cases. Shifting the burden to the Government would force it to get very involved in a relationship that it should stay out of.

If the Government were required to prove that its adversary defense counsel was adequate, it would be strongly motivated and well advised during a criminal trial, in order to protect the prospect of guilty verdicts, to oversee the major decisions and activities of defense counsel and the accused that affect the trial. Performing this function would, as a practical matter, require the prosecution to probe what has heretofore been a sacrosanct area—the highly confidential relationship between a criminal defendant and his lawyer. Some

to place on a defendant the burden of proving a claim that is separate from the elements of the crime charged. *United States v. Greene,* 160 U.S.App.D.C. 21, 31–32, 489 F.2d 1145, 1155–56 (1973), *cert. denied,* 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 190 (1977). As Justice Holmes remarked in *Casey v. United States,* 276 U.S. 413, 418, 48 S.Ct. 373, 374, 72 L.Ed. 632 (1928):

> It is consistent with all the constitutional protections of accused men to throw on them the burden of proving facts peculiarly within their knowledge and hidden from discovery by the Government.

**23.** Access to the facts was complicated by delay since Decoster was tried in 1971, yet the hearing on adequacy of assistance of counsel was not held until February 6, 1974.

tension in this area unavoidably exists when the defendant makes a *prima facie* showing of prejudicial conduct constituting a constitutional violation, and the Government seeks to rebut that showing. Presuming prejudice from certain minimal facts that do not constitute a full *prima facie* case and then switching the burden of proof to the Government (which has limited access to the defendant's information) to prove that no prejudice resulted would heighten that tension inexorably.

To the extent that the prosecutor during trial might implore the trial judge to correct or direct the decisions or acts of defense counsel, or the accused, to prevent presumptive prejudice which would redound against the Government (though it in no way participated in such conduct or decisions), the result could well be judicial supervision of many of the tactical trial decisions of defense counsel. The hazards of creating such a rule were described by Judge Prettyman in *Mitchell v. United States, supra:*

> [T]he constitutional right of an accused to the assistance of counsel might well be destroyed if counsel's selections upon tactical problems were supervised by a

judge. The accused is entitled to the trial judgment of his counsel, not the tactical opinions of the judge. Surely a judge should not share the confidences shared by client and counsel. An accused bound to tactical decisions approved by a judge would not get the due process of law we have heretofore known. And how absurd it would be for a trial judge to opine that such-and-such a course was ineffective or incompetent because it persuaded him (the judge) to decide thus-and-so adversely to the accused.

104 U.S.App.D.C. at 63, 259 F.2d at 793. These difficulties can be avoided by leaving the burden of proof in most cases on the defendant to show substantial unfair prejudice from the acts or omissions of counsel. Such showing would constitute a *prima facie* case of a Sixth Amendment violation, and the burden of proceeding would then be cast on the Government to disprove the *prima facie* case and failing that the accused would prevail.[24]

### E. Sixth Amendment Framework

To summarize, Sixth Amendment right to "assistance of counsel" cases can be divided into two categories: (1) those in which the accused is actually denied the assistance of

---

**24.** Our refusal to relieve defendant from the burden of proving prejudice, through the device of presuming it, is supported by *Tollett v. Henderson,* 411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973), a case with strong Sixth Amendment overtones. In *Tollett,* the Court announced a standard to determine when a criminal defendant who pleads guilty on the advice of counsel is entitled to federal collateral relief on proof of an independent constitutional defect in the prior proceedings (there, the method of selecting the indicting grand jury):

> In order to obtain his release on federal habeas under these circumstances, respondent must not only establish the unconstitutional discrimination in selection of grand jurors, *he must also establish that his attorney's advice to plead guilty without having made inquiry into the composition of the grand jury rendered that advice outside the "range of competence demanded of attorneys in criminal cases."*

411 U.S. at 268, 93 S.Ct. at 1608–1609 (emphasis added). The Court also stated:

> If a prisoner pleads guilty on the advice of counsel, *he must demonstrate* that the advice was not "within the range of competence demanded of attorneys in criminal

cases," *McMann v. Richardson,* [397 U.S. 759], at 771 [, 90 S.Ct. 1441 at 1449, 25 L.Ed.2d 763].

411 U.S. at 266, 93 S.Ct. at 1608 (emphasis added). Unlike *Murphy* and *Agurs* which are Fifth Amendment cases, *McMann* is specifically concerned with Sixth Amendment rights. The Court stated that the competence demanded of attorneys devolves from the Sixth Amendment:

> Whether a plea of guilty is unintelligent and therefore vulnerable when motivated by a confession erroneously thought admissible in evidence depends as an initial matter, not on whether a court would retrospectively consider counsel's advice to be right or wrong, but on whether that advice was *within the range of competence demanded of attorneys in criminal cases.* On the one hand, uncertainty is inherent in predicting court decisions; but on the other hand *defendants facing felony charges are entitled to the effective assistance of competent counsel.* Beyond this we think the matter, for the most part, should be left to the good sense and discretion of the trial courts with the admonition that if the *right to counsel guaranteed by the Constitution*

counsel, and (2) those in which his constitutional right to the assistance of counsel is denied by virtue of the ineffective representation that counsel rendered. The classic case involving the actual denial of counsel is *Gideon v. Wainwright* : [25] no defense coun-

is to serve its purpose, defendants cannot be left to the mercies of incompetent counsel, and that judges should strive to maintain proper standards of performance by attorneys who are representing defendants in criminal cases in their courts.

397 U.S. at 770–71, 90 S.Ct. at 1448–1449 (emphasis added). The reference to *McMann* in *Tollett* makes clear that the Supreme Court in some circumstances involving alleged Sixth Amendment violations approves of placing the burden to demonstrate the incompetence of counsel *on the defendant.* There is no indication in *Tollett* that the defendant should be relieved of this burden by presuming incompetence of counsel in certain situations except those obvious instances where unfair prejudice *to his constitutional right* can be directly inferred from the evidence. Thus, *Tollett* suggests that *presumptions* of prejudice *merely* from the acts of omissions of counsel in the conduct of the defense should not be indulged.

While the procedure advocated here is consistent with the Supreme Court's decisions, it differs in certain respects from that adopted in other circuits. For example, in *McQueen v. Swenson*, 498 F.2d 207 (8th Cir. 1974), *writ dismissed*, 425 F.Supp. 373 (E.D.Mo.1976), *rev'd and remanded*, 560 F.2d 959 (8th Cir. 1977), the court discussed the precepts that govern the procedure for determining violations of the right to the adequate assistance of counsel in the Eighth Circuit. In that case Judge Bright stated that the burden is on the defendant to substantiate a claim of inadequate assistance—a proposition with which we agree:

We recognize that there is and should be a presumption that counsel is competent, which must be overcome by the petitioner in order for an ineffective assistance of counsel claim to lie.

498 F.2d at 216. The opinion further stated that evaluation of a habeas corpus petition alleging inadequate assistance of counsel is a two-step process: first, determining whether there has been the violation of a duty owed by a defense attorney to his client; and second, determining whether that failure prejudiced the defense. 498 F.2d at 218. We agree that inadequate assistance analysis has several components: the defendant, unless the violation and the substantial unfair prejudice to his constitutional right are apparent on the face of the record, must demonstrate (1) the existence of a duty owed him by his counsel, and (2) a substantial violation of that duty (3) which results in substantial unfair prejudice to his case and thence to his right. However, Judge Bright appears to be of opinion that a very limited investigation would constitute a constitutional violation, and that determining the existence of prejudice was in effect determining whether the constitutional error was harmless under *Chapman. Id.* It is our view that the constitutional violation is not made out *until* the defendant has carried his complete burden; at that point in inadequate assistance cases, the analysis is over and the harmless error doctrine does not apply. Applying the *Chapman* test to an inadequate assistance case requires that the court deem the denial of adequate assistance "nonsubstantial," since the *Chapman* harmless error doctrine, by its own terms, does not apply to "constitutional errors that 'affect substantial rights' of a party." 386 U.S. at 23, 87 S.Ct. at 828.

It is important to recognize, however, the similarities between our approach and that adopted by the Eighth Circuit. Judge Bright's conclusion in *McQueen* summarizes that circuit's procedure as follows:

What we are saying is that, here, the petitioner must shoulder an initial burden of showing the existence of admissible evidence which could have been uncovered by reasonable investigation and which would have proved helpful to the defendant either on cross-examination or in his case-in-chief at the original trial. Once this showing is made, a new trial is warranted unless the court is able to declare a belief that the omission of such evidence was harmless beyond a reasonable doubt.

498 F.2d at 220. What we are saying in this case is that, unless the violation and substantial unfair prejudice is apparent to the court on the record, appellants must shoulder the initial burden and make a *prima facie* showing of all the elements of the burden we have outlined above. Then the burden of proceeding shifts to the Government to rebut this showing. After these showings, a new trial is not warranted unless the court determines that on the whole record it appears that the defendant has met his burden.

**25.** 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). Gideon was charged with a non-capital felony. His request for court appointed counsel was denied because Florida law only permitted appointment of counsel for indigents in capital cases. The Supreme Court reversed Gideon's conviction, holding that his constitutional right to the assistance of counsel had been denied.

sel was appointed. Other examples in which the assistance of counsel was actually denied include *Geders v. United States*[26] and *Herring v. New York*.[27] In both of those cases the defendant did not have the assistance of a lawyer at a critical stage in his trial.

The second category, which may be termed a constructive denial of counsel, includes cases in which defense counsel was present and able to participate in every aspect of the trial, but for one reason or another the defense presented is viewed as the equivalent of a denial of the constitutional right to the "assistance of counsel."

Cases in which the defense lawyer was ineffective fall into this second category: though the defendant was actually represented, his lawyer's performance was so ineffective that it was tantamount to a denial of his constitutional right.

If a defendant is denied the actual assistance of counsel, his constitutional right is violated without any further showing. A showing of such denial is all the prejudice that the Constitution requires, so when he is denied the "presence and assistance" of counsel at a critical phase of his trial a defendant need not prove further exactly how he was harmed.[28] But cases where

**26.** 425 U.S. 80, 91, 96 S.Ct. 1330, 1337, 47 L.Ed.2d 592 (1976) ("an order preventing petitioner from consulting his counsel 'about anything' during a 17-hour overnight recess between his direct- and cross-examination impinged upon his right to the assistance of counsel guaranteed by the Sixth Amendment").

**27.** 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975). The trial court's refusal to permit final argument in a non-jury case was held to be a violation of the Sixth Amendment.

**28.** Chief Justice Burger wrote for the Court in *Holloway v. Arkansas*, 435 U.S. 475, 489, 98 S.Ct. 1173, 1181, 55 L.Ed.2d 426 (1978):

[T]his Court has concluded that the assistance of counsel is among those "constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." *Chapman v. California*, supra, 386 U.S., at 23, [87 S.Ct. 824, at 827]. Accordingly, when a defendant is deprived of the presence and assistance of his attorney, either throughout the prosecution or during a critical stage in, at least, the prosecution of a capital offense, reversal is automatic. *Gideon v. Wainwright*, 372 U.S. 335 [83 S.Ct. 792, 9 L.Ed.2d 799] (1963); *Hamilton v. Alabama*, 368 U.S. 52 [82 S.Ct. 157, 7 L.Ed.2d 114] (1961); *White v. Maryland*, 373 U.S. 59 [83 S.Ct. 1050, 10 L.Ed.2d 193] (1963).

*See Matthews v. United States*, 145 U.S.App. D.C. 323, 332, 449 F.2d 985, 994 (1971) (Leventhal, J., concurring).

The dissent asserts that the distinction between "actual" and "constructive" denials of the assistance of counsel is a "verbal formalism [that] simply does not correspond to the reality of ineffective assistance." Dissent, n. 129. It contends that since an accused has a right to the effective, as well as the actual, assistance of counsel, cases involving an allegedly inadequate performance by defense counsel (e. g. failure to cross-examine certain witnesses; fail-

ure to make an opening statement) must be treated the same as cases in which the defendant did not have a lawyer or the lawyer was prevented from assisting his client in material ways (e. g. prevented from cross-examining witnesses or making an opening statement). *Id.* I disagree.

There is an obvious difference between cases in which counsel is present and able to exercise his judgment to use a certain tactic *vel non*, such as to cross-examine a witness, and cases in which the lawyer is denied the right to exercise that professional judgment which is basic to his representation. The Sixth Amendment right to have the assistance of counsel is primarily the right to have the benefit of a lawyer's judgment at all stages of a criminal trial. Cf. *Mitchell, supra* at —— —— of 199 U.S.App. D.C., at 229–230 of 624 F.2d. If that right is denied, then reversal is required without any further independent showing of prejudice. *Holloway, supra*. In addition the Supreme Court has applied a judicial gloss on the Sixth Amendment, holding that one's right to the assistance of counsel may be held to be denied when defense counsel is ineffective. *McMann v. Richardson, supra*, 397 U.S. 771 n. 14, 90 S.Ct. 1441. The dissent contends that because additional prejudice need not be shown in cases where there is an actual denial of counsel, it follows that prejudice is not an element of ineffectiveness cases either. Therefore the dissent argues that the only question is "whether defense counsel acted in the manner of a diligent and competent attorney . . .." Dissent —— of 199 U.S.App.D.C., 287 of 624 F.2d.

But determining whether counsel has been "*effective*" raises different questions than an inquiry into whether the assistance of counsel was actually *denied*. While the language of the Sixth Amendment focuses on whether an accused had "the Assistance of Counsel" at all, the judicial gloss is concerned with whether counsel was "effective" or "ineffective." And this may involve questions of degree. It is

counsel was present and assisting, and which involve allegations that a defendant's constitutional right to assistance of counsel was constructively denied as a result of the defense lawyer's ineffectiveness, are different. In these cases the question is: was the attorney's performance so deficient as to constitute the equivalent of a denial of the accused's constitutional right? And in case after case involving an alleged constructive denial of the assistance of counsel it has been held that a lawyer's ineffectiveness is not tantamount to denial of the constitutional right to the assistance of counsel unless the defendant can show that he was prejudiced.[29] Therefore in order to establish that his lawyer's ineffectiveness amounted to a Sixth Amendment violation, a defendant must show substantial unfair prejudice to his defense resulting from a substantial violation of duty owed him by his counsel.

To illustrate: suppose defense counsel, as frequently happens in criminal cases, does not call any witnesses.[30] Such an allegation would have no force unless it were shown that witnesses to beneficial material facts exist and the lawyer's failure to produce their testimony worked some substantial unfair prejudice to defendant's cause. If the defendant makes the requisite *prima facie* showing of a substantial violation of the constitutional duty owed him by counsel that resulted in substantial unfair prejudice to his defense, the burden of proceeding shifts to the Government.[31] Then the Government has a right to show, for example, that the alleged witnesses did not exist or could not be located, or that counsel was given no indication that such witnesses did exist, or that the testimony of the witnesses was irrelevant or otherwise deficient.[32] If

---

plain from a glance at any dictionary that when the Court used the term "ineffective" it was concerned with the *impact* that counsel's alleged failure may have on the trial. "Ineffective" means, "not producing the desired effect." *Webster's New World Dictionary of the American Language* (College Edition, 1968). If the Supreme Court had intended the one-dimensional inquiry proposed by the dissent it could have focused solely on competence or performance. Its use of the term "ineffective" is consistent with the view adopted by this and the plurality opinion that prejudice is an element of an accused's constitutional claim of ineffectiveness. Thus, the distinction that is drawn here between cases involving "actual" and "constructive" denials of the assistance of counsel is valid—it rests on the difference between the right explicitly granted in the Constitution and the different formulation of the right created by a judicial gloss on the Constitutional provision.

29. *See* cases cited *supra* at —— to —— of 199 U.S.App.D.C. at 219 to 226 of 624 F.2d. See also the recent decision in *Cooper v. Fitzharris*, 586 F.2d 1325, 1331 (9th Cir. 1978) (en banc), in which the court stated:

> When the claim of ineffective assistance of counsel rests upon specific acts and omissions of counsel at trial . . . relief will be granted only if it appears that the defendant was prejudiced by counsel's conduct.

30. In a great many criminal cases, the best, if not the only defense, is merely putting the government to its proof and attempting to convince the jury that the charge has not been proved beyond a reasonable doubt.

31. Judge Craven, dissenting in *Coles v. Peyton*, 389 F.2d 224, 230 (1968), hit the nub of the problem squarely:

> I think the correct rule is that the burden of showing lack of prejudice falls on the state when, *but only when,* the petitioner has shown a set of facts that demonstrate prejudice to his defense, inherently or otherwise.

(Emphasis in original). Thus, Judge Craven expressed his agreement with the view that the initial burden to show prejudice falls on the defendant, and the Government has nothing to rebut—and certainly no burden to proceed—until the defendant fulfills this burden. It is significant that the Fourth Circuit in *Jackson v. Cox*, 435 F.2d 1089, 1093 (1970) declined to apply the rule in *Coles*, which had presumed the existence of prejudice, to a case with facts very similar to the instant case.

This analysis is consistent with *United States v. Pinkney*, 177 U.S.App.D.C. 423, 431–32 n. 59, 543 F.2d 908, 916–17 n. 59 (1976), where Judge Robinson stated:

> Only if the evidentiary elements of that claim [of inadequate assistance of counsel] appeared in appellant's motion would he have been entitled to a hearing, and only if evidence offered at a hearing tended to establish the elements would the Government have been summoned to disestablish prejudice.

32. Where the conduct of trial counsel is questioned, since his professional standing is directly involved, he should be permitted to participate as a third party in that proceeding on an equal basis with the Government.

despite the Government's effort to rebut the evidence presented by the defendant, the defendant eventually carries his burden—he demonstrates that a substantial violation of a duty owed him by counsel resulted in substantial unfair prejudice to his defense—then a constitutional violation has occurred.[33]

Applying this test to the instant case, it is clear that Decoster's Sixth Amendment right was not infringed. First, Decoster has great difficulty demonstrating that there was a substantial breach of duty by his lawyer. Judge Waddy's findings to the contrary have not been shown to be clearly erroneous. I agree that counsel is under an obligation to investigate non-fabricated defenses, but the facts here overwhelmingly support Judge Waddy's finding that the only possible defense for Decoster was to put the Government to its proof. From the entire record, it is my view that Decoster's lawyer concluded that he was guilty after: (1) participating in the preliminary hearing; [34] (2) six interviews with appellant; [35] (3) studying the government's file, to which he had access; [36] (4) reviewing the grand jury testimony; [37] (5) reading the transcript of the preliminary hearing; [38] and (6) receiving a letter from Decoster in which he admitted that he was fighting with the victim at the time of the robbery.[39] In

33. *Beasley v. United States,* 491 F.2d 687 (6th Cir. 1974). *See Glasser v. United States,* 315 U.S. 60, 75–76, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

34. Trial counsel attributed his knowledge to the fact that he had conferences with the prosecutors and that he conducted the preliminary hearing for all three defendants. Tr., Feb. 6, 1974, at 34–35; Tr., Feb. 11, 1974, at 12–14.

35. Findings and Conclusions, at 6, 10.

36. Tr., Feb. 11, 1974, at 11–14.

37. Tr., Feb. 11, 1974, at 11, 12–14.

38. Tr., Feb. 6, 1974, at 34; Tr., Feb. 11, 1974, at 12–13.

39. Tr., Feb. 6, 1974, at 24–25. Appellant prepared a handwritten letter to counsel, which counsel testified was received by him either the day of, one day before, or two days before trial, *id.* at 24, which was held on November 15–16, 1971. Decoster testified that he wrote the letter during three weeks of September 1971 when he was confined at the jail (Tr. Feb. 6, 1974, 59–60). Later he changed his testimony and stated that he wrote the letter between May and November 1970 (*id.* 60–61). Thus, the precise date cannot be fixed and both appellant and counsel in the passage of time since the event have a valid excuse for not remembering the precise date. If the letter was written between May and November, 1970, as Decoster testified, his counsel had this admission of his involvement at a very early date. The view that the letter was sent at this time is corroborated by the fact that Decoster made a similar statement in a letter to Judge Waddy dated November 4, 1970. Decoster's letter to his counsel, Government Exhibit # 2, was as follows:

200. 19th St. S.E.
Wash., D.C.

Dear Sir:

As I tried to call you before, but couldn't make contact, I decided to write again. Its important I see you, as you are my lawyer and I don't have ways of fighting my case without you. To get to the point, I want to file assault charges against my accuse *[sic]* victim. I think I have as much right as he has, at least I'm entitle *[sic]* to it. If they can charge me with robbery while fighting, I think I have as much right as him, and can do the same. As for Elley *[sic]* & Taylor my accuse *[sic]* partners they can testify their role. Elley *[sic]* came to my aide *[sic]* when the victim stuck his hand in his pocket & Taylor was just standing on the sidewalk. I hope you can do something about this as soon as you get this letter. Please let me know something. If he can be free so can I.

Willie Decoster
Dorm D.C.D.C. 162743

This letter clearly admits Decoster's participation in the robbery with his "accuse[d] partners." The letter is ample justification for counsel not to look for alibi witnesses.

Appellant also sent a handwritten note to Judge Waddy, which was received by him on November 4, 1970 and filed on November 13, 1970. *See* Tr., Feb. 6, 1974, at 62. This letter follows without corrections (emphasis added):

Honorable Judge Waddy,

I am an Inmate of D.C. Jail who has been incarcerated for five month on a charge that has been change from robbery to arm robbery. The motive for this letter is to request from the court another lawyer because I've been misrepresented for five month with my present lawyer . . . .. Also I would like to protect myself and family which consist of nine more younger than I am, which are barely being supported because my father is the only capable one. The rest is trying to get something I miss. Education. Being an

addition, counsel, who acted for all defendants at the preliminary hearing,[40] knew that both men who were with Decoster at the time of the robbery had pleaded guilty to that charge on June 18, 1971. Under such circumstances, an extensive investigation was not warranted.

More important, there is not a shred of evidence in the record suggesting that Decoster was prejudiced in any way by the conduct of his counsel. We now know, on the basis of Decoster's admission at sentencing on March 3, 1972, that he was guilty, and this is corroborated by a letter he wrote to the Judge which the court referred to at sentencing and which Decoster then acknowledged.[41] Even without Decoster's admissions, it would be hard to imagine a case with more certain proof of guilt and with less room for creditable contrary evidence. Two policemen actually observed Decoster committing the robbery in broad daylight; one of them chased him and *without losing sight of him,* arrested him. (The dissent shades the facts by stating that the police

officers "found" Decoster. Dissent page —— of 199 U.S.App.D.C., page 267 of 624 F.2d.) Decoster was identified on the spot by the victim and one of Decoster's confederates contradicted Decoster's alibi when he testified that Decoster was present at the scene of the robbery. With this factual background, it is not, and cannot be, contended that Decoster was innocent. Even the most extensive investigation could not have discovered exculpatory facts, for there were none to find. Since any failure on the part of defense counsel to investigate was not prejudicial to Decoster, Decoster's Sixth Amendment right to have the assistance of counsel was not violated.

## II.  THE DISSENT'S POSITION ON THE BURDEN OF PROOF

Since Decoster has been wholly unable to show that he was prejudiced as a result of his lawyer's alleged inadequacies, the dissent is forced to argue that the burden of proof is on the government to show that

---

individual of limited education its only natural for me to protect my innocence and with the transcript from my hearing which I cannot obtain because of illegal counseling. *I can prove that I am only guilty of assault by self defence.* But the court says I must wait until Jan. 12, 1971 at my trial to prove my innocence which I think is unconstitutional because there is no evidence or witness of robbery. I was accepted by Blackman Development Center on Oct. 12, but my lawyer hadn't file a motion for bond review. So there was another one of his promise of what he would do. So Your Honor it would be a pleasure if I could speak to you in behave of this case and the way its been handled for the last five month. It could not be explain in writing so I ask this opportunity for a lawyer and justice. I would be to happy if you would consider this letter soon as possible.

Both of these written notes completely contradict the testimony Decoster gave on the stand (Tr., Nov. 16, 1971, at 30–34). The statements in the letter prove his participation in the events constituting the robbery and the falsity of any claim of alibi. His testimony in court is also contradicted by the testimony of all the witnesses, including his accomplice Eley. In the hearing on remand, Decoster reiterated his trial testimony of November 16, 1971 that he was not at the scene (Tr., Feb. 6, 1974, at 65–68). But in so doing, he stated his letter to his counsel was a fabrication (*Id.* at 71). He

also testified on remand, in contradiction to his trial testimony, that he had never seen Eley before he was arrested (*Id.* at 65), and he claimed that Eley's testimony at trial was fabricated (*Id.* at 71).

**40.** He represented Decoster and Taylor, and Eley's counsel asked no questions.

**41.** Tr., Mar. 3, 1972 (sentencing), at 3–4:

THE COURT:  .  .  .  the Court has received a long letter from the Defendant, himself, stating that he has learned the error of his ways and that he has found out that he was fooling with the wrong crowd, and that he had been using drugs and he now knows that the use of drugs could lead only to death or jail, neither one of which is acceptable to him.

Mr. DeCoster, do you have something you want to say on your own behalf?

DEFENDANT: I just wanted the Court to know that I was sincere in writing this letter. I feel like I can be—well, I know I can be rehabilitated which I have did on my part in having to come to face the facts. It just seems like, you know—well, really, I left home when I was at an early age and I didn't have that much confidence and I just hooked up in the wrong places and in the wrong ways. But now I believe that I can—I know that given an opportunity that I can help my family as well as myself. So I ask this Court upon sentencing me to consider this.

Decoster was not prejudiced.[42] In addition to *DeCoster I*[43] and the dissenting opinion in *Cooper v. Fitzharris,* 586 F.2d 1325 (9th Cir. 1978) (en banc),[44] which are obviously not controlling, my dissenting colleagues rely primarily on three cases: *Geders v. United States,*[45] *Holloway v. Arkansas,*[46] and *Chapman v. California.*[47] They conclude, on the basis of these decisions, that "[r]ecent Supreme Court decisions affirm that a distinct showing of prejudice is unnecessary to establish a Sixth Amendment violation."[48] That conclusion is unwarranted in the context of a claim based on *ineffective* assistance of counsel.

A. *Geders v. United States*

*Geders* is easily distinguished from this case. It was *not* based on ineffectiveness. In that case the defendant was not permitted to consult with his attorney during the overnight recess between his direct- and cross-examination. This prevented the accused from having the *actual* assistance of counsel during a critical stage of his trial. When a person is *actually* denied counsel at an important point in his trial, his constitutional right is violated without any further showing of prejudice. This case, which involves an alleged *constructive* denial of counsel because of the defense lawyer's ineffectiveness, involves different considerations.[49] Accordingly, *Geders* is not controlling here.

B. *Holloway v. Arkansas*

In *Holloway,* three defendants were charged in connection with a rape and robbery incident. The public defender who was appointed to represent all three defendants informed the court that his clients had conflicting interests, but the trial court insisted on joint representation. The Supreme Court reversed the defendants' convictions, holding "that whenever a trial court improperly requires joint representation over timely objection reversal is automatic." [50]

The facts in *Holloway* have a superficial similarity to those involved here. In both cases the defendants were actually represented by counsel throughout their trials. Nevertheless, the two reasons why the Supreme Court presumed that there was prejudice in *Holloway,* and dispensed with the requirement that the defendant show it, are plainly inapplicable here.

First, the Supreme Court noted that a defense counsel's statement that his clients have conflicting interests is extremely strong evidence that joint representation will prejudice them by preventing their counsel from being able to fully represent one of them at all stages of the trial. Chief Justice Burger wrote:

[M]ost courts have held that an attorney's request for the appointment of separate counsel, based on his representations as an officer of the court regarding a conflict of interests, should be granted. . . . An "attorney representing two defendants in a criminal matter is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial." *State v. Davis* [110 Ariz. 29, 31, 514 P.2d 1025, 1027 (1973)]. Second, defense attorneys have the obligation, upon discovering a conflict of interests, to advise the court at once of the problem.

---

42. Judge Robinson also takes this position, but unlike my dissenting colleagues, he concludes that the Government has met its burden of proof.

43. *See* n. 10, *supra.*

44. Dissent n. 143.

45. 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 590 (1976).

46. 435 U.S. 475, 98 S.Ct. 1891, 32 L.Ed.2d 358 (1978).

47. 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

48. Dissent —— of 199 U.S.App.D.C., 289 of 624 F.2d.

49. *See* page —— of 199 U.S.App.D.C., page 231 of 624 F.2d, *supra.*

50. 435 U.S. at 488, 98 S.Ct. at 1181.

*Ibid.* Finally, attorneys are officers of the court, and " 'when they address the judge solemnly upon a matter before the court, their declarations are virtually made under oath.' " *State v. Brazile* [226 La. 254, 266, 75 So.2d 856, 860–61 (1954)]. We find these considerations persuasive. 435 U.S. at 485–86, 98 S.Ct. at 1179–1180 (footnotes omitted). In effect, the Court was able to determine from counsel's statement that the accused had been denied full representation by his counsel because of the lawyer's conflicting loyalties. Since the conflict of interest creates a presumption of prejudice, a further showing of prejudice was not required.[51]

In addition, the Supreme Court recognized that it would be virtually impossible for an accused to show prejudice in the joint representation context.

[A] rule requiring a defendant to show that a conflict of interests—which he and his counsel tried to avoid by timely objections to the joint representation—prejudiced him in some specific fashion would not be susceptible of intelligent, even handed application. In the normal case where a harmless error rule is applied, the error occurs at trial and its scope is readily identifiable. Accordingly, the reviewing court can undertake with some confidence its relatively narrow task of assessing the likelihood that the error materially affected the deliberations of the jury. Compare *Chapman v. California, supra,* [386 U.S.] at 24–26 [87 S.Ct. 824, at 828–829], with *Hamling v. United States,* 418 U.S. 87, 108 [94 S.Ct. 2887, 2902, 41 L.Ed.2d 590] (1974), and *United States v.*

*Valle-Valdez,* 554 F.2d 911, 914–917 (CA9 1977). But in a case of joint representation of conflicting interests the evil—it bears repeating—is in what the advocate finds himself compelled to *refrain* from doing, not only at trial but also as to possible pretrial plea negotiations and in the sentencing process. It may be possible in some cases to identify from the record the prejudice resulting from an attorney's failure to undertake certain trial tasks, but even with a record of the sentencing hearing available it would be difficult to judge intelligently the impact of a conflict on the attorney's representation of a client. And to assess the impact of a conflict of interests on the attorney's options, tactics, and decisions in plea negotiations would be virtually impossible. Thus, an inquiry into a claim of harmless error here would require, unlike most cases, unguided speculation.

435 U.S. at 490–91, 98 S.Ct. at 1182.

These two reasons do not support a presumption of prejudice in cases that, like this one, involve allegations that defense counsel was ineffective. Unlike the joint representation cases, there is no showing that a defense lawyer's mistakes usually cause prejudice to an accused. This case is a good example in which a defendant was not even slightly harmed as a result of his counsel's alleged errors.

Perhaps more important, in cases involving alleged inadequacy of representation, it will not be as difficult for the defendant to prove prejudice. For example, if (as the dissent asserts) an attorney fails to undertake a thorough investigation, the defend-

---

**51.** An example of this, from my own experience as United States Attorney, is a case that is unreported (except possibly in its disbarment aspect) which involved a lawyer representing several defendants who entered guilty pleas on his advice. It subsequently appeared that the lawyer had drawn a false indictment against a more affluent brother of one of the defendants in an effort to improve his attorney's fee by "taking care" of that charge. Upon this showing of his lack of fidelity as a lawyer, and without more, the court set aside the judgments of conviction on the guilty pleas. Thereafter the defendants were tried and convicted and the lawyer was disbarred. In my view,

setting aside the original convictions was fully justified because the defendants in that case were denied the assistance of counsel who possessed the fidelity required of all lawyers. Complete fidelity of a lawyer to his client is an essential element of the existence of the relationship. The defendants were thus denied the assistance of such counsel as the Constitution requires. The harm to the defendants resulted from the demonstrated lack of that fundamental good moral character required of all lawyers. This prejudice went directly to their constitutional right and there was no necessity to prove any prejudice or harm to any particular defense that they might have had.

ant could readily prove prejudice simply by showing that the evidence that would have been found was exculpatory. Unlike the joint representation cases, the defendant would not be forced to engage in "unguided speculation." [52]

In short, while the facts in *Holloway* (the trial court ignored counsel's warning that his clients had conflicting interests) establish inherent prejudice so that "a distinct showing of prejudice [was] unnecessary," [53] that ruling does not constitute a precedent for presuming prejudice from a defendant's allegations that his counsel provided ineffective representation.

## C. *Chapman v. California*

According to the dissent, *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) establishes that "the burden in each case rests squarely on the government to prove beyond a reasonable doubt that [the] error was harmless." [54] I have no quarrel with that interpretation of *Chapman* : once a constitutional error is proven the burden of proceeding does shift to the government to prove that the error is harmless. But it begs the question for the dissent to rely on *Chapman* here because *Chapman* does not address who has the burden of proof with respect to whether a constitutional error has been committed.

Before the burden of proof shifts to the government under *Chapman,* whatever prejudice the constitutional error involves must first be established by the claimant. Thus, in *Chapman* itself, the Government was not required to show that the error was harmless until the defendants had shown

that a prejudicial error had been committed. Mr. Justice Black wrote:

> Certainly error, constitutional error, in illegally admitting *highly prejudicial evidence* or comments, casts on someone other than the person *prejudiced* by it a burden to show that it was harmless.

386 U.S. at 24, 87 S.Ct. at 828 (emphasis added). *Chapman,* therefore, only supports the dissent's position if one assumes that counsel's alleged breach of duty alone constitutes a constitutional violation. Since that is the question at issue in this case, such an assumption is obviously inappropriate.

## D. *Chambers v. Maroney*

While neither *Geders, Holloway,* nor *Chapman* is precedent for the view adopted by the dissent, another Supreme Court opinion, *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), is strong authority for the rule that the burden of proving prejudice rests on the accused.[55] In *Chambers,* the defendant asserted that he "was not afforded the effective assistance of counsel" because his new counsel at his second trial [56] did not confer "with [him] until a few minutes before the second trial began." 399 U.S. at 53, 90 S.Ct. at 1982. The defendant contended that because his lawyer was "unprepared," he failed to make an adequate effort "to have [certain] guns and ammunition excluded from evidence." 399 U.S. at 54, 90 S.Ct. at 1982. The district court rejected petitioner's claim without a hearing and the court of appeals affirmed, noting that "the guns and other materials seized from the

---

**52.** *See Cooper v. Fitzharris,* 586 F.2d 1325, 1332 (9th Cir. 1978) (en banc).

**53.** Dissent —— of 199 U.S.App.D.C., 289 of 624 F.2d.

**54.** *Id.* page 199 of U.S.App.D.C., page 291 of 624 F.2d.

**55.** I have already discussed Supreme Court opinions that are inconsistent with the dissent's position. *E. g. United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975) (*See* page —— of 199 U.S.App.D.C., page 226–227 of 624 F.2d, *supra* );

*Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) (n. 20, *supra* ); and *Tollett v. Henderson,* 411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973) and *McMann v. Richardson,* 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970) (n. 24, *supra* ).

**56.** In his first trial, the defendant was represented by a lawyer from the Legal Aid Society of Allegheny County, which was appointed as his counsel. In his second trial, he was represented by another lawyer from the Legal Aid Society.

car were admissible evidence." Id. In light of the defendant's inability to show that he was prejudiced, the Supreme Court (7–1) affirmed the conviction. Mr. Justice White wrote for the Court:

> Unquestionably, the court should make every effort to effect early appointments of counsel in all cases. But we are not disposed to fashion a *per se* rule requiring reversal of every conviction following tardy appointment of counsel or to hold that, whenever a habeas corpus petition alleges a belated appointment, an evidentiary hearing must be held to determine whether the defendant has been denied his constitutional right to counsel.

399 U.S. at 54, 90 S.Ct. at 1982–1983. From the foregoing it is obvious that a mere breach of duty to an accused is not a constitutional violation unless the defendant proves that he was prejudiced. If the principles advocated in the dissent had been applied in *Chambers,* then the failure of counsel to confer with the accused before trial (a violation of the American Bar Association guidelines) would have been sufficient to establish a constitutional error, thereby forcing the prosecution to prove beyond a reasonable doubt that the defendant was not prejudiced. Thus, *Chambers* is contrary to the basic contention of the dissent.[57]

### III.  THE PHILOSOPHY OF THE DISSENT

There are a great many assertions in the dissent that are not supported by the record and which are unsound factually, legally and logically. These are set forth in considerable detail in my dissent to the panel opinion in *Decoster II,* (1976), 199 U.S.App. D.C. ——, 624 F.2d 196. The plurality opinion ignores many of these and only partially deals with others. Lest silence be interpreted as recognizing their validity a few are hereinafter replied to.

### A.  Adequacy of Investigation

The principal contention of the dissent is that counsel's investigation was inadequate because certain witnesses or possible witnesses were not interviewed. The supposed witnesses fit into five categories: (1) witnesses at the Golden Gate Bar, (2) witnesses who were in the D.C. Annex, (3) the two policemen, (4) the victim, and (5) the co-defendants.

1. *Golden Gate Bar.*  There is no controversy as to what happened in the bar; no proffer as to what witnesses in the bar could have said; and Decoster told his counsel, and so testified, that there was "nobody [in the bar] who could testify [he was] there."[58]

2. *D.C. Annex.*  There is no dispute as to what transpired at the hotel, and there has never been any indication that exculpatory evidence could have been obtained from witnesses in the Annex.

3. *Policemen.*  Counsel examined officer Ehler at the preliminary hearing.[59] In addition, the United States Attorney furnished Decoster's lawyer with all Jencks Act material and grand jury testimony in advance of the trial. From this, he knew that the testimony of all three of the Government's witnesses was substantially the same, and very prejudicial to defendant's case.

4. *Victim.*  After the incident, Crump moved away from the Washington area. There is no indication that he was available to be interviewed by defense counsel. In

---

**57.** Similarly, it conflicts with the thesis of Judge Robinson's concurring opinion.

The dissent attempts to garner hidden support from *Chambers,* but nothing therein can be construed as "tacit approval of [a] . . . presumption-of-prejudice rule . . . ." Dissent n. 140, cf. 399 U.S. at 53–54, 90 S.Ct. 1975. *Chambers* also specifically rejects arbitrary *per se* and automatic reversal rules to which the dissent leans. Dissent, page —— of 199 U.S. App.D.C., page 293 of 624 F.2d and n. 149.

**58.** Tr. (Feb. 6, 1974) 72.

**59.** Officer Ehler testified: "Mr. Decoster and Mr. Ely had a hold of the subject, the complainant. One of them was yoking him, I didn't know which one it was at the time, but—and *they* were removing something from his pockets." Tr., Preliminary Hearing (June 8, 1970) 5–6 (emphasis added).

addition, a witness need not consent to pretrial interviews by defense counsel, and there is no assurance that Crump would have done so. Finally, Crump was seriously injured in an automobile accident, and his ability to recollect the incident at the trial was hampered. His only testimony at the trial was as to his identification at the scene of the crime. In light of the limited nature of his testimony, a lengthy interrogation of Crump would have been useless.

5. *Co-defendants.* Decoster's counsel was familiar with their versions of the events because he had represented two of the defendants at the preliminary hearing. Counsel's probing cross-examination of the government's witnesses proves his familiarity with the facts of the case.

Even now, the dissent and appellant do not and cannot point to any exculpatory evidence that could have been found if Decoster's lawyer had conducted the unnecessarily thorough investigation that the dissent demands. Judge Bazelon concedes that "[m]y colleagues may be correct that no material information could be elicited from such an investigation." [60] His whole argument rests on the assertion that "it is . . . possible" that exculpatory evidence could have been found. From this he concludes that an enormous investigation should have been conducted so that we would not have to "speculate, post hoc, as to what the witnesses would have said." [61]

On this record, it is clear that it is only my dissenting colleagues who are engaging in speculation. Decoster's counsel knew from the information available to him that his client was guilty.[62] This knowledge was confirmed after the trial when Decoster admitted his guilt. Thus, without speculating at all, it can be said that no investigation, however exhaustive, could have discovered evidence that would have helped Decoster. When as here a defense attorney knows his client is guilty, I wholeheartedly agree with then Judge (now Justice) Stevens' statement that "counsel ha[s] no duty to search for witnesses, expert or otherwise, who might falsely testify to the contrary." *Matthews v. United States*, 518 F.2d 1245, 1246 (7th Cir. 1975). This statement contradicts the dissent's claim that counsel was required to search for alibi witnesses. Dissent nn.107, 110.

## B. *Duty to Investigate Accused's Contradictory Statements*

The dissent contends that defense counsel are obligated to investigate contradictory statements by an accused. Dissent n.110. To apply that law here, an accused like Decoster who initially told his attorney that he was present at the scene of the robbery, but later contradicted himself and said that he was not present, would thereby force his counsel to conduct an independent investigation for evidence that might support either statement to determine which version should be presented as a defense.[63] This suggestion is incredible. It grossly over-

---

60. Dissent n. 107.

61. *Id.*

62. *See* pages ———— of 199 U.S.App.D.C., pages 232–234 of 624 F.2d, *supra.*

63. Dissent page —— of 199 U.S.App.D.C., page 286 of 624 F.2d.
   The dissent overstates the conflict between the police officer's testimony and Decoster's story, Dissent page —— of 199 U.S.App.D.C., page 283 of 624 F.2d. Given Decoster's letters to his judge and attorney any conflict with police testimony was minimal—whether with his accomplices who pled guilty he assaulted Crump either in self defense or to rob him.
   The dissent predicates some of its criticism of defense counsel on the ground that he "disbelieved his client and therefore thought that further inquiry would prove fruitless." Dissent page —— of 199 U.S.App.D.C., page 284 of 624 F.2d. However, it was *believing* Decoster's statements in his letters that he *was* present and assaulted Crump in self defense that would reduce the need for an extensive investigation. (Decoster's statement in his letter to the judge in November, 1970 that he was present at the robbery casts doubt on the dissent's assertion "that Decoster claimed he was not with them [his co-defendants]," cf. Dissent n. 110). The testimony of the police officer and the guilty pleas of Decoster's co-defendants also led to the same result. Thus, this case cannot be compared to the case referred to by the dissent at n. 105.

states the duty to investigate and is symptomatic of the unreasonable duties that the dissent is attempting to foist on defense lawyers. Without any investigation, the defendant's contradictory statements are conclusive proof that one of them is false and defense counsel owes no duty to a prevaricating accused to straighten out an obviously crooked story. *See* Dissent nn.22, 49, 112, page —— of 199 U.S.App.D.C., page 272 of 624 F.2d.

## C. Duty to Investigate for a Guilty Client

The dissent states: "[T]he suggestion that a client whose lawyer believes him to be guilty deserves less pretrial investigation is simply wrong. An attorney's duty to investigate is not relieved by his own perception of his client's guilt or innocence." [64] This pronouncement is foreign to a lawyer's basic obligation to the court and his profession. When, as here, defense counsel has reasonable grounds for believing his client guilty, that perception *must* influence his representation of the client. My dissenting colleagues recognize that a lawyer's obligation is only to make "reasonable" inquiries (dissent n.112), but then they ignore the reasonableness requirement and dissent because of counsel's failure to investigate in support of a fabricated defense. Dissent pages ——, ——, ——, —— of 199 U.S.App. D.C., pages 285, 286, 292, 294 of 624 F.2d. The dissent would "brand as ineffective any conduct falling below the minimum standards of competent lawyering, without regard to the client's guilt or innocence." Dissent n.131. While the quality of counsel's performance may not depend on the guilt or innocence of his client, that does not contradict the principle that in determining whether a counsel has breached a duty, the guilt or innocence of his client may affect what he was required to do to satisfy the requirement of a reasonably competent lawyer.

Defense counsel are not required to close their eyes to the obvious and search for alibis for defendants who would like assistance in the fabrication of a defense, for that would be a violation of the ethical standards of the legal profession. As Chief Justice Burger wrote for the Court: there is "an important limitation on a defendant's right to the assistance of counsel: counsel *ethically* cannot assist his client in presenting *what the attorney has reason to believe is false testimony.*" *United States v. Grayson,* 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582, 592 (1978) (emphasis added). Thus, when the dissent states that an attorney cannot be guided by "his own perception of his client's guilt or innocence," [65] it contradicts the Supreme Court.

## D. Bond Review

The dissent contends that defense counsel's delay in seeking bond review is an example of his ineffectiveness. It is clear, however, that such delay was entirely irrelevant to the outcome of the case, for when the bond review motion was filed it was denied. Even assuming that counsel had unreasonably delayed filing for bond review, Decoster was not prejudiced in any way.

In addition, on the facts of this case it is apparent that it was unnecessary for defense counsel to file for bond review at all. Counsel, however, cannot be blamed for filing such a frivolous motion as this court is partially responsible because of the ever increasing list of unreasonable burdens some of our opinions place on defense counsel. On the facts the merit of the decision to deny bond reduction cannot be questioned. When Decoster was arrested on this charge, (1) he was already being sought as a fugitive on a bench warrant issued in

---

64. *Id.* page —— of 199 U.S.App.D.C., page 283 of 624 F.2d.

The dissent speculates about the reasons for what it considers an inadequate number of investigations by appointed defense counsel, n. 80, without reflecting on the number of investigations in cases where defendants hire their own counsel. As to the reasons, these most likely lie in the admitted fact (Dissent, page —— of 199 U.S.App.D.C., page 287 of 624 F.2d) that most defendants are guilty and they are the best witnesses to the relevant events.

65. *See* page —— of 199 U.S.App.D.C., page 240 of 624 F.2d, *supra.*

another case; (2) he had no fixed address, no community ties, and no employment whatsoever; (3) he was an admitted narcotics user; (4) he had previously been arrested for carrying a dangerous weapon and had jumped bail while under a $600 bond; (5) as a juvenile he had been involved in a robbery and was sent to the Receiving Home from which he escaped; [66] and (6) the Bail Agency did not recommend release, even on conditions.

The wisdom of the decision to continue Decoster's incarceration was borne out when his trial was postponed. As a result of this delay, Decoster was released to the Black Man's Development Center. As might have been expected from his history of escapes, appellant promptly became a fugitive from justice. Under these circumstances, all of which were known to Decoster's counsel, it is folly to suggest that a motion for release should have been filed or that any prejudice resulted from trial counsel not immediately moving for Decoster's release. It was a complete waste of judicial effort for the panel, knowing all of this, to remand the case for a hearing on this frivolous point.

### E. Decoster as a Fugitive from Justice

The dissent comments critically about the seventeen month period between the date of the offense and appellant's trial. It fails to recognize that over eight months of this delay was caused by Decoster jumping bail and remaining a fugitive. The facts are delineated in the Government's Supplemental Brief 3:

On January 21 appellant absconded from the Black Man's Development Center and never returned. [The] Bail Agency then reported that appellant had further violated the conditions of his release by reporting only once since being released. When the case was called for trial on February 9, appellant did not appear, and a bench warrant issued. Appellant was not rearrested until September 1971, after his codefendants in this case had

pleaded guilty [at their trial] on June 18, 1971.

The trial was also delayed because one of the primary prosecution witnesses, Mr. Crump, was seriously injured in an automobile accident. The seventeen month delay, therefore, was not caused by any fault on the part of the Government.

### F. Avoiding Futile Retrials

The dissent states:

Although the question of prejudice remains part of the court's inquiry, it is distinct from the determination of whether the defendant has received effective assistance. Rather, prejudice is considered only in order to spare defendants, prosecutors and the courts alike a truly futile repetition of the pretrial and trial process.[67]

Decoster was found guilty on clear, uncontradicted evidence. Prior to trial his letters in effect admitted his participation in the robbery and thereafter, at sentencing, he practically admitted his guilt. If this case is a good example of how my dissenting colleagues would apply their rule, then it is hard to imagine what it would take to convince them that a retrial would be futile. This illustrates part of the problem presented by the issues here. Courts can agree on language for standards for counsel but some judges, as in the dissent, give the standards such an unreasonable construction that the actual standard becomes meaningless.

### G. Decoster's Participation in the Events of the Robbery

There is considerable doubt about what story Decoster was telling when he was first arrested. The dissent states: "Decoster claimed that he was not with [his co-defendants]." Dissent n.110. Yet in his letter to Judge Waddy filed November 13, 1970, Decoster wrote: "I can prove that I am only guilty of assault by self defence." See dissent n.22. And in his letter to his counsel, which Decoster testified he mailed

---

**66.** Tr., Sentencing (March 3, 1972) 2–3.

**67.** Dissent page —— of 199 U.S.App.D.C., page 275 of 624 F.2d.

between May and November, 1970, he admitted his participation in the events of the robbery. Dissent page —— of 199 U.S.App. D.C., page 273 of 624 F.2d. These letters obviously contradict the statements of the dissent at n.110 because if Decoster were "guilty of assault by self defence" he would have had to be in Crump's presence when he assaulted him in "self defence." So to the extent that the dissent relies on any claim by Decoster that he was not with the co-defendants it is of questionable validity.

## H. Sentencing

The dissent states that the Department of Corrections "clarified Decoster's sentence" because it was allegedly not properly executed.[68] This confuses the role of trial and appellate counsel and what is referred to as a "clarification" is nothing more than the routine computation of a legally adjudged sentence.

The dissent also implies that "counsel's failure to offer any allocution" caused "the trial judge's decision to sentence Decoster to a prison term of 2–8 years while his co-defendants received only probation."[69] The lesser sentences for the co-defendants, however, were justified by (1) their guilty pleas, and because they did not (2) use narcotics, (3) jump bail, and (4) have a substantial criminal record, as Decoster did.[70]

## I. Reversible Error

The trial court found after an extensive and complete hearing that Decoster's counsel, in putting the Government to its proof, had presented Decoster's only defense and that Decoster had failed to demonstrate any prejudice from his counsel's conduct of his defense. The dissent has failed to demonstrate wherein the trial court's findings and conclusions are clearly erroneous. In material respects, the dissent understates incrim-

inating evidence, seeks to avoid evaluating "the precise effect" of omissions by defense counsel, dissent 26, grossly exaggerates the probative effect of evidence that might favor the defendant, claims impeachment on the basis of immaterial variances, dissent n.106, indulges in a great deal of unwarranted speculation, grossly misstates my position, dissent n.102, places unwarranted reliance on dissenting opinions and its prior opinion in this case, goes outside the record, raises new issues, dissent n.38, 89, 105, refuses to recognize that Decoster was attempting to force his counsel to assert a perjured defense, relies on immaterial and irrelevant evidence, and would rigidly apply erroneous legal theories and arbitrary *per se* and "automatic reversal" rules, dissent page —— of 199 U.S.App.D.C., page 293 of 624 F.2d, n.149. Thus, no reversible error has been shown.

## J. Changing Judges' Duties

The dissent argues that the "adversary system is . . . in shreds,"[71] and suggests that trial judges should greatly expand their intervention in the trial of criminal cases, allegedly to protect defendants. This overlooks the rule that a judge's obligation is to see that justice is done—*to all parties*. The dissent would ignore the rights of the public.

## K. Extraneous Considerations

Most extraordinarily, the dissent sees merit in a "rule requiring *automatic reversal*" in order to "provide the deterrent effect necessary to insure · that all defendants—innocent or guilty—receive the effective assistance of counsel" according to the extreme standards of the dissent. It argues: "Reversing convictions [automatically] is likely to have a significant *prophylactic effect* for several reasons . . . [among them] . . . frequent reversals

---

**68.** *Id.* n. 58.

**69.** *Id.* page —— of 199 U.S.App.D.C., page 295 of 624 F.2d.

**70.** *See United States v. Roberts*, 199 U.S.App. D.C. ——, 600 F.2d 815 (D.C.Cir. 1979) (State-

ment on Suggestion for Rehearing en banc by MacKinnon, J.), and Tr., Sentencing (March 3, 1972) 3–4.

**71.** Dissent —— of 199 U.S.App.D.C., page 297 of 624 F.2d.

are likely to *attract the attention of the public* and may enhance the likelihood of legislative reform[s]." Dissent page —— of 199 U.S.App.D.C., page 293 of 624 F.2d and n.145. (Emphasis added). However, it is fundamental to the proper administration of justice that criminal convictions should only be reversed for legal error and never for the *"prophylactic effect"*. I cannot agree with the outrageous suggestion that freeing convicted criminals is an appropriate way to go about securing legislation from Congress that conforms to the desires of individual judges.

### L. *Ready for Trial*

The dissent finds fault with Decoster's lawyer because

> even after receiving appellant's letter [stating that he was only guilty of assault by self-defense] counsel was ready to go to trial without having attempted to contact the co-defendants to learn their version of the events on the night of the robbery.[72]

This criticism is preposterous. Defense counsel had been acting for Decoster since May 30, 1970, and was ready to go to trial in November, 1971: while the record is not clear, it is my analysis that counsel's defense was that Decoster was only fighting not robbing, the victim. The testimony of two accomplices who had pled guilty would obviously not be helpful. The day before trial in 1972 Decoster changed his story and claimed that he was not at the scene of the robbery. On these facts, counsel had no choice but to announce ready for trial. What else could he have done: ask for a continuance and tell the court that he needed extra time because his client was changing his story? Of course not. The trial date had been set after Decoster's long fugitivity and Decoster's attempt to change his story on the eve of a reset trial was no justification for a continuance. No Judge would or should grant a continuance under such circumstances. In short, counsel's difficulties were caused by Decoster's eleventh hour attempt to fabricate an alibi. Counsel simply had to do as well as he could with a bad situation.[73] The dissent in this complaint thus unsuccessfully scratches in barren ground to find some basis to criticize counsel.

### M. *Representation of Indigents*

The dissent plays the theme from *Griffin v. Illinois*, 351 U.S. 12, 19, 76 S.Ct. 585, 591, 100 L.Ed. 891 (1956), that "[t]here can be no equal justice where the kind of trial a man gets depends on the amount of money he has." But there is *nothing in the record* to indicate that Decoster's poverty caused him to commit robbery or prevented him from receiving a fair trial.[74] Increased billions have been spent in recent years to alleviate

---

72. *Id.* page —— of 199 U.S.App.D.C., page 267 of 624 F.2d.

73. In my view one error of counsel alleged by the dissent, his decision to waive his opening statement, was good strategy. In light of Decoster's inability to adhere to a single story, counsel could not be sure what story his client would choose to assert at trial. Under these circumstances, making an opening statement could have caused serious harm to defendant's case. For instance, had counsel stated that Eley would testify to an alibi, Eley's testimony that Decoster was present at the scene of the robbery would have caused even greater damage to appellant's case than actually occurred. Therefore, with the accused changing his story, the position taken by counsel (as the district court found) was an exercise of good judgment. Counsel's decision to waive his opening statement certainly did not constitute a breach of duty to Decoster.

74. The dissent presents a false picture when it implies that indigent defendants in felony cases went unrepresented in most courts until recently. For many years in most courts in the nation, lawyers gave free legal representation to accused felons who could not afford counsel, and the lawyers were completely uncompensated for such time consuming duties. Such service to indigent defendants was considered to be an obligation of all lawyers. Many jurisdictions also provided paid public defenders. The cases that have held that counsel is required in major criminal cases dealt with isolated courts that did not follow the general national practice. *E. g., Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1930); *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Argersinger v. Hamlin,* 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972). *See* Mayer, *The Lawyers* 163 (1966).

poverty, but during this period all forms of crime have soared. And under the Criminal Justice Act most defendants in this court are as well, if not better represented than the Government. Thus, the dissent's reference to poverty is an injudicial appeal to sympathy.

Those of us who have been familiar through the years with the massive efforts of the members of the bar to represent indigent defendants, most times without any fee, deny categorically the assertion by the dissent that criminal defendants are poorly served by the bar. Dissent, 2, 6, n.3, n.80, n.89. We specifically resent the inference that appointed counsel scrimp on requesting investigative expense because of an alleged fear that their own fees would thereby be lessened. Dissent n.80. And the claim that some writers and reports support its position, when it is based on partial statements, is unseemly. For instance, Tague, The Attempt To Improve Criminal Defense Representation, 15 Am. Crim.L.Rev. 109, 131 (1977) is cited, Dissent n.80. But the statement is ignored that "The relationship that an attorney has with his client and with the court can be further strained if the attorney must be ordered to investigate." *Id.* at 133.

The dissent purports to be concerned with "equal justice" for the poor. But its myopic view of justice overlooks justice for the public, and for that far larger number of poor Americans who are the victims of crime. It has also been a boon to some defendants who are not only not poor but are extremely wealthy. Illicit drug dealers, many of whom are rolling in illegal wealth, are equal beneficiaries with the poor.[75] The ease with which a post trial claim of ineffective assistance of counsel can be made is evidenced by the reported claim of Patty Hearst, not normally thought of as poor, that her defense counsel, the famed F. Lee

Bailey, had provided her with ineffective assistance.[76]

It is hardly an exaggeration to say that under the arguments of the dissent, the principle issue in a criminal appeal is whether the accused is poor, rather than whether his guilt was properly determined in a fair trial. Thankfully, this Circuit has now definitively rejected that approach. Neither a rich man nor a poor man has a right to use perjured testimony in his defense. Neither a rich nor a poor defendant has a right to compel his counsel to investigate perjured alibis. And no defendant, be he rich or poor, has a right to have his conviction set aside because his lawyer did not investigate to obtain witnesses who would support a phony defense.

## IV. CONCLUSION

While purporting to explore standards for defense counsel in their representation of criminal defendants, *Decoster I* was in fact a bold attempt to shift the burden of proof to the Government. The intolerable results that inevitably follow from such a shift are well illustrated by the position taken by the panel below and the dissent here.

We now repudiate this misguided attempt to change the law and reaffirm the well established rule in this Circuit that the burden of proving prejudice from defense counsel's ineffectiveness rests on the accused. Counsel in this Circuit need not search for non-existent witnesses who might support perjured alibis conjured up by defendants on the eve of trial.

Thus fails the attempt of my dissenting colleagues to create a standard of law that would result in a retrial for an obviously guilty defendant, supposedly because his lawyer's investigation of the crime was not thorough enough, despite the defendant's failure to produce a single witness who

---

**75.** *E. g., United States v. Davis,* 183 U.S.App. D.C. 162, 175, 562 F.2d 681, 694 (1977); *United States v. Moore,* 164 U.S.App.D.C. 319, 505 F.2d 426 (1974), *rev'd* 423 U.S. 122, 96 S.Ct. 335, 46 L.Ed.2d 333 (1975); *United States v. Lee,* 165 U.S.App.D.C. 50, 64–69, 506 F.2d 111, 125–30 (1974), *cert. denied,* 421 U.S. 1002, 95

S.Ct. 2403, 44 L.Ed.2d 670 (1975); *United States v. Moore,* 158 U.S.App.D.C. 375, 496, 486 F.2d 1139, 1260 (en banc), *cert. denied,* 414 U.S. 980, 94 S.Ct. 298, 38 L.Ed.2d 224 (1973).

**76.** Washington Star, August 9, 1978.

would testify to a single truthful exculpatory fact. Decoster was found guilty by a jury. The trial judge twice concurred in that judgment. The accused in effect admitted his participation in the robbery and his guilt and on appeal to this court did not contend that his counsel had been ineffective. That claim was initiated by the other members of the original panel. It would be unthinkable for this court to reverse such a conviction because defense counsel failed to investigate every possible fabricated defense.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge, concurring in the result:

I agree with the majority of my brethren that the conviction in this case should be affirmed. I am unable, however, to subscribe to one link in the chain of reasoning they forge in reaching this result. While I applaud the collective action of the full court in now assuring to those accused of crime a level of legal assistance commensurate with the demands of the Sixth Amendment, I deplore the court's allocation to the accused of a burden of demonstrating that he was jeopardized by established dereliction of duty on the part of his counsel. Judges Leventhal and MacKinnon, and my colleagues concurring with them, make prejudice to the defense—likely harm in the one instance and actual injury in the other—an indispensable prerequisite to any finding of ineffective assistance, and assign the onus of proof on that score to the defendant.[1] In so holding they stray rather

widely, I believe, from established principles of pertinent jurisprudence.

These considerations summon this opinion, and dictate the general course it will take. I first summarize in brief fashion the position of the court.[2] Next I set forth my understanding of the test imposed by the Sixth Amendment for measuring the sufficiency of the service rendered by counsel for an accused.[3] I then elucidate my stand on burden of proof of prejudice in ineffective-assistance cases.[4] Lastly, I explain why I conclude that counsel's performance in this case was constitutionally ineffective but nevertheless was harmless error.[5]

## I. THE COURT'S POSITION

The critical issue we are convened to resolve is the standard appropriately to be utilized in evaluating claims that defense counsel's performance was constitutionally infirm. Early cases in this circuit shunned the Sixth Amendment as a source of entitlement to effective aid by a member of the bar.[6] Relying instead upon the Fifth, those decisions measured counsel's adequacy by the impact of any deficiency on the fairness of the trial;[7] resultantly, there was concern only if execution of the defense function was *so abominable* that it rendered the trial "a farce and a mockery of justice."[8] As late as *Bruce v. United States*[9] in 1967, this court maintained that while "[t]hese words [were] not to be taken literally," they nevertheless were "a vivid description of the principle that the accused has a heavy burden in showing requisite

---

1. Leventhal Opinion (Op.), 199 U.S.App.D.C. at ——, 624 F.2d at 199; MacKinnon Op., 199 U.S.App.D.C. at ——, 624 F.2d at 217.

2. See Part I *infra.*

3. See Part II *infra.*

4. See Part III *infra.*

5. See Part IV *infra.*

6. This trend commenced three decades ago in *Diggs v. Welch*, 80 U.S.App.D.C. 5, 6–7, 148 F.2d 667, 668–669, *cert. denied*, 325 U.S. 889, 65 S.Ct. 1576, 89 L.Ed. 2002 (1945). For other cases of similar bent, see note 8 *infra.*

7. See *Diggs v. Welch, supra* note 6, 80 U.S. App.D.C. at 7, 148 F.2d at 669; *Jones v. Huff*, 80 U.S.App.D.C. 254, 255, 152 F.2d 14, 15 (1945).

8. *Diggs v. Welch, supra* note 6, 80 U.S.App. D.C. at 7, 148 F.2d at 669. See *United States v. Hammonds*, 138 U.S.App.D.C. 166, 169–170, 425 F.2d 597, 600–601 (1970); *Harried v. United States*, 128 U.S.App.D.C. 330, 333–334, 389 F.2d 281, 284–285 (1967); *Mitchell v. United States*, 104 U.S.App.D.C. 57, 63, 259 F.2d 787, 793, *cert. denied*, 358 U.S. 850, 79 S.Ct. 81, 3 L.Ed.2d 86 (1958); *Jones v. Huff, supra* note 7, 80 U.S.App.D.C. at 255, 152 F.2d at 15.

9. 126 U.S.App.D.C. 336, 379 F.2d 113 (1967).

unfairness." [10]  And though it is now said that *Bruce* implicitly took a Sixth Amendment approach to the problem,[11] the *Bruce* court acknowledged no more than that in "rare and extraordinary" instances "an accused may obtain relief  .  .  .  if he shows both that there has been gross incompetence of counsel and that this has in effect blotted out the essence of a substantial defense either in the District Court or on appeal." [12]  That was then the court's concept of the accused's constitutional due, at least where the question was presented by collateral attack upon a conviction.[13]

As Judge Leventhal's survey of judicially-enunciated formulae for gauging ineffective-assistance claims discloses, every test thus far developed in this and other circuits, however expressed in words, has imposed an initial burden on the defendant to establish that his counsel's performance at trial was abnormally deficient.[14]  Every opinion announced today espouses a standard incorporating that thesis centrally as a hurdle that the defendant must first clear.  Judge Leventhal, for a plurality of the court, in-

sists upon proof of "serious incompetency, inefficiency or inattention of counsel—behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer." [15]  Judges Bazelon and MacKinnon would require the defendant to demonstrate, not merely a violation of particular duties, but a "substantial" violation.[16]  I myself believe that the defendant must point to some substantial deviation from a norm of reasonable competence.[17]  Despite the terminological differences in the heft of the showing to be made, each formulation emphasizes that counsel's breach must be serious, and that the defendant bears the onus of making it out.

Perhaps more importantly, the court is agreed that the "gross incompetence" standard of *Bruce* is dead, and that in my view is how it should be.  For nearly four decades the guaranty of competent representation in federal criminal proceedings has had Sixth [18] as well as Fifth Amendment [19] underpinnings, a verity long calling for a thorough reexamination of this circuit's criteria for proving and assessing asserted viola-

10.  *Id.* at 339, 379 F.2d at 116.

11.  Leventhal Op., 199 U.S.App.D.C. at ——, 624 F.2d at 204.

12.  *United States v. Bruce, supra* note 9, 126 U.S.App.D.C. at 339–340, 379 F.2d at 116–117 (footnote omitted).

13.  Unlike the case before us, *Bruce* was an appeal from denial of a motion pursuant to 28 U.S.C. § 2255 (1976).  The *Bruce* court observed that "a more powerful showing of inadequacy is necessary to sustain a collateral attack than to warrant an order for new trial either by the District Court or by this court on direct appeal," but felt that "[i]t would not be fruitful to attempt further delineation of the applicable standard by reference to generalities  .  . ." *Id.* at 340, 379 F.2d at 117 (footnotes omitted).

14.  See Leventhal Op., 199 U.S.App.D.C. at ——, 624 F.2d at 203–206.

15.  Leventhal Op., 199 U.S.App.D.C. at ——, 624 F.2d at 206–207.

16.  Bazelon Op., 199 U.S.App.D.C. at ——, 624 F.2d at 264; MacKinnon Op., 199 U.S.App. D.C. at ——, 624 F.2d at 217.

17.  Part III *infra*.

18.  *Holloway v. Arkansas*, 435 U.S. 475, 481–484, 490, 98 S.Ct. 1173, 1177–1179, 1182, 55 L.Ed.2d 426, 433–434, 438 (1978) (appointment of single counsel for three defendants, without investigation of counsel's representations that a conflict of interest existed, violates Sixth Amendment right to effective assistance); *McMann v. Richardson*, 397 U.S. 759, 770–771, 90 S.Ct. 1441, 1448–1449, 25 L.Ed.2d 763, 773 (1970) ("defendants facing felony charges are entitled to the effective assistance of competent counsel.  .  .  .  [I]f the right to counsel guaranteed by the Constitution is to serve its purpose, defendants cannot be left to the mercies of incompetent counsel," citing *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)); *Glasser v. United States*, 315 U.S. 60, 76, 62 S.Ct. 457, 468, 86 L.Ed. 680, 702 (1942) (defendant has right to "effective assistance of counsel, guaranteed by the Sixth Amendment"); *United States v. Hurt*, 177 U.S. App.D.C. 15, 18, 543 F.2d 162, 165 (1976); *Scott v. United States*, 138 U.S.App.D.C. 339, 340, 427 F.2d 609, 610 (1970).

19.  *E. g., Powell v. Alabama*, 287 U.S. 45, 68–72, 53 S.Ct. 55, 63–65, 77 L.Ed. 158, 170–172 (1932) (right to effective assistance of counsel in state trials guaranteed by the Due Process Clause of the Fourteenth Amendment).

tions. So, while a defendant must show some substantial dereliction in his counsel's performance in order to qualify for relief, the level of the representation required is now considerably higher than it once was. On the other hand, a majority of my colleagues retain in some form the other aspect of *Bruce*—the defendant's burden of proof *vis-a-vis* resulting prejudice—as a constitutional element in the adjudication of ineffective-assistance contests. A plurality of the court sets the required showing as likely harm; Judge MacKinnon says it should be actual harm.[20] I am unable to perceive any sound justification for saddling the defendant with the additional obligation of establishing that a demonstrated transgression of his right to effective aid by a lawyer either probably or actually influenced the outcome of his case.

## II. THE CONSTITUTIONAL TEST

The Sixth Amendment solemnly proclaims that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."[21] So plain and potent an injunction obviously demands a great deal more than mere appointment and physical presence of a legal representative. Indeed, it has long been recognized that one accused of crime must be afforded, even apart from the Sixth Amendment mandate, a lawyer's help in substance as well as form. In *Powell v. Alabama*[22] in 1932, the Supreme Court held that, simply as a matter of due process, it was not enough that counsel for a defendant in a state capital prosecution is "assign[ed] at such a time or under such circumstances as to preclude the giving of effective aid in the preparation and trial of the case."[23] And during the nearly half-century since *Powell* was decided, it has become increasingly clear that the Sixth Amendment entitlement to "assistance of counsel," no less than its due process counterpart, is fully the right to *effective* assistance of counsel.[24]

The Supreme Court has never undertaken to delineate the content of the "effective aid" of which *Powell* spoke, or to comprehensively define the standard of counsel-aid constitutionally demanded. That might be taken as good reason for believing that the expression is to have its natural and ordinary meaning; in any event, its connotation can hardly be mistaken. Counsel, to be sure, is not required to win the case, but "effective aid" certainly contemplates that counsel will endeavor to pursue a course reasonably calculated to achieve for the accused the most advantageous resolution of the case possible under the circumstances. Equally certain it is that an accused is due more than a lawyer whose performance barely escapes the label "grossly incompe-

---

20. Leventhal Op., 199 U.S.App.D.C. at ——, 624 F.2d at 206; MacKinnon Op., 199 U.S.App.D.C. at ——, 624 F.2d at 213.

21. United States Const. amend. VI.

22. *Supra* note 19.

23. 287 U.S. at 71, 53 S.Ct. at 65, 77 L.Ed. at 172.

24. *Holloway v. Arkansas, supra* note 18, 435 U.S. at 490, 98 S.Ct. at 1182, 55 L.Ed.2d at 438 ("[t]he mere physical presence of an attorney does not fulfill the Sixth Amendment guarantee when the advocate's conflicting obligations have effectively sealed his lips on crucial matters"); *Geders v. United States,* 425 U.S. 80, 88–91, 96 S.Ct. 1330, 1335–1337, 47 L.Ed.2d 592, 599–601 (1976) (Sixth Amendment confers right to assistance and guidance of counsel; defendant cannot constitutionally be prevented from consulting with his attorney during an overnight recess); *McMann v. Richardson, supra* note 18, 397 U.S. at 770–771, 90 S.Ct. at 1448–1449, 25 L.Ed.2d at 773 (defendants have a right to effective assistance of competent counsel); *Glasser v. United States, supra* note 18, 315 U.S. at 75–76, 62 S.Ct. at 467–468, 86 L.Ed. at 702 (under Sixth Amendment, defendant is entitled to "the benefit of the undivided assistance of counsel of his own choice. . . . Irrespective of any conflict of interest, the additional burden of representing another party may conceivably impair counsel's effectiveness"). See also *Avery v. Alabama,* 308 U.S. 444, 446, 60 S.Ct. 321, 322, 84 L.Ed. 377, 379 (1940) (state cannot "convert the appointment of counsel into a sham and nothing more than a formal compliance with the Constitution's requirement that an accused be given the assistance of counsel. The Constitution's guaranty of assistance of counsel cannot be satisfied by mere formal appointment").

tent"—the standard espoused in *Bruce*.[25] In my view, "effective" assistance is a call for reasonably competent assistance,[26] for anything less robs "effective" of far too much of its evident meaning.

That the Supreme Court intends "effective aid" to signify reasonable competence is evident from a number of its decisions. In *McMann v. Richardson*,[27] the Court declared that "defendants . . . are entitled to the effective assistance of competent counsel,"[28] and that counsel's advice must be "within the range of competence demanded of attorneys in criminal cases."[29] Moreover, the Court has utilized the term "effective" to zealously guard from outside interference activities of counsel designed to maintain the representation at a wholesome level.[30] Defense counsel must be free

to decide whether and when to put his client on the witness stand.[31] He must be permitted to present a closing summation.[32] He must be allowed to confer with his client during an overnight recess.[33] It would be incongruous for the Court to protect so scrupulously the right to effective assistance when it is endangered by outside tampering but contemporaneously to ignore all but gross incompetence when substantially deficient service is traced directly to shortfalls in counsel's ability or effort.

The farce-and-mockery test of effective assistance, to which the gross-incompetence test is first cousin, is definitely on the wane.[34] A majority of the federal circuits now have adopted some version of reasonable competence.[35] With that I agree, and I

**25.** See text *supra* at note 12.

**26.** *E. g., United States v. DeCoster (DeCoster I)*, 159 U.S.App.D.C. 326, 331, 487 F.2d 1197, 1202 (1973).

**27.** *Supra* note 18.

**28.** 397 U.S. at 771, 90 S.Ct. at 1449, 25 L.Ed.2d at 773.

**29.** *Id.*

**30.** See cases cited *infra* notes 31–33.

**31.** *Brooks v. Tennessee*, 406 U.S. 605, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972); *Ferguson v. Georgia*, 365 U.S. 570, 81 S.Ct. 756, 5 L.Ed.2d 783 (1961).

**32.** *Herring v. New York*, 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975).

**33.** *Geders v. United States, supra* note 24.

**34.** Only three circuits continue to utilize the farce-and-mockery test. *United States v. Wright*, 573 F.2d 681, 683–684 (1st Cir.), *cert. denied*, 436 U.S. 949, 98 S.Ct. 2857, 56 L.Ed.2d 792 (1978) (ineffective assistance of counsel means presentation that makes a mockery, sham or farce of trial); *United States v. Bubar*, 567 F.2d 192, 202 (2d Cir.), *cert. denied*, 434 U.S. 872, 98 S.Ct. 217, 54 L.Ed.2d 171 (1977) (assistance not ineffective unless purported representation by counsel made trial farce and mockery of justice); *United States v. Riebold*, 557 F.2d 697, 703 (10th Cir.), *cert. denied*, 434 U.S. 860, 98 S.Ct. 186, 54 L.Ed.2d 133 (1977) (representation competent unless perfunctory, in bad faith, sham, or pretense). Both the First and the Second Circuits have, however, recently adverted to the higher reasonable-compe-

tence standard without expressly overruling earlier farce-and-mockery language. See *United States v. Wright, supra*, 573 F.2d at 684 (even under higher standard of "reasonably effective assistance," defendant's counsel provided effective assistance); *United States v. Williams*, 575 F.2d 388, 393 (2d Cir.), *cert. denied*, 439 U.S. 842, 99 S.Ct. 134, 58 L.Ed.2d 141 (1978) (performance of counsel did not make proceedings farce or mockery, nor did it fall below standard of reasonably competent attorney acting as diligent, conscientious advocate); *United States v. Tolliver*, 569 F.2d 724, 731 (2d Cir. 1978) (defense counsel's conduct easily met even the more liberal standard that defendant is entitled to reasonably effective assistance of attorney acting as diligent, conscientious advocate).

**35.** See *Moore v. United States*, 432 F.2d 730, 736 (3d Cir. 1970) (defendant entitled to counsel exercising level of skill and knowledge customary to the time and place of representation); *Marzullo v. Maryland*, 561 F.2d 540, 543–544 (4th Cir. 1977), *cert. denied*, 435 U.S. 1011, 98 S.Ct. 1885, 56 L.Ed.2d 394 (1978) (representation must be "within the range of competence demanded of attorneys in criminal cases"); *United States v. Carter*, 566 F.2d 1265, 1272 (5th Cir.), *cert. denied*, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978) (standard for evaluating defense counsel is whether defendant received "reasonably effective assistance"); *United States v. Yelardy*, 567 F.2d 863, 866 (6th Cir.), *cert. denied*, 439 U.S. 842, 99 S.Ct. 133, 58 L.Ed.2d 140 (1978) (assistance of counsel not ineffective when advice is "within the range of competence demanded of attorney in criminal cases"); *Monteer v. Benson*, 574 F.2d 447, 450 (8th Cir. 1978) (defendant entitled

cannot improve on the *DeCoster I* formulation: "a defendant is entitled to the reasonably competent assistance of an attorney acting as his diligent conscientious advocate." [36] All of the standard-of-performance rhetoric in today's opinions seems to come down ultimately to essentially this yardstick for measurement of defense counsel's performance.

I perceive no policy consideration sufficiently forceful to persuade me that utilization of this standard bodes ill for either the attorney-client relationship or the adversary system. Reasonable competence is the concept traditionally and universally employed as the measure of the lawyer's civil liability, without apparent untoward effect.[37] I cannot see how it could take on a destructive propensity merely because the object is reversal of a conviction rather than an assessment of damages.[38] And even assuming that resort to the familiar doctrine of reasonableness upon judicial evaluation of defense counsel's performance may lead to a modicum of trial-court in-

volvement in defense activities, some policing of counsel's rendition is both necessary and appropriate.[39] As the Supreme Court has admonished,

> if the right to counsel guaranteed by the Constitution is to serve its purpose, defendants cannot be left to the mercies of incompetent counsel . . . . [J]udges should strive to maintain proper standards of performance by attorneys who are representing defendants in criminal cases in their courts.[40]

. Nor do I have any quarrel with the plurality's position that the criterion for measuring effectiveness of the assistance must preserve counsel's freedom "to make quick judgment," [41] and that a "shortfall by defense counsel that is perceptible but is modest . . . is no basis for judicial interposition." [42] A reasonableness standard is eminently consistent with these concerns, for it is breached only when counsel's conduct deviates so substantially from an acceptable norm as to merit the label "unreasonable." Plainly, neither "quick judg-

to the "exercise [of] the customary skills and diligence that a reasonably competent attorney would perform under similar circumstances"); *Cooper v. Fitzharris*, 586 F.2d 1325, 1328 (9th Cir. 1978) (defendant entitled to reasonably competent and effective representation). Although the Seventh Circuit does not employ the farce-and-mockery test, it subscribes to a standard that appears to fall somewhere between farce and mockery and reasonably effective assistance. See *United States ex rel. Rooney v. Housewright*, 568 F.2d 516, 525–526 (7th Cir. 1977) (attorney must "exhibit[ ] a minimum degree of professional competency").

**36.** *DeCoster I, supra* note 26, 159 U.S.App.D.C. at 331, 487 F.2d at 1202.

**37.** See, e. g., *National Sav. Bank v. Ward*, 100 U.S. 195, 198, 25 L.Ed. 621, 622 (1880) (attorney is bound to act with "a proper degree of skill, and with reasonable care and to the best of his knowledge"); *Wilcox v. Plummer*, 29 U.S. (4 Pet.) 172, 180, 7 L.Ed. 821, 824 (1830) (attorney is impliedly bound "to act diligently and skillfully" in the conduct of his client's case); *Dorf v. Relles*, 355 F.2d 488, 492 (7th Cir. 1966) (attorney owes to client "good faith and reasonable skill and diligence in the prosecution of the case"); *Palmer v. Nissen*, 256 F.Supp. 497, 501 (D.Me.1966) (attorney is bound to execute business in his profession entrusted to his care with a reasonable degree

of care, skill and dispatch); *Transamerica Ins. Co. v. Keown*, 451 F.Supp. 397, 402 (D.N.J. 1978) (attorney's "standard of care is measured by the knowledge and skill ordinarily possessed and exercised by others in the profession"); *Davis v. Associated Indem. Corp.*, 56 F.Supp. 541, 543 (M.D.Pa.1944) (attorney "must give such attention to his duties, and to the interests of his client, as ordinary prudence demands, or members of the profession usually bestow"). See generally W. Prosser, Torts, § 32 at 161–165 (4th ed. 1971).

**38.** I cite the civil counterpart of the ineffective assistance claim in criminal litigation simply to make the point stated in text. In a civil action for damages, of course, the burden is upon the plaintiff to prove injury flowing from the lawyer's breach of duty, see generally W. Prosser, Torts, § 328A at 149 (4th ed. 1971), and the analogy is lost at this point. See Part III *infra*.

**39.** Bazelon Op., 199 U.S.App.D.C. at ——, 624 F.2d at 297.

**40.** *McMann v. Richardson, supra* note 18, 397 U.S. at 771, 90 S.Ct. at 1449, 25 L.Ed.2d at 773.

**41.** Leventhal Op., 199 U.S.App.D.C. at ——, 624 F.2d at 208.

**42.** *Id.*

ments" nor "modest shortfalls," merely by reason of their character, are sufficiently off the mark to beckon the hand of the courts.[43]

Lastly, there is the query on the caliber of counsel's performance in the instant case, and for myself it is enough to give a short answer. Whatever the full range of his constitutional duty to his client,[44] it is clear that counsel was obligated to conduct a suitable investigation into the facts of the case and to plot the defensive strategy accordingly.[45] For reasons subsequently appearing, I am satisfied that he did not properly discharge that responsibility,[46] and on this at least seven members of the court concur.[47] Where I part company with the majority is the point at which we come to consider whether it was incumbent upon the client to discharge a burden of demonstrating more.

## III. THE BURDEN OF PROOF ON PREJUDICE

The burden of proving unconstitutionality is upon him who asserts it.[48] "That burden," we have said, "extends to production of the facts essential to a determination respecting the constitutional claim."[49] Resultantly, the defendant who would charge ineffective representation "must," we have added, "set forth evidence upon which the elements of a constitutionally

**43.** "A retrospective examination of a lawyer's representation to determine whether it was free from any error would exact a higher measure of competency than the prevailing standard. Perfection is hardly attainable and certainly is not the general rule, especially in professional work where intuitive judgments and spontaneous decisions are often required in varying circumstances. The artistry of the advocate is difficult to judge retrospectively because the elements influencing judgment usually cannot be captured on the record. The kaleidoscopic range of possibilities often seems limitless, and it is proverbial that the finest ideas emerge on the way back from the courthouse. The advocate's work, therefore, is not readily capable of later audit like a bookkeeper's. Of course, not all the activity of the advocate has this highly subjective quality. It is possible to examine the sufficiency of his preparation and the adequacy of his knowledge of the relevant law. Review may disclose failures at the trial. All these are matters which will inform the judgment on a retrospective inquiry whether counsel adequately performed his duty. But since what is required is normal and not exceptional representation, there is room for the realization that it would be difficult to find a case where even the ablest and most experienced trial lawyer would be completely satisfied after a searching re-examination of his conduct of a case." *Moore v. United States, supra* note 35, 432 F.2d at 736–737. See also Bazelon Op., 199 U.S.App.D.C. at ——, 624 F.2d at 276.

**44.** Judge Bazelon has "attempted to give substantive content to the Sixth Amendment's mandate by setting forth [the] minimum requirements of [a] competent performance" in the form of "duties . . . derived from the American Bar Association's *Standards for the Defense Function.*" Bazelon Op., 199 U.S.App.D.C. at ——, 624 F.2d at 275. While I would look to these standards as indications of con-

temporary thought on what a competent performance should offer, I share the plurality's difficulties respecting their use for much more. See Leventhal Op., 199 U.S.App.D.C. at ——, 624 F.2d at 223. Reasonable competence, I think, must retain the degree of flexibility characteristic of most constitutional tests. Judges undoubtedly have enough of a feel to say with confidence that particular activities must enter at a reasonable level of quality into any performance to be deemed effective. Beyond that, in my view, the precise content of effective counsel-assistance must steadily evolve through the traditional and ongoing process of constitutional interpretation in given concrete contexts. In any event, I perceive no need to venture beyond the case before us, and for me the outcome on duty to investigate is decisive. See Part IV *infra,* and note 159.

**45.** See Part III *infra.*

**46.** See Part IV *infra.*

**47.** See Leventhal Op., 199 U.S.App.D.C. at ——, 624 F.2d at 212; Bazelon Op., 199 U.S.App.D.C. at ——, 624 F.2d at 279. But see MacKinnon Op., 199 U.S.App.D.C. at ——, 624 F.2d at 232.

**48.** See, *e. g., Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752, 766 (1976); *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 364, 93 S.Ct. 1001, 1006, 35 L.Ed.2d 351, 358 (1973); *Goldblatt v. Town of Hempstead,* 369 U.S. 590, 596, 82 S.Ct. 987, 991, 8 L.Ed.2d 130, 135 (1962); *Flemming v. Nestor,* 363 U.S. 603, 617, 80 S.Ct. 1367, 1376, 4 L.Ed.2d 1435, 1448 (1960).

**49.** *United States v. Canty,* 152 U.S.App.D.C. 103, 110, 469 F.2d 114, 121 (1972).

deficient performance might properly be found." [50] We remain divided, however, on the question whether the demonstration incumbent upon the defendant includes a showing that his counsel's allegedly subpar rendition actually or potentially affected the outcome of the case.

A majority of the court considers detriment to the defendant's interests an indispensable ingredient of his constitutional claim, and thus a factor for him to prove. For them, the defendant must establish adversity resulting from the deficient conduct, else there is no infringement of the constitutional right. For Judge Leventhal and subscribers to his opinion, the crucial item is likely prejudice,[51] for Judge MacKinnon and those who join him, it is actual prejudice.[52] Judge MacKinnon goes so far as to insist that overwhelming evidence of guilt relieves defense counsel of the duty to conduct any more than minimal investigation on his client's behalf.[53]

I cannot agree with either of these formulations. Careful review of the caselaw convinces me that the burden-of-proof allocation they direct is an unwarranted distortion of the role that prejudice ordinarily plays in constitutional determinations and an impermissible expansion of the limited function of harmless error. In my view, the defendant establishes a constitutional violation when he makes out a substantial breach of duty by his counsel, and it is then up to the Government to demonstrate lack of ensuing prejudice if it can.

A. *The General Role of Prejudice in Constitutional Adjudications*

In *Chapman v. California*,[54] the Supreme Court was asked to decide whether a violation of the Federal Constitution can ever be considered innocuous. The Court's response, in essence, was that the answer depends upon the nature of the constitutional entitlement at stake. The Court declared that "there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." [55] The Court refused, however, "to hold that all federal constitutional errors, regardless of the facts and circumstances, must always be deemed harmful." [56] Rather, said the Court, "there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." [57] Thus an absence of prejudice may or may not be a valid judicial concern when a federal constitutional transgression is under investigation.

*Chapman* also addressed the allocation of burden of proof in those instances where harmlessness is entitled to some role. "Certainly error, constitutional error, in illegally admitting highly prejudicial evidence or comments," the Court cited as an example, "casts on someone other than the person prejudiced by it a burden to show that it was harmless"; [58] [i]t is for that reason," the Court noted, "that the original common-law harmless-error rule put the burden on the beneficiary of the error either to prove that there was no injury or to suffer a reversal of his erroneously obtained judgment." [59] And not only is the burden thus to be assigned but, when the asserted error is of constitutional dimension, it is a burden

**50.** *United States v. Pinkney,* 177 U.S.App.D.C. 423, 431, 543 F.2d 908, 916 (1976).

**51.** Leventhal Op., 199 U.S.App.D.C. at ——, 624 F.2d at 207.

**52.** MacKinnon Op., 199 U.S.App.D.C. at ——, 624 F.2d at 232.

**53.** *Id.* at ——, 624 F.2d at 233.

**54.** 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

**55.** *Id.* at 23, 87 S.Ct. at 827–828, 17 L.Ed.2d at 710 (footnote omitted). See also *Harrington v. California,* 395 U.S. 250, 251, 89 S.Ct. 1726, 1727, 23 L.Ed.2d 284, 286 (1969).

**56.** *Chapman v. California, supra* note 54, 386 U.S. at 21, 87 S.Ct. at 827, 17 L.Ed.2d at 709.

**57.** *Id.* at 22, 87 S.Ct. at 827, 17 L.Ed.2d at 709.

**58.** *Id.* at 24, 87 S.Ct. at 828, 17 L.Ed.2d at 710.

**59.** *Id.,* citing 1 J. Wigmore, § 21 (3d ed. 1940).

of peculiar weight. The rule appropriate, the Court declared, "requir[es] the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."[60] So it was that, for cases wherein harmlessness is a factor at all,[61] the bottom line was drawn: "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."[62]

*Chapman* did not, of course, speak to the precise question dividing us today—whether the defendant must prove prejudice as an element of his constitutional ineffective-assistance claim. But indubitably implicit in *Chapman* is the central theme that for a great many constitutional violations—and for perhaps the decided majority—the defendant need not demonstrate harm, either actual or potential, in order to obtain relief. Rather, it may be permissible, but only in some instances, for the Government to attempt to show lack of prejudice, and even then the proof must establish it beyond a reasonable doubt.

*Chapman* remains the seminal precedent today,[63] and obviously it demands two vital inquiries in the case at bar. Is prejudice a legitimate consideration in the assessment of a charge of ineffective assistance of counsel? If so, upon whom rests the burden of proof? Stating the second question somewhat differently, is a showing of threatened or consummated harm from a proven breach of counsel's duties an essential element of the defendant's claim, or is a demonstration of actual harmlessness a matter for the Government to undertake?

Many constitutional errors in criminal trials invoke a per se rule. The constitutional violation triggers spontaneous reversal of an ensuing conviction without any exploration into its real or probable effect upon the trial. Just when that will be the case is a question answerable only upon careful analysis of the nature of the right invaded and its capacity to withstand the inherent fallibility of an investigation into prejudice. From a host of diverse considerations that may deserve attention in the analysis, several come immediately to the fore.

One is the constitutional, statutory or judicial recognition the right has been accorded,[64] as well as the purpose the right subserves.[65] Another is the degree of prejudicial propensity of a trespass upon the right.[66] Still another is the feasibility of an

---

**60.** *Chapman v. California, supra* note 54, 386 U.S. at 24, 87 S.Ct. at 828, 17 L.Ed.2d at 710. For this the Court found support in its earlier decision in *Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171, 173 (1963).

**61.** See text *supra* at note 55.

**62.** *Chapman v. California, supra* note 54, 386 U.S. at 24, 87 S.Ct. at 828, 17 L.Ed.2d at 710–711. See also *Harrington v. California, supra* note 55, 395 U.S. at 251, 89 S.Ct. at 1727, 23 L.Ed.2d at 286.

**63.** See *Holloway v. Arkansas, supra* note 18, 435 U.S. at 490, 98 S.Ct. at 1182, 55 L.Ed.2d at 438 (citing *Chapman v. California, supra* note 54).

**64.** See *Estelle v. Williams,* 425 U.S. 501, 504, 96 S.Ct. 1691, 1693, 48 L.Ed.2d 126, 130 (1976) (citing overwhelming judicial recognition of accused's right not to be compelled to go to trial in prison clothing); *Estes v. Texas,* 381 U.S. 532, 544, 85 S.Ct. 1628, 1633–1634, 14 L.Ed.2d 543, 551 (1965) (noting that 48 states and the Federal Rules have proscribed the use of televi-

sion in the courtroom); *Peters v. Kiff,* 407 U.S. 493, 501–503, 92 S.Ct. 2163, 2168, 33 L.Ed.2d 83, 93–94 (1972) (adverting to long history of constitutional protection from actually or potentially biased tribunal); *Johnson v. Zerbst,* 304 U.S. 458, 467–468, 58 S.Ct. 1019, 1024, 82 L.Ed. 1461, 1468 (1938) (citing explicit guaranty of right to counsel in Sixth Amendment).

**65.** See *Barker v. Wingo,* 407 U.S. 514, 519–521, 92 S.Ct. 2182, 2186–2187, 33 L.Ed.2d 101, 110–111 (1972); *United States v. Dougherty,* 154 U.S.App.D.C. 76, 91, 473 F.2d 1113, 1128 (1972).

**66.** See *Estelle v. Williams, supra* note 64, 425 U.S. at 504, 96 S.Ct. at 1693, 48 L.Ed.2d at 130 (trial of defendant in prison attire inherently prejudicial; actual harm need not be shown); *Barker v. Wingo, supra* note 65, 405 U.S. at 521, 532, 92 S.Ct. at 2187, 2193, 33 L.Ed.2d at 111–112, 118 (violation of right to speedy trial not inherently prejudicial; actual injury must be shown); *Hamilton v. Alabama,* 368 U.S. 52, 55, 82 S.Ct. 157, 159, 7 L.Ed.2d 114, 116–117 (1961) (absence of counsel on entry of guilty plea inherently prejudicial; actual prejudice

effort to measure the impact of the constitutional violation upon the outcome of the trial.[67] Not the least may be an uncompromising policy of deterring repetition of the same unconstitutional conduct in the future.[68] A modest sampling of Supreme Court decisions will illustrate the interplay of these and other factors.

Conviction by a judge having personally a direct and substantial interest in convicting necessitates reversal "[n]o matter what the evidence was against" the accused because "he had the right to have an impartial judge"[69] stemming from long-standing judicial realization that a biased tribunal violates fundamental due process.[70] Conviction by a jury selected through use of discriminatory techniques demands the same result because "[i]t is in the nature of [that evil] that proof of actual harm, or lack of harm, is virtually impossible to adduce,"

and "there is no way to determine what jury would have been selected under a constitutionally valid selection system, or how that jury would have decided the case."[71] Inflammatory publicity massively and pervasively surrounding a trial vitiates it without any special showing of consequent harm when "the totality of circumstances" indicates inherent prejudice.[72] Televising courtroom proceedings in a criminal case has been held violative of due process even absent proof of injury because it is innately harmful,[73] its adverse effects are too subtle to prove[74] and the practice has met widespread condemnation.[75]

Similarly, admission into evidence of a coerced confession requires reversal as the sanction responsive to offensive police activity, irrespective of evidence of guilt dooming any argument that the admission was actually prejudicial.[76] Committing the

need not be shown); *Estes v. Texas, supra* note 64, 381 U.S. at 542–550, 85 S.Ct. at 1632–1636, 14 L.Ed.2d at 550–554 (use of television in courtroom inherently prejudicial; actual prejudice need not be shown); *Turner v. Louisiana,* 379 U.S. 466, 473–474, 85 S.Ct. 546, 550, 13 L.Ed.2d 424, 429–430 (1965) (no need to consider actual effects of close contact between jurors and prosecution witnesses because association inherently prejudicial); *Rideau v. Louisiana,* 373 U.S. 723, 726–727, 83 S.Ct. 1417, 1419–1420, 10 L.Ed.2d 663, 665–666 (1963) (televising defendant in act of confessing crime inherently prejudicial; actual prejudice need not be shown); *Williams v. Kaiser,* 323 U.S. 471, 475–476, 65 S.Ct. 363, 366, 89 L.Ed. 398, 402 (1945) (absence of attorney at entry of guilty plea inherently prejudicial; actual prejudice need not be shown).

**67.** See *Peters v. Kiff, supra* note 64, 407 U.S. at 503–504, 92 S.Ct. at 2169, 33 L.Ed.2d at 94–95 (proof of harm from verdict of unconstitutionally selected jury impossible to adduce); *Estes v. Texas, supra* note 64, 381 U.S. at 544–545, 85 S.Ct. at 1633–1634, 14 L.Ed.2d at 551 (harmful effects from televised trial too subtle to prove).

**68.** See note 76 *infra* and accompanying text.

**69.** *Tumey v. Ohio,* 273 U.S. 510, 535, 47 S.Ct. 437, 445, 71 L.Ed. 749, 759 (1927).

**70.** *Id.* at 522–531, 47 S.Ct. at 441–444, 71 L.Ed. at 754–758.

**71.** *Peters v. Kiff, supra* note 64, 407 U.S. at 504, 92 S.Ct. at 2169, 33 L.Ed.2d at 94–95. In *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42

L.Ed.2d 690 (1975), the Court, holding that the Sixth Amendment guaranty of an impartial jury encompasses the right to a jury drawn from both the male and female populations, reversed a conviction reached by an unconstitutionally drawn jury without even discussing the relevance of prejudice. *Id.* at 526–538, 95 S.Ct. at 695–702, 42 L.Ed.2d at 695–703; see *id.* at 538–543, 95 S.Ct. at 702–704, 42 L.Ed.2d at 703–705 (dissenting opinion).

**72.** *Sheppard v. Maxwell,* 384 U.S. 333, 351–353, 363, 86 S.Ct. 1507, 1516–1517, 1522, 16 L.Ed.2d 600, 614, 621 (1966).

**73.** *Estes v. Texas, supra* note 64, 381 U.S. at 542–550, 85 S.Ct. at 1632–1636, 14 L.Ed.2d at 550–554.

**74.** *Id.* at 544, 85 S.Ct. at 1633, 14 L.Ed.2d at 551.

**75.** *Id.*

**76.** *Blackburn v. Alabama,* 361 U.S. 199, 206–207, 80 S.Ct. 274, 279–280, 4 L.Ed.2d 242, 248 (1960) ("in cases involving involuntary confessions, [the] Court enforces the strongly felt attitude of our society that important human values are sacrificed when an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will. . . . [A] complex of values underlies the stricture against use by the state of confessions which, by way of convenient shorthand, [the] Court terms involuntary . . . . .") (citations omitted); *Spano v. New*

jury to continuous custody by deputy sheriffs who also were the principal prosecution witnesses denies due process "even if it could be assumed that the deputies never did discuss the case directly with any members of the jury," for "it would be blinking reality not to recognize the extreme prejudice inherent in [the] continual association . . . ." [77] And incorporation of an unconstitutional presumption into the court's instructions to the jury invalidates the verdict even though it is amply sustained by evidence apart from the presumption; the reason is that "[i]n view of the place of importance that trial by jury has in our Bill of Rights, it is not to be supposed that Congress intended to substitute the belief of appellate judges in the guilt of an accused, however justifiably engendered by the dead record, for ascertainment of guilt by a jury under appropriate judicial guidance, however cumbersome that process may be." [78] And we ourselves have held that denial of the accused's fundamental statutory, quasi-constitutional right to appear *pro se* is not redeemed by "the subsequent conclusion that [his] practical position [was not] disadvantaged," [79] for the right "is designed to safeguard the dignity and autonomy of those whose circumstances or activities have thrust them involuntarily into the criminal process." [80]

As *Chapman* made clear, however, not every mistake of constitutional magnitude in a criminal trial leads inexorably to reversal. The majority opinion was careful to point out "that there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may . . . be deemed harmless . . . ." [81] The concurring opinion similarly noted that "constitutional rights are not fungible goods," and that "[t]he differing values which they represent and protect may make a harmless-error rule appropriate for one type of constitutional error and not for another." [82] Indeed, the particular violation dealt with in *Chapman* [83] was held to invoke, not the per se rule of automatic reversal, but the special federal harmless-error rule fashioned in that case for infringements of those constitutional rights that might tolerate it.[84] It bears repeating, however, that when harmlessness is permitted any sway at all, a much higher-than-normal standard for affirmance obtains: "[B]efore a federal constitutional error can be held harmless, the

---

*York,* 360 U.S. 315, 320–321, 79 S.Ct. 1202, 1205–1206, 3 L.Ed.2d 1265, 1270 (1959) ("[t]he abhorrence of society to the use of involuntary confessions does not turn alone on their inherent untrustworthiness. It also turns on the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves"); *Rochin v. California,* 342 U.S. 165, 173, 72 S.Ct. 205, 210, 96 L.Ed. 183, 190–191 (1952) ("[u]se of involuntary verbal confessions in State criminal trials is constitutionally obnoxious not only because of their unreliability. . . . Coerced confessions offend the community's sense of fair play and decency"). Reversal is automatic despite the presence of other evidence leaving little doubt of the truth of what was confessed. *E. g., Haynes v. Washington,* 373 U.S. 503, 518, 83 S.Ct. 1336, 1345, 10 L.Ed.2d 513, 523 (1963); *Lynumn v. Illinois,* 372 U.S. 528, 537, 83 S.Ct. 917, 922, 9 L.Ed.2d 922, 928 (1963); *Rochin v. California, supra.*

77. *Turner v. Louisiana, supra* note 66, 379 U.S. at 473, 85 S.Ct. at 550, 13 L.Ed.2d at 429.

78. *Bollenbach v. United States,* 326 U.S. 607, 615, 66 S.Ct. 402, 406, 90 L.Ed. 350, 356 (1946).

79. *United States v. Dougherty, supra* note 65, 154 U.S.App.D.C. at 91, 473 F.2d at 1128.

80. *Id.*

81. *Chapman v. California, supra* note 54, 386 U.S. at 22, 87 S.Ct. at 827, 17 L.Ed.2d at 709.

82. *Id.* at 44, 87 S.Ct. at 838, 17 L.Ed.2d at 722.

83. Prosecutorial comment on the defendants' failures to testify and an instruction authorizing the jury to draw adverse inferences from those failures, practices condemned in *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965).

84. *Chapman v. California, supra* note 54, 386 U.S. at 22–26, 87 S.Ct. at 827–829, 17 L.Ed.2d at 707–711.

court must be able to declare a belief that it was harmless beyond a reasonable doubt." [85]

Since *Chapman's* day, decisions holding constitutional errors harmless are legion.[86] Usually, they have involved transgressions in the presence of the court,[87] instances in which assessment of the harm can be made with relative safety.[88] As the Supreme Court recently remarked,

> [i]n the normal case where a harmless error rule is applied, the error occurs at trial and its scope is readily identifiable. Accordingly, the reviewing court can undertake with some confidence its relatively narrow task of assessing the likelihood that the error materially affected the deliberations of the jury.[89]

It is evident, however, that there are out-of-court contexts in which it is entirely feasible to ascertain whether the accused almost assuredly would have been convicted even absent the cited error.[90] One such occasion rather clearly is when "the case against [the defendant is] . . . so overwhelming that [the court can] conclude that [the] violation . . . was harmless beyond a reasonable doubt . . . ." [91]

## B. The Role of Prejudice in Right-to-Counsel Cases

Supreme Court decisions on the function of prejudice in right-to-counsel cases reflect essentially the same considerations pertinent in other areas of constitutional error.[92]

---

85. *Id.* at 24, 87 S.Ct. at 828, 17 L.Ed.2d at 710–711.

86. See *Brown v. United States,* 411 U.S. 223, 230–232, 93 S.Ct. 1565, 1570, 36 L.Ed.2d 208, 215 (1973) (statement submitted into evidence in contravention of *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); error deemed harmless); *Schneble v. Florida,* 405 U.S. 427, 430–432, 92 S.Ct. 1056, 1059–1060, 31 L.Ed.2d 340, 344–345 (1972) (*Bruton* violation harmless error); *Harrington v. California, supra* note 55, 395 U.S. at 251–254, 89 S.Ct. at 1727, 23 L.Ed.2d at 286 (*Bruton* violation harmless error); *Bumper v. North Carolina,* 391 U.S. 543, 550, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797, 803 (1968) (admission of evidence seized in transgression of Fourth Amendment evaluated under *Chapman* harmless-error test); *Fontaine v. California,* 390 U.S. 593, 596, 88 S.Ct. 1229, 1231, 20 L.Ed.2d 154, 157 (1968) (comments on defendant's failure to take the witness stand—an infringement of his constitutional privilege against self-incrimination, see note 83 *supra*—viewed under *Chapman* harmless-error test); *United States v. Alston,* 179 U.S.App.D.C. 129, 130, 551 F.2d 315, 316 (1976) (erroneous burden-of-proof instruction dealt with under *Chapman* harmless-error test); *United States v. Pinkney,* 179 U.S.App.D.C. 282, 285–286, 551 F.2d 1241, 1244–1245 (1976) (erroneous burden-of-proof instruction addressed under *Chapman* harmless-error test); *United States v. Liddy,* 177 U.S.App.D.C. 1, 7–8, 542 F.2d 76, 82–83 (1976) (merits of claims of violations under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and deprivation of Sixth Amendment right to compulsory process not reached because error if any was harmless); *United States v. Scott,* 174 U.S.App.D.C. 96, 98–99, 529 F.2d 338, 340–341 (1975) (erroneous burden-of-proof instruction harmless beyond a reasonable doubt); *United States v. Liddy,* 166 U.S.App.D.C. 95, 111–112,

509 F.2d 428, 444–445 (1974), *cert. denied,* 420 U.S. 911, 95 S.Ct. 833, 42 L.Ed.2d 842 (1975) (admission of evidence that accused retained attorney and instruction permitting adverse inference to be drawn therefrom "raises Sixth Amendment problems under *Griffin*," *supra* note 83; even assuming constitutional violation, error was harmless under *Chapman*); *United States v. Lindsay,* 165 U.S.App.D.C. 105, 113, 506 F.2d 166, 174 (1974) (admission of unconstitutionally seized evidence assessed under *Chapman* harmless-error test).

87. The harmless error test is most commonly applied in cases in which the asserted constitutional violation takes the form of receipt of inadmissible evidence, erroneous jury instructions or improper comments by the prosecutor. See cases cited *supra* note 86.

88. Error consisting of a specific trial occurrence differs readily from pervasive error in the form of a biased tribunal, prejudicial publicity or complete lack of counsel. Compare cases cited *supra* note 86 with text *supra* at notes 64–80.

89. *Holloway v. Arkansas, supra* note 18, 435 U.S. at 490, 98 S.Ct. at 1182, 55 L.Ed.2d at 438.

90. See notes 103–113 *infra* and accompanying text.

91. *Harrington v. California, supra* note 55, 395 U.S. at 254, 89 S.Ct. at 1728, 23 L.Ed.2d at 287.

92. See *Holloway v. Arkansas, supra* note 18, 435 U.S. at 487–491, 98 S.Ct. at 1180–1182, 55 L.Ed.2d at 436–438; *Herring v. New York, supra* note 32, 422 U.S. at 865, 95 S.Ct. at 2556–2557, 45 L.Ed.2d at 602; *Chapman v. California, supra* note 54, 386 U.S. at 43, 87 S.Ct. at

Two factors combine to frequently render *Chapman's* special harmless-error rule inappropriate. First, entitlement to assistance of counsel is explicitly conferred by the Sixth Amendment,[93] with effectiveness of the assistance as its soul.[94] Second, harm to the accused's interests is inherent in many denials of the right,[95] and the scope of consequent injury all too often is not readily identifiable or probable.[96]

Thus, where the defendant had no counsel at all at a critical stage of his trial, automatic reversal of his conviction is usually in order.[97] That result follows also when counsel became available too late for adequate preparation,[98] or when he labored under a conflict of interest precluding completely loyal and effective service to his client.[99] In these instances, harm to the accused is well nigh inescapable,[100] and intelligent assessment of its range is elusive because the effects of the violation might well permeate the entire trial.[101]

In some circumstances, however, not even a total lack of counsel necessarily commands these conclusions. Prejudice may not approach the plane of inevitability, or an acceptable judicial appraisal thereof may not be out of reach.[102] Examples of resort

837, 17 L.Ed.2d at 721 (concurring opinion); *Hamilton v. Alabama, supra* note 66, 368 U.S. at 55, 82 S.Ct. at 159, 7 L.Ed.2d at 116–117; *Glasser v. United States, supra* note 18, 315 U.S. at 75–76, 62 S.Ct. at 467, 86 L.Ed. at 706.

**93.** See text *supra* at note 21; *Johnson v. Zerbst, supra* note 64, 304 U.S. at 467–468, 58 S.Ct. at 1024, 82 L.Ed. at 1468.

**94.** See notes 21–36 *supra* and accompanying text.

**95.** *Chapman v. California, supra* note 54, 386 U.S. at 43, 87 S.Ct. at 837, 17 L.Ed.2d at 721 (concurring opinion); *Hamilton v. Alabama, supra* note 66, 368 U.S. at 55, 82 S.Ct. at 159, 7 L.Ed.2d at 116–117 ("[o]nly the presence of counsel could have enabled [the] accused to know all the defenses available to him and to plead intelligently"); *Williams v. Kaiser, supra* note 66, 323 U.S. at 475–476, 65 S.Ct. at 366, 89 L.Ed. at 402 ("[a] layman is usually no match for the skilled prosecutor whom he confronts in the courtroom. He needs the aid of counsel lest he be the victim of overzealous prosecutors, of the law's complexity, or of his own ignorance or bewilderment").

**96.** *Hamilton v. Alabama, supra* note 66, 368 U.S. at 55, 82 S.Ct. at 159, 7 L.Ed.2d at 116–117 ("the degree of prejudice [from absence of counsel at arraignment] can never be known"); *Williams v. Kaiser, supra* note 66, 323 U.S. at 475, 65 S.Ct. at 366, 89 L.Ed. at 402 ("we cannot know the degree of prejudice which the denial of counsel caused"); *Glasser v. United States, supra* note 18, 315 U.S. at 75–76, 62 S.Ct. at 467, 86 L.Ed. at 702 ("[t]o determine the precise degree of prejudice sustained by [the defendant] as a result of [appointed counsel's conflict of interest] is at once difficult and unnecessary").

**97.** See, *e. g., Chapman v. California, supra* note 54, 386 U.S. at 43, 87 S.Ct. at 837, 17 L.Ed.2d at 721; *Gideon v. Wainwright, supra* note 18, 372

U.S. at 336–338, 345, 83 S.Ct. at 793, 797, 9 L.Ed.2d at 800, 806; *Hamilton v. Alabama, supra* note 66, 368 U.S. at 55, 82 S.Ct. at 159, 7 L.Ed.2d at 116–117; *Williams v. Kaiser, supra* note 66, 323 U.S. at 475–476, 65 S.Ct. at 366, 89 L.Ed. at 402; *White v. Maryland*, 373 U.S. 59, 60, 83 S.Ct. 1050, 1051, 10 L.Ed.2d 193, 194 (1963).

**98.** *Powell v. Alabama, supra* note 19, 287 U.S. at 71–72, 53 S.Ct. at 65, 77 L.Ed. at 171–172.

**99.** *Holloway v. Arkansas, supra* note 18, 435 U.S. at 481–484, 490, 98 S.Ct. at 1177–1179, 1182, 55 L.Ed.2d at 433–434, 438; *Glasser v. United States, supra* note 18, 315 U.S. at 76, 62 S.Ct. at 468, 86 L.Ed. at 702.

**100.** See note 95 *supra*.

**101.** See note 96 *supra*.

**102.** See *Milton v. Wainwright*, 407 U.S. 371, 377–378, 92 S.Ct. 2174, 2178, 33 L.Ed.2d 1, 6–7 (1972) (alleged Fifth and Sixth Amendment infractions not reached because error, if any, was harmless); *Coleman v. Alabama*, 399 U.S. 1, 11, 90 S.Ct. 1999, 2004, 26 L.Ed.2d 387, 397–398 (1970) (case remanded to determine whether denial of right to counsel at preliminary hearing was harmless error); *United States v. Wade*, 388 U.S. 218, 242, 87 S.Ct. 1926, 1940, 18 L.Ed.2d 1149, 1166 (1967) (case remanded to ascertain impact of lack of counsel at lineup). See also *Anderson v. United States*, 122 U.S. App.D.C. 277, 279, 352 F.2d 945, 947 (1965) (absence of counsel at arraignment harmless because record "affirmatively shows that no prejudice resulted"); *In re DiBella*, 518 F.2d 955, 959 (2d Cir. 1975) (exclusion of counsel from reading of grand jury minutes during contempt proceedings harmless where client was allowed to repeat substance to counsel and exact phraseology was not possibly important); *United States v. Crowley*, 529 F.2d 1066, 1070–1071 (3d Cir.), *cert. denied*, 425 U.S. 995, 96

to the harmless-error rule are to be found when the sole consequence of the violation is the admission of evidence tainted by the absence of counsel at the time of its acquisition. An identification of an unrepresented suspect at a pretrial lineup is legally inadmissible,[103] as is an in-court identification attributable only to the lineup,[104] but the use of such an identification does not necessitate reversal if the Government proves its harmlessness beyond a reasonable doubt.[105] The admission into evidence of a voluntary confession taken from an uncounselled arrestee without constitutionally-required warnings,[106] or out of the presence of counsel after his appointment,[107] may similarly be cured,[108] in both instances, if the error is discrete and its adverse effects measurable.

Want of counsel at some other pretrial proceedings—preliminary hearing,[109] arraignment,[110] entry of a not-guilty plea[111]—or even during short periods of the trial itself[112] may be found to be harmless. In each situation, by reason of the nature of the proceeding or the brevity of counsel's absence, the range of possible negative consequences is limited[113] and possibly amenable to evaluation.

Impairment of the right to effective assistance of counsel shares the characteristics of other right-to-counsel violations treatable as harmless error. Prejudice may not be invariably a concomitant of counsel's delinquency, or the presence and extent of injury may be susceptible to an acceptable

S.Ct. 2209, 48 L.Ed.2d 820 (1976) (denial of counsel at hearing on motion to withdraw guilty plea harmless under the circumstances).

**103.** *Gilbert v. California,* 388 U.S. 263, 269–273, 87 S.Ct. 1951, 1954–1957, 18 L.Ed.2d 1178, 1184–1187 (1967). See also *Moore v. Illinois,* 434 U.S. 220, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977).

**104.** *United States v. Wade, supra* note 102, 388 U.S. at 223–242, 87 S.Ct. at 1930–1940, 18 L.Ed.2d at 1155–1166.

**105.** *Moore v. Illinois, supra* note 103, 434 U.S. at 232, 98 S.Ct. at 466, 54 L.Ed.2d at 263 (case remanded for determination of whether admission of evidence of identification of unrepresented accused at preliminary hearing was harmless error); *Gilbert v. California, supra* note 103, 388 U.S. at 274, 87 S.Ct. at 1957, 18 L.Ed.2d at 1187 (case remanded for inquiry into degree of harm from introduction of evidence of pretrial identification of unrepresented suspect at lineup); *United States v. Wade, supra* note 102, 388 U.S. at 242, 87 S.Ct. at 1940, 18 L.Ed.2d at 1166 (case remanded for ascertainment of impact on in-court identification of prior identification of unrepresented suspect at pretrial lineup).

**106.** See *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**107.** See *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

**108.** *Milton v. Wainwright, supra* note 102, 407 U.S. at 375–378, 92 S.Ct. at 2177–2178, 33 L.Ed.2d at 5–7 (merits of alleged *Massiah* violation not reached because error, if any, harmless); *United States v. Cheung Kin Ping,* 555 F.2d 1069, 1076–1077 (2d Cir. 1977) (use of

defendant's incriminating statements inadmissible under *Miranda* harmless error because evidence was merely cumulative).

**109.** See *Coleman v. Alabama, supra* note 102, 399 U.S. at 10–11, 90 S.Ct. at 2003–2004, 26 L.Ed.2d at 397–398. But see *White v. Maryland, supra* note 97.

**110.** See *Anderson v. United States, supra* note 102. But see *Hamilton v. Alabama, supra* note 66.

**111.** See *United States v. Crowley, supra* note 102; *McGill v. United States,* 121 U.S.App.D.C. 179, 180–182, 348 F.2d 791, 792–794 (1965).

**112.** See *In re DiBella, supra* note 102; *United States v. Calabro,* 467 F.2d 973, 988–989 (1972), *cert. denied,* 410 U.S. 926, 93 S.Ct. 1358, 35 L.Ed.2d 587 (1973) (counsel's absence because of illness during jury deliberations and return of verdict harmless).

**113.** In another context, the Supreme Court has observed that " 'lack of counsel at a preliminary hearing involves less danger to "the integrity of the truth-determining process at trial" than the omission of counsel at the trial itself or on appeal. Such danger is not ordinarily greater, we consider, at a preliminary hearing at which the accused is unrepresented than at a pretrial line-up or at an interrogation conducted without presence of an attorney.' " *Adams v. Illinois,* 405 U.S. 278, 283, 92 S.Ct. 916, 919, 31 L.Ed.2d 202, 208 (1972), quoting *People v. Adams,* 46 Ill.2d 200, 263 N.E.2d 490, 494 (1970), in turn quoting *Stovall v. Denno,* 388 U.S. 293, 298, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199, 1204 (1967).

degree of accurate measurement.[114] It is worth noting in this connection that in meeting his burden of showing inadequate representation, it is not enough that the defendant merely protest that his counsel was incompetent; he must stake out the shortfalls of which he complains.[115] This sort of particularization, in turn, supplies the specific points of reference that facilitate the inquiry on prejudice. In *Chambers v. Maroney*,[116] for example, upon a charge that counsel was inadequate because he was appointed too close to trial to permit preparation, the Supreme Court examined the deficiencies cited and found that in each instance the blunder, if any, was noninjurious.[117]

I conclude, then, that the right to effective assistance of counsel is amenable to the harmless-error rule. This is not to say, however, that prejudice to the accused, either threatened or consummated, is a *sine qua non* of the constitutional claim. The defendant must demonstrate a substantial failure by counsel to discharge an important duty, but when he does so I think the claim is sustained although counsel's mistake may be inconsequential—and thus may not incur reversal—because as matters turn out it doubtless did not influence the end result.

## C. *Allocation of the Burden of Proof on Prejudice*

Proof of actual or potential harm is not normally an element of the showing prerequisite to establishing a violation of a right specifically enumerated in the Constitution.[118] To be sure, prejudice is a factor relevant though not indispensable to a determination respecting observance of the Sixth Amendment right to speedy trial;[119] certainly, too, "in most cases involving claims of due process deprivations  .  .  . a showing of identifiable prejudice to the accused" is required.[120] But prejudice is

---

**114.** See *United States ex rel. Chambers v. Maroney,* 408 F.2d 1186, 1194 (3d Cir. 1969), aff'd, *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Twiford v. Peyton,* 372 F.2d 670, 673 (4th Cir. 1967); *Martin v. Commonwealth of Virginia,* 365 F.2d 549, 551–552 (4th Cir. 1966).

**115.** See *United States v. Pinkney, supra* note 50, 177 U.S.App.D.C. at 430–432, 543 F.2d at 915–917.

**116.** *Supra* note 114.

**117.** 399 U.S. at 53–54, 90 S.Ct. at 1982–1983, 26 L.Ed.2d at 429–430.

**118.** See, *e. g., Dickey v. Florida,* 398 U.S. 30, 54, 90 S.Ct. 1564, 1577, 26 L.Ed.2d 26, 41–42 (1970) ("[w]ithin the context of Sixth Amendment rights, the defendant generally does not have to show that he was prejudiced by the denial of counsel, confrontation, public trial, and impartial jury, knowledge of the charges against him, trial in the district where the crime was committed, or compulsory process"); *Chapman v. California, supra* note 54, 386 U.S. at 42–44, 87 S.Ct. at 836–837, 17 L.Ed.2d at 720–721 (concurring opinion) (citing numerous cases requiring automatic reversal for violations of Fifth and Sixth Amendment rights); *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (defendant claiming violations of Fourth Amendment rights need only show that evidence has been seized without a properly-issued warrant and without the justification of an exception to the warrant

requirement); *Snyder v. Massachusetts,* 291 U.S. 97, 116, 54 S.Ct. 330, 336, 78 L.Ed. 674, 683 (1934) (some "constitutional privileges or immunities may be conferred so explicitly as to leave no room for an inquiry whether prejudice to a defendant has been wrought through their denial"). See also text *supra* at notes 54–64.

**119.** *Barker v. Wingo, supra* note 65, 407 U.S. at 521, 532, 92 S.Ct. at 2187, 2193, 33 L.Ed.2d at 111–112. Extraordinary treatment is accorded the speedy trial right because it "is generically different from any of the other rights enshrined in the Constitution for the protection of the accused." *Id.* at 519, 92 S.Ct. at 2186, 33 L.Ed.2d at 110. First, "there is a societal interest in providing a speedy trial which exists separate from, and at times in opposition to, the interests of the accused." *Id.* at 519, 92 S.Ct. at 2186, 33 L.Ed.2d at 110–111. Second, "deprivation of the right may work to the accused's advantage." *Id.* at 521, 92 S.Ct. at 2187, 33 L.Ed.2d at 111. Third, "the right to speedy trial is a more vague concept than other procedural rights." *Id.* at 521, 92 S.Ct. at 2187, 33 L.Ed.2d at 112. Finally, unlike many other protections that can be safeguarded through exclusion of tainted evidence or reversal for a new trial, the only remedy for a speedy-trial violation is dismissal of the charge. *Id.* at 522, 92 S.Ct. at 2188, 33 L.Ed.2d at 112.

**120.** *Estes v. Texas, supra* note 64, 381 U.S. at 542, 85 S.Ct. at 1632–1633, 14 L.Ed.2d at 550. See also *United States v. Agurs,* 427 U.S. 97, 108, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342, 352

presumed for many due process denials,[121] and so too it generally is for trespasses on the Sixth Amendment right to counsel.[122] Sometimes, as has been seen, that presumption is conclusive in the sense that any effort to demonstrate an absence of injury-in-fact is totally foreclosed.[123] And even when the presumption is not fully preclusive, it permits no more than an attempted showing by the accused's adversary that the constitutional transgression was harmless beyond a reasonable doubt.[124]

In no uncertain terms, a positive guaranty of assistance of counsel is enshrined in the Sixth Amendment.[125] It is, I reiterate, unmistakably a pledge of the effective as-sistance of counsel.[126] I perceive no reason why that right, like the vast majority of others that the Constitution makes explicit, should not be fully honored upon the usual presumption, as distinguished from proof of prejudice from its denial.

The right we deal with was first articulated by the Supreme Court nearly a half-century ago.[127] It has enjoyed full stature in the Court ever since.[128] It has been proclaimed with regularity in every federal circuit.[129] Though sometimes attributed to the exigencies of due process, its Sixth Amendment origin has long been recognized;[130] though originally construed narrowly,[131] it has in recent years received in-

(1976); *Murphy v. Florida,* 421 U.S. 794, 803, 95 S.Ct. 2031, 2038, 44 L.Ed.2d 589, 596–597 (1975).

**121.** See *Estelle v. Williams, supra* note 64, 425 U.S. at 503–506, 96 S.Ct. at 1692–1694, 48 L.Ed.2d at 130–131; *Peters v. Kiff, supra* note 64, 407 U.S. at 501–502, 92 S.Ct. at 2168–2169, 33 L.Ed.2d at 93–95; *Estes v. Texas, supra* note 64, 381 U.S. at 542–550, 85 S.Ct. at 1636–1638, 14 L.Ed.2d at 550–554; *Turner v. Louisiana, supra* note 66, 379 U.S. at 473–474, 85 S.Ct. at 550, 13 L.Ed.2d at 429–430; *Rideau v. Louisiana, supra* note 66, 373 U.S. at 726–727, 83 S.Ct. at 1419–1420, 10 L.Ed.2d at 665–666; *In re Murchison,* 349 U.S. 133, 136–139, 75 S.Ct. 623, 625–627, 99 L.Ed. 942, 946–948 (1955); *Tumey v. Ohio, supra* note 69, 273 U.S. at 532, 535, 47 S.Ct. at 444, 445, 71 L.Ed. at 758, 759.

**122.** Although for some violations of the Sixth Amendment right to counsel the Government is permitted to show defensively a lack of prejudice, see notes 102–113 *supra* and accompanying text, the defendant nevertheless is not required to make an affirmative showing of prejudice in order to establish his constitutional claim. See *Dickey v. Florida, supra* note 118.

**123.** See notes 55, 63–80, 92–102 *supra* and accompanying text.

**124.** See text *supra* at note 62.

**125.** See text *supra* at note 21.

**126.** See notes 18, 21–36 *supra* and accompanying text.

**127.** *Powell v. Alabama, supra* note 19, 287 U.S. at 68–72, 53 S.Ct. at 63–65, 77 L.Ed. at 170–172.

**128.** See notes 18, 19 *supra.* For a recent instance, see *Holloway v. Arkansas, supra* note 18, 435 U.S. at 481–484, 98 S.Ct. at 1177–1179, 55 L.Ed.2d at 433–434.

**129.** See, *e. g., United States v. Hurt,* 177 U.S. App.D.C. 15, 18, 543 F.2d 162, 165 (1976); *Diggs v. Welch, supra* note 6, 80 U.S.App.D.C. at 6–7, 148 F.2d at 668–669; *Leventhal v. Gavin,* 421 F.2d 270, 272–273 (1st Cir.), *cert. denied,* 398 U.S. 941, 90 S.Ct. 1857, 26 L.Ed.2d 277 (1970); *United States v. Bubar, supra* note 34, 567 F.2d at 201–202; *United States v. Wight,* 176 F.2d 376, 379–380 (2d Cir. 1949), *cert. denied,* 338 U.S. 950, 70 S.Ct. 478, 94 L.Ed. 586 (1950); *United States ex rel. Johnson v. Johnson,* 531 F.2d 169, 174 (3d Cir.), *cert. denied,* 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976); *Wood v. Zahradnick,* 578 F.2d 980, 982 (4th Cir. 1978); *Jones v. Cunningham,* 297 F.2d 851, 854–855 (4th Cir. 1962); *United States v. Alvarez,* 580 F.2d 1251, 1254–1255 (5th Cir. 1978); *Collingsworth v. Mayo,* 173 F.2d 695, 697 (5th Cir. 1949); *Wilson v. Cowan,* 578 F.2d 166, 168 (6th Cir. 1978); *United States ex rel. Healey v. Cannon,* 553 F.2d 1052, 1057 (7th Cir.), *cert. denied,* 434 U.S. 874, 98 S.Ct. 221, 54 L.Ed.2d 153 (1977); *United States ex rel. Feeley v. Ragen,* 166 F.2d 976, 980–981 (7th Cir. 1948); *Beran v. United States,* 580 F.2d 324, 326 (8th Cir. 1978), *cert. denied,* 440 U.S. 946, 99 S.Ct. 1422, 59 L.Ed.2d 634 (1979); *Taylor v. United States,* 282 F.2d 16, 20 (8th Cir. 1960); *Farrow v. United States,* 580 F.2d 1339, 1361 (9th Cir. 1978); *Brubaker v. Dickson,* 310 F.2d 30, 37 (9th Cir. 1962), *cert. denied,* 372 U.S. 978, 83 S.Ct. 1110, 10 L.Ed.2d 143 (1963); *United States v. Riebold, supra* note 34, 557 F.2d at 702–703; *Williams v. Cox,* 350 F.2d 847, 849 (10th Cir. 1965).

**130.** See text *supra* at notes 6–19.

**131.** See notes 6–13 *supra* and accompanying text.

creased judicial attention and protection.[132] The implication is that once it is realized that the right to effective assistance of counsel is grounded on the express command of the Sixth Amendment as well as encompassed in the generality of the due process concept, no justification for requiring the defendant to prove prejudice is apparent.

Ineffective assistance of counsel has a built-in potential for harm to the client. The right to effective assistance thus shares with most other constitutional guaranties a characteristic which normally obviates any need for proof of prejudice, and sometimes even forecloses consideration of arguments that in the particular situation a denial of

the right might have been wholly innocuous.[133] Indeed, ineffective assistance is not far removed from total lack of assistance, which frequently calls for automatic reversal.[134] And while the harmless-error rule is in vogue when there was counsel—though inadequate counsel [135]—the Supreme Court has yet to levy on the defendant a burden of showing that demonstrated incompetence threatened or wrought damage to his cause.[136] Nothing in the nature of this fundamental constitutional right suggests to me that we should make such an imposition today.[137]

In sum, I cannot accept the theory that proof of actual or potential harm to the accused is an element of an ineffective-as-

132. See notes 34–35 *supra* and accompanying text.

133. See notes 63–80, 93–101 *supra* and accompanying text.

134. See text *supra* at notes 92–101.

135. See text *supra* at notes 116–117.

136. In *Chambers v. Maroney, supra* note 114, the Supreme Court addressed a contention that the assistance furnished by counsel for the accused at his second trial—an attorney different from his representative at the first trial—was ineffective owing to tardiness in the appointment of second-trial counsel. 399 U.S. at 53–54, 90 S.Ct. at 1982–1983, 26 L.Ed.2d at 429–430. The Court of Appeals for the Third Circuit had found that the accused had not been prejudiced, *United States ex rel. Chambers v. Maroney, supra* note 114, and the Supreme Court agreed, stating that "the claim of prejudice from the substitution of counsel was without substantial basis." 399 U.S. at 54, 90 S.Ct. at 1982, 26 L.Ed.2d at 430 (footnote omitted). That statement cannot be taken as support for the proposition that the defendant bears the onus of proving prejudice. The Court of Appeals subscribed to the legal thesis "that the belated appointment of counsel is inherently prejudicial and makes out a prima facie case of denial of effective counsel, with the burden of proving absence of prejudice shifted to the prosecuting authorities," 408 F.2d at 1189–1190, and the court's sole concern was whether that burden had been met. *Id.* at 1188–1196. The Court of Appeals concluded that the record contained " 'adequate affirmative proof' to rebut the prima facie presumption of prejudice from the belated appointment of counsel." *Id.* at 1195, quoting *Fields v. Peyton,* 375 F.2d 624, 628 (4th Cir. 1967) (footnote omitted). It was to that holding that the Supreme Court spoke,

and which it affirmed. See 399 U.S. at 53–54, 90 S.Ct. at 1982–1983, 26 L.Ed.2d at 429–430.

137. Nor am I persuaded that this imposition becomes necessary on the ground that evidence bearing vitally on the impact of counsel's inadequate performance usually is solely in the defendant's possession. See Leventhal Op., —— U.S.App.D.C. at ——, 624 F.2d at 208; MacKinnon Op., —— U.S.App.D.C. at ——, 624 F.2d at 228. This argument overlooks the distinction between establishing substantially deficient representation, and identifying the effect of the deficiency on the outcome of the case. It is indeed the defendant's lot to delineate his counsel's departure from the constitutional norm. See text *supra* at notes 41–43. In so doing, the defendant may have to show just what his counsel should have done differently on the facts as he derived them from the defendant and other sources known only to him, and to this extent it may well be true that the evidence is exclusively in his hands. But that is the defendant's concern, not the Government's at all; and once counsel's deficiencies have been documented, resolution of an issue of injury to the defendant's interests does not require peculiar reference to evidence controlled by the defendant. That is accomplished instead by viewing the proven shortfalls in the context of events as they unfolded at trial. Sometimes it will necessitate an investigation into leads or witnesses neglected by defense counsel in order to ascertain what a proper investigation might have turned up and what effect any evidence thereby unearthed might have had at trial. There is no reason for assuming that with respect to these activities the accused is any better situated than the Government, and there is ample basis for believing that ofttimes his position will be relatively worse.

sistance claim. I think the claim is established by a suitable showing that counsel defaulted on an obligation owed the accused,[138] and that any asserted lack of injury therefrom is to be treated here just as it normally is in any other instance of curable constitutional error.[139] This means, of course, that the burden rests upon the Government to prove absence of harm to the accused, and to prove it beyond a reasonable doubt.[140]

The Leventhal-MacKinnon approach, I submit, confuses two independent questions commonly arising in ineffective-assistance litigation. One is whether defense counsel measured up to the constitutional standard of reasonably competent representation. This entails scrutiny of the quality of the service rendered. The other is whether proven deficiency in counsel's performance clearly lacked adverse impact. The task here is simply to determine whether the error could have contributed in any material way to the result reached in the case. Harm is the focal point of the second; it has no bearing whatever on the first. And harmlessness is a doctrine serving only to avoid needless retrials where, owing to the innocuousness of the violation, the outcome would likely be the same.[141]

The critical distinction between the defendant's burden to show a constitutional transgression and the Government's burden to demonstrate lack of ensuing prejudice becomes apparent when we look back three years to our *Pinkney* decision.[142] Following a conviction on two drug charges and be-

fore sentencing thereon, the Government filed an "allocution memorandum" containing information purporting to link Pinkney with narcotics trafficking and advocating the maximum penalty. After imposition of less severe though stiff sentences, Pinkney moved the District Court to reconsider them, insisting that his counsel had not discussed the Government's memorandum with him and reminding that counsel had not disputed its contents at sentencing. The motion was denied and on appeal we declined to upset that ruling.[143] We acknowledged the constitutional implications of the asserted breach of duty [144] but deemed it unimportant because "[t]he record . . . [did] not support the contention that counsel's alleged derelictions frustrated [Pinkney's] opportunity to present his side of the controversy." [145] We pointed to Pinkney's obligation at this juncture to "set forth evidence upon which the elements of a constitutionally deficient performance might properly be found," [146] and we found that Pinkney's motion did not survive this requirement for two reasons. In the first place, he did not verify the deficiency complained of.[147] Beyond that, after learning of the central allegation of the allocution memorandum, he did not utilize open opportunities to convey to the sentencing judge anything he might have wished to say.[148]

These omissions are very different from a failure to carry the burden on an issue of prejudice from an established violation.[149]

---

**138.** See notes 41–43 *supra* and accompanying text.

**139.** See notes 118–124 *supra* and accompanying text.

**140.** See text *supra* at notes 54–62.

**141.** See *Chapman v. California, supra* note 54, 386 U.S. at 22, 87 S.Ct. at 827, 17 L.Ed.2d at 709.

**142.** *United States v. Pinkney, supra* note 50.

**143.** 177 U.S.App.D.C. at 428–432, 543 F.2d at 913–917.

**144.** *Id.* at 429, 543 F.2d at 914.

**145.** *Id.*

**146.** *Id.* at 431, 543 F.2d at 916 (footnotes omitted).

**147.** *Id.* at 432, 543 F.2d at 917.

**148.** *Id.* at 429–430, 543 F.2d at 914–915.

**149.** The statement in the opinion that the "motion gave no indication as to the evidence, if any, by which [Pinkney] would undertake an effort at refutation" was directed solely at Pinkney's "insist[ence] upon a further opportunity to dispute the drug-involvement allegations of the Government's memorandum . . . ." *Id.* at 432, 543 F.2d at 917.

Although, we did not reach the question of prejudice in *Pinkney*,[150] we took pains to explain the distinction:

> Our conclusion . . . in no way impinges upon the rule . . . that once a substantial violation of counsel's duties is shown, the Government's burden is to demonstrate lack of prejudice therefrom. . . . In the case before us, we deal only with a procedural prerequisite to a hearing on appellant's assertion that the representation afforded at sentencing fell below the constitutional norm. The essence of appellant's contention is that sentencing counsel deprived him of the opportunity to combat allegations of the Government's allocution memorandum by failing to inform him of the memorandum. . . . Only if the evidentiary elements of that claim had appeared in appellant's motion would he have been entitled to a hearing, and only if evidence offered at a hearing tended to establish the elements would the Government have been summoned to disestablish prejudice. But if, on the other hand, appellant had met these preconditions, the Government would then have encountered the burden of proving that counsel's dereliction did not harm appellant—for example, because the allocution memorandum actually had no effective role in the sentencing process.[151]

This is the major point of deviation between the position of a majority of the court's members and mine. In my view, the claimant before us needed only to show that his counsel fell substantially short of the standard of reasonable competence; in theirs, threatened or consummated injury therefrom is an additional required part of the showing. I believe the majority err in their approach and denude the constitutional right to effective assistance of counsel of a great deal of the value it was intended to have.

## IV. THE PRESENT CASE

Turning now to Decoster's arguments that the assistance furnished by his trial counsel was constitutionally ineffective, I find inescapable the conclusion that counsel failed miserably in responding to his obligation to conduct a reasonably competent investigation into the facts of the case. Prior to trial, as Judge Bazelon studiously recounts,[152] counsel made no real effort to tap known or likely sources of information, which included codefendants as well as prosecution witnesses. The duty to investigate is vital, and its violation is obviously fraught with danger to the interests of the client.[153] Here the investigative responsibility was almost wholly unmet, and I cannot view the dereliction as less than appalling.

I am equally convinced, however, that the record firmly establishes the violation as harmless. Two police officers witnessed the robbery in progress. One chased Decoster from the spot the short distance to the hotel lobby wherein he was apprehended, never losing sight of him for so much as a moment. Within minutes the robbery victim, in the presence of both officers, identified Decoster as one of the culprits, as the officers themselves were later to do. Decoster's own testimony aside, no basis for impeaching these witnesses on these vital points surfaces on the record either of the preliminary hearing or the trial.[154] In sharp contrast, Decoster's alibi, initially feeble, met disaster after he called

---

**150.** Contrary to suggestions in other opinions, Leventhal Op., 199 U.S.App.D.C. at —— n.75, 624 F.2d at 208 n.75; MacKinnon Op., 199 U.S.App.D.C. at ——, 624 F.2d at 225. Pinkney never arrived at the stage at which prejudice might have become a subject of inquiry. Since Pinkney did not surmount the hurdle of suitably alleging a violation, there was no occasion to consider whether it was harmful to the outcome on sentencing.

**151.** *United States v. Pinkney, supra* note 50, 177 U.S.App.D.C. at 431–432 n. 59, 543 F.2d at 916–917 n. 59 (citation omitted).

**152.** Bazelon Op., 199 U.S.App.D.C. at ——, 624 F.2d at 279.

**153.** See Judge Bazelon's excellent discussion on this point. Bazelon Op., 199 U.S.App.D.C. at ——, 624 F.2d at 278.

**154.** I am mindful that the victim could not identify Decoster at trial, but that was be-

to the stand one of his codefendants only to hear him testify that he saw Decoster in a fight with the victim at the scene of the crime. This is not to say that every prosecutorial presentation in which the evidence is so lopsided may fairly be characterized as overwhelming,[155] for that appearance may be attributable, at least in part, to counsel's deficiencies. But considering here the Government's direct and positive proof, the number of Government witnesses,[156] the consistency of their testimony, and the improbability of misinterpretation of the criminal activity or misidentification of Decoster as a participant, I see no reason for supposing that pretrial interviews with these witnesses would have turned up anything but ominous news for the defense.

Counsel's omission to hunt for alibi witnesses was similarly unhurtful. Aside from the clerk on duty in the hotel lobby when Decoster was taken into custody, there is little to indicate that the prospect of locating any such witnesses was better than highly remote. More importantly, I cannot

cause—after the robbery and before trial—the victim had sustained an accident impairing his vision.

**155.** See *Chapman v. California, supra* note 54, 386 U.S. at 23, 87 S.Ct. at 827, 17 L.Ed.2d at 710 ("[t]he California constitutional [harmless error] rule . . . perhaps over emphasi[zes] . . . the court's view of 'overwhelming evidence'. . . ."

**156.** The victim, Trial Transcript (Tr.) (Nov. 15, 1972) 32, 41, 43, and the arresting officer, Tr. (Nov. 15, 1972) 39–41, as well as the arresting officer's partner, Tr. (Nov. 16, 1972) 12, all identified Decoster as one of the robbers.

**157.** Decoster testified that he met the victim at a bar, had a drink with him, then left and returned directly to his hotel. Tr. (Nov. 16, 1972) 29–35.

**158.** See Note, *Ineffective Representation as a Basis for Relief from Conviction: Principles for Appellate Review*, 13 Colum. J. of L. & Soc. Prob. 1, 83 (1977) ("a failure to interview one of several government witnesses can be shown to have been harmless when the witness' subsequent testimony was not significant"). Judge Bazelon in dissent urges that counsel's inadequate pretrial investigation deprived Decoster of informed guidance on whether to plead guilty, and advances this as an example of prejudice. Bazelon Op., 199 U.S.App.D.C. at

hypothesize any appreciable probability that the jury's verdict would have differed had counsel found someone able to testify that Decoster and the victim drank together at a bar shortly before the robbery occurred, or someone who had seen Decoster enter the hotel lobby shortly after the robbery transpired.[157] No witness in one or the other place could possibly have established Decoster's absence from the scene of the offense at the instant it was perpetrated. It is clear, of course, that at that point in time Decoster was somewhere between the bar and the lobby, but the question is whether that somewhere was the site of the crime. The most that can be said is that such a witness might have tended weakly and circumstantially to corroborate Decoster's claim that he was not there. But it would blink reality to seriously suggest that, in the face of the Government's powerful eyewitness case, so little would have carried the day.[158]

I think, then, that in the area of pretrial investigation counsel's performance was

—, — — —, 624 F.2d at 292, 294–295. I am unable to agree. While it is possible to speculate that counsel failed to consult or improperly advised his client on pleading guilty, Decoster has never advanced that contention nor is there any foundation in the record for it. Aside from the difficulty that the point is not properly before us, it encounters also a far more formidable barrier. A question of harm to the accused from ineffective assistance of his counsel is not reached unless and until the accused has established both the fact and the substantiality of counsel's asserted violation. This means that the accused must delineate all essential circumstances in support of his claim when it it is readily within his power to do so. *United States v. Pinkney, supra* note 50, 177 U.S.App. D.C. at 430–432, 543 F.2d at 915–917; text *supra* at notes 142–151. Moreover, in the context of omitted or incompetent advice on a guilty plea, the required demonstration on substantiality necessitates at the threshold a showing that the accused was at least amenable to such a plea. It is a known phenomenon that some defendants in criminal cases disdain the very thought of pleading guilty, and in this instance we are left completely in the dark as to whether Decoster would willingly have entertained and seriously considered a plea, or whether instead he would have insisted upon his right to a trial.

substantially deficient and therefore constitutionally ineffective. But I believe, too, that in the circumstances counsel's inadequacies were harmless beyond a reasonable doubt.[159] On that ground, I concur in affirmance of the conviction.

BAZELON, Circuit Judge, with whom J. SKELLY WRIGHT, Chief Judge, joins, dissenting:

Willie Decoster was denied the effective assistance of counsel guaranteed by the Sixth Amendment because he could not afford to hire a competent and conscientious attorney. His plight is an indictment of our system of criminal justice, which promises "Equal Justice Under Law," but delivers only "Justice for Those Who Can Afford It." Though purporting to address the problem of ineffective assistance, the majority's decision ignores the sordid reality that the kind of slovenly, indifferent representation provided Willie Decoster is uniquely the fate allotted to the poor. Underlying the majority's antiseptic verbal formulations is a disturbing tolerance for a criminal justice system that consistently provides less protection and less dignity for the indigent. I cannot accept a system that conditions a defendant's right to a fair trial on his ability to pay for it. Like Justice Black, I believe that "[t]here can be no equal justice where the kind of trial a man gets depends on the amount of money he has."[1] The Constitution forbids it. Morality condemns it. I dissent.

I.

The evolution of the right to the Assistance of Counsel reflects a growing awareness of the barriers faced by the indigent defendant seeking a fair trial, and of the challenge these obstacles pose to our ideal of justice without regard to wealth. By any reckoning, the barriers are formidable. The "street crime" that clogs our courts is bred by poverty and discrimination. It is committed by the dispossessed, the disadvantaged and the alienated of our society—those who most need the advice of a trained advocate. In the words of Justice Sutherland:

Even the intelligent and educated layman has small and sometimes no skill in the science of law. . . . He requires the guiding hand of counsel at every step in the proceedings against him. . . . If that be true of men of intelligence, how much more true is it of the ignorant and illiterate, or those of feeble intellect.[2]

And the cruel irony, of course, is that the indigent are the very people who are least able to obtain competent representation. For the most part, "you get what you pay for" in legal representation.[3]

159. I see no need to address Decoster's remaining complaints of ineffective assistance since they also, for identical reasons, would succumb to the doctrine of harmless error.

1. *Griffin v. Illinois*, 351 U.S. 12, 19, 76 S.Ct. 585, 591, 100 L.Ed. 891 (1956).

2. *Powell v. Alabama*, 287 U.S. 45, 69, 53 S.Ct. 55, 64, 77 L.Ed. 158 (1932).

3. Despite recent expressions of concern over lawyer incompetence, *see* note 169 *infra*, the problem is not simply that there are too few good attorneys, but that competent legal representation in the United States is grossly maldistributed. There is no dearth of competent counsel for the rich in our society. But no one can say that the same is true for the indigent. The inadequate representation received by the poor is universally recognized and is well documented by the numerous studies and commentary cited below. Nor is the problem of ineffective assistance limited to those who are technically "indigent" and are provided counsel by the court. Those who can scrape together a few dollars to hire their own attorney can retain an attorney who, for a modest fee, will generally provide "modest" services—plea negotiations and *pro forma* representation with little investigation, preparation or concern for their client's cause. Most indigent defendants, of course, must accept whomever the court appoints to represent them. And although the commitment and competence of court-appointed counsel has improved markedly over recent years, particularly with the development of public defender systems, its effectiveness is still handicapped by unmanageable caseloads, insufficient support services, inexperience in criminal trial practice, lack of independence from the judiciary that controls the appointments and fixes compensation, and inadequate levels of funding and fee schedules.

On the subject of indigent representation, *see generally* American Bar Association Project on Minimum Standards for Criminal Justice, Pro-

Only recently have we even recognized that the lack of effective counsel inevitably deprives the poor of the right to a fair trial. For a great many years, the shameful truth was that only the rich could obtain counsel, since only the rich could afford to pay counsel. One hundred and forty-one years after the adoption of the Bill of Rights, the Supreme Court first held, in *Powell v. Alabama*,[4] that due process requires the appointment of counsel for an indigent defendant in a capital case. Not until *Gideon v. Wainwright*,[5] more than thirty years later, did the Court acknowledge that the "noble ideal" of equal and fair justice could not be realized "if the poor man charged with crime has to face his accusers without a lawyer to assist him."[6] Only then did the Court extend the right to counsel to all state felony prosecutions. And not until 1972, in *Argersinger v. Hamlin*,[7] did the Court affirm the right to counsel in all criminal prosecutions resulting in the deprivation of the accused's liberty.

The Supreme Court's effort to .eliminate second-class justice for the poor has not been confined to providing counsel for the indigent.[8] But the right to counsel is most essential in assuring fair and equal justice,[9]

viding Defense Services (App. Draft 1968); American Bar Association Standing Committee on Legal Aid and Indigent Defendants, The Center for Defense Services: A Draft Discussion Proposal for the Establishment of a Nonprofit Corporation to Strengthen Indigent Defense Services (Feb. 1978 Draft) [hereinafter cited as The Center for Defense Services]; Boston University Center for Criminal Justice, Right to Counsel in Criminal Cases: The Mandate of Argersinger v. Hamlin (S. Krantz ed. 1976); L. Downie, Justice Denied (1971); National Legal Aid & Defender Ass'n, The Other Face of Justice (1973); Alschuler, *The Defense Attorney's Role in Plea Bargaining*, 84 Yale L.J. 1179 (1975); Bazelon, *The Defective Assistance of Counsel*, 42 U.Cinn.L.Rev. 1 (1973); Bazelon, *The Realities of* Gideon *and* Argersinger, 64 Geo.L.J. 811 (1976); Wice & Suwak, *Current Realities of Public Defender Programs: A National Survey and Analysis*, 10 Crim.L.Bull. 161 (1974); Note, *Providing Counsel for the Indigent Accused: The Criminal Justice Act* 12 Am.Crim.L.Rev. 789 (1975).

With specific reference to the District of Columbia, *see generally* H. Subin, Criminal Justice in a Metropolitan Court (1966); Comm. of the D.C. Bar on Effective Representation of Indigents in Criminal Cases, Report on the Appointed Counsel Program in the District of Columbia Courts (Dec. 1973); Joint Comm. of the Judicial Conf. of the D.C. Cir. and the D.C. Bar (Unified), Report on Criminal Defense Services in the District of Columbia (Austern-Rezneck Report) (April 1975); Report of the Comm. on Complaints of Ineffective Assistance of Counsel (Wolf Committee Report) (June 1977); Washington Pretrial Justice Program, Report on Disposition of Complaints Against Attorneys Appointed Under the Criminal Justice Act in D.C. Superior Court (Feb. 1977).

These studies document time and again that it is primarily the indigent and the poor who suffer at the hands of incompetent counsel. I am unaware of a single decision or opinion that acknowledges this basic reality underlying the problem of ineffective assistance.

4. 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932).

5. 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

6. *Id.* at 344, 83 S.Ct. at 796–797.

7. 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972). *See Scott v. Illinois*, 440 U.S. 367, 99 S.Ct. 1158, 59 L.Ed.2d 383 (1979).

8. *See, e. g., Mayer v. Chicago*, 404 U.S. 189, 198, 92 S.Ct. 410, 416, 30 L.Ed.2d 372 (1971) (indigent convicted of offense punishable only by fine "cannot be denied a 'record of sufficient completeness' to permit proper consideration of his claims"); *Tate v. Short*, 401 U.S. 395, 91 S.Ct. 668, 28 L.Ed.2d 130 (1971) (indigent unable to pay fine cannot be incarcerated to satisfy offense punishable only by fine); *Williams v. Illinois*, 399 U.S. 235, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970) (incarceration of indigent unable to pay fine cannot exceed maximum statutory period); *Roberts v. LaVallee*, 389 U.S. 40, 88 S.Ct. 194, 19 L.Ed.2d 41 (1967) (per curiam) (right to free transcript of preliminary hearing); *Long v. District of Iowa*, 385 U.S. 192, 87 S.Ct. 362, 17 L.Ed.2d 290 (1966) (per curiam) (right to free transcript on collateral appeal); *Draper v. Washington*, 372 U.S. 487, 83 S.Ct. 774, 9 L.Ed.2d 899 (1963) (right to free transcript on direct appeal); *Smith v. Bennet*, 365 U.S. 708, 81 S.Ct. 895, 6 L.Ed.2d 39 (1961) (waiver of filing fees for state post-conviction proceedings); *Burns v. Ohio*, 360 U.S. 252, 79 S.Ct. 1164, 3 L.Ed.2d 1209 (1959) (state cannot require indigent to pay filing fee before permitting appeal); *Griffin v. Illinois*, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956) (right to free transcript on appeal for indigents).

9. "The constitutional requirement of substantial equality and fair process can only be attained where counsel acts in the role of an active advocate in behalf of his client. . . ."

for without the conscientious and knowledgeable advice of a trained legal advocate, an accused can secure none of the safeguards of the criminal process intended to protect *all* defendants. "The [right to] counsel is often a requisite to the very existence of a fair trial."[10] To the extent that the indigent defendant receives inadequate representation, markedly inferior to that available to a defendant who can afford "competent and conscientious counsel," a dual system of justice endures.

Inevitably there will be disparities in the quality of representation; some lawyers are simply more able or more conscientious than others. What offends the Constitution, however, is not merely that there are variations in the quality of representation, but that the burden of less effective advocacy falls almost exclusively on a single subclass of society—the poor. In constructing standards for assessing the ineffective assistance of counsel, we must therefore consider not only what measures are necessary to assure a fair trial in the case of any particular defendant. We also must structure our approach to eliminate the gross disparities of representation that make a mockery of our commitment to equal justice. We must institutionalize and enforce standards of attorney competence designed to assure adequate representation for *all* defendants.

Because my colleagues in the majority divorce their analysis from the economic and social reality underlying the problem of ineffective assistance of counsel, their decision leaves indigent defendants nothing more than an empty promise in place of the Sixth Amendment's commitment to adequate representation for all defendants, rich and poor. At best, the majority's approach might help to rectify a few cases of blatant injustice. But their standards do nothing to help raise the quality of representation provided the poor to a level anywhere approaching that of the more affluent. On the contrary, my colleagues condone callous, back-of-the-hand representation by dismissing the basic duties of competent lawyering as "aspirational." The majority thus provides no incentive or structure to improve the caliber of defense advocacy. By focusing exclusively on the consequences of counsel's dereliction, their approach encourages an attorney who believes that his client is guilty to "cut corners," with little risk that he will be held accountable for the inadequacies of his representation. The majority opinions may say "we don't commend this," or "we don't approve of that," but their bottom line is "*Affirmed.*"

In its holding, the majority turns its back on the evolution in this circuit of the standard for evaluating claims of ineffective assistance.[11] In the earliest cases, we approached the problem solely from a due process-fundamental fairness viewpoint, requiring a defendant seeking relief to show that the proceedings were a "farce and a mockery of justice."[12] In *Bruce v. United*

---

*Anders v. California*, 386 U.S. 738, 744, 87 S.Ct. 1396, 1400, 18 L.Ed.2d 493 (1967).

**10.** *Argersinger v. Hamlin, supra*, 407 U.S. at 31, 92 S.Ct. at 2009. *Accord, Lakeside v. Oregon*, 435 U.S. 333, 341, 98 S.Ct. 1091, 1096, 55 L.Ed.2d 319 (1978) ("In an adversary system of criminal justice, there is no right more essential than the right to the assistance of counsel.").

**11.** Despite numerous opportunities, the Supreme Court has never directly confronted the fundamental question of the proper standards and procedures for evaluating challenges to the effectiveness of counsel. *See Maryland v. Marzullo*, 435 U.S. 1011, 98 S.Ct. 1885, 56 L.Ed.2d 394 (1978) (White, J., with Rehnquist, J., dissenting from denial of certiorari). The Court has come closest to addressing the issue of ineffective assistance in the context of a prisoner's collateral attack on the voluntariness of his guilty plea. In *McMann v. Richardson*, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970), for example, the Court stated that a petitioner seeking relief on that ground must demonstrate that the advice of counsel was not "within the range of competence demanded of attorneys in criminal cases." *Id.* at 771, 90 S.Ct. at 1449, *accord, Tollett v. Henderson*, 411 U.S. 258, 266, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973). But the Court has yet to determine the minimum standard of attorney competence required by the Sixth Amendment's guarantee of effective assistance of counsel.

**12.** *Diggs v. Welch*, 80 U.S.App.D.C. 5, 7, 148 F.2d 667, 669, *cert. denied*, 325 U.S. 889, 65

*States,*[13] we reconsidered that standard. We explained that the "farce and mockery" requirement was not to be taken literally, but was meant only to demonstrate that in order to obtain relief the accused bears a heavy burden of showing that "there has been gross incompetence of counsel and that this has in effect blotted out the essence of a substantial defense . . . ."[14] Shortly after *Bruce,* however, we explicitly recognized that the requirement of effective assistance of counsel derives not only from the Due Process Clause, but from the Sixth Amendment itself.[15] Consequently, in our original opinion in this case, *United States v. DeCoster (DeCoster I),*[16] this court adopted a standard for direct appeals consistent with the Sixth Amendment's "more stringent requirements":[17] *"a defendant is entitled to the reasonably competent assistance of an attorney acting as his diligent conscientious advocate."*[18]

*DeCoster I* represented a major advance in this court's recognition of the realities of ineffective assistance. In that case, this court shifted the focus of judicial inquiry away from the prejudice to the defendant in any particular case and toward the task of articulating basic duties counsel owes his client. This approach, for the first time, gave content to what previously had been empty verbal formulations. Even more importantly, it recognized that the very lack of effective trial counsel might preclude a defendant from later establishing prejudice.

Thus the court concluded that the only way to assure that every defendant receives a fair trial is to promulgate and enforce standards of adequate representation that apply across-the-board. Underlying *DeCoster I,* therefore, was a commitment to the basic principle that every defendant—rich or poor, innocent or guilty—is entitled to the reasonably competent assistance of an attorney acting as his diligent conscientious advocate.

## II.

Appellant Willie Decoster and two codefendants, Douglas Eley and Earl Taylor, were arrested for the robbery of Roger Crump on the evening of May 29, 1970. Two police officers on plainclothes patrol observed three men accosting Crump in the parking lot of the Golden Gate Bar. When the officers jumped from their car, the robbers fled and were pursued by the police. Officer Box and the victim found Decoster in the lobby of a nearby hotel, the D.C. Annex, where he was immediately arrested and identified by Crump.[19]

At his trial on November 15, 1971, appellant testified that on the evening of the crime he had been drinking with Crump at the Golden Gate Bar.[20] Decoster claimed that he left Crump at the bar and walked directly to his hotel, where, while standing by the desk waiting to obtain his room key, he was arrested. One of appellant's alleged

---

S.Ct. 1576, 89 L.Ed. 2002 (1945); *see, e. g., Jones v. Huff,* 80 U.S.App.D.C. 254, 152 F.2d 14 (1945).

**13.** 126 U.S.App.D.C. 336, 379 F.2d 113 (1962).

**14.** *Id.* at 339–340, 379 F.2d at 116–17. In *Bruce,* the claim of ineffective assistance arose on collateral attack. We noted that "a more powerful showing of inadequacy is necessary to sustain a collateral attack than to warrant an order for a new trial either by the District Court or by this court on direct appeal." *Id.* at 340, 379 F.2d at 117.

**15.** *Scott v. United States,* 138 U.S.App.D.C. 339, 340, 427 F.2d 609, 610 (1970) (per curiam).

**16.** 159 U.S.App.D.C. 326, 487 F.2d 1197 (1973). In the subsequent opinions of this court the spelling of appellant's name has been corrected

to "Dec oster," rather than "DeC oster." References in this opinion to *DeCoster I,* however, will retain the spelling used in that opinion.

**17.** *See Moore v. United States,* 432 F.2d 730, 737 (3rd Cir. 1970) (en banc).

**18.** *DeCoster I,* 159 U.S.App.D.C. at 331, 487 F.2d at 1202 (emphasis in original).

**19.** Decoster's codefendants also were apprehended near the scene of the crime and were identified subsequently at the police station.

**20.** Crump admitted having had a drink with someone in the bar just before the robbery occurred, but could not specifically remember whether he had met Decoster.

accomplices, Douglas Eley, was also called as a defense witness but his testimony contradicted Decoster's in several respects. Most importantly, on direct examination he claimed to have seen appellant and Crump fighting in the parking lot outside the bar at the time of the alleged robbery. Following the trial, appellant was convicted of armed robbery and sentenced to 2–8 years.[21]

On appeal, this court was troubled by a number of actions taken by Decoster's court-appointed counsel which, taken together, suggested that Decoster may not have received the effective assistance of counsel. The record showed that on Nov. 4, 1970, several months after appellant's arrest, the trial judge received a letter from Decoster in which he requested new counsel because his attorney was not providing adequate representation.[22] Decoster charged that although he had been accepted for pretrial custody by the Black Man's Development Center on October 12, defense counsel had not kept his promise to file for bond review.[23] Appellant also requested a copy of the transcript of his preliminary hearing, which he had been unable to obtain through his attorney.[24]

Although Decoster's counsel finally filed the requested bond review motion on November 9,[25] he not only failed to mention that third-party custody had been arranged, but he also filed the motion in the wrong court.[26] On November 18, the district court advised counsel of his error and continued the motion to await review by the proper court, as required by law.[27] Again, however, counsel delayed filing; not until De-

**21.** Decoster was also convicted of assault with a dangerous weapon and received a sentence concurrent when his armed robbery sentence. Trial counsel failed to challenge the legality of this concurrent sentence. On the original appeal in this case, the assault conviction was vacated as a lesser included offense of armed robbery arising from the same act or transaction. *DeCoster I,* 159 U.S.App.D.C. at 328, 487 F.2d at 1199 n. 2.

**22.** The letter, which was filed in the district court on November 13, 1970, reads as follows:

Honorable Judge Waddy,
I am an Inmate of D.C. Jail who has been incarcerated for five month on a charge that has been change from robbery to arm robbery. The motive for this letter is to request from the court another lawyer because I've been misrepresented for five month with my present lawyer . . .. Also I would like to protect myself and family which consist of nine more younger than I am, which are barely being supported because my father is the only capable one. The rest is trying to get something I miss, Education. Being an individual of limited education its only natural for me to protect by innocence and with the transcript from my hearing which I cannot obtain because of illegal counseling. I can prove that I am only guilty of assault by self defence. But the court says I must wait until Jan. 12, 1971 at my trial to prove my Innocence which I think is unconstitutional because there is no evidence or witness of robbery. I was accepted by Blackman Development Center on Oct. 12, but my lawyer hadn't file a motion for bond review. So there was another one of his promise of what he would do. So Your Honor It would be a pleasure if I could speak to you in behave of this case and the way its been handled for the last five month. It could not be explain in writing so I ask this opportunity for a lawyer and justice. I would be to happy if you would consider this letter soon as possible.

Yours truly,
Willie Decoster, Jr.

The district court took no action on Decoster's letter and apparently made no inquiry into the substance of the charges against his attorney. *See* note 38 *infra.*

**23.** Appellant had been incarcerated because he was unable to meet the $5,000 bond set for him, and not because he was deemed to pose a danger to the community. *Compare* 18 U.S.C. § 3146 *with* 18 U.S.C. § 3148.

**24.** Defense counsel never did obtain a copy of the preliminary hearing. *See* pp. ——–— of 199 U.S.App.D.C., pp. 271–272 of 624 F.2d *infra.*

**25.** Apparently out of exasperation with his lawyer's inaction, Decoster, coincidentally, prepared his own *pro se* motion for bond review that same day. Appellant's motion was filed with the district court on November 16, 1970.

**26.** Defense counsel filed the motion in U.S. District Court. It should have been filed in the D.C. Court of General Sessions, which had originally set bail.

**27.** *See* 18 U.S.C. §§ 3146(d) & 3147; *Grimes v. United States,* 129 U.S.App.D.C. 308, 394 F.2d 933 (1967).

cember 9, did he file a motion for bond review in the proper court.[28]

We also noted that events at the beginning of trial raised serious questions about the adequacy of counsel's pretrial preparation and communication with his client. As the trial was about to start, and after counsel had asserted that he was prepared to proceed, appellant himself stepped forward and asked if the court would subpoena his two codefendants,[29] explaining that he "didn't have a chance" to discuss the matter with his lawyer. Defense counsel then told the court that he had considered the possibility of issuing subpoenas, "except for the fact that we have no address for the other defendants." [30] The prosecutor immediately volunteered that codefendant Eley was in jail with Decoster; [31] an address for Taylor was subsequently provided from the court records.[32] The court thereupon ordered defense counsel to "take care of the situation." [33]

Moments later, after defense counsel again announced that he was ready for trial, the prosecutor informed the court that the Government had not received any response to its alibi-notice demand. Defense Counsel replied that although he might rely on an alibi defense, no response was needed because the Government had not given the twenty days' notice required by the local rules. The trial judge ordered the defense to provide the names of alibi witnesses anyway, whereupon defense counsel relented and stated, "We will proceed without the alibi witnesses." [34]

Defense counsel then informed the court that his client wished to waive jury trial. When asked if he was aware that the trial

28. In this bond review motion, counsel did indicate that the Black Man's Development Center was receptive to third-party custody. That statement, however, was the only change from the motion originally filed in the District Court a month earlier. The motion was denied by the Court of General Sessions on December 12, but the District Court granted the motion and released appellant to the Black Man's Development Center on Jan. 14, 1971, two days after a continuance was granted in appellant's trial at the prosecution's request.

29. Decoster's codefendants had been tried five months earlier. They both pleaded guilty in the middle of their trial to one count of robbery, received suspended sentences of 18 months to 5 years, and were placed on 5-years probation.

30. Transcript of Nov. 15, 1971 (Tr. I) at 5.

31. Eley was committed to the D.C. Jail on November 3, 1971, pursuant to a bench warrant for probation violation issued on October 8, 1971.

32. Taylor's address was found from a personal recognizance release form filed with the court 11 months earlier. This address proved to be out of date, however, and the belated effort to locate him was unsuccessful.

33. Despite the trial court's directive, counsel initially was willing to wait until "later in the day" to prepare the subpoenas. Only when the trial judge pointed out that the subpoenas could be processed during the trial preliminaries did counsel move to have them prepared. Tr. I at 9–10. Even then, however, the subpoe-

nas were not issued until after the first day of the two-day trial.

34. The following colloquy occurred:

[U.S. ATTORNEY]: There was a notice filed under Rule 87 of the Local Rules, Your Honor, an alibi notice demand, to which the government has not yet received a response so I take it from that that there is no alibi defense in this case.

[DEFENSE COUNSEL]: If the court please, . . . I feel this motion at this time should be denied because we have not had the time under the statute to comply with the demand as made by the rules.

THE COURT: Well do you intend to rely on alibi?

[DEFENSE COUNSEL]: We may.

    *      *      *      *      *      *

THE COURT: Well you did announce ready for trial, [counsel], and if you are going to rely on an alibi then you must know the witnesses that you are going to use as alibi witnesses. You announced ready.

[DEFENSE COUNSEL]: If the Court please—

THE COURT: Look, I am not forgiving [the U.S. Attorney] for not filing his motion under Rule 87 timely, but nevertheless it seems to me that if you have your witnesses ready for trial there seems to be no reason why you shouldn't be able to give him the names of the people you intend to call as alibi witnesses at this time.

[DEFENSE COUNSEL]: We will proceed without the alibi witnesses. We will consider we don't have alibi witnesses.

Tr. I at 6–8.

judge already had heard evidence concerning Decoster's case while presiding over the trial of his codefendants, counsel responded that he was not.[35] After attempting unsuccessfully to find another judge who could hear the case at such a late date, the trial judge ruled that he could not hear the case himself but would instead preside over a jury trial. Appellant's case thereupon proceeded to trial before a jury.

In the midst of all this confusion, Decoster again complained to the court about his attorney's efforts on his behalf.

> THE DEFENDANT: Your Honor, I feel that this case should be continued because this is, I can't get proper repre-

sentation that I should be getting and too I think I should have an accurate statement of what happened here when the other two defendants was in court.[36]

Defense counsel then requested to withdraw from the case "because apparently I have caused some dissatisfaction to the defendant. . . ."[37] The district judge, however, did not inquire into the basis of the defendant's complaints. Instead, after receiving counsel's assurances that he had prepared the case and was ready to go to trial, the court denied the request for a continuance and refused to appoint new counsel.[38]

**35.** Tr. I at 13. Decoster's codefendants pleaded guilty after the prosecution had presented its case. The district judge not only presided over the codefendant's trial, but also read the probation office reports on the codefendants prior to sentencing them in September, 1971. Tr. I at 18.

**36.** Tr. I at 15.

**37.** Tr. I at 16. In urging the appointment of new counsel, defense counsel explained:

> [DEFENSE COUNSEL]: If the court please, counsel has been in this position prior to this time where the defendant has become unhappy with counsel. Over many years in the practice of law before this court I know this situation comes up, but I do think this is perhaps an unusual dissatisfaction with counsel . . . . I feel if Your Honor would permit me to withdraw and appoint another counsel in the case for whom the defendant may have a greater regard or with whom he would have more rapport, it would be to his best interests in the long run in the appellate procedures.

Tr. I at 19.

**38.** THE COURT: But I haven't found any grounds for relieving you of your assignment, [counsel]. You tell me you have prepared the case.

> [DEFENSE COUNSEL]: Right. I am ready to go forward.
>
> THE COURT: You are ready to go forward.

*Id.* Although appellant has not challenged his conviction on this basis, it is firmly established that when the defendant makes a pretrial challenge to the adequacy of counsel's representation, the trial court is obligated to inquire into the substance of the defendant's allegations. *See, e.g., United States v. Woods,* 487 F.2d 1218, 1220 n.2 (5th Cir. 1973) (trial court has responsibility to make inquiry of defendant and appointed counsel concerning defendant's

claim of lack of preparation); *United States v. Young,* 482 F.2d 993, 995 (5th Cir. 1973) (reversible error for trial judge not to conduct thorough inquiry into source and factual basis of defendant's complaint; error held harmless because defendant's claim later shown to be insubstantial); *Sawicki v. Johnson,* 475 F.2d 183, 184 (6th Cir. 1973) (per curiam) (thorough investigation of defendant's allegations required); *United States v. Morrissey,* 461 F.2d 666, 669–70 & n.6 (2d Cir. 1972) (perfunctory inquiry into truth and scope of defendant's allegations, without more, constitutes reversible error; held harmless because defendant's claims were either invalid or cured by subsequent actions of attorney and judge); *United States v. Seale,* 461 F.2d 345, 359–60 (7th Cir. 1972) (failure to inquire into basis of defendant's dissatisfaction with counsel is abuse of discretion); *Brown v. Craven,* 424 F.2d 1166, 1170 (9th Cir. 1970) (trial court obligated to conduct inquiry necessary to ease defendant's "dissatisfaction, distrust, and concern" for adequacy of court-appointed counsel's representation); *Monroe v. United States,* 389 A.2d 811 (D.C.App.1978) (Sixth Amendment imposes affirmative duty on trial court to conduct inquiry into defendant's pretrial allegations of counsel's lack of ability or preparedness; inquiry must be on record and findings of fact must be sufficient to permit meaningful appellate review). In *Brown v. United States,* 105 U.S. App.D.C. 77, 264 F.2d 363 (en banc), *cert. denied,* 360 U.S. 911, 79 S.Ct. 1299, 3 L.Ed.2d 1262 (1959), this court considered the scope of the trial judge's obligation to inquire into the defendant's objection to counsel. In his concurrence, Chief Justice (then Judge) Burger summarized the grounds of common agreement between the majority and dissenting opinions:

> [W]hen, for the first time, an accused makes known to the court in some way that he has a complaint about his counsel, the court must rule on the matter. If the

In view of the foregoing, in our original opinion [39] we remanded for supplementary hearings on the adequacy of trial counsel's representation and granted leave for appellate counsel to move for a new trial. At the hearings on remand,[40] the district court elicited further information about trial counsel's preparation and his explanations for his actions. Counsel admitted that he had not interviewed the robbery victim or either of the police officers.[41] He also admitted that he had made no attempt to contact or interview the hotel desk clerk or, for that matter, anyone else at either the D.C. Annex hotel or the Golden Gate bar.[42]

As for the codefendants, counsel conceded that he had not interviewed Taylor,[43] but claimed that he had talked with Eley in the cellblock behind the courtroom on the

---

reasons are made known to the court, the court may rule without more. If no reasons are stated, the court then has a duty to inquire into the basis for the client's objection to counsel and should withhold a ruling until reasons are made known.

*Id.*, 105 U.S.App.D.C. at 83, 264 F.2d at 369 (Burger, J., concurring). *See also United States ex rel. Martinez v. Thomas*, 526 F.2d 750, 755 (2d Cir. 1975); *United States v. Calabro*, 467 F.2d 973, 986 (2d Cir. 1972), *cert. denied*, 410 U.S. 926, 93 S.Ct. 1358, 35 L.Ed.2d 587 (1973); *Farrell v. United States*, 391 A.2d 755 (D.C.App.1978).

Trial court inquiry into the basis of the defendant's objections is, of course, consistent with the Supreme Court's admonition that "judges should strive to maintain proper standards of performance by attorneys who are representing defendants in criminal cases . . . ." *McMann v. Richardson*, 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970). Moreover, an investigation into the substance of the defendant's complaint at the time it is first tendered obviates several of the difficulties appellate courts may later encounter when undertaking such inquiry. Only the trial court can conduct a full evidentiary hearing to explore the substantiality of the defendant's allegations. When the defendant charges that counsel is unprepared for trial, counsel's investigative efforts can be ascertained and evaluated without reference to subsequent developments and later-acquired knowledge. Unlike postconviction appellate review, this inquiry is not clouded by the possibility that the defendant's claim may have been motivated simply by his conviction at trial. And pretrial scrutiny of the defendant's charges not only reduces the likelihood of a postconviction ineffective assistance claim. It also creates a record that reviewing courts can rely upon when an ineffectiveness claim is raised on appeal.

More importantly, a thorough inquiry at this stage of the proceedings allows the trial court to take preventive action in those cases where the defendant's objections prove to be well-founded. Ineffective defense advocacy can be deterred at the outset, thereby preventing Sixth Amendment deprivations and maintaining the integrity of the adversary system. Finally, the pretrial inquiry serves interests of judicial economy by helping to eliminate any deficien-

cies in the representation of counsel before the resources of the·judicial system have been invested in a full-blown trial.

**39.** *Decoster I*, 159 U.S.App.D.C. 326, 487 F.2d 1197 (1973).

**40.** Hearings on appellant's motion for a new trial were held before Judge Waddy on February 6, 11, and 13, 1974.

**41.** Remand Transcript, Feb. 6, 1974 (R.Tr. I) at 42; District Court Findings of Fact and Conclusions of Law on Remand, April 23, 1975 (Findings) at 8–9. The two officers and the complainant were the prosecution's only witnesses at trial. Crump, the victim, testified that three men accosted him on the night of the robbery; one assailant yoked him from behind, another rummaged through his pockets and removed his wallet containing $110, and the third stood a few feet in front of him holding a knife. When shown a knife by the prosecutor, Crump could not identify it, but said that it looked like the one used in the robbery. Because Crump's eyesight and memory had been damaged in an automobile accident shortly after the robbery, he was unable to identify Decoster at trial or provide further details. He did remember, however, that on the night of the robbery he had identified all three of the men who had been arrested.

At trial Officer Box identified Decoster as the man he had seen going through Crump's pockets and testified that he had chased appellant into the D.C. Annex, never losing sight of him. Box also stated that he had not observed a weapon being used during the robbery. The second police officer, Officer Ehler, also identified Decoster as the man rummaging through Crump's pockets. He said that he had chased, arrested and searched Earl Taylor, the lookout, and had found a straight razor in his pocket. Ehler made no mention of having seen a weapon during the crime, however. Ehler also testified that although all three men were searched at the time of the arrest, the items alleged to have been stolen were never recovered.

**42.** R.Tr. I at 44.

**43.** R.Tr. I at 37.

second day of the trial.[44] Counsel also admitted that he never obtained a transcript of the preliminary hearing, but stated that since he had conducted most of the cross-examination at that hearing, he saw no need for the transcript.[45] Moreover, counsel testified that the U.S. Attorney's Office usually makes a copy of the transcript available during discovery. Although he did not specifically remember Decoster's case,[46] counsel said he assumed that the government's copy had been available and that he had read it.[47]

In attempting to defend his actions, counsel testified that he had not interviewed any witnesses because, until shortly before trial, appellant had never mentioned any possible alibi witnesses. Counsel explained that, to the best of his recollection, Decoster had continuously maintained that he had joined Crump for a drink in the bar, had left him there, and had just returned to his hotel when he was arrested.[48] Then, on the eve of trial,[49] counsel received a letter in which appellant changed his story, alleged

**44.** Counsel testified, however, that he had no notes of his conference with Eley. R.Tr. I at 39. And the remand hearings produced conflicting testimony on whether Eley had been interviewed. Eley and Decoster, who were together at the time counsel claimed to have interviewed Eley, both remembered counsel having visited the cellblock. But appellant did not recall that Eley had been interviewed, *id.* at 64–65, 72, and Eley denied ever having spoken to counsel before trial, Remand Transcript, Feb. 13, 1974 (R.Tr. III) at 82–84. The district court, without elaborating, found Eley's testimony "incredible" and credited that of trial counsel. Findings at 14.

**45.** R.Tr. I at 34. Only one witness, Officer Ehler, testified at the preliminary hearing, held 17 months before trial. Counsel testified that he noticed no discrepancy between Ehler's testimony at trial and at the preliminary hearing, R.Tr. I at 35, 41. At least one significant contradiction did exist, however. *See* note 106 *infra.*

**46.** Counsel remembered having conferences with one of the government prosecutors handling Decoster's case, Daniel Toomey, and suggested that Toomey might have shown him a copy of the transcript. R.Tr. I at 40. But the preliminary hearing transcript was not even ordered by the U.S. Attorney's Office until after Toomey had handed the case over to another prosecutor. Remand Transcript, Feb. 11, 1974 (R.Tr. II) at 11, 19.

**47.** Counsel similarly assumed that, following his usual practice, he had obtained appellant's arrest record at the police department, although again he could not state definitely that he had done so in appellant's case. Counsel could not find a copy of the arrest record in his files, however. R.Tr. I at 46–47.

The two U.S. Attorneys who had handled Decoster's case were also called as witnesses. Although neither could remember any particular conference with defense counsel about appellant's case, both did testify that they had frequently discussed counsel's cases with him. R.Tr. II at 10, 17–18. One prosecutor stated further that counsel's usual practice on many

afternoons was to jump "in and out" of the prosecutors' offices to speak informally to them regarding discovery. *Id.* at 13. This prosecutor also confirmed that his files showed that Decoster's preliminary hearing transcript had been ordered on October 29, 1971, *id.* at 12, and that it was his practice to show the transcript to a defense attorney whenever it was requested. *Id.* at 12, 13.

Since the remand hearings were held over two years after Decoster's trial, it is not surprising that none of the attorneys involved could recall from memory whether any discovery was conducted. What is surprising, if not shocking, is that none of the participants had any notation in their files of any discovery having been made; indeed, none of the participants appear to have maintained any records of the pretrial discussions and exchanges of information in appellant's case. If only as a matter of good officekeeping, defense counsel should have recorded exactly when and what he saw of the prosecutor's files. And certainly it is not unreasonable to expect the prosecutor to note in his own records that certain information was made available to defense counsel. But because no records were kept by either party, the only evidence of counsel's discovery efforts consists of vague recollections and tentative testimony about the attorneys' "usual practice" in such cases. When the attorneys involved may be handling up to 300 different cases in a year, *see* note 89 *infra*, reliance on such testimony to support a finding that full discovery was conducted in any specific case seems particularly inappropriate.

**48.** This was the substance of appellant's testimony at trial, as well.

**49.** The exact date on which counsel received Decoster's letter is the subject of considerable dispute. Counsel claimed to have received the letter "either the day, or two, before trial, or on the date of trial [November 15, 1971]." R.Tr. I at 24. Although the letter was not dated, it indicates that it was sent from the D.C. Jail dormitory, in which Decoster had been confined from June to November, 1970, and then

that he had fought with Crump but did not rob him, and asserted that his codefendants would support this version of the offense.[50] Explaining why he had not interviewed Decoster's codefendants even after receiving this letter, counsel stated that "it was my feeling at that time that any testimony that might be given by either of these defendants might be contradictory to what I had already heard from the Defendant." [51] Counsel claimed that he did interview Eley after appellant insisted at trial that his codefendants be subpoenaed, and that Eley told him that Decoster was not at the scene of the crime.[52] Believing that Eley would say this in court, counsel decided to put him on the stand, but Eley instead testified that he saw Decoster and Crump fighting outside the bar.[53]

Counsel also was asked at the remand hearing to explain the reasons underlying certain "tactical decisions" he had made. He could not recall why the motion for bond review was filed in the wrong court, or why he failed to mention appellant's acceptance by the Black Man's Development Center in the original motion. With respect to the waiver of jury trial, counsel said that although he opposed the idea, he had requested a bench trial at his client's insistence.[54] Finally, counsel stated that he gave no opening statement because he had felt it to be unnecessary, and not because he had no defense theory at the time the trial started. However, counsel could not recall why he had concluded that an opening statement was unnecessary.[55]

In its findings on remand, the district court isolated seven [56] particular acts or

---

again for three weeks in September, 1971. Appellant did not remember writing any letters during his second period in the dormitory, and thought he might have written the letter sometime from May to November, 1970. *Id.* at 58–61. Despite Decoster's testimony and the address on the letter, the district court apparently credited counsel's recollection of when he had received it. *See* Findings at 12.

**50.** This "self-defense" version is consistent with appellant's letter to the district judge in November, 1970, *see* note 22 *supra*, and with Eley's testimony at trial. The letter's account, however, differs from appellant's own testimony at trial. When confronted with this contradiction at the remand hearings, Decoster reaffirmed his trial testimony and claimed that the letter was a fabrication. R.Tr. I at 70–71.

**51.** R.Tr. I at 29.

**52.** Counsel was unaccompanied when he interviewed Eley and counsel obtained no written statement from Eley. In fact, counsel testified that he did not even take notes of the conference. Thus, we have only the conflicting testimony of defense counsel, Eley, and Decoster as to what occurred. *See* note 44 *supra*.

**53.** Ironically, counsel noted at the remand hearing that "[i]t's a cardinal rule with defense counsel that they never put on a witness unless they know what a witness is going to say and I would never have put on Eley unless I knew what he was going to say." R.Tr. I at 40. At trial, counsel made no effort to bring to the court's attention the apparent conflict between Eley's proposed and actual testimony. This failure suggests either that, contrary to counsel's claim in the remand hearing, R.Tr. I

at 40, counsel never obtained assurances from Eley as to his testimony, or that counsel negligently failed to impeach Eley's damaging testimony at trial.

**54.** At the remand hearings, counsel said that he believed he had advised appellant of the consequences of requesting trial by the same judge who had heard evidence against his codefendants. R.Tr. I at 37.

**55.** R.Tr. I at 45–46.

**56.** Appellant's brief presses one additional claim: counsel's failure to object to the defendant's appearance before the jury in jail clothes. It is firmly established that an accused cannot, over his objection, be compelled to go to trial in prison clothing. *See, e.g., Estelle v. Williams,* 425 U.S. 501, 512, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976); *Gaito v. Brierley,* 485 F.2d 86 (3rd Cir. 1973); *Bentley v. Crist,* 469 F.2d 854 (9th Cir. 1972); *Hernandez v. Beto,* 443 F.2d 634 (5th Cir.), *cert. denied,* 404 U.S. 897, 92 S.Ct. 201, 30 L.Ed.2d 174 (1971); *Brooks v. Texas,* 381 F.2d 619 (5th Cir. 1967); *cf. United States v. Carter,* 173 U.S.App.D.C. 54, 522 F.2d 666 (1975). *See also* American Bar Association Project on Minimum Standards for Criminal Justice, Trial by Jury § 4.1(b) (Approved Draft 1968). Forcing the accused to appear in jail clothes not only violates his due process right to the presumption of innocence, but also implicates the equal protection guarantee because it generally operates only against those who cannot post bail prior to trial. *See Estelle v. Williams, supra,* 425 U.S. at 503–06, 96 S.Ct. 1691. Because the Supreme Court has held that "the failure to make an objection to the court as to being tried in such clothes, for whatever reason, is suffi-

omissions by defense counsel that were alleged to have deprived appellant of the effective assistance of counsel.[57] With respect to three of the allegations—counsel's waiver of opening statement, his attempt to waive jury trial, and his failure to see that Decoster was given credit for time served as ordered by the sentencing judge[58]—the district court found no ineffective assistance.[59] Two other claims—the delay in

moving for bond review and the failure to obtain a transcript of the preliminary hearing—were rejected because the court found that the appellant had not been prejudiced by the violations.[60] On the final two allegations—counsel's failure to interview witnesses and his premature announcement that he was ready for trial—the district court's conclusions can be interpreted as holding either that there was no constitu-

cient to negate the presence of compulsion necessary to establish a constitutional violation," *id.* at 512–13, 96 S.Ct. at 1697 the need for counsel to safeguard his client's rights by voicing objection at trial is imperative. Appellate counsel, however, did not raise this issue before the district court in his motion for a new trial. Consequently, the record is barren of what considerations, if any, underlay trial counsel's "decision" not to object. Although we cannot speculate on why trial counsel failed to object, his inaction on this matter certainly reflects the tenor of his general performance in this case.

**57.** The district judge pointed to these seven allegations (as does the majority here) and treated them essentially as if each was asserted to be an independent event constituting ineffective assistance in and of itself. This is not the nature of appellant's claim. By isolating specific examples of counsel's alleged ineffectiveness, and then dismissing each of these breaches as either excusable or inconsequential, the trial judge and my colleagues totally ignore their aggregate effect on the quality of counsel's performance. This case does not present a series of isolated omissions and failures by counsel; it is a picture of pervasive indifference and incompetent representation—only some of which is visible in the record and manifested in the specific allegations brought by appellate counsel.

**58.** At the remand hearings, appellant alleged that trial counsel had been deficient in not ensuring that Decoster's sentence was properly executed. (Appellant had not been given credit for the time he spent in custody prior to trial. As a result of a motion filed on June 19, 1972 in the district court by appellate counsel appointed by this court, the Department of Corrections clarified Decoster's sentence and credited him with the time previously served.) On April 23, 1975, in announcing its Findings, the district court rejected this sentencing-failure claim on the ground that counsel's representation of the defendant had been completed at the time this issue arose. Findings at 17. *See* Local Rule 2–3(a)(2), United States District Court for the District of Columbia.

**59.** The district court labeled the waiver of opening argument "an informed tactical judgment on the part of defense counsel." Findings at 17. The court also found that it was the defendant who demanded to be tried by the court despite counsel's "inclinations" to have a jury trial. *Id.* at 15. Curiously, my colleagues find appellant's claim on this ground to be "frivolous" because he was in fact tried by a jury. But the point is that Decoster did not want a jury trial. Had counsel known prior to the morning of trial that the district judge would be forced to disqualify himself, successful arrangements might have been made to have Decoster's case heard by a different judge—and without a jury, as Decoster had requested.

The majority relies upon our great admiration and respect for the late Judge Waddy—which is shared by all the members of this court—to speculate that the appellant wanted Judge Waddy to hear the case with or without a jury, notwithstanding his participation in the earlier trial of appellant's codefendants. But the record shows only that appellant asked to be tried without a jury, and there is no indication whatsoever that he particularly wanted his trial to be before Judge Waddy. In fact, even after counsel requested that Judge Waddy disqualify himself, the defense reasserted its desire to be tried without a jury, thus indicating that a trial without a jury was its primary, if not only, concern. Tr. I at 13–14.

**60.** The district court concluded that although counsel was "dilatory" in filing the motion and "erred" in filing it in the wrong court, his actions "did not, in the slightest degree, limit defendant's ability to contact witnesses and inform his counsel of them if there were any; nor did it frustrate his defense, nor affect his guilt or innocence." *Id.* at 6. The district court also found that counsel knew what the transcript contained from his representation of Decoster at the preliminary hearing. Further, the court did not find any substantial variation between Ehler's testimony at the hearing and at trial. *Id.* at 7–8. *But see* note 106 *infra*.

tional violation or simply that no prejudice to appellant was shown.[61]

## III.

The analysis of this case should be guided by the principles established in *DeCoster I*.[62] We there held that upon showing a substantial violation of any of counsel's specified duties, a defendant establishes that he has been denied effective representation and the burden shifts to the government to demonstrate that the violation did not prejudice the defendant. Thus, *DeCoster I* prescribed a three-step inquiry for determining whether a claim of ineffective assistance of counsel warrants reversing a conviction:

1) Did counsel violate one of the articulated duties?

2) Was the violation "substantial"?

3) Has the government established that no prejudice resulted?

The heart of this approach lies in defining ineffective assistance in terms of the *quality of counsel's performance*, rather than looking to the effect of counsel's actions on the outcome of the case. If the Sixth Amendment is to serve a central role in eliminating second-class justice for the poor, then it must proscribe second-class performances by counsel, whatever the consequences in a particular case. Moreover, by focusing on the quality of representation and providing incentives in all cases for counsel to meet or exceed minimum standards, this approach reduces the likelihood that any particular defendant will be prejudiced by counsel's shortcomings. In this way, courts can safeguard the defendant's rights to a constitutionally adequate trial without engaging in the inherently difficult task of speculating about the precise effect of each error or omission by an attorney. Although the question of prejudice remains part of the court's inquiry, it is distinct from the determination of whether the defendant has received effective assistance. Rather, prejudice is considered only in order to spare defendants, prosecutors and the courts alike a truly futile repetition of the pretrial and trial process.

### A. Violation of Articulated Duties

In *DeCoster I*, this court attempted to give substantive content to the Sixth Amendment's mandate by setting forth minimum requirements of competent per-

---

61. With respect to these allegations, the court concluded:

> 1. * * *
> [T]his Court finds that while the proper and prudent course for [counsel] was to have interviewed the complaining witness, the police officers and the co-defendants prior to announcing "Ready", his failure to do so in this particular case does not add up to ineffective assistance of counsel warranting a new trial.
> 2. While it may be that defense counsel herein was lax in his duty to conduct as thorough a factual investigation as might have been possible, we find that counsel did raise the only defense available to him, which defense was putting the government to its proof. And in light of Decoster's posture and attitude during the course of these proceedings, this Court cannot say that defense counsel substantially violated any one of the duties owed to his client.
> * * * * * *
> 3. Further, considering the record *in toto*, while it might appear that defense counsel was less than a "diligent conscientious advocate," the weight of the government's case at trial and supported on the hearing on remand

convinces this Court that Decoster was not prejudiced thereby and not denied the "reasonably competent assistance of an attorney" under the circumstances.
*Id.* at 19–20.

62. 159 U.S.App.D.C. 326, 487 F.2d 1197 (1973). Although the division of this court in today's decision places our previous ruling in *DeCoster I* in question, a majority of the court today explicitly reaffirms the standard adopted in that opinion: a defendant is entitled to the reasonably competent assistance of an attorney acting as his diligent conscientious advocate. *See* Statement of Wright, C. J.; Opinion of MacKinnon, J. at p. —— of 199 U.S.App.D.C., at p. 222 of 624 F.2d & n.11. *Cf. People v. Pope*, 23 Cal.3d 412, 152 Cal.Rptr. 732, 590 P.2d 859 (1979) (adopting *DeCoster I* formulation). Where today's decision departs from *DeCoster I* is in the consequences that are held to flow from counsel's violation of a duty to his client. Regardless of the future vitality of *DeCoster I* as precedent within this Circuit, however, I continue to believe that the principles and analysis in that opinion should govern our approach in this and other ineffectiveness claims.

formance.[63] The obligations were described as "duties owed by counsel to client," [64] and thus were not offered as merely "aspirational" guidelines to which attorneys should strive. Indeed, the duties announced in *DeCoster I* represent the rudiments of competent lawyering guaranteed by the Sixth Amendment to every defendant in a criminal proceeding.[65]

The duties set forth in *DeCoster I* were derived from the American Bar Association's Standards for the Defense Function.[66] These ABA Standards summarize the consensus of the practicing Bar on the crucial elements of defense advocacy in our adversary system. Even though these standards were not intended by their drafters to serve "as criteria for judicial evaluation of effectiveness[,]" [67] this court noted that "they are certainly relevant guideposts in this largely uncharted area." [68] Naturally, given the complexities of each case and the constant call for professional discretion, it would be a misguided endeavor to engrave in stone any rules for attorney performance.[69] Nonetheless, preserving flexibility

**63.** *DeCoster I* articulated the following duties owed by counsel to a client:

*In General* —Counsel should be guided by the American Bar Association Standards for the Defense Function. . . .

*Specifically* —(1) Counsel should confer with his client without delay and as often as necessary to elicit matters of defense, or to ascertain that potential defenses are unavailable. Counsel should discuss fully potential strategies and tactical choices with his client.

(2) Counsel should promptly advise his client of his rights and take all actions necessary to preserve them. . . .

(3) Counsel must conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed. . . . [I]n most cases a defense attorney, or his agent, should interview not only his own witnesses but also those that the government intends to call, when they are accessible. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. And, of course, the duty to investigate also requires adequate legal research.

159 U.S.App.D.C. at 332–33, 487 F.2d at 1203–04 (footnotes omitted.)

**64.** *DeCoster I,* 159 U.S.App.D.C. at 332, 487 F.2d at 1203.

**65.** The duties set forth in *DeCoster I* are similar to those promulgated by the Fourth Circuit in *Coles v. Peyton,* 389 F.2d 224, 226 (4th Cir.), *cert. denied,* 393 U.S. 849, 89 S.Ct. 80, 21 L.Ed.2d 120 (1968):

Counsel for an indigent defendant should be appointed promptly. Counsel should be afforded a reasonable opportunity to prepare to defend an accused. Counsel must confer with his client without undue delay and as often as necessary, to advise him of his rights and to elicit matters of defense or to ascertain that potential defenses are unavailable. Counsel must conduct appropriate investigations, both factual and legal, to deter-

mine if matters of defense can be developed, and to allow himself enough time for reflection and preparation for trial.

**66.** American Bar Association Project on Standards for Criminal Justice, The Prosecution Function and the Defense Function (App. Draft 1971) [Defense Function Standards hereinafter cited as ABA Standards]. The ABA House of Delegates approved the second edition of the Defense Function standards on February 12, 1979. The new edition reflects the work of the ABA, its consultants, and representatives from approximately fifty nationwide groups interested in the improvement of American criminal justice. *See* Foreword to American Bar Association Standards Relating to the Administration of Criminal Justice, Prosecution and Defense Function (2d ed., approved draft without commentary 1979). By adopting the second edition of the Defense Function standards, with only one deletion from the first edition, both the ABA Standing Committee on Association Standards for Criminal Justice and the ABA House of Delegates have reaffirmed the continued validity of these standards as a "national norm" for measuring the effectiveness of counsel. *See* Hodson, *Revising the Criminal Justice Standards,* 64 A.B.A.J. 986, 987 (1978).

**67.** ABA Standards at § 1.1(f) (2d ed. at § 4–1.-1(f)) (cited in *DeCoster I,* 159 U.S.App.D.C. at 332, 487 F.2d at 1203 n.25).

**68.** *DeCoster I,* 159 U.S.App.D.C. at 332, 487 F.2d at 1203 n.25.

**69.** The courtroom performance of an attorney, for example, ordinarily involves many tactical and strategic judgments that are not subject to categorical prescriptions. *See Estelle v. Williams,* 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). Tasks such as juror voir dire, witness selection, evidentiary objections, direct and cross-examination, opening and closing argument, and preparation of jury instructions may often be handled differently; what is reasonable in one case may be questionable in a different factual setting.

is not incompatible with establishing minimum components of effective assistance, and the ABA Standards give helpful guidance in pursuing both aims.[70]

In *DeCoster I* this court was sensitive to these concerns and so did not attempt to prescribe categorical standards of attorney performance. Instead, we took pains to note that the articulated duties were "meant as a starting point for the court to develop, on a case by case basis, clearer guidelines for courts and for lawyers as to the meaning of effective assistance."[71] We recognized, however, that there were certain tasks, such as the ones we enumerated in our decision, that can never be ignored: conferring with the client without delay and as often as necessary; fully discussing potential strategies and tactical choices; advising the client of his rights and taking all actions necessary to preserve them; and conducting appropriate factual and legal investigations.[72] I submit that no one can

dispute that a reasonably competent lawyer, absent good cause,[73] would or should do less. Counsel should proceed in the representation of his client under the guidance of these minimal duties, departing only when the particular needs of his client compel a different course of action.

Prominent among the duties of defense counsel is the obligation to "conduct appropriate investigations, both factual and legal, to determine what matter of defense can be developed."[74] As the Commentary of the ABA Standards stresses, "[I]nvestigation and preparation are the keys to effective representation . . . . It is impossible to overemphasize the importance of appropriate investigation to the effective and fair administration of criminal justice."[75]

Investigation is crucial for several reasons. First, the proper functioning of our adversary system demands that both sides prepare and organize their case in advance

**70.** Judge MacKinnon correctly notes that the Advisory Committee that authored the ABA Standards did not propose them "as a set of per se rules applicable to post-conviction procedures." ABA Standards at 11. As the Committee explained, "[t]he standards have been drawn with their primary impact on the conduct of prosecutors and defense counsel in mind. The larger considerations involved in a determination of whether the conduct of a prosecutor or defense lawyer was such that a conviction should be overturned are beyond the scope of the Committee's work." *Id.* The Committee did suggest, however, that its recommendations might prove useful "in providing a yardstick for the evaluation of the effectiveness of a lawyer's conduct when it is called into question by an attack on the validity of a conviction because of his performance." *Id.* at 10.

Moreover, the Committee stressed that its proposals would contribute nothing to the administration of justice if viewed as "mere paper standards." Noting that the Bar and judiciary had long been woefully lax in adequately enforcing appropriate standards of professional and ethical conduct, the Committee warned that "departures from authoritative professional standards" should no longer be tolerated. *Id.* In this regard, it is significant that the ABA characterized its proposals as "standards" rather than "guidelines."

**71.** 159 U.S.App.D.C. at 333 n.23, 487 F.2d at 1203 n.23.

**72.** In *United States v. Pinkney*, 179 U.S.App. D.C. 282, 290, 551 F.2d 1241, 1249 (1976), this

court recognized that "[i]n order to properly fulfill his responsibilities, counsel's energies and resources should be directed as fully to the dispositional phase of the proceedings as to pretrial preparation and courtroom advocacy." Accordingly, we extended *DeCoster I* by setting forth minimum standards for effective representation at sentencing. Specifically, we imposed upon counsel the duty to familiarize himself with all sentencing reports in advance of the sentencing hearing, as well as the duty to confer with his client during the presentence period in order to keep the client fully informed and to ascertain his views of the dispositional alternatives and their implications. *Id.*, 179 U.S.App.D.C. at 290–91, 551 F.2d at 1249–50. *See United States v. Martin*, 154 U.S.App.D.C. 359, 370–72, 475 F.2d 943, 954–56 (1973) (Bazelon, C. J., dissenting); ABA Standards § 8.1 (2d ed. § 4–8.1) (Sentencing). *See also Gadsden v. United States*, 223 F.2d 627, 630 (1955) ("The right to effective assistance of counsel at the sentencing stage of the proceeding is guaranteed by the Constitution."), *cert. denied, Hines v. United States*, 350 U.S. 949, 76 S.Ct. 324, 100 L.Ed. 827 (1956).

**73.** *See* Part IIIB, *infra*.

**74.** *DeCoster I*, 159 U.S.App.D.C. at 333, 487 F.2d at 1204.

**75.** ABA Standards at 225. *See* ABA Standards § 4.1 (2d ed. § 4–4.1) (Duty to Investigate).

of trial. There can be no justice where one party to the battle has made no effort to arm itself with the pertinent facts and law.[76] Second, in a very practical sense, cases are won on the facts. Proper investigation is critical not only in turning up leads and witnesses favorable to the defense, but in allowing counsel to take full advantage of trial tactics such as cross-examination and impeachment of adverse witnesses. And of course, adequate legal investigation is necessary to ensure that all available defenses are raised and that the government is put to its proof.[77] "[I]t is axiomatic among trial lawyers and judges that cases are not won in the courtroom but by the long hours of laborious investigation and careful preparation and study of legal points which precede the trial." [78]

Moreover, the necessity for exhaustive investigation is not limited to its value in preparation for trial. As a leading manual for defense lawyers emphasizes:

"The *facts* are counsel's most important asset not only in arguing before a jury but in every other function counsel performs: seeking advantageous terms of bail, urging the prosecutor to drop or reduce charges, negotiating with him about a plea, urging a favorable sentence recommendation on a probation officer or sentencing disposition on a judge." [79]

At a minimum, the duty to investigate requires counsel (or his investigator) [80] to

---

**76.** *See* ABA Standards at 224 ("In our system of justice a trial is not an inquiry to expose previously unknown facts.").

**77.** *See United States v. Ash,* 413 U.S. 300, 316–17, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973), *quoting United States v. Bennett,* 409 F.2d 888 (2d Cir.), *cert. denied, [Haywood v. United States; Jessey v. United States],* 396 U.S. 852, 90 S.Ct. 113, 117, 24 L.Ed.2d 101 (1969).

**78.** ABA Standards at 224. *See Moore v. United States,* 432 F.2d 730, 739 (3d Cir. 1970) (en banc) ("[R]epresentation involves more than the courtroom conduct of the advocate. The exercise of the utmost skill during the trial is not enough if counsel has neglected the necessary investigation and preparation of the case or failed to interview essential witnesses or to arrange for their attendance.").

**79.** A. Amsterdam, B. Segal & M. Miller, Trial Manual for the Defense of Criminal Cases § 106 (3d ed. 1976) (emphasis added).

**80.** Congress has recognized the critical importance of adequate pretrial investigation through the adoption of the Criminal Justice Act. That Act provides that:

Counsel for a person who is financially unable to obtain investigative, expert, or other services necessary for an adequate defense may request them in an ex parte application. Upon finding, after appropriate inquiry in an ex parte proceeding, that the services are necessary and that the person is financially unable to obtain them, the court, or the United States magistrate if the services are required in connection with a matter over which he has jurisdiction, shall authorize counsel to obtain the services.

18 U.S.C. § 3006A(e)(1) (1976). The statute has been interpreted to authorize payments in those circumstances "in which a reasonable attorney would engage such services for a client having the independent financial means to pay for them." *United States v. Bass,* 477 F.2d 723, 725 (9th Cir. 1973). *Accord, United States v. Theriault,* 440 F.2d 713, 717 (5th Cir. 1971) (Wisdom, J., concurring), *on appeal after remand,* 474 F.2d 359 (per curiam), *cert. denied,* 411 U.S. 984, 93 S.Ct. 2278, 36 L.Ed.2d 960 (1973). *See also Mason v. State of Arizona,* 504 F.2d 1345, 1354 (9th Cir. 1974), *cert. denied,* 420 U.S. 936, 95 S.Ct. 1145, 43 L.Ed.2d 412 (1975) ("a state court should probably view with considerable liberality a motion for such pre-trial assistance"); *United States v. Tate,* 419 F.2d 131, 132 (6th Cir. 1969) ("Congressional purpose in adopting this statute was to seek to place indigent defendants as nearly as may be on a level of equality with nonindigent defendants in the defense of criminal cases"); Pye, *The Administration of Criminal Justice,* 66 Colum.L.Rev. 286, 291 (1966) (describing the investigative provisions of the CJA as one of the Act's chief purposes).

Despite the availability of CJA funds both for hiring independent investigators and for compensating counsel who perform such services themselves, few court-appointed counsel make use of the Act to support investigations on behalf of their clients. In fiscal year 1975, for example, the D.C. Superior Court issued CJA orders appointing counsel in 12,130 adult cases (felonies and misdemeanors) and 5,167 juvenile cases. Yet payments were made to investigators in only 109 adult and 13 juvenile cases. (The Public Defender Service, which has a full-time investigative staff, handled an additional 212 investigations for court-appointed counsel.) In 1976, the figures were comparable: of 13,536 adult and 5,337 juvenile cases, investigative payments were made in 386 and 255 cases, respectively (with the Public Defender Service providing aid in an additional 156 cases).

contact persons whom he has or should have reason to believe were witnesses to the events in question, to seek witnesses in places where he has or should have reason to believe the events occurred, and to conduct these interviews and investigations as promptly as possible, before memories fade or witnesses disappear.[81]

In the present case, Decoster's attorney did none of these things. Although the failure to interview a particular witness, by itself, may not rise to the level of inadequate assistance, defense counsel's investigation and preparation for this case was so perfunctory that it clearly violated his duties to his client.[82] The prosecution called three witnesses at trial—Roger Crump and Officers Box and Ehler. Despite the cardinal rule that proper investigation begins with interviews of those witnesses whom the government intends to call,[83] particularly the arresting and investigating officers,[84] defense counsel made no attempt to interview any of these witnesses at any time prior to trial. Nor did he request or obtain a transcript of the preliminary hearing where these witnesses testified.[85] Defense counsel did not even contact and interview Decoster's codefendants, Eley and Taylor, before trial. Nor did he seek or talk to any witnesses at the hotel or bar. In fact, defense counsel made absolutely no effort to discover, contact, or interview *a single witness* prior to trial.[86] Apparently, he was willing to go to trial without having made any real effort to determine what could be elicited by way of defense or to evaluate the strengths and weaknesses of his client's case.[87]

One explanation for the infrequency with which court-appointed counsel request investigative expenses is their fear, often reinforced by comments from trial judges, that any money spent on such services will eventually be subtracted from the remuneration the attorneys themselves would otherwise receive. See Tague, *The Attempt to Improve Criminal Defense Representation,* 15 Am.Crim.L.Rev. 109, 131 (1977); Austern-Rezneck Report, *supra* note 3, at 45. Moreover, the Criminal Justice Act itself, by compensating attorneys at rates of $30 per hour for time expended in court and only $20 per hour for out-of-court time, provides a disincentive for counsel to perform their own investigatory work. *See* 18 U.S.C. § 3006A(d)(1) (1976).

81. *See generally* G. Shadoan, Law and Tactics in Federal Criminal Cases 7 (1964); Young Lawyers Section, D.C. Bar Ass'n, 11th Annual Criminal Practice Institute—Trial Manual §§ 2.1, 2.12 (1974).

82. While the majority properly notes that the Constitution contains no mandate that counsel "leave not the smallest stone unturned," Opinion of Leventhal, J., at —— of 199 U.S.App. D.C., at 210 of 624 F.2d, Decoster's attorney did not turn over even the largest boulder.

83. "[A] defense attorney, or his agent, should interview not only his own witnesses but also those that the government intends to call, when they are accessible." *DeCoster I,* 159 U.S.App. D.C. at 333, 487 F.2d at 1204.

84. *See* A. Amsterdam, B. Segal & M. Miller, *supra* note 79, § 95.

85. Despite the obvious value of a transcript of appellant's preliminary hearing for use in impeaching the prosecution's witnesses, *see, e. g., id.* §§ 132, 144, counsel ignored his client's requests and did not even take the simple step of obtaining a copy. *See* pp. —— – —— of 199 U.S.App.D.C., pp. 271–272 of 624 F.2d, *supra.* Yet, acquiring the ability to impeach government witnesses is particularly crucial when, as the district court here observed, "the only defense available . . . was putting the government to its proof." *Findings* at 19. *See* note 106 *infra.*

86. Judge MacKinnon notes that there was no assurance that the prosecution witnesses would have consented to interviews by defense counsel. Opinion of MacKinnon, J., at —— of 199 U.S.App.D.C., at 238 of 624 F.2d. Unfortunately, due to counsel's failure even to attempt to obtain interviews, we will never know whether permission would have been granted. (Of course, witnesses—particularly police officers—are the property of neither the prosecution nor the defense, and as citizens they have a *moral,* if not legal, obligation to talk to defense counsel in order to prevent an unfair trial. *Cf. Gregory v. United States,* 125 U.S. App.D.C. 140, 369 F.2d 185 (1966) (prosecutor's advice to witnesses not to talk to anyone unless he was present was unprofessional and denied defendant a fair trial)). But the issue before us is not whether these witnesses would have spoken to counsel upon request, but whether counsel who makes no effort to interview critical prosecution witnesses should be considered to be providing effective assistance to his client.

87. Further support for the inference that counsel had not even formulated a coherent defense

Moreover, defense counsel's violations of the duties owed to his client were not limited to an egregious failure to investigate. There are several indications that counsel did not "confer with his client . . . as often as necessary to elicit matters of defense, or to ascertain that potential defenses are unavailable."[88] Surely, many of the problems that developed at and just prior to trial could have been eliminated had counsel more fully prepared himself and discussed the case with his client.[89] In addition, coun-

strategy is found in the events that occurred at the outset of trial: the confusion over whether an alibi defense would be presented, the belated efforts to subpoena appellant's codefendants, the offer to waive jury trial, and the failure to make an opening statement. At best, these episodes reflect the futile attempts of a defense attorney to cope with an unfortunate predicament brought about by his own inadequate preparation. At worst, they represent the visible tip of an iceberg of inexcusable attorney failures and oversights.

**88.** *DeCoster I,* 159 U.S.App.D.C. at 332, 487 F.2d at 1203. Counsel's duty to confer with his client also includes the obligation to "discuss fully potential strategies and tactical choices . . . ." *Id. See* ABA Standards § 3.8 (2d ed. § 4–3.8) (Duty to Keep Client Informed).

Although the inquiry on remand focused on counsel's investigative efforts, two particular revelations indicate that communications between counsel and appellant were minimal. First, at the outset of trial, Decoster requested the court to subpoena his codefendants, explaining that he "didn't have a chance" to talk to his lawyer about this crucial matter of the witnesses that the defense expected to call. *See* p. —— of 199 U.S.App.D.C., p. 269 of 624 F.2d *supra. Cf.* ABA Standards § 5.2(b) (2d ed. § 4–5.2(b)) ("The decisions on what witnesses to call . . . are the exclusive province of the lawyer *after consultation with his client.*") (emphasis added).

Further, the letter that Decoster sent his attorney sometime before trial opened with the following sentences: "As I tried to call you before, but couldn't make contact, I decided to write again. Its important I see you, as you are my lawyer and I don't have ways of fighting my case without you." Supplementary Brief and Appendices for Appellee, at 48. At the remand hearings, counsel indicated that he had no specific recollection of when he last saw appellant before trial, but suggested that he "might have had contact with him within the week before, ten days before." R.Tr. I at 44. Appellant gave no testimony on this issue.

**89.** Counsel's failure to investigate and confer with his client more frequently may have resulted from his inability to devote sufficient time to each of his cases. The records of the Administrative Office of the United States Courts reveal that in 1972, the year that Decoster went to trial, his attorney received payments under the Criminal Justice Act totalling $51,098.47 for handling 284 different cases—

more than one case for every working day. This total, of course, does not include any criminal and civil cases that Decoster's attorney may have handled on a retained basis. *Compare* ABA Standards § 1.2(d) (2d ed. § 4–1.2(d)) ("A lawyer should not accept more employment than he can discharge within . . . the limits of his capacity to give each client effective representation.").

Unfortunately, many court-appointed counsel maintain unmanageable caseloads, in part because a high-volume business is required to compensate for low fee schedules under the CJA. *See, e. g., United States ex rel. Green v. Rundle,* 434 F.2d 1112, 1115 (3d Cir. 1970) (court-appointed attorneys were carrying from 600 to 800 cases per year, and often handled 40 to 50 cases a day); *Colson v. Smith,* 315 F.Supp. 179 (N.D.Ga.1970), *aff'd,* 438 F.2d 1075 (5th Cir. 1971) (petitioner's court-appointed counsel was handling approximately 5,000 criminal cases a year); Austern-Rezneck Report, *supra* note 3, at 11 (eleven D.C. attorneys frequently mentioned as either incompetent or uninterested and overloaded with cases were appointed to a total of 657 felonies, 576 serious misdemeanors, and 60 less serious misdemeanors in one year; one handled 113 felonies and 86 serious misdemeanors; another had 136 felonies and 50 serious misdemeanors); Report on Appointed Counsel Program in D.C. Courts, *supra* note 3, at 15–17 (in many felonies, less than 10 hours is expended on entire case; some attorneys are handling over 200 felonies per year).

Similar caseload problems often impair the ability of public defender organizations to provide effective assistance. *See generally* The Center for Defense Services, *supra* note 3, at 21–23; 4 National Institute of Law Enforcement and Criminal Justice (LEAA), The National Manpower Survey of the Criminal Justice System: Courts 22–24 (1978); NLADA, The Other Face of Justice 29 (1973). In the District of Columbia, the Public Defender Service has attempted to ensure that the quality of its representation does not suffer because of overloaded calendars by adopting limits on the number of cases that any attorney may carry. *See* Austern-Rezneck Report, *supra* note 3, at 99–100 (setting maximum of 30 open cases per attorney at any time, 20 in an active posture, and expecting that no attorney will close more than 120 criminal cases annually); *id.* at 122–23 (recommending similar maximum caseload standards for all CJA counsel). *Cf. Wallace v.*

sel was derelict in his duty to "promptly advise his client of his rights and take all actions necessary to preserve them."[90] For example, 50 days elapsed from the time appellant was accepted for third-party custody until his attorney filed a proper bond review motion.[91] Finally, counsel's representation of his client at the sentencing hearing was anything but diligent and conscientious. Despite the critical need for effective advocacy at what "may well be the most important part of the entire proceeding,"[92] counsel's total contribution at appellant's hearing consisted of the following "allocution":

> If the Court please, Counsel is aware that Your Honor has a fully comprehensive a [sic] detailed probation report, and Counsel is aware of the report and would submit based on said report.[93]

In sum, counsel violated each of the duties enunciated in *DeCoster I* as the prerequisites of a reasonably competent performance. Appellant's court-appointed attorney provided the kind of shoddy representation that *none of us would tolerate for ourselves*—a slovenly, slipshod job, almost totally lacking in preparation, characterized by repeated failures to protect his client's rights and an obvious indifference to his client's fate.

## B. *"Substantial" Violations*

Contrary to the intimations of the majority, we do not contend that the slightest departure from a checklist of counsel's duties establishes ineffectiveness and requires reversal.[94] Since counsel's decisions must be adapted to the complexities of a given case, the proper performance of an attorney's obligations necessarily entails considerable discretion. Moreover, the human animal is too fallible and the task of defense counsel too complex to expect that every action taken by an attorney will prove correct on hindsight. We have repeatedly cautioned that "[t]his court does not sit to second guess strategic and tactical choices made by [defense] counsel."[95] The Sixth Amendment demands that counsel's conduct be conscientious, reasonable, and informed by adequate investigation and preparation; it does not demand that counsel's performance be flawless.

Thus, like the majority, we recognize that counsel's conduct must be evaluated in the

*Kern,* 392 F.Supp. 834, 848–49 (E.D.N.Y.) (Legal Aid Society's caseload too high to allow for effective assistance of counsel; Legal Aid enjoined from accepting additional cases until average attorney caseload falls below 40), *vacated on jurisdictional grounds,* 481 F.2d 621 (2d Cir. 1973), *cert. denied,* 414 U.S. 1135, 94 S.Ct. 879, 38 L.Ed.2d 761 (1974); Wagner, *Colorado Defenders Fight Excessive Caseload,* 6 Nat'l Legal Aid & Defender Ass'n Washington Memo 1 (October 1977) (Colorado public defenders refused further appointments because of case overload; judge agreed to assign cases to private counsel until caseload becomes manageable).

90. *DeCoster I,* 159 U.S.App.D.C. at 332, 487 F.2d at 1203. One of the rights that can be protected only by prompt legal action is "the accused's right to be released from custody pending trial." *Id.*

91. Counsel's failure to see that Decoster properly received credit for the 310 days he had been incarcerated prior to his trial on the instant offense is also noteworthy—not because it constituted a specific violation of a duty owed to appellant, but because it *illustrates the* indifference of counsel to his client's rights.

92. *United States v. Pinkney, supra* note 72, 179 U.S.App.D.C. at 290, 551 F.2d at 1249. *See generally,* American Bar Association Project on Minimum Standards for Criminal Justice, Sentencing Alternatives and Procedures (App. Draft 1968).

93. Sentencing Transcript, March 3, 1972, at 3.

94. Indeed, our position is that a finding of ineffective assistance need not automatically require the reversal of an appellant's conviction. *See* notes 121 & 131 *infra.*

95. *DeCoster I,* 159 U.S.App.D.C. at 330, 487 F.2d at 1201. *See, e. g., United States v. Moore,* 174 U.S.App.D.C. 113, 529 F.2d 355 (1976); *United States v. Brown,* 155 U.S.App. D.C. 177, 179, 476 F.2d 933, 935 (1973) (per curiam); *Campbell v. United States,* 126 U.S. App.D.C. 250, 251, 377 F.2d 135, 136 (1966). By the same token, we have also stressed that "when counsel's choices are uninformed because of inadequate preparation, a defendant is denied the effective assistance of counsel." *DeCoster I,* 159 U.S.App.D.C. at 330, 487 F.2d at 1201.

context of a particular case and that not every deviation from a perfect, or even average performance makes out a claim of ineffective assistance. Instead, counsel's violations must be substantial to offend the Sixth Amendment right to effective assistance of counsel.[96] The duties articulated in *DeCoster I*, like the ABA Standards and the obligations prescribed by the Fourth Circuit in *Coles v. Peyton*,[97] describe the minimum components of a competent performance and provide the court with an objective basis for assessing the adequacy of representation. A demonstration that counsel has violated one of these duties compels further inquiry into counsel's conduct to determine whether, in this specific case, counsel's departure from the prescribed standards was either "excusable" or "justifiable." The first of these inquiries recognizes that even the most diligent and conscientious attorney may occasionally falter in fulfilling his responsibility; one minor error in an otherwise commendable performance does not automatically render the representation inadequate.[98] The second inquiry is necessary because the "reasonably competent" attorney must tailor his actions to fit the unique circumstances presented by a given case; some particular situations may justify or even mandate a course of action that transgresses the general list of duties, a list that of necessity was designed to govern defense counsel's conduct in the typical criminal case.

In this case, the frequency and pervasiveness of defense counsel's omissions and failures certainly belie any notion that these actions were isolated and excusable events. The violation in this case was not simply that counsel failed to interview certain named witnesses. The record reveals that counsel conducted almost no investigation whatsoever in the 17 months preceding trial. Consequently, he began trial unaware of what the prosecution witnesses would say and as a result was unable to refute their stories, was ignorant of the possible defenses and witnesses he might present, and was even unsure of his own client's version of the events.

Nor do any special circumstances justify counsel's breach of his obligations. In some cases prudential judgments or tactical considerations may be involved in counsel's decision about whom to interview.[99] In the present case, however, there simply is no

**96.** Even absent a showing of substantial violation under the Sixth Amendment, the due process clause of the Fifth Amendment guarantees defendants protection against prejudicial errors by their counsel. *See* note 121 *infra*.

**97.** 389 F.2d 224, 226 (4th Cir.), *cert. denied*, 393 U.S. 849, 89 S.Ct. 80, 21 L.Ed.2d 120 (1968). *See* note 65 *supra*. The duties enumerated in *Coles* have recently been reaffirmed by the Fourth Circuit as "a definitive, objective description of the competency normally demanded of counsel in certain aspects of their service." *Marzullo v. Maryland*, 561 F.2d 540, 544 (4th Cir. 1977), *cert. denied*, 435 U.S. 1011, 98 S.Ct. 1885, 56 L.Ed.2d 394 (1978).

**98.** This does not mean, of course, that a defendant has no recourse for minor attorney errors not amounting to ineffective assistance. But where counsel's error amounts to no more than an isolated misstep in an otherwise reasonably competent performance, there are nonconstitutional doctrines other than ineffective assistance that are better suited to protect the interests of the defendant. For example, a reviewing court's authority to notice "[p]lain errors or defects affecting substantial rights," Fed.R.Crim.P. 52(b), permits this court to address and rectify attorney errors that arise during the course of the trial proceedings, particularly omissions such as the failure to move for the suppression of inadmissible evidence. Under 28 U.S.C. § 2106 (1976), federal appellate courts are empowered to fashion any remedy that is "just under the circumstances." *Cf. Dyer v. United States*, 126 U.S.App.D.C. 312, 379 F.2d 89 (1967) (reversing conviction on basis of "misgivings" about counsel's performance without finding any constitutional violation). And in our supervisory function, we have the responsibility to preserve the orderly functioning of the trial courts and the obligation to protect the rights of the accused. *See McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943). Thus, at least on direct appeal, these doctrines provide ample authority to remedy those errors of trial counsel that may not rise to the level of constitutional violations.

**99.** *See United States v. Clayborne*, 166 U.S. App.D.C. 140, 509 F.2d 473 (1974) (failure to interview witness justified because client had been in frequent contact with witness).

possible justification for counsel's near-total lack of investigation and preparation.

Defense counsel's failure to investigate cannot be justified on the basis that he felt he was familiar enough with the facts of this case to judge for himself that his client was guilty. To begin with, the assertion that defense counsel had sufficient knowledge of what an investigation would reveal is manifestly unsupportable. From all that appears affirmatively in the record, defense counsel's entire knowledge of the events in question derived solely from two sources: conversations he may have had with his client and his representation of the defendant at the preliminary hearing. As to the former, the record reveals only that appellant and his attorney appeared in court together on six occasions;[100] counsel presented no evidence on remand on the extent of his communications with his

client. As to the latter, the preliminary hearing occurred 17 months before trial, lasted all of 20 minutes and consisted entirely of the testimony of Officer Ehler, who was not even the arresting officer. Thus, defense counsel's total knowledge of the case in fact consisted entirely of two conflicting versions of the events—one from a police officer and the other from his own client.[101]

Perhaps counsel concluded from this limited information that his client had no alibi defense and was guilty, and that therefore counsel was excused from conducting any investigation.[102] But the suggestion that a client whose lawyer believes him to be guilty deserves less pretrial investigation is simply wrong. An attorney's duty to investigate is not relieved by his own perception of his client's guilt or innocence.[103] I can think of nothing more destructive of the

**100.** Findings at 6, 10. Judge MacKinnon refers to these contacts between the defendant and his attorney as "interviews," Opinion of MacKinnon, J., at p. —— of 199 U.S.App.D.C., at p. 233 of 624 F.2d, but the district court found only that counsel had appeared with appellant in court on six occasions prior to trial. When at trial appellant accused counsel of inadequate representation, counsel asserted that he had conferred regularly with his client. As noted previously, however, the record contains several indications that communications between appellant and counsel were minimal at best. *See* note 88 *supra.*

**101.** Judge MacKinnon suggests that counsel acquired further knowledge of the case from the government's file and the grand jury testimony. Opinion of MacKinnon, J., at —— of 199 U.S.App.D.C., at 233 of 624 F.2d. Although it was not established that counsel ever availed himself of the opportunity to examine these materials, even full access to the government file is no substitute for personal interview and investigation. Surely, one cannot believe that the prosecutor will ask—and record the answers to—all or even most of the questions that defense counsel would want answered in preparing the defense.

**102.** Judge MacKinnon apparently would go one step further and *require* an attorney to refrain from investigation if he believes his client to be guilty. Opinion of MacKinnon, J., at —— —— —— of 199 U.S.App.D.C., at 239–240 of 624 F.2d. Judge MacKinnon points to the ethical standards of the legal profession that prohibit an attorney from assisting a client who wishes to present false testimony. He also cites Justice (then Judge) Stevens' statement that when

a defendant admits guilt to his attorney, the attorney has no duty to search for a witness who might testify falsely. *Id.* at —— of 199 U.S.App.D.C., at 239 of 624 F.2d. *See* Opinion of Leventhal, J., at —— —— —— of 199 U.S. App.D.C., at 209–210 of 624 F.2d (citing passage in full).

But an attorney's duty not to present perjured testimony is not a mandate to abjure investigation on behalf of his client, as appears to have happened here. In our adversary system it is not the attorney's role to prejudge the guilt or innocence of his client. And, even in those cases where a defendant admits guilt to his attorney, the attorney must conscientiously gather information to protect the defendant's interests at all stages of the criminal process. *See* note 103 and pp. —— —— —— of 199 U.S.App. D.C., pp. 286–289 of 624 F.2d *infra.*

**103.** Indeed, a lawyer's complete, independent investigation is so vital a component of effective representation that even the defendant's confidential admission of guilt does not affect the obligation and scope of counsel's duty to investigate. The ABA Standards explicitly state that "[t]he duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or his stated desire to plead guilty." ABA Standards § 4.1 (2d ed. § 4–4.1). Whether the client decides to plead guilty or to go to trial, investigation is essential in fulfilling the lawyer's role of raising mitigating factors and obtaining the most favorable disposition for the defendant in the contexts of pretrial release, charging and plea negotiations, argument to the jury, and sentencing. *See* ABA Standards at 227.

adversary system than to excuse inadequate investigation on the grounds that defense counsel—the accused's only ally in the entire proceedings—disbelieved his client and therefore thought that further inquiry would prove fruitless.[104] The Constitution entitles a criminal defendant to a trial in court by a jury of his peers—not to a trial by his court-appointed defense counsel.[105]

In this case, however, court-appointed counsel failed to interview even the prosecution witnesses, ostensibly because he was already "aware" of the main points of their likely testimony. By virtue of his attendance at the preliminary hearing perhaps counsel obtained a good indication of Officer Ehler's likely testimony at trial.[106] But there can be no justification for counsel's

**104.** Such attitudes can only exacerbate what is already a serious problem of defendant mistrust of court-appointed counsel. *See, e. g.,* J. Casper, American Criminal Justice: The Defendant's Perspective 106–15 (1972); ABA Standards at 197–98; Wice & Suwak, *supra* note 3, at 171.

**105.** The dangers that can result from excusing counsel's inadequate representation on the ground that his client's "guilt is obvious" are vividly illustrated by a series of events occurring shortly after appellant's trial involving the same attorney whose performance is challenged in the present case. In December 1971, Decoster's lawyer was appointed to represent another indigent defendant, Samuel A. Saunders, who was accused of purse snatching. (D.D.C., Cr. No. 2004–71). The victim, an elderly woman who owned a restaurant near Saunders' residence, saw Saunders some five and a half weeks after the robbery, called the police, and had him arrested. Although the Bail Agency recommended release with third-party custody, bond was set for Saunders at $5,000. Decoster's lawyer filed no motion for bond reduction or review; as a result, Saunders remained incarcerated through the trial and appellate stages. Memorandum of Points and Authorities in Support of Defendant's Motion for Release Pending New Trial at 2, *United States v. Saunders* (D.D.C. Cr. No. 2004–71).

Saunders, who spent over 9 years in an institution for the mentally retarded and is half-blind, *id.,* maintained that he was innocent and that he had been working on the day of the robbery. Trial Transcript of March 2, 1972 (Tr.), at 90, 92. Decoster's lawyer evidently did not believe him; as in the present case, the lawyer apparently conducted no investigation whatsoever. At trial, Saunders' entire defense consisted of his own testimony. Counsel offered no opening statement. On direct examination, he elicited a statement from Saunders that he had not stolen the purse. *Id.* at 81. Decoster's lawyer made no attempt to develop the defense beyond this single denial. On cross-examination, counsel sat silently as Saunders became increasingly confused about whether each question of the U.S. Attorney referred to the day of the robbery or the day of his arrest. *Id.* at 84–90. Nor did counsel attempt to clarify matters on redirect, despite the prosecutor's use of this confusion to imply that Saunders was lying. The most critical dereliction, however, was the lawyer's failure to pursue either in redirect examination or through post-trial investigation, Saunders' assertion during cross-examination that he had been working for the D.C. Employment Service on the day of the robbery and that "they will verify that date." *Id.* at 91.

Not surprisingly, Saunders was convicted and sentenced to 2–6 years. Fortunately, this court appointed a conscientious attorney to represent Saunders on appeal. This lawyer, after reading the transcript of the trial, was disturbed by Saunders' protestations of innocence, and she had her secretary call the U.S. Employment Service. The labor office checked their records for the date of the robbery and found indisputable documentary proof that Saunders had been working on a Washington Star delivery truck on that day and was nowhere near the scene of the crime. Defendant's Motion for New Trial with Supporting Affidavits and Memorandum of Points and Authorities in Support Thereof. The district court granted a motion for a new trial based on the newly-discovered evidence and the charges against Saunders were dismissed. In the meantime, Saunders had spent a year in jail for a crime he had not committed.

Saunders, of course, could demonstrate prejudice, even under the majority's proposed analyses. But there are undoubtedly countless other indigent defendants, like Decoster himself, who are represented with the same callous indifference by court-appointed trial counsel, and who are not fortunate enough to have indisputable evidence, preserved in documentary form, attesting to the prejudice they have suffered. Even if many of these defendants are "probably guilty," they deserve the effective services of a lawyer who is a "conscientious advocate in their behalf." And we can achieve this end only by assuring that counsel fulfills the minimum obligations of a competent attorney without regard to his—or our—subjective beliefs about the defendant's guilt.

**106.** There can be no similar excuse, however, for counsel's failure to obtain the transcript of Ehler's testimony at the preliminary hearing. Had counsel done so, he might have been able to turn the officer's testimony to appellant's advantage, by noting the discrepancies be-

failure to interview either complainant Crump or Officer Box, the critical witnesses to the circumstances surrounding the arrest of appellant.[107]

As for the codefendants Taylor and Eley, the district court concluded that, "[a]s a result of the information the defendant had given him and his knowledge of the prior 'guilty' pleas of the co-defendants, [counsel] considered that their testimony might be contradictory to that of the defendant."[108] My colleagues apparently believe that this finding justifies counsel's failure to interview the codefendants. But counsel's speculations and beliefs are no substitutes for facts. No matter how experienced an attorney is, no matter how astute his predic-

tions of the content of the witnesses' testimony might be, it is inexcusable not to interview such key potential witnesses on the ground that counsel feels that their testimony might contradict what the defendant has told him. Counsel's reasoned and informed judgment that a witness' testimony would not aid the defense may justify not calling that witness to testify, but it cannot excuse the failure even to interview him.[109]

It is true that appellant complicated defense counsel's task when, sometime before trial, he sent counsel a letter suggesting a new version of what happened on the day of his arrest.[110] Again, however, this has no

---

tween Ehler's testimony at trial and at the preliminary hearing. Although the district court did not find "any substantial variation" in Ehler's testimony, there was one glaring inconsistency. At trial, Ehler identified Decoster as the assailant who went through Crump's pockets. Trial Transcript, Nov. 16, 1971 (Tr. II), at 12. Yet at the preliminary hearing almost a year and a half earlier, Ehler stated that he did not know which of the attackers was holding Crump and which was rummaging through his pockets. Preliminary Hearing Transcript, June 8, 1970 (P.T.), at 8. Although the identity of the assailant responsible for seizing Crump's wallet is legally immaterial, the obvious and unexplainable discrepancy in Ehler's testimony could have been valuable in impeaching the officer's credibility.

Officer Ehler also testified at the preliminary hearing that he had seen Earl Taylor acting as a lookout in the robbery; Ehler did not mention that Taylor had a weapon. Yet at trial, counsel made no attempt to explore the seeming inconsistency between Ehler's version of the events and that of Crump, who, despite having lost his memory in an automobile accident, stated that Taylor had held a knife on him. Tr. I at 30. In this regard, it might also have been significant that appellant's codefendants pleaded guilty to robbery, rather than armed robbery, and received significantly lighter sentences than Decoster.

107. Also, had counsel investigated the scene of the crime, he might have been able to discover whether it was in fact possible, as Officer Box testified, that the pursuing officer could have followed Decoster from the parking lot and into the hotel lobby without ever losing sight of him.

The majority would excuse counsel's failure to interview other possible witnesses as well. It is said that the "abstract possibility" that the desk clerk or other possible witnesses at the

hotel or bar might have provided useful testimony "is not only speculative but remote in the extreme." Opinion of Leventhal, J., at p. —— of 199 U.S.App.D.C., at p. 211 of 624 F.2d. My colleagues may be correct that no material information could be elicited from such an investigation. On the other hand, it is also possible that the desk clerk was away from his post and had seen appellant enter the lobby. Similarly, he might have confirmed that appellant's demeanor clearly indicated that he had not been running for any length of time before entering the hotel. These differing conjectures simply prove the main point: Counsel should have investigated and interviewed potential witnesses to determine what they had to offer, so that neither he—nor we—would be compelled to speculate, post hoc, as to what the witnesses would have said.

108. Findings at 19.

109. Cf. Stokes v. Peyton, 437 F.2d 131, 137 (4th Cir. 1970) (failure to interview cannot be justified by attorney's belief that testimony would not help).

110. The district court and majority opinions emphasize that prior to the letter, appellant had not suggested that his codefendants might be valuable defense witnesses. It is true, of course, that defense counsel often must rely upon his client as a primary source of information, particularly if an alibi defense is alleged and the defendant claims to have been elsewhere. But defense counsel's duty is to conduct an independent investigation; he cannot limit himself to interviewing only those whom the defendant affirmatively requests to be contacted. Defense counsel knew that Decoster's codefendants allegedly participated in the robbery and that Decoster claimed that he was not with them. This certainly should have alerted

bearing on counsel's failure to investigate.[111] By his own account, counsel did not learn of the self-defense theory until the day before or the day of the trial. Appellant's conflicting stories, therefore, obviously cannot excuse counsel's inaction during the previous seventeen months. If anything, appellant's differing accounts should have emphasized the need for an independent investigation to determine which, if either, version was accurate and could be presented as a defense.[112] Yet, even after receiving appellant's letter, counsel was ready to go to trial without having attempted to contact the codefendants to learn their version of the events on the night of the robbery.

In the end, the majority's conclusion that appellant was not denied the effective assistance of counsel rests on their perception that the record contains overwhelming evidence of appellant's guilt.[113] [U]ltimately, "there was a total failure of appellant to show that it was likely that counsel's deficiencies had any effect on the outcome of [the] trial." [114] The logic of their position seems to be as follows: If the accused was probably guilty, then nothing helpful could have been found even through a properly conducted investigation. Thus, any violation of that duty—no matter how egregious—was inconsequential and hence excusable.[115]

counsel to the need to contact them. Furthermore, even after appellant told counsel by letter that his codefendants would support his version of the events, counsel made no effort to contact them. It was Decoster himself who insisted at trial that they be subpoenaed and interviewed.

111. In many cases, courts have found ineffective assistance without even inquiring into the communications between counsel and client. A lawyer's failure to uncover exculpatory evidence that should have been found, or more generally, his failure to make a thorough investigation, has been found to constitute ineffective assistance. See, e. g., McQueen v. Swenson, 498 F.2d 207 (8th Cir. 1974); Garton v. Swenson, 497 F.2d 1137 (8th Cir. 1974); Johns v. Perini, 462 F.2d 1308 (6th Cir.), cert. denied, 409 U.S. 1049, 93 S.Ct. 519, 34 L.Ed.2d 501 (1972); Pennington v. Beto, 437 F.2d 1281 (5th Cir. 1971); Andrews v. United States, 403 F.2d 341 (9th Cir. 1968); Coles v. Peyton, 389 F.2d 224 (4th Cir.), cert. denied, 393 U.S. 849, 89 S.Ct. 80, 21 L.Ed.2d 120 (1968); Brooks v. Texas, 381 F.2d 619 (5th Cir. 1967); Brubaker v. Dickson, 310 F.2d 30 (9th Cir. 1962), cert. denied, 372 U.S. 978, 83 S.Ct. 1110, 10 L.Ed.2d 143 (1963); McLaughlin v. Royster, 346 F.Supp. 297 (E.D.Va.1972); Kott v. Green, 303 F.Supp. 821 (N.D.Ohio 1968); Goodwin v. Swenson, 287 F.Supp. 166 (W.D.Mo.1968); Smotherman v. Beto, 276 F.Supp. 579 (N.D. Tex.1967).

112. Contrary to the assertion by other members of this court that imposing a duty to investigate in this case would be equivalent to requiring counsel to assist the accused in fabricating a defense, investigation is critical for the very reason that it will prevent lawyers from unwittingly presenting perjured testimony, as apparently occurred in this case. Counsel is of course under no duty to fabricate defenses, but

a lawyer does have an obligation to make reasonable inquiry into whether any valid defenses do exist. See Jones v. Cunningham, 313 F.2d 347, 353 (4th Cir.), cert. denied, 375 U.S. 832, 84 S.Ct. 42, 11 L.Ed.2d 63 (1963). Moreover, counsel can discover whether the testimony of his client or a witness is truthful only by conducting a complete, independent investigation.

113. In addition to the evidence in the trial record, Judge MacKinnon suggests there is evidence that prior to his sentencing, Decoster in effect admitted his guilt in a letter to the trial judge. Opinion of MacKinnon, J., at —— of 199 U.S.App.D.C., at 234 of 624 F.2d. Although we do not know what DeCoster said in that letter, it would be a mistake to place too much significance on appellant's representations at sentencing. Even those defendants who are convinced of their innocence are reluctant to press their contentions before the court at that time out of fear that they will receive a lengthier sentence if they do not accept responsibility and show remorse for their conduct. See Tague, supra note 80, at 123 n.82. Cf. United States v. Grayson, 438 U.S. 41, 50, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978) (defendant's apparent truthfulness while testifying on his own behalf is probative of his attitudes towards society and prospects for rehabilitation and hence relevant to sentencing).

114. Opinion of Leventhal, J., at —— of 199 U.S.App.D.C., at 214 of 624 F.2d. Accord, Opinion of MacKinnon, J., at —— & —— of 199 U.S.App.D.C., at 234 & 242 of 624 F.2d.

115. In discussing the scope of a proper investigation, for example, Judge Leventhal refers to the requirement that information alleged to have been overlooked must be material to the defense. Opinion of Leventhal, J., at ——, —— of 199 U.S.App.D.C., at 210, 211, of 624 F.2d.

Even on its own terms, such reasoning is faulty. It assumes that the value of investigation is measured only by information it yields that will exonerate the defendant. Yet, even if an investigation produces not a scintilla of evidence favorable to the defense—an unlikely hypothesis—appellant still will benefit from a full investigation. One of the essential responsibilities of the defense attorney is to conduct an independent examination of the law and facts so that he can offer his professional evaluation of the strength of the defendant's case.[116] If this full investigation reveals that a plea of guilty is in the defendant's best interests, then the attorney should so advise his client and explore the possibility of initiating plea discussions with the prosecutor.[117] It is no secret that in the majority of criminal prosecutions the accused is in fact guilty, notwithstanding any initial protestations of innocence. It is also no secret that the vast majority of criminal prosecutions culminating in conviction are settled through plea bargaining.[118] Indeed, the Supreme Court

has recognized that plea bargaining will remain "an essential component of the administration of justice" in this country until the courts' resources are greatly expanded.[119] In many cases, therefore, perhaps the most valuable function that defense counsel can perform is to advise the defendant candidly that a thorough investigation—conducted by his own representative and seeking any glimmer of exonerating evidence—has turned up empty. Only then can the defendant truly evaluate his position and make an informed decision whether to plead guilty or whether to continue to assert his innocence at trial.[120]

More importantly, the majority's position confuses the defendant's burden of showing that counsel's violation was "substantial" with the government's burden of proving that the violation was not "prejudicial." The former entails a forward-looking inquiry into whether defense counsel acted in the manner of a diligent and competent attorney; it asks whether, at the time the events occurred, defense counsel's violations

(With this general proposition I can agree, although I suspect that in application, my interpretation of what information is material would differ from the majority's.) Yet in assessing Decoster's claim that counsel failed to conduct an adequate investigation, Judge Leventhal repeatedly requires the appellant to show not that certain information was material, but that it likely would have affected the outcome. E.g., Opinion of Leventhal, J., at —— —— of 199 U.S.App.D.C., at 212–213 of 624 F.2d. Thus, if appellant was guilty, his lawyer need have conducted no investigation.

Although an inquiry into the effect on outcome—however broadly that term is defined—may be a relevant factor in the question of reversal, *it should not bear on the effectiveness of the attorney's performance.* *See* note 131 *infra.*

**116.** "Prior to trial an accused is entitled to rely upon his counsel to make an independent examination of the facts, circumstances, pleadings and laws involved and then to offer his informed opinion as to what plea should be entered." *Von Moltke v. Gillies,* 332 U.S. 708, 721, 68 S.Ct. 316, 322, 92 L.Ed. 309 (1948). *See* ABA Standards § 5.1(a) (2d ed. § 4–5.1(b)) ("After informing himself fully on the facts and the law, the lawyer should advise the accused with complete candor concerning all aspects of the case, including his candid estimate of the probable outcome.").

**117.** *See* ABA Standards § 6.1(b) (2d ed. § 4–6.-1(b)) (Duty to Explore Disposition Without Trial).

**118.** *See Brady v. United States,* 397 U.S. 742, 752 n.10, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1969) (reporting estimates that between 90% and 95% of all criminal convictions are by pleas of guilty).

**119.** *Santobello v. New York,* 404 U.S. 257, 260, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971) (Burger, C. J.).

**120.** The present case highlights the importance of conducting a prompt and thorough investigation. Although no inquiry was made on remand into counsel's role, if any, in advising appellant on seeking a plea bargain, the record does reveal that the possibility of a plea was raised at some time during the proceedings. R.Tr. I, at 15–16, 18. In light of the utter lack of investigation conducted by defense counsel, and the apparent unfamiliarity of counsel with the circumstances of the offense and the background of his client, there must be serious doubt that he could have offered his client competent advice regarding the acceptance of a possible plea bargain. There must be serious doubt, as well, whether counsel could have capably negotiated with the prosecution on his client's behalf.

of the duties owed to his client were justifiable. In contrast, the inquiry into "prejudice" requires an after-the-fact determination of whether a violation that was admittedly "substantial," nevertheless did not produce adverse consequences for the defendant.

All that the accused must show to establish a Sixth Amendment violation is that counsel's acts or omissions were substantial enough to have deprived him of the effective assistance of counsel in his defense. He need not prove that counsel's violations

were ultimately harmful in affecting the outcome of his trial.[121] Quite simply, the inquiry into the adequacy of counsel is distinct *from the inquiry into guilt or innocence.* The Constitution entitles every defendant to counsel who is "an active advocate in behalf of his client." [122] Where such advocacy is absent, the accused has been denied effective assistance, regardless of his guilt or innocence. The majority opinions nevertheless force the appellant to shoulder the burden of proving that counsel's acts or omissions actually or likely affected the outcome of the trial.[123] To thus condition

**121.** Separating the inquiry into the adequacy of counsel's performance from that of prejudice to the defendant reflects the distinction between the Sixth Amendment right to the effective assistance of counsel and the Fifth Amendment right to a fair trial. Although demonstrating a likelihood of prejudice may be required to make out a due process claim under the Fifth Amendment, it should be clear that prejudice is not an element that must be shown in establishing a violation of the Sixth Amendment. *See, e. g., Moore v. United States,* 432 F.2d 730, 737 (3rd Cir. 1970) (en banc) ("[T]he ultimate issue is not whether a defendant was prejudiced by his counsel's act or omission, but whether counsel's performance was at the level of normal competency."). Indeed, this distinction between the Fifth and Sixth Amendment sources of the right to effective assistance was the basis for this circuit's rejection of the due process "farce and mockery" test in favor of the "reasonably competent assistance" standard. *See* pp. —— of 199 U.S.App.D.C., pp. 266–267 of 624 F.2d *supra.*

Judge MacKinnon's reliance on the line of Fifth Amendment cases to support his view that the defendant must prove "unfair prejudice" is thus misplaced. *See* Opinion of MacKinnon, J. at —— of 199 U.S.App.D.C., at 226–227 of 624 F.2d. Similarly inapposite are those pre-*DeCoster I* cases in our circuit— e. g., *Mitchell, Bruce, Hammonds, Matthews, Harried, Scott*—in which, consistent with the Fifth Amendment, the defendant bore the burden of demonstrating that he had been denied a fair trial. The defendant's due process rights under the Fifth Amendment are simply not coextensive with the Sixth Amendment right to the effective assistance of counsel.

**122.** *Anders v. California,* 386 U.S. 738, 744, 87 S.Ct. 1396, 1400, 18 L.Ed.2d 493 (1967).

**123.** The majority opinions read *United States v. Pinkney,* 543 F.2d 908 (1976), as requiring the defendant not only to show a substantial breach of counsel's duties but also to demonstrate that the violation affected the proceed-

ings' outcome. The case does not so hold. In fact, Judge Robinson's opinion in *Pinkney* carefully distinguished between the appellant's burden of showing a substantial violation and the government's burden of proving lack of prejudice to the outcome. *Pinkney* simply held that as a procedural prerequisite to an evidentiary hearing on a motion for a new trial, *id.,* 177 U.S.App.D.C. at 431, 543 F.2d at 916 n.59, the appellant "must set forth evidence upon which the elements of a constitutionally deficient performance might properly be found." *Id.,* 177 U.S.App.D.C. at 431, 543 F.2d at 916. Further, "only if evidence offered at a hearing tended to establish the elements would the Government have been summoned to disestablish prejudice." *Id.,* 177 U.S.App.D.C. at 431, 543 F.2d at 916 n.59. In the present case, appellant has established the elements of a Constitutional violation by demonstrating an unjustifiable violation of counsel's duty to investigate. In *Pinkney,* where there was no claim of inadequate investigation, counsel's failure to refute the government's sentencing allocution could have amounted to ineffective assistance only if counsel had failed to discuss the allegations with his client or if counsel had known of information contradicting the government's allegations but had failed to bring that information to the court's attention. The petitioner was denied relief because the record contained no evidence to support either hypothesis, not because the petitioner had failed to show prejudice.

Indeed, the only reference in *Pinkney* to prejudice to the outcome is contained in footnote 59, where the court explicitly stated:

Our conclusion in this regard in no way impinges upon the rule, which we readily reaffirm, that once a substantial violation of counsel's duties is shown, the Government's burden is to demonstrate lack of prejudice therefrom. . . . [I]f . . appellant had met these preconditions [i. e., had offered evidence tending to establish that counsel had failed to inform him of the Government's allocution memorandum], the Government would then have encoun-

the right to effective assistance of counsel on the defendant's ability to demonstrate his innocence is to assure that only the constitutional rights of the innocent will be vindicated. Our system of criminal justice does not rest on such a foundation.

Recent Supreme Court decisions affirm that a distinct showing of prejudice is unnecessary to establish a Sixth Amendment violation. In *Geders v. United States*,[124] for example, the defendant had been ordered not to consult with his attorney during the overnight recess between his direct and cross-examination. The Court of Appeals affirmed the conviction on the grounds that the defendant failed to claim any prejudice from his inability to confer with counsel.[125] The Supreme Court, however, found that the petitioner had been deprived of his Sixth Amendment right and made no inquiry into whether he had been prejudiced in any way by the trial court's order. That the defendant had been deprived of the assistance of counsel established the constitutional violation; no showing of prejudice was necessary.[126]

More recently, in *Holloway v. Arkansas*,[127] the Court found a violation of the Sixth Amendment in the trial court's failure to appoint separate counsel in the face of the defense attorney's assertions that conflicting interests might prevent him from providing effective assistance for each of three codefendants. In *Holloway*, as in *Geders*, the petitioners' appeal below had been rejected on the ground that the record demonstrated no actual conflict of interest or prejudice to the defendants. Again, however, the Supreme Court did not inquire into whether the defendants were prejudiced or even into whether trial counsel's claim of possible conflicting interests was valid. Because the trial court failed, in the face of counsel's objections, either to appoint separate counsel or to ascertain whether the risk of conflict of interests was too remote to require such appointment, the defendants were deprived of their right to the effective assistance of counsel.[128] Upon finding a constitutional violation, the Court then proceeded, in a separate part of its

tered the burden of proving that counsel's dereliction did not harm appellant—for example, because the allocution memorandum actually had no effective role in the sentencing process. *Id.*

**124.** 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976).

**125.** *Id.* at 85–86, 96 S.Ct. 1330.

**126.** Judge Leventhal apparently seeks to distinguish *Geders* on the ground that counsel's effectiveness had been impeded by "direct state interference," whereas in the instant case, counsel's performance is "untrammelled and unimpaired" by state action. *See* Opinion of Leventhal, J., at ––– & ––– of 199 U.S.App. D.C., at 201 & 202 of 624 F.2d. The issue, however, is not whether the state is to be blamed for counsel's actions, but whether the defendant's constitutional rights were violated. The Sixth Amendment entitles the accused to the effective assistance of counsel. From the defendant's perspective, it is difficult to see how the cause of counsel's derelictions could bear any relationship to the prejudicial effect on the defendant's interests. Of what possible significance is it to a defendant whether his counsel fails to present closing argument because the court denies him that opportunity,

*see Herring v. New York*, 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975), or because he foregoes it in order to avoid a parking ticket? *See United States v. Benn*, 155 U.S.App.D.C. 180, 476 F.2d 1127 (1973).

Moreover, it is difficult to perceive a rational basis for partitioning the continuum of ineffective assistance cases on the basis of governmental "structural or procedural impediments." State action permeates the entire criminal process. It is the state that formulates and prosecutes the charges against the accused. It is the state that provides the forum for the defendant's trial and sets the rules that govern those proceedings. It is the state that punishes the convicted offender for his wrongdoing. And, most critically for the indigent defendant, it is the state that provides the assistance of counsel so indispensable to the fair administration of our adversary system of criminal justice. If counsel's conduct has deprived the defendant of his constitutional rights, then it is the state's responsibility, through the courts, to vindicate those rights.

**127.** 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978).

**128.** *Id.* at 484, 98 S.Ct. 1173.

opinion, to determine whether reversal of the petitioners' convictions was required.[129]

## C. Was the Substantial Violation Prejudicial?

Having determined in this case that counsel's violation of his duty to his client was substantial,[130] and that appellant consequently was denied the effective assistance of counsel, we now must consider whether this violation of the Sixth Amendment mandates reversing appellant's conviction.[131] Our inquiry is governed by *Chap-*

**129.** Judge MacKinnon attempts to account for these and other cases in which the defendant is not required to demonstrate prejudice, *see, e. g., Herring v. New York, supra,* by characterizing them as cases in which the accused has "actually" been denied the assistance of counsel. Opinion of MacKinnon, J., at —— of 199 U.S.App.D.C., at 229 of 624 F.2d. *Geders,* for example, is interpreted as a case in which, *for the period of the overnight recess,* the defendant was denied the "actual" assistance of counsel; *Holloway* is described as a case in which the petitioners were denied "full representation" by counsel. In these situations, Judge MacKinnon explains, the denial of the "actual assistance of counsel" is apparent on the face of the record and further prejudice is not required. In those cases in which counsel has merely provided inadequate assistance, however, the defendant must prove that counsel's assistance was so ineffective as to constitute the equivalent of non-assistance of counsel. The distinction contained in Judge MacKinnon's verbal formalism simply does not correspond to the reality of ineffective assistance. Judge MacKinnon nowhere explains why a defendant whose counsel cannot consult with him overnight has been denied the "actual" assistance of counsel, while Decoster's counsel, who declined to consult with Decoster at all, was providing "actual assistance." Nor does Judge MacKinnon explain when "full representation" has been denied, much less when such denial is apparent.

I submit that anytime the record reveals that counsel has substantially violated the duties owed to his client, the denial of the "active" assistance of counsel is apparent. The Sixth Amendment demands more than placing a warm body with a law degree next to the defendant. "It has long been recognized that the right to counsel is the right to the effective assistance of counsel." *McMann v. Richardson, supra,* 397 U.S. at 771, n.14, 90 S.Ct. at 1449, n.14. "The mere physical presence of an attorney does not fulfill the Sixth Amendment guarantee . . . ." *Holloway v. Arkansas,* 435 U.S. at 490, 98 S.Ct. at 1182. A defendant is no less harmed when counsel is present but fails to perform the duties owed to his client than when counsel is absent altogether. I fail to see how a defendant is any more damaged by the failure to have an opportunity to consult with counsel during one overnight recess in a ten-day trial than by the near-total failure of his attorney to investigate and consult with him prior to trial. *See Cooper v. Fitzharris,* 586 F.2d 1325, 1338 (9th Cir. 1978) (en banc) (Hufstedler, J., with Ely & Hug, JJ., concurring and dissenting) ("It makes little sense to distinguish between cases where counsel is denied and cases where counsel is incompetent because representation by incompetent counsel may be little or not better than no representation at all."). In either case, the defendant has been denied the effective assistance of counsel; and in neither case does the Sixth Amendment violation hinge on a showing of prejudice.

**130.** A majority of the members of this court today agree that counsel's performance was at least subject to serious question, if not condemnation. *See* Opinion of Robinson, J., at —— of 199 U.S.App.D.C., at 262 of 624 F.2d; Opinion of Leventhal, J., at —— of 199 U.S.App.D.C., at 211 of 624 F.2d. And the trial judge on remand also indicated that he had serious misgivings about counsel's performance. Findings at 20.

**131.** This approach clearly separates the question of whether the appellant's Sixth Amendment rights were violated from the question of prejudice. *See* note 121 *supra.* This distinction is critical because it recognizes that even in those cases where a new trial is not required because the defendant was not prejudiced, counsel's performance may still have been ineffective. It thus allows courts to identify and brand as ineffective any conduct falling below the minimum standards of competent lawyering, without regard to the client's guilt or innocence. This determination should help deter defense counsel from violating the duties owed to their clients. *Cf.* Opinion of Robinson, J., at —— of 199 U.S.App.D.C., at 253 of 624 F.2d.

This Circuit's early "farce and mockery" test and *Bruce's* "gross incompetence blotting out a substantial defense" test failed to recognize this distinction between counsel's ineffectiveness and prejudice to the defendant. Indeed, I now recognize an oversight in *DeCoster I,* which coalesced these questions when it stated that if "a defendant shows a substantial violation . . . he has been denied effective representation *unless the government . . . 'can establish lack of prejudice thereby.'*" 159 U.S.App.D.C. at 333, 487 F.2d at 1204 (emphasis added). Instead, the analysis of ineffective assistance should recognize that the question of attorney performance is distinct from the issue of prejudice to the defendant. *Cf. McQueen v. Swenson,* 498 F.2d 207, 218 (8th

*man v. California*,[132] in which the Supreme Court concluded that "there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may . . . be deemed harmless . . . ."[133] For these errors, a return to earlier stages in the criminal process would merely be an exercise in futility because the second proceedings would be certain to reach the same result as the first.

Under *Chapman* the burden in each case rests squarely on the government to prove beyond a reasonable doubt that an error was harmless before the defendant's conviction can be allowed to stand.[134] To place the burden on the defendant would require him to establish the likelihood of his innocence. The presumption of innocence[135] that cloaks the accused cannot be stripped by a conviction obtained in something less than a constitutionally adequate trial.

To satisfy its burden of establishing lack of prejudice, it is not enough for the government simply to point to the evidence of guilt adduced at trial, no matter how overwhelming such evidence may be.[136] In the first place, "proof of prejudice may well be absent from the record precisely because counsel has been ineffective."[137] When, as in this case, ineffectiveness is founded upon gross omissions of counsel rather than spe-

Cir. 1974) (evaluation of habeas petition alleging ineffective assistance is two-step process: first, determining whether there has been failure to perform some duty owed by defense counsel to his client and, second, determining whether the constitutional error prejudiced the defense); *Moore v. United States, supra* note 17, 432 F.2d at 737 ("This standard [of normal competency] also makes it clear that the ultimate issue is not whether a defendant was prejudiced by his counsel's acts or omission, but whether counsel's performance was at the level of normal competency.").

**132.** 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

**133.** *Id.* at 22, 87 S.Ct. at 827. Prior to *Chapman,* the Supreme Court had indicated that constitutional violations could never be harmless. *See id.* at 42–45, 87 S.Ct. 824 (Stewart, J., concurring).

**134.** *Id.* at 23–24, 87 S.Ct. 824; *Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963). This principle is consistent with the constitutional mandate that the government must prove guilt of a criminal offense beyond a reasonable doubt. *See Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Just as a trier-of-fact must find guilt beyond a reasonable doubt, an appellate court must be no less certain that a constitutional violation did not affect the proceedings below.

The reasonable doubt rule is animated by the twin concerns of maintaining an accurate balance between prosecutor and defendant by compensating for systematic flaws in a decision-making process acknowledged to be imperfect, and of introducing a deliberate imbalance into the process consistent with "a fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free." *In re Winship, supra,* 397 U.S. at 372, 90 S.Ct. at 1077 (Harlan, J., concurring). *See* Underwood, *The Thumb on the Scales of Justice: Burdens of Persuasion in Criminal Cases,* 86 Yale L.J. 1299, 1306–07 (1977). When we know that an error has been introduced into the adversary adjudicative process through the ineffectiveness of counsel, the justification for tilting the scales toward the defendant is even stronger than when the likelihood of error is merely speculative. *See United States v. Burton,* 189 U.S.App.D.C. 327, 355, 584 F.2d 485, 513 n.91 (1978) (Robinson, J., dissenting).

**135.** *See Coffin v. United States,* 156 U.S. 432, 453, 15 S.Ct. 394, 39 L.Ed. 481 (1895) (presumption of innocence "axiomatic," "elementary," and "foundation" of administration of criminal law).

**136.** Determining harmlessness by focusing on whether the jury's verdict is supported by overwhelming evidence is questionable quite apart from the special problems of its application in the ineffectiveness context. First, such an approach usurps the jury's function to a far greater degree than one that focuses the appellate court's inquiry on an examination of the nature and effect of the error. Second, lower courts' findings of harmlessness under an overwhelming evidence test are less subject to consistent and even-handed appellate review. Finally, the overwhelming evidence test is contrary to the principle that constitutional protection is due all citizens, the guilty as well as the innocent. *See* Field, *Assessing the Harmlessness of Federal Constitutional Error—A Process in Need of a Rationale,* 125 U.Pa.L.Rev. 15, 33 (1976).

**137.** *DeCoster I,* 159 U.S.App.D.C. at 333, 487 F.2d at 1204.

cific errors, counsel's violations so permeate the trial that they necessarily cast doubt on the entire adjudicative process.[138] Even where the consequences of counsel's omissions are less pervasive, it will generally be impossible to know precisely how the proceedings were affected,[139] and the resulting prejudice will be "incapable of any sort of measurement."[140] As the Supreme Court has emphasized, " 'The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in

---

**138.** In *Holloway v. Arkansas, supra,* the Supreme Court explained in the context of a joint representation case why a determination of the prejudice resulting from counsel's omissions could be founded upon nothing more than impermissible speculation:

> In the normal case where a harmless error rule is applied, the error occurs at trial and its scope is readily identifiable. Accordingly, the reviewing court can undertake with some confidence its relatively narrow task of assessing the likelihood that the error materially affected the deliberations of the jury. . . . But in a case of joint representation of conflicting interests *the evil —it bears repeating—is in what the advocate finds himself compelled to refrain from doing, not only at trial but also as to possible pretrial plea negotiations and in the sentencing process.* It may be possible in some cases to identify from the record the prejudice resulting from an attorney's failure to undertake certain trial tasks, but even with a record of the sentencing hearing available it would be difficult to judge intelligently the impact of a conflict on the attorney's representation of a client. And to assess the impact of a conflict of interests on the attorney's options, tactics and decisions in plea negotiations would be virtually impossible. Thus, an inquiry into a claim of harmless error here would require, unlike most cases, unguided speculation.

435 U.S. at 490–91, 98 S.Ct. at 1182 (citations omitted) (emphasis added).

**139.** One of the dangers of attempting to assess the harmlessness of a constitutional error by looking to the evidence of guilt at trial is that counsel's ineffectiveness may have so distorted the record that the record is an unreliable indicator of the defendant's guilt. And, as noted in *United States ex rel. Green v. Rundle,* 434 F.2d 1112, 1115 (3rd Cir. 1970), changes in circumstances since the time of trial may also make it difficult for the court to determine the presence or absence of prejudice.

**140.** *United States v. Hurt,* 177 U.S.App.D.C. 15, 21, 543 F.2d 162, 168 (1976). The likelihood that counsel's omissions will have impaired the defense, combined with the difficulty of proving that fact, have led several other circuits to presume the existence of prejudice in certain situations. *See, e. g., United States ex rel. Green v. Rundle, supra,* 434 F.2d at 1115; *Coles v. Peyton,* 389 F.2d 224 (4th Cir.), *cert. denied,* 393 U.S. 849, 89 S.Ct. 80, 21 L.Ed.2d 120 (1968). Such a presumption is often created when counsel is not appointed until the eve of trial. *See, e. g., Garland v. Cox,* 472 F.2d 875 (4th Cir.), *cert. denied, Slayton v. Garland,* 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973); *Fields v. Peyton,* 375 F.2d 624 (4th Cir. 1967).

In *United States ex rel. Mathis v. Rundle,* 394 F.2d 748 (3d Cir. 1968), the Third Circuit established the rule that belated appointment of counsel was inherently prejudicial and makes out a prima facie case of ineffective assistance, shifting the burden of proving the absence of prejudice to the prosecuting authorities. This rule was applied subsequently in *United States ex rel. Chambers v. Maroney,* 408 F.2d 1186 (3d Cir. 1969). There the court rejected a habeas petitioner's claim of ineffective assistance because the record contained adequate affirmative proof that there was no prejudice. On appeal, the Supreme Court affirmed appellant's conviction, noting that it was "not disposed to fashion a *per se* rule requiring reversal of every conviction following tardy appointment of counsel . . . ." *Chambers v. Maroney,* 399 U.S. 42, 54, 90 S.Ct. 1975, 1982, 26 L.Ed.2d 419 (1970). Although the Third Circuit later jettisoned its presumption-of-prejudice rule because it was no longer needed to effectuate prompt appointments within the circuit, *Moore v. United States, supra* note 17, it is significant that the Supreme Court left the rule undisturbed in *Chambers. See Garland v. Cox, supra,* 472 F.2d at 878 (maintaining presumption of prejudice as best way to serve "our notions of justice and fair play").

Judge MacKinnon's opinion draws heavily upon the Supreme Court's language in *Chambers* to support his view that "a mere breach of duty to an accused is not a constitutional violation [requiring reversal] unless *the defendant* proves that he was prejudiced." Opinion of MacKinnon, J., at —— of —— U.S.App.D.C., at 238 of 624 F.2d (emphasis added). But *Chambers* merely held that late appointment *vel non* did not require reversal. The Court's opinion is silent on the issue of who bears the burden of demonstrating the existence or absence of prejudice. Indeed, in its tacit approval of the lower court's presumption-of-prejudice rule, *Chambers* is plainly consistent with the approach prescribed in this opinion: once the defendant has shown a substantial violation of counsel's duties, the government must rebut the presumption of prejudice by proving that the error was harmless.

nice calculations as to the amount of prejudice resulting from its denial.' " [141]

Moreover, "prejudice" to the defendant may take many forms. The likelihood of acquittal at trial is not the only touchstone against which the consequence of counsel's failures is to be measured. The duties of an attorney extend to many areas not necessarily affecting the outcome of trial. As the present case highlights, inadequate investigation and preparation may prejudice the defendant not only *at* trial but *before* trial—in counsel's inability to offer informed, competent advice on whether to plead guilty and whether to demand a jury trial—as well as *after* trial—in providing ineffective representation at sentencing.[142]

These principles, in fact, might suggest that a per se rule is appropriate in all cases in which counsel's representation fails to meet the standards of the Sixth Amendment.[143] It may be that the prejudice to the defendant from the denial of effective assistance of counsel is so great, and the likelihood that the government can prove lack of prejudice so small, that reversal should be required whenever a substantial violation of counsel's duties is shown. Indeed, the Supreme Court has frequently emphasized that "the assistance of counsel is among those 'constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error.' " [144] And it may be that only a rule requiring automatic reversal can provide the deterrent effect necessary to insure that all defendants—innocent or guilty—receive the effective assistance of counsel.[145]

Nevertheless, there may be cases—however few—in which the reviewing court can isolate specific deficiencies in counsel's performance and can accurately gauge the consequences of counsel's acts or omissions.[146]

---

**141.** *Holloway v. Arkansas*, 435 U.S. 475, 488, 98 S.Ct. 1173, 1181, 55 L.Ed.2d 426 (1978), *quoting Glasser v. United States*, 315 U.S. 60, 76, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

**142.** Where counsel's inadequate investigation has prevented him from properly advising his client on pretrial matters, the defendant should receive not only a new trial but also an opportunity to engage in plea discussions after discussing the matter fully with informed, competent counsel. In contrast, the appropriate remedy for violations that affect only sentencing is to remand for resentencing rather than a new trial. *See United States v. Pinkney, supra* note 72, 179 U.S.App.D.C. at 289 n.49, 551 F.2d at 1248 n.49.

**143.** *See, e. g., Cooper v. Fitzharris, supra* note 129, 586 F.2d 1325, 1334–42 (Hufstedler, J., dissenting); *Beasley v. United States*, 491 F.2d 687, 696 (6th Cir. 1974). Judge Hufstedler's dissenting opinion in *Cooper* does not recognize, as Judge Leventhal implies, that effect on outcome should be pertinent in determining whether a defendant has been denied the effective assistance of counsel. *See* Opinion of Leventhal, J., at ——, —— of 199 U.S.App.D.C., at 203, 205 of 624 F.2d. Rather, Judge Hufstedler merely acknowledges the obvious: the potential prejudicial impact of an alleged attorney error may be relevant in assessing the adequacy of representation simply because the greater the impact, the more likely it is that counsel deviated from his obligations. But as Judge Hufstedler clearly states: "This does not mean that prejudice must be shown to demonstrate that counsel was constitutionally ineffective." *Cooper v. Fitzharris, supra*, 586 F.2d at 1340. Particularly significant in this regard is her observation: "Some courts have confused the inquiry into whether attorney errors were significant enough to constitute ineffective counsel with the question of whether ineffectiveness of counsel affected the outcome of the case." *Id.* at 1340 n.18.

**144.** *Holloway v. Arkansas*, 435 U.S. 475, 489, 98 S.Ct. 1173, 1181, 55 L.Ed.2d 426 (1978), *quoting Chapman v. California, supra*, 386 U.S. at 23, 87 S.Ct. 824.

**145.** Reversing convictions is likely to have a significant prophylactic effect for several reasons. First, to the extent that trial judges and prosecutors can prevent ineffectiveness from tainting a plea or conviction, they will be encouraged to do so. Second, insofar as ineffectiveness results from indifferent or incompetent lawyers, they will be less likely to receive appointments. Third, in those jurisdictions where ineffectiveness results largely from the unmanageable caseloads of appointed counsel and public defenders, judges will be discouraged from overburdening them. Finally, frequent reversals are likely to attract the attention of the public and may enhance the likelihood of legislative reform. *See* Part IV, *infra*.

**146.** In the present case, for example, it may be possible to determine the effect of counsel's failure to familiarize himself with the preliminary hearing testimony. If the government could prove that there were no significant discrepancies between Officer Ehler's testimony

For example, when a defendant alleges ineffectiveness because his counsel has failed to object to the introduction of arguably inadmissible evidence, the consequences of counsel's violation may readily be measured. There, the government may be able to prove harmlessness either by showing that a suppression motion would not have succeeded (and the evidence would have been admitted anyway),[147] or by proving that there was no "reasonable possibility that the evidence complained of might have contributed to the conviction."[148] Similarly, where counsel violates his duties by failing to interview a particular witness, the government may be able to carry its burden by proving, through proffer of the witness' testimony, that the witness had nothing relevant to offer even if he had been interviewed. As these examples demonstrate, in appropriate circumstances, reversing the

defendant's conviction may not be required because rectifying counsel's errors could not possibly benefit the defendant.[149]

On the record before us in the present case, I would conclude that the government has failed to discharge its burden of proving that no adverse consequences resulted from counsel's gross violations of his duties to his client. Several important questions on the matter of prejudice remain unanswered, and in the absence of any evidence on these critical issues, I am unable to find that counsel's violations were "so unimportant and insignificant"[150] that reversing appellant's conviction would be a futile exercise. No inquiry was made for example, on the relationship between counsel's failure to investigate and Decoster's decision to go to trial rather than to seek and possibly accept a plea bargain comparable to that of his codefendants.[151] Nor was there exploration

---

at trial and at the preliminary hearing, *but see* note 106 *supra*, then it would be in a position to show that counsel's failure to obtain the transcript could not have prejudiced Decoster.

**147.** In *Cooper v. Fitzharris, supra* note 129, for example, the defendant's claim of ineffective assistance was based primarily on counsel's failure to move to suppress certain evidence. The defendant in that case was not prejudiced by counsel's omission, since the evidence was in fact legally admissible under the standards in effect at the time of trial. *See id.*, 586 F.2d at 1333–34. Thus, as the court in *Cooper* explained, the impact of counsel's errors "appear[ed]" on the face of the trial record. Their prejudicial effect can be evaluated from that record with reasonable certainty. In such a case there is no reason to reverse a conviction if it appears that the defense was not prejudiced by the alleged inadequacies of counsel's performance." *Id.* at 1332.

Because *Cooper* was limited to the situation in which "the claim of ineffective assistance is founded upon specific acts and omissions of defense counsel at trial," *id.* at 1331, the court reasonably inquired into whether any prejudice could have flowed from the alleged errors. But the court seemed to place the burden of demonstrating the absence of prejudice on the defendant, at least where that determination can be made from the record with reasonable certainty. Moreover, the opinion in *Cooper* is ambiguous regarding whether the absence of prejudice means that counsel was not constitutionally ineffective or simply that nonprejudicial ineffectiveness does not require reversal. *See* notes 121 & 131 *supra*.

**148.** *Fahy v. Connecticut, supra*, 375 U.S. at 86–87, 84 S.Ct. at 230. In *United States v. Pinkney, supra* note 123, the court indicated that if the appellant had been able to establish a substantial violation of counsel's duties, then the government would have been given the opportunity to demonstrate that the violation could not have affected the outcome by proving that the allocution memorandum actually had no effective role in the sentencing process. 177 U.S.App.D.C. at 431–32, 543 F.2d at 916–17 n.59.

**149.** If experience should later teach that it is too difficult to assess the impact of counsel's violations or that interests of judicial economy militate against searching for harmlessness that can rarely be found, then a per se rule requiring automatic reversal should be adopted.

**150.** *Chapman v. California, supra*, 386 U.S. at 22, 87 S.Ct. 824.

**151.** *See* note 120 *supra*. Decoster's codefendants pleaded guilty to one robbery count and received suspended sentences and 5-years probation. Decoster was convicted of armed robbery and was sentenced to 2–8 years. A serious possibility leaps out of this record that some measure of Decoster's sentence resulted from shoddy legal representation—especially in light of the pervasive indications that counsel for appellant did not seriously attend to the interests of his client.

Judge Robinson, however, would burden the defendant with having to establish the "fact

of whether counsel's failure to offer any allocution at the sentencing hearing had any bearing on the trial judge's decision to sentence Decoster to a prison term of 2–8 years while his codefendants received only probation.[152]

In *DeCoster I*, the court expressly stated that reversal would be required, "unless the government, *'on which is cast the burden of proof once a violation of these precepts is shown,* can establish lack of prejudice thereby.' " [153] Thus, any doubts about the harmlessness of counsel's violations in this case would ordinarily be resolved against the government, and the case would be reversed and remanded for a new trial. Yet, despite our prior remand, it is not clear that the government was ever required to satisfy its burden of proving that the denial of Decoster's right to the effective assistance of counsel was harmless beyond a reasonable doubt. In ruling on several of appellant's contentions the district court found that counsel had not violated any duty owed to his client. As to these issues, therefore, the question of the prejudicial effect of counsel's conduct was never reached. On several other allegations, the district judge appears to have required appellant to demonstrate that he was prejudiced by counsel's actions in order to estab-

lish a constitutional violation. Thus, the government was not put to its proof in establishing harmlessness. Moreover, the initial remand hearing was conducted without benefit of this opinion's elucidation of the principles set forth in *DeCoster I* governing questions of ineffective assistance. I therefore would remand the case to allow the government an opportunity to satisfy its burden of proving harmlessness.

## IV

Of course, even reversing Decoster's conviction would not remedy the pervasive problem of ineffective representation of the indigent.[154] The disparity between representation of the poor and of the well-to-do reflects the larger inequality of riches in our affluent society. The imbalance in the quality of legal assistance provided for the indigent and the wealthy is only one of a host of inequities in our society—inequality of educational opportunity, of jobs, of housing, of health care.

It is not the province of the judiciary to remedy all these inequities. We have neither the means nor the competence to redress all of society's imbalances. We however do have the duty, entrusted to us by the Bill of Rights, to assure that no individual is deprived of liberty by our courts of

and the substantiality of counsel's asserted violation" before this court could even remand for more evidence on the likelihood of ineffective assistance in defendant's plea decision. Opinion of Robinson, J., at p. —— of 199 U.S.App. D.C., p. 263 of 624 F.2d n.158. But trial counsel can hardly be expected to establish his own incompetence. Moreover, appellate counsel is ordinarily reluctant to impugn the competence of a colleague at bar. Also according to Judge Robinson, evidence of defendant's amenability to a guilty plea is necessary before an appellate court may consider the inadequacy of counsel's plea advice. *Id.* Yet how can it be reasonable to expect a defendant to estimate the advisability of entering a plea when he has never had the benefit of basic investigation and legal advice by counsel?

Our criminal justice system could not at present function without the plea bargain, yet countless cases of inadequate assistance concerning the plea never reach the attention of appellate courts. Although we do not know at this moment whether Decoster was prejudiced by his counsel's conduct surrounding the plea, the blatant disparity between Decoster's treat-

ment and that of his codefendants, and the overall record of his attorney's performance, warrant remand on this issue alone. From the point of view of the fair administration of justice, in the circumstances of this case we cannot ignore the likelihood that defendant's decision not to plead was made without proper advice.

152. *See* note 29 *supra.*

153. 159 U.S.App.D.C. at 333, 487 F.2d at 1204 (emphasis added).

154. Throughout this opinion, I have necessarily limited my discussion to the problem of the representation of the indigent defendant in the criminal process. Inadequate legal assistance for the poor, however, is not confined to the criminal process: it pervades the entire legal system. This reality, no less than ineffective assistance for the criminal defendant, challenges our fundamental belief in equal justice under law.

law without a constitutionally adequate trial. We violate this duty when we place our imprimatur of "Equal Justice Under Law" on the incompetent performance of court-appointed counsel in cases like the one before us.[155]

An appellate court's role is limited. We can promulgate standards that specify the minimum requirements of the constitutionally mandated competent performance. We can closely scrutinize the records of those cases in which effectiveness is at issue, carefully monitoring trial counsel's performance to ensure that the attorney's obligation have been fulfilled.[156] When substantial violations are uncovered, we can enforce the Sixth Amendment's guarantee by vacating the defendant's conviction and remanding for a new trial in which the effective assistance of counsel will be provided.

The real battle for equal justice, however, must be waged in the trenches of the trial courts. Although reversing criminal convictions can have a significant deterrent effect, an appellate court necessarily depends upon the trial courts to implement the standards it announces. No amount of

rhetoric from appellate courts can assure indigent defendants effective representation unless trial judges—and ultimately defense counsel themselves—fulfill their responsibilities. The Supreme Court, too, has recognized the duty of the trial court to fulfill the Sixth Amendment's promise:

> [I]f the right to counsel guaranteed by the Constitution is to serve its purpose, defendants cannot be left to the mercies of incompetent counsel, and    .  .  . judges should strive to maintain proper standards of performance by attorneys who are representing defendants in criminal cases in their court.[157]

Because, as this case demonstrates, ineffective representation is often rooted in inadequate preparation, a first step that a trial judge can take is to refuse to allow a trial to begin until he is assured that defense counsel has conducted the necessary factual and legal investigation. The simple question, "Is defense ready?" may be insufficient to provide that assurance. Instead, we should consider formalizing the procedure by which the trial judge is informed about the extent of counsel's preparation.[158] Before the trial begins—or before a guilty

**155.** Perhaps some view the goal of equal justice as "utopian" and feel that society's unwillingness to expend the considerable resources required to improve the quality of representation for the poor will doom to failure any efforts in this regard. Perhaps they believe that courts should not promise equality if it cannot be delivered. I cannot agree that the promise of equal justice for all is impossible to attain. And I do not believe that the difficulty of attaining that goal justifies stopping short of the mark. Some of my colleagues would relegate fundamental rights to mere "aspirations." Aspirations provide little comfort to those, like the poor, who are powerless to fulfill them. Not just "earthbound," see Opinion of Leventhal, J., at —— of 199 U.S.App.D.C., at 217 of 624 F.2d, but shackled to an approach that has failed in the past, some of my colleagues find it "salutary" to pursue a course that cannot provide "Equal Justice Under Law."

**156.** In this circuit, the practice of appointing new counsel in many *in forma pauperis* criminal appeals has significantly improved our ability to monitor trial counsel's performance. The appellate lawyer can take an objective look at the entire case and can ask the court to examine issues that should have been raised below

but were not, including the effectiveness of trial counsel. It is unreasonable to expect that trial counsel will acknowledge the inadequacies of their own performance or that *pro se* petitions filed by illiterate or semi-literate defendants will be sufficient to uncover Sixth Amendment violations.

**157.** *McMann v. Richardson*, 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970).

**158.** The inquiry conducted in this situation would be similar to that mandated when the defendant, at the beginning of trial, challenges his attorney's capacity to render effective assistance due to his lack of preparation. When such an objection is made, the Sixth Amendment imposes an affirmative obligation on the trial court to inquire into the basis of the defendant's complaint. *See* note 38 *supra*. In *Sawicki v. Johnson, supra* note 38, the court expressly stated that this investigation should focus on whether counsel fulfilled the obligations enumerated in *Coles v. Peyton, supra* note 65, duties similar to those established in *DeCoster I, see* note 63 *supra*.

plea is accepted [159]—defense counsel could submit an investigative checklist certifying that he has conducted a complete investigation and reviewing the steps he has taken in pretrial preparation, including what records were obtained, which witnesses were interviewed, when the defendant was consulted, and what motions were filed.[160] Although a worksheet alone cannot assure that adequate preparation is undertaken, it may reveal gross violations of counsel's obligations; at a minimum, it should heighten defense counsel's sensitivity to the need for adequate investigation and should provide a record of counsel's asserted actions for appeal.

The trial judge's obligation does not end, however, with a determination that counsel is prepared for trial. Whenever during the course of the trial it appears that defense counsel is not properly fulfilling his obligations, the judge must take appropriate action to prevent the deprivation of the defendant's constitutional rights. "It is the judge, not counsel, who has the ultimate responsibility for the conduct of a fair and lawful trial." [161]

My colleagues fear that judicial "inquiry and standards . . . [may] tear the fabric of [our] adversary system." [162] *But for so very many indigent defendants, the adversary system is already in shreds.* Indeed, until judges are willing to take the steps necessary to guarantee the indigent defendant "the reasonably competent assistance of an attorney acting as his diligent conscientious advocate," [163] we will have an adversary system in name only. The adversary system can "provide salutary protection for the rights of the accused" [164] only if

159. *See United States v. Simpson*, 154 U.S. App.D.C. 350, 352–58, 475 F.2d 934, 936–42 (1973) (per curiam) (Bazelon, C. J., dissenting), *cert. denied*, 414 U.S. 873, 94 S.Ct. 140, 38 L.Ed.2d 91 (1973).

160. At present, appointed counsel in the District of Columbia Superior Court must submit a Supplemental Voucher Information form with every request for compensation under the Criminal Justice Act, 18 U.S.C. § 3006A (1976). As I have noted in *United States v. Simpson, supra* note 159, this document could easily be converted into a worksheet to examine counsel's preparation in the case. A similar form used by the U. S. District Court for the District of Maryland is found in Report of the Judicial Conference of the United States: Jan. 13, 1965, 36 F.R.D. 277, 338 (1965). Several commentators have also suggested checklists of functions defense counsel must perform preparatory to trial. *See, e. g.,* Tague, *The Attempt to Improve Criminal Defense Representation,* 15 Am. Crim.L.Rev. 109, 164 n.285 (1977); Bazelon, *The Realities of Gideon and Argersinger, supra* note 3, at 836–38; Finer, *Ineffective Assistance of Counsel,* 58 Cornell L.Rev. 1077, 1119 (1973).

161. *Lakeside v. Oregon*, 435 U.S. 333, 341, 98 S.Ct. 1091, 1096, 55 L.Ed.2d 319 (1978). The government prosecutor is under no less of a duty to see that the trial conforms to constitutional standards:

The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.
*Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935).

162. Opinion of Leventhal, J., at —— of 199 U.S.App.D.C., at 208 of 624 F.2d. My colleagues also fear that an inquiry into counsel's performance will undercut the attorney-client relationship. When the inquiry is conducted upon the defendant's post-trial motion for relief and after counsel's representation has concluded, then of course any concerns about the attorney-client privilege evaporate. *See* ABA Standards § 8.6(c) (2d ed. § 4–8.6(c)); ABA Code of Professional Responsibility, DR 4–101(D). But even if conducted at or before trial, the judge's inquiry need not cut so deeply that it invades the attorney-client relationship. When it appears that defense counsel has overlooked a valid defense or has made a major blunder, the trial judge need only ask whether counsel has an informed tactical reason for his actions. If so, then the inquiry need go no further; if not, then any deeper intervention would be welcomed by the defendant. We must remember that the attorney-client privilege is designed to protect the client, not the attorney. It is incongruous to suggest that the sanctity of that privilege should act as a shield to block efforts at safeguarding the defendant's rights.

163. *DeCoster I,* 159 U.S.App.D.C. at 331, 487 F.2d at 1202.

164. Opinion of Leventhal, J., at —— of 199 U.S.App.D.C., at 208 of 624 F.2d.

both sides are equally prepared for the courtroom confrontation.[165]

Some of my colleagues are also concerned that a wide-ranging inquiry into the conduct of defense counsel would transform the role of the trial judge. To emphasize the supposed hazards of such a result, the majority refers to the warning of Judge Prettyman in *Mitchell v. United States* : [166]

> If the trial judge were required, after a trial has been concluded, to judge the validity of the trial by appraising defense decisions, *he would also be under an obligation to protect those rights of an ac-*

*cused as the trial progressed.* [Emphasis added]

Yet this is the very role that the Constitution has assigned the trial judge. His is the ultimate responsibility for ensuring that the accused receives a fair trial, with all the attendant safeguards of the Bill of Rights. It is no answer to say that defense counsel will fulfill the function of protecting the accused's interest; the very essence of the defendant's complaint is that he has been denied effective assistance of counsel.[167] The trial judge simply cannot "stand idly by while the fundamental rights of a criminal defendant are forfeited through the inaction of ill-prepared counsel . . . ." [168]

*Id.* at 65–66, 259 F.2d at 795–96.

---

**165.** Some commentators have questioned the propriety of the adversary system as the "engine of truth" in the criminal process. *See*, e. g., Frankel, *The Search for Truth: An Umpireal View*, 123 U.Pa.L.Rev. 1031 (1975). Many of their criticisms are well taken. But many of the failings of the adversary system do not stem from inherent defects in the adversary process. Rather, they result from the imbalance between the opposing parties that is a by-product of the inferior representation available to the poor. A serious commitment to eliminate the gross disparities in representation would go a long way toward bringing the realities of the adversary system into line with the model on which much of Anglo-American jurisprudence is based.

**166.** 104 U.S.App.D.C. 57, 63, 259 F.2d 787, 793, *cert. denied*, 358 U.S. 850, 79 S.Ct. 81, 3 L.Ed.2d 86 (1958). In dissenting to the majority opinion in *Mitchell*, Judge Fahy responded to the court's concern that judicial oversight of counsel's performance might threaten the relationship between the bench and the bar:

> The traditional amenities appropriate to the relationship between courts and members of the bar are not a substitute for inquiry in a particular case into the question whether a defendant has received assistance of counsel in terms of requisite skill. The bar is composed of professionals who have special responsibilities by reason of their calling. While the courts have the duty to defend them against unjust appraisal of their skill and judgment, I think the courts cannot bar inquiry into those matters when the substantial constitutional issue is raised.
>
> *   *   *   *   *   *
>
> Embarrassment caused counsel by an unjust charge of ineffective assistance is a price that unfortunately must be paid at times for careful judicial administration. And where the charge is just the remedy is not to save counsel from embarrassment but to save his client from unjust conviction or sentence.

**167.** The need for the trial judge to monitor counsel's performance during trial is heightened if reviewing courts are to be limited to considering only those claims that were raised by objection at trial. *See Wainwright v. Sykes*, 433 U.S. 72, 117–18, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) (Brennan, J., dissenting).

**168.** *United States v. Powe*, 192 U.S.App.D.C. 224, 237–38, 591 F.2d 833, 846–47 (1978).

In light of Judge Leventhal's repeated charges that our approach will produce a "thorough reordering of the adversary system," I must emphasize that I am not proposing to transform the adversary system into one "more inquisitorial in nature." Indeed, nothing could be farther from the truth. *The purpose of our approach is merely to assure that our "adversary system of justice" really is adversary.*

Judge Leventhal frequently expresses his fears that the approach outlined in this opinion will undercut the adversary system and seriously disrupt the administration of justice. Yet nowhere does he elucidate the exact nature of the predicted dire consequences. The approach adopted in this opinion does not require that defense counsel reveal—at each stage of the proceedings—the precise information and reasoning that prompted him to pursue a given course; it only requires that he be able to assert that his actions have in fact been based upon informed tactical decisions. And if counsel is eventually called upon to justify his conduct in a post-trial inquiry, it is enough for him to defend his actions by articulating the reasoning behind them; the reviewing court will not substitute its own judgment as long as counsel's decisions are informed and rational. I thus cannot understand how the adversary system will be "tortured out of shape" if defense counsel must contemplate from the beginning that he may be called upon to justify his conduct at some future date. And I fail to see how

However vigilant the judge, the problem of inadequate representation of the indigent cannot be solved by the courts alone. The bench, bar and public must jointly renew our commitment to equal justice.[169]

The bar certainly must increase its efforts to monitor the performances of its members and to take appropriate disciplinary action against those attorneys who fail to fulfill their obligations to their clients.[170] Addi-

requiring defense counsel to fulfill the most rudimentary obligations of pretrial investigation and preparation will disrupt the administration of justice.

169. In recent years the problem of lawyer incompetence has been the subject of increased concern among judges, the legal community and the public at large. *See, e. g.,* Advisory Comm. to the Judicial Council on Qualifications to Practice before the United States Courts in the Second Circuit, Final Report on Proposed Rules for Admission to Practice (1975), *summarized in New Admission Rules Proposed for Federal District Courts,* 61 A.B.A.J. 945 (1975) (the Clare Committee Report); Burger, *The Special Skills of Advocacy: Are Specialized Training and Certification of Advocates Essential to Our System of Justice?,* 42 Fordham L.Rev. 227 (1973); Kaufman, *Does the Judge Have a Right to Qualified Counsel?,* 61 A.B.A.J. 569 (1975); Kaufman, *The Court Needs a Friend in Court,* 60 A.B.A.J. 175 (1974); Tamm, *Advocacy Can Be Taught—the N.I.T.A. Way,* 59 A.B.A.J. 625 (1973); Wilkey, *A Bar Examination for Federal Courts,* 61 A.B.A.J. 1091 (1975); *Lawyers on Trial,* Newsweek, Dec. 11, 1978 at 98.

Many reforms have been advocated, including increased trial advocacy training in the law schools, on-the-job certification for specialty practices, and raising the standards for admission to practice to include mandatory law school courses and mandatory continuing education requirements. Efforts to raise the overall level of lawyers' skills are commendable, but none of these proposals even begins to address the unique problems of providing adequate representation for the poor. None of these suggested reforms attempts to deal with the most frequent causes of ineffective assistance for the poor defendant—attorney indifference and overwork. None offers any prospect for correcting the gross imbalance in the distribution of legal representation between the poor and the affluent. Most importantly, none of these reforms can provide any assurance that each defendant will receive the effective and conscientious assistance of counsel guaranteed by the Sixth Amendment.

170. To date, the bar has been notably lax in disciplining those attorneys who shirk their obligations, despite various provisions of the Code of Professional Responsibility that are designed to protect against such violations. *See, e. g.,* ABA Code of Professional Responsibility, Ethical Consideration 2–30 ("Employment should not be accepted by a lawyer when he is unable to render competent service

. . . ."); *id.* Ethical Consideration 6–1 ("[A] lawyer should act with competence and proper care in representing clients."); *id.* Disciplinary Rule 6–101(A)(2) ("A lawyer shall not: . . . Handle a legal matter without preparation adequate in the circumstances."); Rules of the D.C. Court of Appeals Governing the Bar of the District of Columbia, Rule XI, § 6(1)(b) ("Bar Counsel shall have the power and *duty*: . . To investigate all matters involving alleged misconduct by an attorney . . . called to his attention whether by complaint or otherwise.") (emphasis added).

In June, 1977, a committee of the D.C. Bar issued a detailed report on the bar's procedures for handling complaints of ineffective assistance of counsel, particularly those from indigents represented by CJA attorneys. The report criticized the D.C. Bar's own Disciplinary Board for failing to investigate such complaints:

We believe that the problem of substandard performance by court appointed attorneys is one which has been created in substantial part by the tolerance of such conduct over more than a decade. Attorneys accepting cases under the Criminal Justice Act frequently depend upon a high volume of cases in order to earn a living. This is especially the case since the vouchers that such attorneys submit for compensation are frequently reduced by the judges. This economic pressure on attorneys has an effect on the quality of representation. Failure to enforce the disciplinary rules under these circumstances, and the continued appointment of the most notoriously neglectful attorneys, has signaled many criminal practitioners that there is no real level of professionalism required. Once the disciplinary rules are enforced, we believe that a different message will be communicated, and that a large part of the problem will resolve itself by increased levels of performance by attorneys not wanting to risk disciplinary action.

Wolf Committee Report, *supra* note 3, at 10–11.

In the *Saunders* case, *see* note 105, *supra,* appellate counsel was so outraged by trial counsel's failure to carry out his obligations as an attorney that she filed a grievance with the D.C. Bar Association. The results of that complaint are not public, but it is significant that Decoster's attorney continued to receive appointments in the D.C. courts. Apparently, this is not an isolated episode. In 1971, when responsibility for administering the Criminal

tional funding is needed to increase the number of public defender positions and to provide those organizations with better support services. We must increase the compensation of court-appointed counsel to attract high-quality legal talent and to ensure that those who represent the indigent on a regular basis do not have to sacrifice all economic security to perform this vital role. We must reduce the caseloads of both public defenders and court-appointed counsel to manageable levels. And we must establish procedures to insulate appointed counsel from the pressure to curry favor with the judges who appoint them and fix their compensation.

That the ultimate solution does not lie exclusively within the province of the courts does not justify our ignoring the situation nor our accepting it as immutable. The people have bestowed upon the courts a trust: to ensure that the awesome power of the State is not invoked against anyone charged with a crime unless that individual has been afforded all the rights guaranteed by the Constitution. We fail that trust if we sit by silently while countless indigent defendants continue to be deprived of liberty without the effective assistance of counsel.

J. SKELLY WRIGHT, Chief Judge, joined by BAZELON and SPOTTSWOOD W. ROBINSON, III, Circuit Judges:

Justice Act in the District of Columbia was transferred to the Superior Court, the Criminal Justice Act Advisory Board was established as part of the required Plan for Furnishing Representation to Indigents. The Board, which was composed of seven attorneys, was given authority and responsibility to remove attorneys from the list of eligible CJA counsel upon a complaint and demonstration of inadequate representation. In the conclusion of one report on the handling of complaints against court-appointed counsel, however, "[d]espite the clear mandate to act, the Board was wholly ineffectual during its three years of existence." Washington Pretrial Justice Program Report, *supra* note 3, at 5. The Board considered only one particularly egregious case, and even then refused to take any action. *Id.* at 6; Austern-Rezneck Report, *supra* note 3, at 15. The Board's failure to make any attempt to reduce the number of appointed counsel who provide ineffective representation by "decertifying" in-

I write only to note that while there is no majority opinion of the court, Judges Bazelon and Robinson and I agree on the two fundamental principles dispositive of this case: (1) The constitutional standard of effective assistance of counsel in a criminal case is the reasonably competent assistance of an attorney acting as the defendant's diligent, conscientious advocate; and (2) where that standard is shown by the defendant not to have been satisfied, the defendant has been denied his constitutional right to counsel and his conviction must be reversed unless the Government proves beyond a reasonable doubt that the ineffective assistance of counsel was harmless. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

### APPENDIX

Opinion After Remand (Criminal 2002–71).

Before BAZELON, Chief Judge, and WRIGHT and MacKINNON, Circuit Judges.

Opinion for the Court filed by BAZELON, Chief Judge.

Dissenting Opinion filed by MacKINNON, Circuit Judge.

BAZELON, Chief Judge:

Appellant was convicted of armed robbery and was sentenced to 2–8 years.[1] On

competent attorneys and removing them from the appointment lists was criticized by two independent studies commissioned by the D.C. Bar, first in 1973, *see* Report on Appointed Counsel Program, in D.C. Courts, *supra* note 3, at 31–32, and again in 1975, *see* Austern-Rezneck Report, *supra* note 3, at 124 ("One of the most serious weaknesses in the existing system is the lack of effective machinery for hearing grievances and taking disciplinary action against errant and incompetent attorneys.").

1. Appellant was also convicted of assault with a dangerous weapon and received a sentence concurrent with his armed robbery sentence. Since assault with a dangerous weapon is a lesser included offense of armed robbery arising from the same act or transaction, *United States v. Johnson,* 155 U.S.App.D.C. 28, 475 F.2d 1297 (1973), we vacated the assault conviction. *United States v. DeCoster,* 159 U.S. App.D.C. 326, 328 n.2, 487 F.2d 1197, 1199 n.2 (1973).

appeal, this court *sua sponte* noticed several indications that appellant's sixth amendment right to the effective assistance of counsel had been violated. *United States v. DeCoster,* 159 U.S.App.D.C. 326, 328–330, 487 F.2d 1197, 1199–1201 (1973). Unwilling to speculate about whether these indications would reveal a failure to provide effective assistance, we remanded the record for supplementation.

Appellant moved in the district court for a new trial. After holding evidentiary hearings and oral argument, the district judge denied the motion. The record has been returned to us, and we find that appellant's conviction must be reversed because his Sixth Amendment rights were infringed.

I

The facts surrounding the offense are set forth in our first opinion and can be briefly summarized. The victim, Roger Crump, testified that on May 27, 1970, his wallet containing $110 was taken by three men, one of whom held a knife. He further testified that while this was occurring, two persons, who he later learned were plainclothes officers Box and Ehler, jumped out of a car and chased the three men. Because his eyesight was impaired as a result of an automobile accident occurring months after the alleged offense, Crump was unable to identify the appellant at trial. He stated, however, that immediately after the alleged robbery he had identified all three persons who were arrested.

Officers Box and Ehler did identify appellant as one of the persons they had seen robbing the victim. Officer Box also testified that he had chased the appellant into a nearby hotel, the D.C. Annex, where appellant was arrested while standing at the hotel desk. At the hotel, Box stated, Crump had identified appellant. Officer Ehler testified that he had chased, arrested, and searched Earl Taylor and had found a straight razor in his pockets. The wallet and money were never found.

In his own defense, appellant testified that on the afternoon of the crime he had been drinking with Crump at the Golden Gate bar, near the scene of the alleged crime. (Crump admitted having been in the bar but could not recall whether he had seen appellant there.) Appellant claimed that after leaving the bar he had walked to the hotel where he was staying, and was arrested while obtaining his key from the desk clerk. He denied having been with Earl Taylor, and denied even knowing the third alleged robber, Douglas Eley, at the time of the offense. The only other defense witness was Eley; he agreed that appellant and Crump had been together at the bar but stated that he had subsequently seen them fighting outside the bar.

The facts surrounding trial counsel's efforts require a more detailed statement. The appellant was arraigned in the Court of General Sessions on May 30, 1970, and bond was set at $5,000. At that time the lawyer who was to represent appellant at trial was appointed. A preliminary hearing was held on June 8 at which trial counsel represented appellant and did most of the questioning. On the basis of Officer Ehler's testimony, the three defendants were held for the Grand Jury.

After being indicted, the three defendants were arraigned in United States District Court, where appellant's counsel's appointment was reaffirmed. On November 4, appellant wrote to the district judge claiming he was guilty only of "assault by self defence" [sic] and requesting a new lawyer. The only specific charge leveled against counsel was that appellant had been accepted for pretrial custody by the Black Man's Development Center on October 12, and no bond review motion had been filed. On November 9 counsel filed such a motion in district court, but did not mention the acceptance by Black Man's. One week later, appellant filed a *pro se* motion for bond review (which also did not mention Black Man's). On November 18, 1970, the district judge, as required by law,[2] continued the

---

**2.** *See* 18 U.S.C. §§ 3146(d), 3147 (1970); *Grimes v. United States,* 129 U.S.App.D.C. 308, 394 F.2d 933 (1967); *Shackleford v. United States,* 127 U.S.App.D.C. 285, 383 F.2d 212 (1967).

motions to await review by the Court of General Sessions, which had originally set the bail. Counsel did not make the motion for review in General Sessions until December 8, and it was denied December 12.

On January 12, 1971, the case was called for trial in district court, but a continuance was granted after the prosecutor indicated Crump was hospitalized following his automobile accident. Two days later, the district judge granted the bond review motion and released appellant to Black Man's. On January 21, 1971, appellant absconded, and shortly thereafter a bench warrant issued. On June 17, trial of the two codefendants commenced, but in the middle of trial they pleaded guilty.

Appellant was rearrested on September 2, 1971, on unrelated charges for which he was ultimately convicted in Superior Court. Trial was set in this case for November 15, 1971. On the day of the trial, appellant asked the court to subpoena the two codefendants, explaining that he "didn't have a chance" to talk to his lawyer about this. Counsel indicated he had considered the possibility of subpoenas, but did not have the codefendants' addresses. The prosecutor reported that Eley was in jail (where he had been for six weeks);[3] the court read from the court file the address Earl Taylor had listed at the time of his release on personal recognizance eleven months earlier. That address proved out of date.

After counsel announced he was ready for trial, the prosecutor informed the court that the Government had served an alibi-notice demand and received no response. Defense counsel argued that while he might rely on an alibi, no response was necessary because the Government had not given 20 days notice as required by the local rules. The court decided that although the Government had been dilatory, the names of alibi witnesses should be provided nonetheless. Counsel then announced that he would "proceed without the alibi witnesses."[4]

Counsel next informed the court that his client wished to be tried without jury. When asked if he had considered the fact that the trial judge already had listened to some of the evidence in the codefendants' trial, counsel stated that he thought their pleas had been entered before any evidence was heard. At this point the defendant requested a continuance because he felt, "I can't get proper representation." Counsel then requested to withdraw because of his client's dissatisfaction, but his motion was denied. Defendant was convicted on November 16 and sentenced March 3, 1972. Our opinion issued October 4, 1973.

This much was clear to us on the original appeal and aroused our concern.[5] At the hearings on remand, held February 6, 11, and 13, 1974, additional information was elicited concerning counsel's preparation and his explanation for his actions. Counsel admitted that he had *not* interviewed the victim, at least one and perhaps both of

---

3. On October 8, 1971, a letter from the Chief Probation Officer informing the court that Eley had been arrested in North Carolina on unrelated charges was placed in the clerk's file for Eley's case. A later report, not available to counsel at the time of appellant's trial but included in the record before us, indicates that Eley was brought to D.C. Jail on November 3, 1971 for a determination of whether to revoke his probation.

4. A partial transcript of this colloquy is reprinted in our first opinion at 159 U.S.App.D.C. at 329, 487 F.2d at 1200.

5. The dissent discusses at some length possible innocent explanations for the various acts and omissions to which we pointed in our first opinion. (Dissent at —— –—— of 199 U.S. App.D.C., at 314–316 of 624 F.2d). We need not consider the adequacy of these explanations, for our point in *DeCoster I* was *not* that the various acts *established* that the defendant was denied his right to effective assistance of counsel, but only that they *raised questions* as to whether a constitutional violation had occurred. The proceedings on remand fully vindicated our belief that it was desirable to ventilate the issues concerning counsel's performance, since as we explain in text, a great deal of significant information was elicited at the hearing.

the police officers,[6] anyone at the Golden Gate bar or D.C. Annex Hotel,[7] or the codefendant Taylor. Counsel claimed that he had interviewed codefendant Eley on the morning of the second day of trial, and that Eley had maintained that appellant was not present during the robbery.[8] Counsel also admitted he had not obtained a transcript of the preliminary hearing, but stated that he had held several conferences with the prosecutors, and surmised, based on their usual practice, that they had made the transcript available to him and that he had read it.[9] He also guessed, based on his usual practice, that he had obtained the 251 Form from the police department.

By way of explanation counsel testified that not until shortly before trial had appellant ever mentioned any witnesses, and then just the two codefendants. Counsel further stated that at about the same time he had received a letter from appellant in which appellant admitted he had fought with Crump but denied having robbed him.[10] The letter indicated that the codefendants would support this claim. Counsel

testified that this letter—which was consistent with Decoster's earlier letter to the district judge and with Eley's trial testimony—was the first time appellant had indicated to counsel that appellant had seen Crump after leaving the bar. Until that time, counsel testified, appellant had maintained, as he testified at trial, that he had gone directly to the hotel.[11] Based on the letter, counsel concluded that the testimony of the codefendants "might be devastating" (presumably to the alibi defense). He nevertheless agreed at trial to subpoena the codefendants, and called Eley after interviewing him and establishing that Eley would support appellant's alibi testimony.[12]

In denying the new trial request, the district court identified seven acts or omissions by counsel which appellant alleged had deprived him of his right to effective assistance of counsel.[13] With respect to two allegations—the delay in moving for bond review and the failure to obtain a transcript of the preliminary hearing—the court found that the defendant had not been prejudiced by the violations. With respect

6. The district judge found counsel had not interviewed either officer.

7. Appellant testified that he had requested his lawyer to interview the manager at the hotel, but made no such request with respect to people at the bar.

8. Eley denied having been interviewed, but the district court found his testimony incredible.

9. Two prosecutors were called as witnesses at the hearing on remand, but neither remembered this case. Each testified, however, that during their tenure in the U.S. Attorney's Office, they had frequently discussed appellant's counsel's cases with counsel. Mr. Cohan, who represented the Government at trial, further stated that appellant's counsel's usual practice was to speak to prosecutors informally regarding discovery and to request to see hearing transcripts, and that Cohan's usual practice was to show them.

10. Appellant wrote to counsel because, as he explained in the letter, "I tried to call you before, but couldn't make contact."

11. At the hearing on remand, appellant clung to his trial testimony and stated that the statement in his letter to counsel was a "fabrication."

12. Counsel was also asked to explain the reasons for certain "tactical decisions" he made. He could not recall why he had moved for bond review in the district court rather than in General Sessions, or why he had omitted mention of the acceptance by Black Man's in the original motion. He stated that he had attempted to waive jury trial at his client's direction, despite counsel's own misgivings. He explained that he had waived opening statement because he believed "the testimony I would have would be sufficient to proceed in this case," but could not recall the factors that led him to that conclusion. And he stated that he did not check to determine if sentence was properly executed, because after filing a notice of appeal on the day sentence was imposed, he considered his representation of appellant terminated.

13. In his supplemental brief filed in this court after the record was returned, appellant generally presses these same points, plus an additional one: counsel's failure to object to appellant's appearing before the jury in prison garb. Since this issue was not raised below the record does not reflect what considerations, if any, underlay counsel's "decision" not to object. Consequently, we cannot consider it at this time.

to three other allegations—counsel's attempt to waive jury trial, his waiver of an opening statement, and his failure to see that Lorton Reformatory gave appellant credit for time served as ordered by the sentencing judge—the court found no ineffective assistance. And with respect to the final two allegations—the failure to interview witnesses and counsel's premature announcement that he was ready—the court made findings of fact and several conclusions of law, reprinted in pertinent part in the margin.[14] These conclusions can be read as either holding that there was no constitutional violation and in any event no prejudice, or simply holding that no prejudice was shown.

## II

### A.

The benchmarks for adjudicating this case are set forth in our original opinion.

---

**14.** 1. . . .

. . . [T]his Court finds that while the proper and prudent course for trial counsel was to have interviewed the complaining witness, the police officers and the codefendants prior to announcing "Ready", his failure to do so in this particular case does not add up to ineffective assistance of counsel warranting a new trial.

2. While it may be that defense counsel herein was lax in his duty to conduct as thorough a factual investigation as might have been possible, we find that counsel did raise the only defense available to him, which defense was putting the government to its proof. And in light of DeCoster's posture and attitude during the course of these proceedings, this Court cannot say that defense counsel substantially violated any one of the duties owed to his client.

 \*  \*  \*  \*  \*  \*

3. Further, considering the record *in toto,* while it might appear that defense counsel was less than a "diligent conscientious advocate," the weight of the government's case at trial and supported on the hearing on remand convinces this Court that DeCoster was not prejudiced thereby and not denied the "reasonably competent assistance of an attorney" under the circumstances.

**15.** *See Diggs v. Welch,* 80 U.S.App.D.C. 5, 7, 148 F.2d 667, 669, *cert. denied,* 325 U.S. 889, 65 S.Ct. 1576, 89 L.Ed. 2002 (1945).

**16.** *See Bruce v. United States,* 126 U.S.App.D.C. 336, 339–40, 379 F.2d 113, 116–17 (1967).

In *DeCoster I* we unanimously held that, at least when counsel's performance is challenged on a direct appeal, appellants need not show that "the proceedings were a farce and a mockery of justice"[15] or that "gross incompetence of counsel . . . has in effect blotted out the essence of a substantial defense."[16] Rather, following a number of other circuits,[17] we adopted a more stringent standard: *"a defendant is entitled to the reasonably competent assistance of an attorney acting as his diligent conscientious advocate."* 159 U.S.App.D.C. at 331, 487 F.2d at 1202. Moreover, recognizing that " 'reasonably competent assistance' is only a shorthand label, and not subject to ready application," we articulated several duties owed by counsel to a client:

> *In General*—Counsel should be guided by the American Bar Association Standards for the Defense Function. . .

---

**17.** At the time *DeCoster I* was decided, three circuits already had rejected the "farce and mockery" standard for some version of a "reasonableness" test. *See Moore v. United States,* 432 F.2d 730 (3rd Cir. 1970) (en banc); *Coles v. Peyton,* 389 F.2d 224 (4th Cir.), *cert. denied,* 393 U.S. 849, 89 S.Ct. 80, 21 L.Ed.2d 120 (1968); *MacKenna v. Ellis,* 280 F.2d 592 (5th Cir. 1960), *modified,* 289 F.2d 928, *cert. denied,* 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78 (1961). *See also McMann v. Richardson,* 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970) (counsel's advice must be "within the range of competence demanded of attorneys in criminal cases"). Since then, three more circuits have joined this trend, *United States ex rel. Williams v. Twomey,* 510 F.2d 634 (7th Cir. 1975); *Beasley v. United States,* 491 F.2d 687 (6th Cir. 1974); *United States v. Easter,* 539 F.2d 663 (8th Cir. 1976); *see also Herring v. Estelle,* 491 F.2d 125 (5th Cir. 1974). One circuit has been ambiguous in its standard, *compare Lischko v. Galli,* 534 F.2d 333 (9th Cir. 1976), *with United States v. Stern,* 519 F.2d 521, 524 (9th Cir.), *cert. denied,* 423 U.S. 1033, 96 S.Ct. 565, 46 L.Ed.2d 407 (1975), and one circuit has indicated it might reconsider its old rule, *Morgan v. Hogan,* 494 F.2d 1220, 1222 n.4 (1st Cir. 1974).

A "reasonableness" standard is rapidly becoming the majority rule in the state courts as well. *See* Bazelon, *The Realities of Gideon and Argersinger,* 64 Geo.L.Rev. 811, 820 n.48 (1976).

*Specifically*—(1) Counsel should confer with his client without delay and as often as necessary to elicit matters of defense, or to ascertain that potential defenses are unavailable. Counsel should discuss fully potential strategies and tactical choices with his client. (2) Counsel should promptly advise his client of his rights and take all actions necessary to preserve them. . . . (3) Counsel must conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed. . . . [I]n most cases a defense attorney, or his agent, should interview not only his own witnesses but also those that the government intends to call, when they are accessible. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. And, of course, the duty to investigate also requires adequate legal research. (Footnotes omitted.)

*Id.* at 332–33, 487 F.2d at 1203–04. And we stated that these duties are only "a starting point for the court to develop, on a case by case basis, clearer guidelines for courts and for lawyers as to the meaning of effective assistance." *Id.* at 332 n.23, 487 F.2d at 1203 n.23.

The requirements set forth in *DeCoster I* are indisputably the minimal components of "reasonably competent assistance." Even so, not every violation of one of the duties warrants reversing a conviction for ineffective assistance. Rather, *DeCoster I* contemplates a three step inquiry: did counsel violate one of his articulated duties; was the violation "substantial"; and was the substantial violation "prejudicial." *Id.* at 333, 487 F.2d at 1204.

If all defense attorneys had the dedication, skill and experience of a Clarence Darrow, or if all clients had the sophistication

and resources of an Andrew Carnegie, then perhaps the concern embodied in *DeCoster I* might be unnecessary. This is not to say that such lawyers always will render, or such clients always receive effective assistance of counsel; the task of criminal representation is too difficult and the human animal too fallible. But in a world of Darrows and Carnegies, perhaps it would be tolerable for judges to assume a more passive role.

We do not live in that kind of world, however. In the real world of criminal justice, the vast majority of defendants lack the means to afford effective representation and/or the sophistication to vindicate their right to it. The governing principle is clear: "There can be no equal justice where the kind of trial a man gets depends on the amount of money he has." *Griffin v. Illinois*, 351 U.S. 12, 19, 76 S.Ct. 585, 591, 100 L.Ed. 891 (1956).

**B.**

"[I]nvestigation and preparation," as the Commentary to the ABA Standards for the Defense Function recognize, "are the keys to effective representation. . . ."

[I]t is axiomatic among trial lawyers and judges that cases are not won in the courtroom but by the long hours of laborious investigation and careful preparation. . . . The adversary process assumes and its proper functioning demands that both sides have prepared and organized their case in advance of trial.[18]

Moreover, as the Standards themselves state, the "duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt."[19]

The duty to investigate is not necessarily fulfilled simply by interviewing those persons whom a client names as defense witnesses;[20] it demands that counsel "make an

---

**18.** ABA Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function and the Defense Function 224–25 (App.Draft 1971). *See also id.* at 226–28.

**19.** *Id.* at 4.1.

**20.** Not infrequently, without inquiring as to what counsel was told by his client, courts have found ineffective assistance in a lawyer's failure to uncover exculpatory evidence that should have been found, or, more generally, in his failure to make a thorough investigation.

independent examination of the facts, circumstances, pleadings and laws involved. . . ."[21] Minimally, this requires counsel (or his investigator) to contact persons whom he has or should have reason to believe were witnesses to the events in question; to seek witnesses in places in which he has or should have reason to believe the events occurred; and to conduct these interviews and investigations as promptly after his appointment as is possible, before memories fade or witnesses disappear.[22]

In this case, according to his own admissions—and the district court's factual findings—neither trial counsel nor an investigator did any of these things. He did not interview codefendant Taylor, and delayed interviewing Eley until the second day of trial.[23] He did not interview the complainant or the arresting officers, and he failed to search for witnesses at the hotel or the bar. From all that appears in the record, counsel advised his client on whether to go to trial, and then conducted the trial, without making any real effort to determine what could be elicited by way of defense.

The dissent argues at length that counsel knew all along that the codefendants would say the alibi was false, and that appellant had participated in the crime to which they pleaded guilty. There is nothing in counsel's testimony at the hearing on remand, however, to support this conclusion. Instead of evidence, the dissent relies on logic, reasoning that counsel's "decision not to contest the finding of probable cause [at the preliminary hearing] necessarily involved knowledge by defense counsel for Decoster and Taylor (the counsel whose conduct is here in question) that could only have been obtained by prior discussion of the offense with these men and by consultation with Eley or his counsel." Dissent at —— of 199 U.S.App.D.C., at 319 of 624 F.2d. The circularity of this deduction is transparent: by assuming precisely what is at issue here—namely, that counsel rendered reasonably effective assistance—the dissent is able to spin a web of facts, which, if supported by the record, would at least present a more difficult question. As matters stand, there is no basis for assuming that counsel had discussions with the code-

*See, e. g., McQueen v. Swenson,* 498 F.2d 207 (8th Cir. 1974); *Garton v. Swenson,* 497 F.2d 1137 (8th Cir. 1974); *Johns v. Perini,* 462 F.2d 1308 (6th Cir.), *cert. denied,* 409 U.S. 1049, 93 S.Ct. 519, 34 L.Ed.2d 501 (1972); *Pennington v. Beto,* 437 F.2d 1281 (5th Cir. 1971); *Andrews v. United States,* 403 F.2d 341 (9th Cir. 1968); *Coles v. Peyton,* 389 F.2d 224 (4th Cir.), *cert. denied,* 393 U.S. 849, 89 S.Ct. 80, 21 L.Ed.2d 120 (1968); *Brooks v. Texas,* 381 F.2d 619 (5th Cir. 1967); *Brubaker v. Dickson,* 310 F.2d 30 (9th Cir. 1962), *cert. denied,* 372 U.S. 978, 83 S.Ct. 1110, 10 L.Ed.2d 143 (1963); *McLaughlin v. Royster,* 346 F.Supp. 297 (E.D.Va.1972); *Kott v. Green,* 303 F.Supp. 821 (N.D.Ohio 1968); *Goodwin v. Swenson,* 287 F.Supp. 166 (W.D.Mo.1968); *Smotherman v. Beto,* 276 F.Supp. 579 (N.D.Tex.1967).

21. *Von Moltke v. Gillies,* 332 U.S. 708, 721, 68 S.Ct. 316, 322, 92 L.Ed. 309 (1948).

22. In addition to their common sense appeal, these requirements are set forth as cardinal rules in the leading manuals for defense lawyers. *See, e. g.,* A. Amsterdam, B. Segal, & M. Miller, Trial Manual for the Defense of Criminal Cases §§ 107, 108, 113 (3d ed. 1974); Young Lawyers Section, D.C. Bar Ass'n, 11th Annual Criminal Practice Institute—Trial Man-

ual §§ 2.1, .12 (1974); G. Shadoan, Law and Tactics in Federal Criminal Cases 7 (1964).

23. The dissent finds us "overly literal," Dissent at ·--· of 199 U.S.App.D.C., at 319 of 624 F.2d, in interpreting the following colloquy:

Q  Would it then be a correct inference that you never interviewed Mr. Taylor prior to the trial?
A  That's true.
Q  Did you make any effort to interview Mr. Taylor before the trial?
A  I did not.

(Tr. at 37), or the following colloquy:

Q  Did you only think that [Taylor and Eley's testimony might be devastating] and not know it because you had not interviewed them before the trial?
A  The only reason I thought that was because of the letter that I received from Mr. Decoster.
Q  Well how could you have any views on what their testimony would be if you had not interviewed them?
A  Because Mr. Decoster had told me that they were with him at the time he was fighting in this letter.  .  .  .

(Tr. at 38), to mean that counsel never interviewed Taylor and did not interview Eley until the second day of trial.

fendants that he failed to mention at the hearing on remand.

Although counsel conducted no interview, it is possible that special circumstances justify this omission, and that therefore the duty to investigate was not breached. To be sure, there is less need or room for tactical decisions in deciding who not to interview than, for example, in deciding who not to call. But tactical and prudential judgments still may be involved,[24] and this court does not sit to "second guess" *informed* judgments of this sort unless they are manifestly unreasonable.[25] In this case, however, we find the explanations proffered by counsel or hypothesized by the government lack plausibility.[26]

1. *Codefendants Taylor and Eley.* Three arguments are offered by the Government to support the failure to or delay in interviewing the codefendants:

(a) It is argued that the fact that appellant gave his counsel conflicting accounts of the events—the alibi and the claim of a fight—somehow excuses the lack of prompt interviews. While the existence of these conflicts might be relevant were counsel's failure to *call* witnesses at issue, the conflicts can hardly justify the failure to *interview*. The defendant did not offer the self-defense claim to his counsel until a day or two before trial, long after the interviews should have been conducted. Moreover, even if defendant had contradicted himself earlier, the importance

of careful investigation would have been heightened, rather than lessened, since counsel would have needed to determine which defense could or should have been presented.

(b) The Government argues that locating Taylor would have been a "formidable task" after appellant's flight. But before the flight, from September 1970 to January 1971 when trial was scheduled to begin, Taylor was available in the D.C. Jail. Moreover, one week after appellant was rearrested, and three days before a trial date was set, Taylor was sentenced in district court to probation. It strains credulity to believe that Taylor could not have been found had appellant's counsel contacted Taylor's on-and-off employer who had written a letter on Taylor's behalf prior to sentencing; Taylor's probation officer, with whom the record reveals Taylor was in regular contact at the time of appellant's trial; or perhaps even Taylor's lawyer.

(c) The district court found that not until the day of trial had appellant suggested to his counsel that the codefendants might be helpful to the defense. But counsel knew that the codefendants were alleged to have participated in a robbery with his client, and knew that his client claimed not to have been there. Surely counsel should have realized that the codefendants were at least *potential* witnesses in support of the alibi, and they should have been interviewed.

---

**24.** Cf. *United States v. Clayborne,* 166 U.S.App. D.C. 140, 509 F.2d 473 (1974) (failure to interview witness excused because client had been in frequent contact with witness).

**25.** *United States v. DeCoster, supra,* at 1201; *see, e. g., United States v. Moore,* 174 U.S.App. D.C. 113, 116 & n.7, 529 F.2d 355, 358 & n.7 (1976); *United States v. Brown,* 155 U.S.App. D.C. 177, 179, 476 F.2d 933, 935 (1973); *Campbell v. United States,* 126 U.S.App.D.C. 250, 251, 377 F.2d 135, 136 (1966); *Jackson v. United States,* 125 U.S.App.D.C. 307, 309, 371 F.2d 960, 962 (1966).

**26.** Our dissenting colleague propounds a number of arguments as to why it would have been fruitless to conduct interviews. For example, it is argued that because the two codefendants confessed their *own* guilt by pleading guilty, they could not have anything useful to contrib-

ute on the question of the *defendant's* guilt. (Dissent at —— of 199 U.S.App.D.C., at 319 of 624 F.2d.) Similarly, it is argued, based on a drawing introduced at trial, that the desk clerk could not have seen appellant enter the hotel lobby. Dissent at —— of 199 U.S.App.D.C., at 319 of 624 F.2d.) On both points the dissent may well be correct. But it is also possible that the dissent is wrong, that, for example, the codefendants would have said appellant was not present, or the clerk would have said that he was away from his desk and saw appellant's entry. These rationalizations only prove our main point: counsel should interview potential witnesses to determine what they have to offer, so that neither he—nor we—must engage in post hoc speculation as to what the witnesses would have said.

2. *The Government witnesses.* The district court found that counsel was justified in not interviewing Officer Ehler because counsel had examined him at the preliminary hearing. We agree. But with respect to Officer Box, the district court noted only that his testimony was "generally consistent with that of Officer Ehler," and with respect to the victim, Crump, that "[t]here was nothing incredible about [his] testimony." Whatever relevance the substance of their trial testimony may have to the question of the effect of the failure to interview, it can hardly provide a tactical justification for not conducting *pretrial* interviews.[27] The government contends that after appellant's flight, interviewing Crump was "impracticable," since he was living in Georgia. But again, the Government ignores the failure to interview for the several months between the time of the offense and the accident, even though the very occurrence of the accident demonstrates the importance of prompt interviews.

3. *The desk clerk at the hotel.* The district court found no reason to seek out the desk clerk because "[t]here was no dispute as to when the defendant entered the D.C. Annex or when and where he was arrested." However, the trial record reveals that appellant claimed he had walked from the bar to the hotel and into the lobby, while Office Box testified that he had chased appellant. Surely the desk clerk should have been contacted to ascertain whether he saw the appellant enter the hotel or remembered anything relevant about appellant's demeanor while at the desk.

4. *Other witnesses.* No other potential witnesses were identified by name or job position. Nevertheless, the record reveals

two potentially fruitful places for investigation that were not tapped: the hotel lobby and the bar. For the same reasons that the hotel clerk's recollections might have been useful, *i. e.*, to resolve the dispute as to how appellant reached the hotel, guests or residents who had been in the lobby at the time should have been interviewed. At the very least, the clerk should have been asked for the names of persons he remembered having seen in the lobby. Similarly, appellant testified that persons unknown to him had been in the bar at the same time he was there. Such witnesses could have been helpful if they could have corroborated appellant's claim that he and Crump had been drinking together, or, perhaps, if they had overheard conversation, or seen Crump and appellant leave. Counsel at least could have questioned employees of the bar to see if they had useful information or could supply the names of customers who were at the bar at the time.

In sum, we hold that counsel's failure to interview Taylor, Crump, Officer Box, or the desk clerk; his delay in interviewing Eley; and his failure to seek out witnesses from the hotel or the bar were not supported by tactical considerations, informed or otherwise, and violated the duty to conduct a factual investigation.[28] Of course, counsel was "under no duty to assist in the fabrication of a defense," as the district court wisely noted. But counsel *was* under a duty to investigate whether there was a non-fabricated defense that could be presented. The dissent may well be correct that there were no such defenses available in this case, although it may be significant that the two codefendants pled guilty only to robbery and not armed robbery. But

---

**27.** We cannot agree with our dissenting colleague, Dissent at —— of 199 U.S.App.D.C., at 319 of 624 F.2d, that reading the prosecutor's notes on his conversation with his witnesses is necessarily an adequate substitute for actually interviewing the witnesses. It defies credulity to believe that in the run of the cases the prosecutors will ask—and record the answers to—all or even most of the questions a defense counsel would want answered in preparing the defense.

**28.** Two other omissions by counsel further support our finding that he was inadequately prepared. First, counsel did not obtain a transcript of the preliminary hearing, and thus was unable to use Officer Ehler's statement at the hearing that he did not know which of the three codefendants actually took Crump's wallet to impeach Ehler's trial testimony that it was Decoster who took the wallet. Second, counsel admitted at trial that he had not learned that appellant's former codefendants had pled guilty in the middle of their trial.

even if the dissent is correct, investigation is still necessary not only so that defendants receive informed advice from their counsel and make informed decisions as to whether to go to trial, but also so that lawyers do not unwittingly present perjured testimony, *as apparently occurred in this case.* Thus, while counsel may have been fully justified in not *calling* the codefendants or any other witnesses, his failure to *interview* them violated the duty to investigate.

### C.

We come then to the question of whether the violation here was "substantial." In *DeCoster I* we had no occasion to define the "substantiality" requirement. Recently, however, in *United States v. Pinkney,* 177 U.S.App.D.C. 423, 543 F.2d 908 (1976), we made clear that for a violation to be substantial it must be "consequential," that is, it in some way must have impaired the defense.[29] *Pinkney* also makes clear that the burden is on the defendant to prove such adverse consequences, since such con-

sequences do not inhere in every violation of the *DeCoster* precepts.[30]

In certain circumstances, however, the acts or omissions of counsel are so likely to have impaired the defense, and yet this consequence would be so difficult to prove, that, in accordance with well-established evidentiary principles,[31] such an impairment can be presumed.[32] For example, there is persuasive authority for indulging such a presumption when counsel is not appointed until the eve of trial,[33] or when counsel has a clear conflict of interest.[34] Only recently, a unanimous Supreme Court held that a petitioner whose right to effective assistance of counsel was infringed by an order issued during trial barring him from consulting with his attorney overnight between his direct and cross-examination need not demonstrate, *or even claim,* prejudice.[35] To use the language of the dissent in the present case, these are all instances in which there is "inherent prejudice" in the nature of the violations. Dissent at —— of 199 U.S.App.D.C., at 335 of 624 F.2d.

**29.** In *Pinkney* appellant contended that his lawyer had failed to discuss with him the Government's sentencing memorandum filed several days before sentencing. The court held that this allegation did not constitute an allegation of a substantial violation of a *Decoster* duty because "any omission by counsel . . . was inconsequential unless there was evidence upon which counsel could undertake a refutation," 177 U.S.App.D.C. at 432 n.60, 543 F.2d at 917 n.60, and "appellant's motion gave no indication as to the evidence, if any, by which he would undertake an effort at refutation," *id.* at 432, 543 F.2d at 917.

**30.** *Id.* at 431 n.59, 543 F.2d at 916 n.59.

**31.** *See, e. g.,* C. McCormick, Evidence § 343 (Cleary ed. 1972) ("The most important consideration in the creation of presumption is probability.")

**32.** In so holding, we align ourselves with several other circuits. For example, in *United States ex rel. Green v. Rundle,* 434 F.2d 1112, 1115 (1970), the Third Circuit held that a showing of "prejudice" is excused when, *inter alia,* the pervasiveness of the ineffective assistance makes prejudice impossible to determine. Similarly, in *Coles v. Peyton,* 389 U.S. 224, *cert. denied,* 393 U.S. 849, 89 S.Ct. 80, 21 L.Ed.2d 120 (1968), the Fourth Circuit presumed prejudice from a near-total failure to investigate.

Although language in *Coles* suggests that prejudice is to be presumed from any violation of the duties *Coles* establishes, *see id.* at 226, *Coles* has been limited to more gross violations, *see, e. g., Jackson v. Cox,* 435 F.2d 1089, 1093 (4th Cir. 1970). *See also Thomas v. Wyrick,* 535 F.2d 407, 414 (8th Cir. 1976).

The primary distinction between our approach and that followed in the cases cited is that we distinguish between the question of whether counsel's violations were consequential, *i. e.,* impaired the defense, and the question of whether the impairment was harmful, *i. e.,* affected the outcome. *See* pp. —— — —— of 199 U.S.App.D.C., pp. 311–312 of 624 F.2d *infra; United States v. Pinkney, supra,* 177 U.S. App.D.C. at 431, 543 F.2d at 916 n.59. We avoid using the term "prejudice" because it blurs these two inquiries.

**33.** *See, e. g., Garland v. Cox,* 472 F.2d 875 (4th Cir.), *cert. denied sub nom., Slayton v. Garland,* 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973); *Martin v. Virginia,* 365 F.2d 549 (4th Cir. 1966).

**34.** *See, e. g., Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *Castillo v. Estelle,* 504 F.2d 1243, 1245 (5th Cir. 1975).

**35.** *Geders v. United States,* 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976).

This case falls squarely within the same category. The violation here—a total failure to conduct factual investigations—makes this case analogous to ones in which counsel is not appointed until immediately before trial. Investigation is so central to the defense function that, except in the most extraordinary circumstances, a gross violation of the duty to investigate will adversely affect a defendant's rights. Furthermore, the violation in this case was *not* simply that counsel failed to interview certain named witnesses.[36] Counsel here also failed to promptly determine whether there were additional witnesses to the alleged robbery or to appellant's alleged flight who could have aided the defense. Appellant cannot be expected to show that such an effort would have been fruitful since the very reason such an effort was necessary was that appellant did not know the identity of any such witnesses.[37]

Finally, we note that even if an investigation would not have produced a scintilla

of evidence favorable to the defense—a somewhat unlikely hypothesis—appellant still would have benefited from a full investigation. Had appellant been told by his lawyer that there was no evidence available to support the defense theory, appellant would have been able to make a better informed decision whether to go to trial, or whether to seek a plea agreement comparable to his two codefendants'. Thus, given both the magnitude of counsel's violation and its probable effect,[38] we conclude that appellant's constitutional right to effective assistance of counsel was violated.

### D.

The remaining question is whether a new trial is required. *DeCoster I* teaches that once appellant discharges his burden of showing a substantial violation of one of counsel's duties, the burden shifts to the Government to establish that the constitutional violation was harmless. 159 U.S.App. D.C. at 333, 487 F.2d at 1204.[39] *DeCoster I*

---

**36.** If this were all that was alleged, appellant would have been required to show that those witnesses' testimony would have helped the defense or else demonstrate a change in circumstances, such as the passage of time, which would have made such a showing impossible.

**37.** *Pinkney* is distinguishable on all these points. Whereas a large-scale failure to investigate will almost always adversely affect a defendant's rights, a failure to inform a defendant of the contents of a government allocution at sentencing is not so inherently injurious, especially when, as in *Pinkney*, the allocution largely rehashes previously published material on drug addiction, 177 U.S.App.D.C. at 426, 543 F.2d at 911, and information previously developed at trial, *id.* at 427, 543 F.2d at 912. Moreover, appellant in *Pinkney* was presumably in a position to come forward with "evidence upon which the elements of a constitutionally deficient performance might properly be found," *id.* at 431, 543 F.2d at 916, *i. e.*, "evidence, if any, by which he would undertake an effort at refutation" of the allocation memorandum, *id.* at 432, 543 F.2d at 917; yet he repeatedly failed to offer such evidence, either after trial or in support of his later motion for resentencing, *id.* at 432, 543 F.2d at 917. As we state in the text, appellant in this case is not now in a position to produce such evidence, nor can it be assumed that his failure to do so means that there was no evidence that might have been discoverable with reasonably thorough investigation and that might have helped his defense.

**38.** The presumption of adverse consequences which we find appropriate here is, of course, rebuttable. Indeed, with respect to counsel's failure to discover prior to trial that appellant's codefendants had not pled guilty until the middle of their trial, *see* note 28 *supra*, the record indicates that the omission was inconsequential, since the trial judge informed counsel of this fact before trial started, and appellant reversed his initial decision to waive jury trial. But there is no similar basis for concluding that counsel's failure to interview the Government witnesses or potential defense witnesses, to search for other defense witnesses, or to be familiar with the preliminary hearing transcript had no impact on defendant's position.

**39.** Although our dissenting colleague devotes a considerable portion of his dissent to attacking this aspect of the holding of *DeCoster I* (Dissent at —— —— —— of 199 U.S.App.D.C., at 327–340 of 624 F.2d), he ultimately seems to accept it. *See* Dissent at —— of 199 U.S. App.D.C., at 334 of 624 F.2d, *quoting United States v. Pinkney, supra* note 29, at 431 of 177 U.S.App.D.C. n.59, at 916 of 543 F.2d n.59. The real issue on which we disagree seems to be whether, on the facts of this case, counsel's omissions should be presumed to have had adverse consequences for the defense. *See* pp. —— ——— —— of 199 U.S.App.D.C., pp. 309–310 of 624 F.2d *supra*.

does not address the question of the weight of the burden the Government must bear. But in imposing a burden on the Government, we did cite, *id.* at 333 n.34, 487 F.2d at 1204 n.34, *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *Chapman* holds that if a defendant's constitutional rights were violated, his conviction must be reversed unless the Government "prove[s] beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* at 24, 87 S.Ct. at 828. This court has previously followed *Chapman* in determining harmlessness *vel non* in the ineffectiveness context.[40] If anything, *Chapman* should apply with greater force in ineffectiveness cases, since a finding that a defendant's sixth amendment right to effective assistance was infringed necessarily casts doubt on the entire adjudicative process. Indeed there is even authority for holding that such violations can never be harmless, on the theory that "[t]he right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial."[41] Although we have rejected that per se approach, we hold that harmlessness must be established beyond a reasonable doubt.

When a defendant, as part of his proof of a constitutional violation, demonstrates the consequences that resulted from counsel's acts or omissions, the Government's burden will be to prove that the injury complained of did not affect the outcome of the proceedings in the trial court. Ordinarily, this will not be an onerous burden: by comparing what the defendant shows should have been produced with the evidence that was adduced at trial, it should be readily apparent whether a reasonable doubt exists as to the effect of the constitutional violation on the outcome.[42] The burden is placed on the Government simply to emphasize that when such a reasonable doubt exists, a new trial is required.

When, however, the defendant is excused from showing adverse consequences, *see* pp. ————–—— of 199 U.S.App.D.C., pp. 309–310 of 624 F.2d *supra*, allocation of the burden with respect to harmlessness often will be dispositive. In such cases, by hypothesis, it is impossible to know precisely how the defendant was affected by counsel's failures; consequently, it will be most difficult for a defendant to prove prejudice or for the Government to negate it. To avoid effectively penalizing a defendant for his counsel's failures, *DeCoster I* requires that in such cases the burden be placed on the Government.

In the instant case, the application of these principles is clear. The Government made no effort to discharge its burden, either by refuting the presumption that adverse consequences resulted from the gross violation of the duty to investigate, or by showing that whatever the consequences they could not have affected the result.[43]

---

**40.** *Matthews v. United States*, 145 U.S.App. D.C. 323, 326, 449 F.2d 985, 988, *rev'd on rehearing on other grounds*, 449 F.2d 992 (1971). *See also United States v. Hurt*, 177 U.S.App.D.C. 162, 543 F.2d 162 (1976).

**41.** *Glasser v. United States*, 315 U.S. 60, 76, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *see Beasley v. United States*, 491 F.2d 687 (6th Cir. 1974).

**42.** For example, with respect to one of counsel's omissions here—his failure to familiarize himself with the preliminary hearing testimony, *see* note 28 *supra*—it is possible to gauge the consequences of the omission, and hence to determine whether the omission was harmless. The consequence of counsel's failure was that appellant lost the opportunity to impeach Officer Ehler's testimony that appellant took the wallet with the Officer's prior testimony that he did not know who took the wallet. We agree with the district court, however, that this consequence was harmless beyond a reasonable doubt: the question of which of three robbers did the actual taking was not material. *See also United States v. Pinkney, supra* note 29, 177 U.S.App.D.C. at 431–432 n.59, 543 F.2d at 916–917 n.59.

**43.** In view of the dissent's discussion of the lack of prejudice from counsel's failure to investigate, *see* dissent at —— of 199 U.S.App. D.C., at 324 of 624 F.2d, we repeat here what we said at p. —— of 199 U.S.App.D.C., p. 308 of 624 F.2d *supra*:

In sum, we hold that counsel's failure to interview Taylor, Crump, Officer Box, or the desk clerk; his delay in interviewing Eley; and his failure to seek out witnesses from the

Accordingly, appellant's conviction must be reversed and the case remanded.[44]

### III

More than six years have elapsed since the alleged offense was committed, and more than four years since defendant was convicted. Of this time, at most only ten months—the time from the date appellant absconded until his retrial—are wholly attributable to the appellant, and during some of that time the complainant was also unavailable. The remainder of the time was consumed by the deliberate workings of the system in the trial court and in this court.

We have recently observed that "delays on appeal are not insulated from the due process clause of the Fifth Amendment."[45] Of course, due process does not require that "careful study" be sacrificed; "the essential ingredient is orderly expedition and not mere speed."[46] Some delay must be anticipated in precedent-setting cases of this sort,

especially since the effective assistance question was not even briefed on the first appeal. Moreover, the price of our insistence on proof concerning counsel's preparation is additional delay while evidence *de hors* the record is presented.[47]

But as we also recently noted, "it would be disingenuous to suggest that the entire time during which a case is under advisement"—or, we might add, on remand—"is consumed in unraveling complex issues. This court, like the District Court, is not free from the problem of calendar backlog."[48] We daresay that "careful study" in this case did not require 18 months between sentencing and our first opinion, another 18 months until the district court's opinion on remand was filed, or more than a year for this opinion to issue.

Because appellant has already served most, if not all, of his sentence, the Government may elect not to retry appellant. For this reason, we do not decide whether due

---

hotel or the bar were not supported by tactical considerations, informed or otherwise, and violated the duty to conduct a factual investigation. Of course, counsel was "under no duty to assist in the fabrication of a defense," as the district court wisely noted. But counsel *was* under a duty to investigate whether there was a non-fabricated defense that could be presented. The dissent may well be correct that there were no such defenses available in this case, although it may be significant that the two codefendants pled guilty only to robbery and not armed robbery. But even if the dissent is correct, investigation is still necessary not only so that defendants receive informed advice from their counsel and make informed decisions as to whether to go to trial, but also so that lawyers do not unwittingly present perjured testimony, *as apparently occurred in this case.* Thus, while counsel may have been fully justified in not *calling* the codefendants or any other witnesses, his failure to *interview* them violated the duty to investigate.

44. Should the Government seek a retrial, the district court will have to decide whether the impossibility at this point of determining whether there were unidentified witnesses favorable to the defense should bar a second trial.

45. *United States v. Sarvis*, 173 U.S.App.D.C. 228, 235, 523 F.2d 1177, 1184 (1975).

46. *Harrison v. United States*, 128 U.S.App.D.C. 245, 249–50, 387 F.2d 203, 207–08 (1967), *rev'd on other grounds*, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968).

47. Several commentators have suggested that this delay could be minimized, and trial judges' ability "to maintain proper standards of performance by attorneys . . . in criminal cases" enhanced, *McMann v. Richardson*, 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970), were trial judges to "develop methods whereby they can quickly discern before a trial begins . . . whether they will receive the truth which results from an effective adversary proceeding." Boston University Center for Criminal Justice, Right to Counsel in Criminal Cases: The Mandate of Argersinger v. Hamlin 196 (1976); *see id.* at 193–98; *United States v. Simpson*, 154 U.S.App.D.C. 350, 352–58, 475 F.2d 934, 936–42 (Bazelon, C. J., dissenting), *cert. denied*, 414 U.S. 873, 94 S.Ct. 140, 38 L.Ed.2d 91 (1973); Finer, *Ineffective Assistance of Counsel*, 58 Cornell L.Rev. 1077, 1088 (1973); Grano, *The Right to Counsel: Collateral Issues Affecting Due Process*, 54 Minn. L.Rev. 1175, 1248 (1970).

48. *United States v. Sarvis, supra* note 38, at 234–35, 523 F.2d at 1183–84.

process would bar a second trial.[49] That question must await the district court's determination in the first instance, should such a trial be sought.

*Reversed.*

MacKINNON, Circuit Judge (dissenting):

In my view this dissent is required because the foregoing opinion relentlessly disregards the facts and the law applicable to this case in an unjustified switching of the burden of proof to reverse a conviction of *an admittedly guilty defendant* without any showing even of a mere possibility that *truthful* evidence might have helped the defense, or might have affected the outcome of the trial.[1] The factual findings of the trial court are obviated without suitable explanation, and, additionally, my two colleagues attempt to change the law by an unjustified appellate experiment so as to greatly increase the *discretionary* powers of appellate judges to reverse criminal convictions. They accomplish this by creating a new and extremely difficult, if not impossible, burden of proof upon the government to again sustain a conviction *after* a prior final judgment of conviction.

With regard to the law, the majority here and in *DeCoster I* are attempting without *en banc* consideration to overrule the unambiguous and settled law of this circuit on the burden of proof to show prejudice; but absent an *en banc* decision changing our decisional law, both opinions which switch the burden of proof are nullities. Even worse, the two opinions in this respect also ignore governing Supreme Court rulings and common law principles and create drastic and unnecessary constitutional conflicts, finishing by refusing to apply the law they seek to create. In saying that a "new trial is required" in this case my colleagues are

compelling a useless ceremony, for they well know that the "allocation of burden", which they here manufacture, will, by their standards, be "dispositive" of any subsequent trial, as it is of this trial in their opinion. (Majority opinion, p. —— of 199 U.S.App.D.C., p. 311 of 624 F.2d). The Government can never satisfy their application of the standard they here create because they require a showing that evidence that cannot be pointed to, from completely speculative witnesses, was not prejudicial to the defendant. The result, beyond belief, is reversal for a failure to investigate a *fabricated* defense by an admittedly guilty defendant.

I do not dissent from the recognition that defense counsel must conform to reasonable standards of representation. My objection is to my colleague's attempt to *shift* the established burden of proof to the Government on an issue that directly intrudes, without justification, into the confidential and privileged relationship between defense counsel and his accused client. The burden of proof more properly should be retained by the defendant.

## THE PROCEDURAL BACKGROUND AND THE FACTS

What the introductory paragraph of the majority opinion fails to disclose is that this is the *third* attempt by my two colleagues in their search for error to find some ground, not raised by appellate counsel, for reversing this judgment of conviction. The appellate odyssey indulged in by the majority finally results in their claiming error on *factual* grounds—never raised by appellant or his counsel—and in holding that the trial judge committed error when he held that defense counsel had presented the *only* defense available to him. But, the majority never point to any other non-fabricated

---

**49.** *See United States v. Perkins,* 162 U.S.App. D.C. 321, 326 n.10, 498 F.2d 1054, 1059 n.10 (1974); *Clemons v. United States,* 133 U.S.App. D.C. 27, 36 n.9, 408 F.2d 1230, 1239 n.9 (1968), *cert. denied,* 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969).

**1.** *United States v. Agurs,* 427 U.S. 97, 108 n.15, 96 S.Ct. 2392, 2400 n.15, 49 L.Ed.2d 342 (1976):

"The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Brady v. Maryland,* 373 U.S. 83, 90–91, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

*truthful* defense that could have been presented.[2]

This case was first appealed on a brief that suggested three issues: (1) denial of speedy trial, (2) insufficiency of the evidence and (3) the alleged error in submitting the aiding and abetting issue to the jury (Appellant's br. iii).

Then, just prior to oral argument on appeal, the division of the court *sua sponte* launched the case into its *Second* Phase with a telephone request to counsel asking them to be prepared to address (1) whether the trial judge improperly denied appellant Youth Corrections Act treatment and (2) whether any question as to the effectiveness of counsel was raised by the discussion of an alibi defense (Tr. Nov. 15, pp. 7–9) and the alleged alibi testimony offered thereafter at trial (Tr. Nov. 16, pp. 29–43).

After oral argument, by the following order, counsel for appellant was ordered:

> . . . *sua sponte* to submit a supplemental memorandum, within ten days from the date of this order, addressed to the question whether the District Court's [sentencing] statement is adequate to support a denial of Youth Corrections treatment to appellant. *See United States v. Coefield,* [155 U.S.App.D.C. 205, 476 F.2d 1152] (1973). Counsel is specifically requested to discuss the consideration, if any, given to the overcrowded conditions then existing at the Lorton Youth Center.

Order of March 21, 1973. The order did not further press the effectiveness of counsel as to the alibi defense.

Appellant's response to this order concerning the Youth Corrections Act was filed on April 2, 1973. Thereafter, without any further mention of the aforesaid response, the majority of the panel embarked on an

expanded *sua sponte* venture on October 4, 1973 when it filed its *DeCoster I* opinion, *United States v. DeCoster,* 159 U.S.App. D.C. 326, 487 F.2d 1197 (1973), ordering a shotgun type *remand* of the case to the trial court for a hearing on the effectiveness of the representation of appellant by his counsel on five specific matters and a general inquiry into defense counsel's preparation and investigation.[3]  159 U.S.App.D.C. at 328, 487 F.2d at 1199. The remand hearing was held as ordered, and the trial judge, applying the test stated in *DeCoster I,* has found that appellant had *not* been denied proper representation by his counsel at the trial. This appeal is from that finding and, despite the absence of any finding that the decision of the trial court is clearly erroneous, the majority reverse its judgment.

We are thus in the *Third* Phase of this court's handling of the case and in the second attempt by my colleagues to raise points on appeal that were not raised by appellate counsel. Indeed, my colleagues have already taken care to sow the seeds of the *Fourth* Phase: because of the delay caused by their fruitless search for other grounds of reversal, the majority intimate that delay itself (if their present tack fails) would now be cause for appellant to claim reversal on speedy trial grounds! Majority opinion, nn.44, 49 and accompanying text at p. —— of 199 U.S.App.D.C., p. 312 of 624 F.2d.

## I.  SPECIFIC ITEMS OF INQUIRY SUGGESTED BY THE OCTOBER 4, 1973 OPINION OF THIS COURT

### A.  *The bond review.*

(1) The majority first claimed that defense counsel did not file a timely bond review motion. This suggestion demon-

---

2. Majority opinion, pp. ——, —— of 199 U.S. App.D.C., pp. 308, 310 of 624 F.2d.

3. *United States v. DeCoster,* 159 U.S.App.D.C. 326, 328–30, 487 F.2d 1197, 1199–1201 (1973). The five specific suggestions listed therein for the district court to review on remand were:

    1.  Delay in filing bond review motion.

2.  Alleged premature announcement of "ready" for trial.
3.  Alleged failure to inquire into disposition of cases against appellant's accomplices.
4.  Alleged lack of communication between counsel and defendant and expressed dissatisfaction of defendant with his counsel.
5.  Contradiction of appellant's testimony by accomplice on a fundamental point.

strates a lack of understanding of the standards that judges ordinarily apply in considering such requests. When appellant was arrested on this charge he was already being sought as a *fugitive on a bench warrant* issued in another case. He had previously been arrested in South Carolina for carrying a dangerous weapon and had *absconded* by leaving the jurisdiction while he was under a $600 bond. Also, as a juvenile he had been involved in a robbery in the District of Columbia and was sent to the Receiving Home from which he *escaped* in 1969 (Tr. March 3, 1972, pp. 2–3). For an appellate court to suggest that defendant's trial counsel was deficient in not immediately moving for release under such circumstances is to suggest that defense counsel should clutter the courts with frivolous motions. In any event when the bond review motion was made on November 9, 1970 it was denied, as it should have been.

Thereafter, however, when the trial was delayed from January 12, 1971 to February 9, 1971, because of an injury to the complaining witness in an accident, appellant was released. As might have been expected from his prior history of two escapes, he promptly became a fugitive from justice for the third time—thus further delaying the trial.

Finally, the so-called delay in moving for bond review had absolutely no relevance whatever to the conviction of appellant. It was a complete waste of judicial time for an appellate court, *knowing all this*, to remand the case for hearing on such frivolous grounds.

### B. *The alibi and readiness for trial.*

(2) The second point of inquiry is a slight enlargement of the original inquiry into alibi procedures. It was a suggestion by the majority that when defense trial counsel announced himself ready for trial he may not have been prepared to go to trial. This conclusion, however, does not clearly follow. The colloquy relied upon in the court's opinion as the basis for further inquiry by the trial court can be explained just as well by a justifiable and not improp-er reluctance of defense counsel to furnish the Government with the details of his alibi defense, including the names of alibi witnesses, in advance of the time the applicable district court rule required him to do so. When we consider that there were no *truthful* alibi witnesses, counsels' refusal to name any witness is completely understandable. In any event this refusal had no adverse effect upon defendant's case because during the trial he was permitted, without objection from the Government, to introduce his subsequently discovered alleged alibi witness whose name had not been previously given. This witness, however, did not testify to an alibi. (Tr. Nov. 16, pp. 39–40). Such testimony cannot be characterized as an alibi. The only person who testified to an alibi was the defendant himself, and Rule 84(c) of the U.S. District Court Rules for the District of Columbia then provided, the same as Fed.R.Crim.P. 12.1(d), now provides: "This rule shall not limit the right of the defendant to testify in his own behalf." Thus, as it turned out, there was no violation of the Alibi Rule. Had Eley testified to an alibi, as appellant thought he would, the circumstance would have benefited the defendant, rather than prejudicing him and it would have been the Government that might have claimed prejudice. Such facts are a far cry from proving inadequate representation by counsel.

### C. *The waiver of a jury trial.*

(3) For their third point my colleagues claimed that defense counsel lacked knowledge of the disposition of the cases against appellant's accomplices and that the offer by defense counsel to try the case to the same court that had heard part of the evidence against the two other accomplices further indicated a laxity in representing Decoster. I would take judicial notice that the trial judge here involved would fairly try the case on the basis of the testimony to be introduced against Decoster notwithstanding the court's prior connection with the case against Decoster's accomplices. I would also have to agree with defense counsel's contention that had the Government

been willing to waive a jury the appellant would have obtained a trial from the judge that was every bit as fair as from any jury. In fact, many lawyers with substantial experience in trying criminal cases believe that trial judges in most cases hold the Government to a stricter standard for proving guilt than do juries. From all that appears in the records of this court the trial judge here involved is no exception to that rule. It is also not without significance in this case that the judge's reputation was such that Decoster was personally anxious to have his case tried by him *without a jury*. So it is by no means clear that counsel's conduct in this respect was in any way adverse to his client's interest.

In any event, since appellant was tried by a jury and not by the court, the record indicated he was not prejudiced in any way. The point is thus irrelevant to the conduct of appellant's lawyer in his trial, and my colleagues in the present draft of their opinion have now recognized this. Moreover, I fail to see that there is any substantial difference in resulting prejudice whether a seasoned trial judge learns the facts of the crime from a jury trial with a mid-trial guilty plea followed by a presentence investigation and sentencing of defendant's accomplices, or the judge learns the details of the crime solely from the exhaustive presentence report following guilty pleas by the accomplices without the prior submission of any evidence. The majority were once again chasing an insubstantial point.

D. *Miscellaneous.*

(4)–(5) The remaining points were even more slight and frivolous and the present greatly modified draft of the majority opinion has abandoned any defense of them. However, since the majority continue to arrive at the same result as it did in its prior drafts it is only fair to say that they have finally given up on their prior contention that defense counsel should be found to have inadequately represented a defendant merely because the truth somehow came out from a defense witness and contributed to a proper guilty verdict.

## II. PREPARATION AND INVESTIGATION BY DEFENSE COUNSEL

In addition to remanding the case for inquiry into the five points just discussed, my colleagues also directed that the trial court inquire into defense counsel's preparation and investigation. The remand hearing was held on three separate days from February 6 to February 13, 1974, and the court filed complete findings of fact and conclusions of law. (Hereafter Findings and Conclusions.) These concluded that "defense counsel was under no duty to assist the defendant in the fabrication of a defense," that defense counsel raised "the only defense available" to Decoster (putting the Government to its proof, Findings and Conclusions, p. 19), and that appellant was not denied "the reasonably competent assistance of an attorney." Appellant's motion for a new trial was therefore denied.

While my colleagues originally set forth five items of suggested deficiency in defense counsel's representation of Decoster, in their present opinion in effect they have now abandoned most of them and finally settled more or less on one item which they now characterize as the failure of defense counsel to promptly interview four groups of witnesses and *alleged* witnesses—which is asserted to be an alleged failure in necessary preparation and investigation.

### A. *The Risk of a Fabricated Defense*

The holding of the majority on this problem of interviewing witnesses, when applied to the facts here, indicates that they would require defense counsel to make a full investigation in support of a *fabricated defense* which is fanciful and contradicted by overwhelming evidence *and not presently claimed by the defendant*.

Of course, the majority come out against assisting in the fabrication of a defense, but they point to no "non-fabricated defense" (Majority opinion, pp. ——, —— of 199 U.S.App.D.C., pp. 308, 310, 624 F.2d), and they find that Decoster was prejudiced by the failure of his counsel to investigate in a vacuum in support of a

defense that is never defined. Result: the conviction is reversed on such grounds by the wholly conclusory assertion of my colleagues that the Government had not sustained the *shifted* burden of proof of establishing beyond a reasonable doubt that counsel did raise the only defense available to him, *i. e.*, putting the government to its proof. What *truthful* defense was even speculatively available, they completely fail to point out or even suggest.

My colleague's opinion does lip service to requiring a factual showing that the alleged error was harmful to the defense, but no impairment is shown. Instead my colleagues attempt to rely on newly established rules of presumption. (Majority opinion, pp. ——–—— of 199 U.S.App. D.C., pp. 309–310 of 624 F.2d). The gist of their real holding is that they would reverse *"even if an investigation would not have produced a scintilla of evidence favorable to the defense"* (Majority opinion, p. —— of 199 U.S.App.D.C., p. 310 of 624 F.2d)—and that is exactly the rule they have applied here. They accomplish this bit of legerdemain by toying with the words "substantial," "consequential," "harmful" and "prejudicial"[4] in a manner that is strongly reminiscent of the many unsuc-

cessful attempts to define "productivity" that emanated from *Durham v. United States*, 94 U.S.App.D.C. 228, 214 F.2d 862 (1954) (en banc).[5]

The real issue here, and in many other cases, which the majority completely ignore, is how extensive an investigation a defense lawyer must make when he has sound reason to believe his client is guilty and when his client urges him to present only a fabricated defense. The extent of any investigation by counsel necessarily must be affected by the guilt or innocence of a defendant. I hold with Judge Waddy's conclusion, which points to the nub of the controversy here, when he stated in his conclusions on the facts of this case:

> Certainly defense counsel was under no duty to assist the defendant in the fabrication of a defense.

Findings and Conclusions, p. 20. The effect of the majority opinion here is to hold that counsel must investigate to support a fabricated defense. It is on this aspect of this case and the means the majority take to accomplish such result in this and other criminal convictions that I part company from my colleagues.

The majority opinion of course disclaims imposing any obligation on defense counsel

---

**4.** In footnote 32 the majority state:

> . . . we distinguish between the question of whether counsel's violations were consequential, *i. e.*, impaired the defense, and the question of whether the impairment was harmful, *i. e.*, affected the outcome. *See* pp. ——–—— of 199 U.S.App.D.C., pp. 311–312 of 624 F.2d *infra; United States v. Pinkney, supra*, 177 U.S.App.D.C. at 431 n.59, 543 F.2d at 916 n.59. We avoid using the term "prejudice" because it blurs these two inquiries.

Majority Op., p. —— of 199 U.S.App.D.C., p. 309 of 624 F.2d. This attempt to create some distinction between "prejudice" and something that "impaired the defense [to a] harmful [extent]" is too thin to be substantial—or workable as a practical matter.

**5.** For an instructive chronicle of this aspect of the *Durham* imbroglio, *see United States v. Peterson*, 166 U.S.App.D.C. 75, 83, 509 F.2d 408, 416 (1974); *United States v. Robertson*, 165 U.S.App.D.C. 325, 340–41, 507 F.2d 1148, 1163–64 (1974) (Wilkey, J., dissenting); *United States v. Morgan*, 160 U.S.App.D.C. 278, 280 n.2, 491 F.2d 71, 73 n.2 (1974); *United States v.*

*Greene*, 160 U.S.App.D.C. 21, 28, 489 F.2d 1145, 1152 (1973), *cert. denied*, 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 190 (1974); *United States v. Marshall*, 153 U.S.App.D.C. 83, 86, 471 F.2d 1051, 1054 (1972) (Bazelon, C. J., dissenting); *United States v. Wilson*, 153 U.S.App.D.C. 104, 108, 471 F.2d 1072, 1076 (1972), *cert. denied*, 410 U.S. 957, 93 S.Ct. 1431, 35 L.Ed.2d 691 (1973); *United States v. Brawner*, 153 U.S.App. D.C. 1, 471 F.2d 969 (1972) (en banc); *United States v. Trantham*, 145 U.S.App.D.C. 113, 115, 448 F.2d 1036, 1038 (1971); *United States v. Eichberg*, 142 U.S.App.D.C. 110, 113, 439 F.2d 620, 623 (1971) (Bazelon, C. J., concurring); *United States v. Carter*, 141 U.S.App.D.C. 46, 54, 436 F.2d 200, 208 (1970); *United States v. Collins*, 139 U.S.App.D.C. 392, 396, 433 F.2d 550, 554 (1970); *Washington v. United States*, 129 U.S.App.D.C. 29, 31, 390 F.2d 444, 446 (1967); *King v. United States*, 125 U.S.App. D.C. 318, 323, 372 F.2d 383, 388 (1967); *Keys v. United States*, 120 U.S.App.D.C. 343, 346 F.2d 824 (1965); *Whalem v. United States*, 120 U.S.App.D.C. 331, 346 F.2d 812 (1965) (en banc); *McDonald v. United States*, 114 U.S. App.D.C. 120, 312 F.2d 847 (1962) (en banc).

to suborn perjury, but the effect of holding that counsel here failed in his constitutional duty to defendant because he did not interview witnesses to support a fabricated defense, in the face of Decoster's obvious guilt and his lawyer's knowledge of his untruthfulness and his guilt, is to force objecting defense counsel in the future to indulge in an investigation for no reason other than to somehow aid an obviously untruthful defense. In this connection it must be recognized at all times that appellant's accomplices, Taylor and Eley, had both pleaded guilty and the case against Decoster was substantially the same as the case against them.

I thus take issue with the effect of my colleagues' holding on the facts of this case, that defense counsel owes the same duty to investigate in support of a fabricated defense—which is this case—as when his client makes what appears to him as a truthful claim of innocence. Once defense counsel has reasonable ground for believing his client guilty, the extent of the investigation required is substantially diminished.

To illustrate the unsoundness of the position of the majority in this case, let us look further at the investigations my colleagues assert should have been conducted in this case by defense counsel. In so doing, while defense counsel made no particular point of the fact at the remand hearing, it is perfectly apparent from the record that he was at a disadvantage in answering many questions (Tr. 40, 44) because of the three years and eight months that elapsed from the preliminary hearing (6/8/70) to the remand hearing (2/11/74) and because many of the questions related to decisions he had been required to make quickly and the reasons therefore had not been recorded. Nor could it have been expected that they would be recorded. Defense counsel in most criminal cases cannot be expected to keep books and records like corporate counsel—the representation is different and the trial pace is much swifter. Defense counsel was also not aware of the great lengths to which a majority of this panel would go to reverse a criminal conviction. See n.7, infra.

### B. The alleged failure to investigate

The majority assert that

[Defense counsel] did not interview codefendant Taylor, and delayed interviewing Eley until the second day of trial. He did not interview the complainant or the arresting officers, and he failed to search for witnesses at the hotel or the bar. From all that appears in the record, counsel advised his client on whether to go to trial, and then conducted the trial without making any real effort to determine what could be elicited by way of defense.

Majority Op. p. —— of 199 U.S.App.D.C., p. 306 of 624 F.2d.

This bald assertion that there was a complete failure to investigate is repeated elsewhere in the majority opinion. It constitutes the *entire basis* for its decision. However, because defense counsel represented Decoster and one of his co-defendants at the preliminary hearing and conducted that hearing for all of them, and represented Decoster continuously thereafter for the 17 months until trial, the record is not clear that the failure to investigate was not just a failure to interrogate some witnesses *shortly before trial. Cf.* Majority Op., n.23. The alleged failure to investigate thus did not cause defense counsel to be ignorant of the facts of the case—which is really the vice that the investigation requirement seeks to avoid. Therefore, the entire base for the majority opinion is not as firm as would be indicated by the frequent repetition of the unqualified assertions that there was a failure to investigate. The frequency with which the majority repeat this claim does not add to its authenticity.

### C. Co-defendants Taylor and Eley

Because, Decoster's defense counsel *represented both Taylor and Decoster at the preliminary hearing on June 8, 1970*, ten days after the offense, in the absence of any showing to the contrary, it can be assumed that he was aware of Taylor's testimony from the very start of the case. I am unwilling to *presume* that counsel did not learn the facts of the case at that time.

The overly strong reliance of the majority on counsel's testimony that he "never interviewed Mr. Taylor prior to the trial" (Tr. 37, *cf.* Majority opinion, note 23) fails to recognize that the principal thrust of the context of his examination at this point in the record was directed to his actions *immediately* "prior to trial" (Tr. 36–37). Counsel obviously never interviewed Taylor *immediately* prior to trial because Taylor was not available then, and prior to that time he had ruled Taylor and Eley out as witnesses because he believed they would both contradict Decoster's story (Tr. 29) (which Eley did). It was not until the day of the trial that Decoster changed his story and demanded that his counsel call Taylor and Eley as witnesses to support his altered defense. Counsel also relied, as he had a right to, on the "letter [he] . . . received from Mr. Decoster" (Tr. 38). (Tr. 21, 25, 29). It thus seems apparent that counsel did not interpret the question as inquiring into the knowledge of the offense and the parties thereto that he had gained beginning some 17 months earlier when he began by representing both Taylor and Decoster at the preliminary hearing. My colleagues are thus *overly* literal in reading the record and their reply to this charge (Majority opinion pp. ——–—— of 199 U.S.App.D.C., pp. 306–307 of 624 F.2d and n.23) is deficient because it completely fails to reflect on the possible limited scope of the question. The majority, thus, erroneously assume, from their unreasonably broad interpretation of the scope of the two questions (*Id.*, pp. ——–—— of 199 U.S. App.D.C., pp. 306–307 of 624 F.2d), that counsel was not familiar with the true facts of the case from the outset. This assumes more from the answer than was clearly asked by the question. The majority faults this conclusion as being based on logic instead of evidence. (*Id.*) Actually it is based on evidence *and* logic, and common sense, as it should be.

The third appellant, Eley, was also a defendant in the *same* preliminary hearing, and while Eley had separate counsel (Mr. Kehoe), it was Decoster's counsel in the preliminary hearing (who was also trial counsel for Decoster) who *pulled the entire laboring oar for all three defendants at that hearing* (Tr. 34 and transcript of preliminary hearing, June 8, 1970). The evidence of guilt against all three men was substantially the same, and following the introduction of the Government's case the decision was obviously made by all not to contest the finding of probable cause by the magistrate. This decision was not attacked then and is not attacked now. To reach the decision not to contest the finding of probable cause necessarily involved knowledge by defense counsel for Decoster and Taylor (the counsel whose conduct is here in question) that could only have been obtained by prior discussion of the offense with these men and by consultation with Eley or his counsel. Moreover, the trial court made a finding that counsel did interview Eley before he acceded to Decoster's demand and placed Eley on the stand. Also, *before Decoster was tried, both Taylor and Eley entered guilty pleas to robbery and were sentenced.*

Then, suddenly, *on the day Decoster's trial began*, Decoster apparently switched his story and told his counsel that he had a self-defense claim and demanded that his counsel call Eley and Taylor as witnesses (Tr. 29). *It is for the failure to have foreseen and investigated this admittedly specious defense, conjured up by the accused on the opening day of the trial, that the majority now bases its reversal of this conviction.* The majority cast their decision in slightly different form by indicating counsel should have realized that Taylor and Eley were at least *potential* witnesses who should have been previously interviewed; but the defendant himself never even claimed the defense involving his confederates as witnesses until the day before trial, so how could counsel be expected to realize that the accused was going to change his story? To require such clairvoyance demands too much of counsel. Moreover, as above pointed out counsel was aware of Taylor's and Eley's participation, and the government's evidence thereof, from the time of the preliminary hearing.

Defense counsel must rely to a great extent on the defendant for the facts of his involvement and that of his accomplices and it is unreasonable to require counsel to anticipate that his defendant on the day trial begins will radically change his story as to his own participation in the crime. It is clear in this record, however, that defense counsel had already been through the preliminary hearing with all three men and it is submitted that this was a sufficient basis for him to conclude, as he did (Tr. 34), that there was no need for the further investigation the majority suggest.

It is also apparent that as a reasonably competent lawyer defense counsel realized from his *early prior knowledge of their acts, and their subsequent guilty pleas and the letter he received from his client,* that Taylor and Eley were not potential witnesses who could benefit his client. He *correctly* concluded that they would contradict his client's story (Tr. 29, 38), and Eley's testimony at trial proved his judgment to be correct. What the majority attempts to do is to rescue Decoster from his perjury and his bull-headed demand on his counsel to call Eley. Decoster forced his counsel to carry out his unreasonable demands and thus there is no reason that he should now be saved from his own folly, particularly so because in his allocution he in effect admitted his guilt.

D. *The Government Witnesses*

The majority admits that there was no need for a further interview of Officer Ehler, since defense counsel had cross-examined him at the preliminary hearing, but insist that Officer Box should have been interviewed. However, prior to trial defense counsel was given full access to the Government file, including the grand jury testimony and the transcript of the preliminary hearing containing Ehler's testimony, and since defense counsel knew of Decoster's untruthfulness, it was not necessary to interview either Box, or the victim Crump. Likewise *there is no showing that these Government witnesses would have willingly submitted to such interview by the lawyer*

*for the accused. They were not required to so do.* Moreover, the testimony of all three Government witnesses was substantially the same and was consistent. The record thus supports a conclusion that there was a lack of prejudice on this score.

The majority, however, attempt to make a point out of the fact that at the preliminary hearing Officer Ehler testified as follows:

Mr. Decoster and Mr. Ely [*sic*] had a hold of the subject, the complainant. One of them was yoking him, *I don't know which one it was at the time,* but—and they were removing something from his pockets.

Tr. Preliminary Hearing 5–6 (emphasis added).

While at Decoster's trial Officer Ehler testified:

[Willie Decoster, Jr.] was the one who was going through the complainant's pockets.

Tr. Nov. 15, 1971, p. 12. This latter statement was corroborated by Officer Box's testimony (Tr. 42, 47). So there is an apparent conflict in that Ehler testified at the preliminary hearing that he did not know whether Decoster or Eley was yoking Crump and at the trial 17 months later he testified that it was Decoster who was going through Crump's pockets, *i. e.,* that left Eley as the one who was yoking Crump. The record does not disclose any specifically obvious explanation for this. The most likely explanation probably lies in the fact that in the interim between the two statements by Officer Ehler the other two participants in the crime, Taylor and Eley, had entered guilty pleas and been sentenced. This necessarily involved the acquisition of considerable additional reliable knowledge by the Government as to what the participation of each accused had been in the crime.

Actually, the point is a minor one, and from a substantive point of view *it is relatively immaterial whether Decoster was going through his victim's pockets or yoking him because both acts aided the same crime and the perpetrators of both acts are prop-*

*erly chargeable as principals.* 18 U.S.C. § 2(a). The important fact is that both officers identified Decoster as an actual participant in the robbery. After originally taking a contrary position, the majority now admit that this was harmless beyond a reasonable doubt (Majority op. n.42). The point was so immaterial it should never have been raised. Also, there is no reasonable doubt about Decoster's identification as a participant in the crime with Taylor and Eley, since he was arrested almost immediately thereafter only a short distance from the scene of the robbery. Even Eley placed Decoster as a participant in the crime.

### E. *The Desk Clerk at the D.C. Annex Hotel*

My colleagues also assert that it was clearly erroneous for the trial judge to find no prejudice in not interviewing the desk clerk at the D.C. Annex Hotel where Decoster was arrested. They suggest the *possibility* that the desk clerk or guests or residents in the lobby at the time *might* have corroborated or denied that Decoster "walked from the bar to the hotel and into the lobby, while Officer Box testified that he had chased appellant" (Majority opinion, p. —— of 199 U.S.App.D.C., p. 308 of 624 F.2d). However, an examination of the transcript indicates that this suggestion is purely speculative, not based on any foundation whatsoever, and so there is no indication that any material testimony could be thus obtained. In the absence of a proper foundation the court cannot just dig up potentially helpful witnesses out of its imagination—that is pure speculation—and that is what the majority opinion here relies upon. There was no showing or proffer of any sort by appellant that there were any guests or residents in the "lobby", or even that this so-called "hotel" had anything that might pass as a lobby, nor any showing as to what the desk clerk would testify to, or that at his location *inside* the hotel he was in a position so that he was *able to see* whether Decoster had walked from the bar to the hotel, or that he "remembered" having seen anybody in the lobby (Majority op., p. —— of 199 U.S.App.D.C., p. 308 of 624 F.2d). Thus no adequate foundation exists in the record for the majority's completely speculative suggestions.

Further, examination of Exhibit 2, which is a sketch of the area, clearly shows that it was *impossible* for the desk clerk to see the path which Decoster testified he took "from the bar to the hotel." This is so because the desk clerk was situated at point (E) on the sketch (Exhibit 2) which was at a considerable distance *inside* the Annex and the entire area that Decoster testified he covered in walking from the bar to the Annex was *around a corner* of the building from the line of vision that the desk clerk had from where he was stationed inside the Annex. *See* point (E), Exhibit 2. It would also have been impossible for the desk clerk to see how Decoster approached the Annex if Decoster had taken the path from the club to the Annex as testified to by the Government witness and Eley or by his own testimony. Exhibit 2 clearly shows that the desk clerk would have had to be able to *see around a corner*, which was a considerable distance away from where he was situated at point (E), before he could have seen how Decoster covered *any* of the distance from the bar to the front door of the Annex. This is difficult to do—even in an appellate opinion of this court. Exhibit 2 and the record prove that it was *not possible* for the desk clerk to be a competent witness on the issue suggested by the majority, *i. e.*, whether Decoster walked from the bar to the Annex. Thus the record discloses that there was no prejudice in not interviewing him.

The assertion by the majority that "the hotel lobby . . . [was a] potentially fruitful [place] for investigation[s]" (Majority op. p. —— of 199 U.S.App.D.C., p. 308 of 624 F.2d), and the finding that defense counsel was constitutionally deficient in his representation of his client, for not doing so is a good example of the far-fetched speculation the majority indulge in to support their extreme conclusions and of what defense lawyers and the public can expect from the majority in the future if they are placed at the mercy of an unrea-

sonable change in the burden of proof in *all* ineffectiveness of counsel cases. Competent lawyers should think twice before accepting defense assignments that would subject their professional reputation to second-guessing appellate criticism on such highly speculative grounds for claimed failure to seek out non-existent and immaterial evidence.

The uncontradicted evidence is that when Decoster was in the lobby he was walking.[6] So the only testimony is that when Decoster was *inside* the hotel he was walking, and, if the desk clerk observed this, his testimony would be merely cumulative. Anything beyond this is pure speculation.

### F. Other Witnesses

The majority make the further speculative suggestion that the desk clerk should have been asked for names of persons in the lobby, and that

> Similarly, appellant testified that *persons unknown to him* had been in the bar at the same time he was there. Such witnesses *could* have been helpful *if* they *could* have corroborated appellant's claim that he and Crump had been drinking together, or, *perhaps, if* they had overheard conversation, or seen Crump and appellant leave. Counsel at least could have questioned employees of the bar to see *if* they had useful information or *could* supply the names of customers who were at the bar at the time.

Majority opinion, p. ——— of 199 U.S.App. D.C., p. 308 of 624 F.2d (emphasis added). The italicized words indicate the degree of speculation indulged in by the majority.

As for any possible witnesses at the Annex, as stated above, there is no conflict in the testimony as to what happened *in* the hotel, so further witnesses were unnecessary. As for witnesses from the bar, Decoster testified that Roger Crump was the only person with him at the Golden Gate Club (Tr. 34). Decoster testified that he had been together with Crump in the bar some time before the robbery (Tr. 30–31), and this was not denied by Crump who, because of his intervening head injuries, testified, "I couldn't say for sure" (Tr. 35, 36). So there was no dispute about what happened in the bar either. In any event, such prior meeting in the bar, as testified to by Decoster, was not helpful to him, since he testified that Crump paid for drinks with cash (Tr. 34), and this testimony afforded the Government a basis for suggesting that this may have given Decoster an opportunity to see that Crump "had quite a big roll of money on him that night" (Tr. 34), thus leading to the robbery. The indictment charged that $110 in cash was taken from Crump in the subsequent robbery.

Decoster also testified that no person in "the little restaurant on 9th St.," where he once claimed to have been before he walked to the D.C. Annex, ". . . could testify that [he was] there" (Tr. 36). So, even if witnesses had been found in the Annex or the bar, *there was no dispute as to the events there*, some of the facts as testified to by Decoster were not helpful to him (Tr. 35, 36), and they were not particularly relevant to the commission of the offense, *i. e.*, the robbery of Crump on the street some

---

6.  (1) Decoster: "I just walked into the door when they arrested me. I was getting my key" (Tr. 35).

The point inside the Annex at which Decoster was arrested was at a considerable distance from the entrance door. *See* point (E) on Exhibit 2.

(2) Crump: "[Decoster] ran into a building" (Tr. 31). This does not indicate that he ran *after* he got *into* the building.

(3) Officer Box arrested Decoster inside the D.C. Annex Hotel and he testified:

". . . when I went inside [the D.C.Annex Hotel] he was at the counter of the Annex and that is where I arrested him . . ."

* * * * * *

Q  Did he have to open the door to get into the D. C. Annex?

A  Yes sir, but it was one of those doors where there is a double door but one of them is stationery [*sic*] and you have to open one to go in.

Q  Had the door closed before you got to it?

A  It was on its way to closing.

Tr. 46.

distance away and out of the view of the phantom and useless witnesses the majority demand be located and interviewed. At this point, the majority's asserted denial of speculation ("Unwilling to speculate . . we remanded . . .," Majority opinion, p. ——, of 199 U.S.App.D.C., p. 301 of 624 F.2d) becomes ludicrous. It is thus clear that the majority opinion is based completely on speculative possibilities from unidentified witnesses for which there is no foundation or support in the record.

## G. Admission of Guilt

A matter of great significance, which my colleagues refuse to recognize, is that prior to his sentencing Decoster in effect admitted his guilt in a letter to the trial judge. Thereafter, the following occurred at his sentencing:

> THE COURT: . . . the Court has received a long letter from the Defendant, himself, stating that he has learned the error of his ways and that he has found out that he was fooling with the wrong crowd, and that he had been using drugs and he now knows that the use of drugs could lead only to death or jail, neither one of which is acceptable to him.
>
> Mr. DeCoster [sic], do you have something you want to say on your own behalf?
>
> DEFENDANT: I just wanted the Court to know that I was sincere in writing this letter. I feel like I can—well, I

know I can be rehabilitated which I have did on my part in having to come to face the facts. It just seems like, you know— well, really, I left home when I was at an early age and I didn't have that much confidence and I just hooked up in the wrong places and in the wrong ways. But now I believe that I can—I know that given an opportunity that I can help my family as well as myself. So I ask this Court upon sentencing me to consider this.

Tr. Sentencing Proceedings, March 3, 1972, p. 4. Thus, Decoster at sentencing did not claim to be innocent and in effect admitted his guilt. From such admission it is apparent that his testimony at trial was false.[7] Thereafter, the height of sophistry is reached when the majority contend that the defendant might have benefited from additional investigation since he could have "been told by his lawyer that there was no evidence available to support the defense theory" (Majority opinion, p. —— of 199 U.S.App.D.C., p. 310 of 624 F.2d). But appellant knew better than anyone that there was no *truthful* evidence to support *any* defense theory. He did not need his lawyer to investigate to tell him what he already knew.

## H. The Suggestion of the Majority as to the Duty of Defense Counsel

The presently stated position of the majority opinion is that from a "full investiga-

**7.** The record indicates that Decoster testified under oath: (1) that the last time he saw Crump was in the Golden Gate Club (Tr. 31); (2) that after he left the Golden Gate Club, he went straight across from the Club to the D.C. Annex Hotel (Tr. 32); (3) that he was not with Taylor at or about 6:15 P.M. on May 29, 1970 (Tr. 33); (4) or with Eley on that night (Tr. 33); and (5) that he did not observe anybody trying to rob Roger Crump on the night of May 29, 1970. This testimony obviously conflicts with Decoster's own handwritten note to the judge, received by him about Nov. 4, 1970 (Tr. Feb. 6, 1974, 62), "that he was guilty only of assault by self defense." In a letter to his lawyer he also said:

> I want to file assault charges against my accuse [sic] victim. I think I have as much right as he has, at least I'm entitle [sic] to it. If they can charge me with robbery while

fighting, I think I have as much right as him and can do the same. As for Elley [sic] and Taylor my accused partners they can testify their role. Elley [sic] came to my aid when the victim stuck his hand in his pocket and Taylor was just standing on the sidewalk. Govt. Ex. 2. Both of these written notes completely contradict the testimony Decoster gave on the stand. They prove his participation in the robbery and the falsity of his alibi. His testimony in court is also contradicted by the testimony of practically all the witnesses, including his accomplice Eley, and on February 6, 1974 Decoster in effect reiterated his denial ((3) and (4) above) that he was with Taylor or Eley at the time of the offense (Tr. Feb. 6, 1974, 65–68). At this time he also testified in contradiction to his trial testimony that he had never seen Eley before he was arrested (Id., 65).

tion . . . appellant [might have] been told by his lawyer that there was no evidence available to support the defense theory [a false alibi] [and] appellant would have been able to make a better informed decision whether to go to trial, or [plead guilty]" (Majority op. p. —— of 199 U.S. App.D.C., p. 310 of 624 F.2d). When the majority opinion refers to "the defense theory," *supra*, in the context of his case it is contending that if, as a result of the investigation, Decoster had realized his alibi defense was weak and so had changed his story to admit the fighting, which was an easily provable obvious fact, and denied the incriminating facts, i. e., the actual taking, the larceny, he might thus have obtained an acquittal by testifying falsely. From the very beginning I have vigorously opposed this latter alternative as not being a legitimate consideration.[8] The reluctance of the majority to discuss this prejudice, argumentatively resulting from the inability to possibly secure an acquittal from the use of testimony the majority now knows is perjured, is part and parcel of the complete failure of the majority even to discuss the effect of Decoster's admission of guilt as

showing lack of prejudice. In other words, there is lurking in the silence of the refusal by the majority to even discuss the lack of prejudice from the refusal to investigate the *fabricated* defense, that *that* reason is implicit in "the defense theory" the majority refer to and asserts reliance upon, but does not explain. And while the majority opinion states that "counsel was 'under no duty to assist in the fabrication of a defense'" (Maj.Op. p. —— of 199 U.S.App. D.C., p. 308 of 624 F.2d), it places all counsel under that precise duty by holding in *this* case that this counsel violated the accused's "constitutional right to effective assistance of counsel" (*Id.*, p. —— of 199 U.S.App.D.C., p. 310 of 624 F.2d) in allegedly not stretching his investigation to provide more fuel for a fabricated defense which *the majority now knows* (p. —— of 199 U.S.App.D.C., p. 310 of 624 F.2d *supra*) would be based on perjury. *What the majority position adds up to is that it reverses the conviction because they contend the defendant was prejudiced by lack of an investigation that might have been used as the basis for talking Decoster out of one perjured defense so he might have relied upon a second perjured defense that had a better chance of succeeding.*[9]

**8.** The difference between robbery and armed robbery in this case carries no assurance of a substantially shorter sentence. When Decoster was sentenced he was already serving a sentence on another conviction, which the majority does not mention. In any event, in most cases claiming ineffective assistance of counsel, where a guilty defendant is involved the difference will be between a justified conviction and a possible unjustified acquittal.

**9.** To appreciate the attitude that my writing colleague by his opinion seeks to engrave upon the law of this circuit, one need only note his current law review article which sets forth his views for the guidance of judges in all ineffective assistance of counsel cases:

In applying this standard [whether the defendant received the effective assistance of counsel], judges should recognize that *all lawyers will be ineffective some of the time*; the task is too difficult and the human animal too fallible to expect otherwise. *It may even be true that given present conditions, appointed counsel and defenders in some areas will be ineffective all of the time.* Perhaps we should replace the phrase "ineffective assistance" with a new term, such as "failure

of the criminal process," which *properly implicates the system rather than the attorney.* Bazelon, *The Realities of Gideon and Argersinger*, 64 Geo.L.J. 811, 823 (1976) (emphasis added) (hereinafter cited as Georgetown Article).

It is of course not true that "all lawyers will be [constitutionally] ineffective some of the time"—and *constitutional* ineffectiveness is what is involved. It is also incorrect to imply that "appointed counsel and defenders in some areas will be *constitutionally* ineffective *all of the time.*" What a gross distortion of fact. This demonstrates how easily my colleague finds *constitutional* error. But then comes the light. What he considers to be "'ineffective assistance' . . . [is really more correctly to be termed] 'failure of the criminal process,' which properly implicates the system rather than the attorney." *Id.* With such a viewpoint, practically all criminal convictions would be set aside, which seems to be my colleague's objective.

It is, thus, not surprising that my colleague has taken the position that prejudice need not be proven by a convicted defendant complaining of his attorney. In indicting the "system" rather than the facts of each case, and in carry-

ing forward that attitude into this case, my colleague is attempting to create a format in this circuit for the easy reversal of criminal convictions. The *Decoster* opinions are deftly crafted to that end. Such opinions would impose upon the Government, once a jury has found a defendant guilty, the burden of proving beyond a reasonable doubt that every conceivable overly imaginative item of defense, that any two activist judges could possibly conceive, had been thoroughly investigated and researched. Such opportunity for unlimited second guessing, as articulated by the majority opinion, would require the Government to negate the entire universe of imaginative defenses instead of meeting specific complaints of claimed prejudice. If this were a valid requirement it might save time to add it to the government's burden at the original trial. The standard of reasonable doubt was intended to apply to guilt as a positive fact. To require such proof of a negative would be like requiring the defendant to prove beyond a reasonable doubt that he was not guilty.

My colleague's disposition to blame the "system" is somewhat reflected by the fact that in the last ten reported opinions involving criminal convictions where "the issues occasion[ed] [a] need" for an opinion (Rule 13(c)), and my two colleagues have been together on a three-judge panel, they have reversed in 8 of the 10 cases. Of the two affirmances, one involved a conviction for fraudulently obtaining gasoline contrary to the fuel conservation restrictions. *United States v. Rosser*, 174 U.S.App.D.C. 79, 528 F.2d 652 (1976); *United States v. Sarvis*, 173 U.S.App.D.C. 228, 523 F.2d 1177 (1975); *United States v. David*, 167 U.S.App.D.C. 117, 511 F.2d 355 (1975); *United States v. DeLoach*, 164 U.S.App.D.C. 116, 504 F.2d 185 (1974); *United States v. Melton*, 160 U.S.App.D.C. 252, 491 F.2d 45 (1974); *United States v. Brown*, 160 U.S.App.D.C. 190, 490 F.2d 758 (1973); *United States v. Wright*, 160 U.S.App.D.C. 57, 489 F.2d 1181 (1973); *United States v. DeCoster*, 159 U.S.App.D.C. 326, 487 F.2d 1197 (1973) ("DeCoster I"); *United States v. Morgan*, 157 U.S.App.D.C. 197, 482 F.2d 786 (1973); *United States v. Riley*, 157 U.S.App.D.C. 27, 481 F.2d 1127 (1973). This indicates eight were reversed (one in part and affirmed in part) and two were affirmed.

This list excludes cases affirmed by orders where the "issues occasion[ed] no need . . ." for an opinion, but includes all published opinions of three-judge panels in criminal cases in which the votes of my colleagues completely controlled the decision—no *en banc* decisions.

In all cases involving criminal convictions during the same period when the issues occasioned a need for an opinion, including those cases on which my colleagues sat, there were 116 affirmances (32 of these affirmed the convictions on some counts and reversed others) and only 52 were reversals.

Thus, we see that the burden my colleague is shifting to the Government in these cases is really not to prove that defense counsel furnished reasonably competent assistance, but to prove to his satisfaction "beyond a reasonable doubt" that "the criminal process" in the United States courts did not fail by my colleague's personal non-legal standard. As he applies this standard to cases before him, it must be recognized from his article that he will consider that all lawyers are (constitutionally) ineffective some of the time; and that it may be true, given "present conditions," that appointed counsel and defenders (that is, all lawyers) in some areas are ineffective *all* of the time. That seems an almost impossible burden for the Government to overcome. In his opinion it could not be overcome here by proving that the accused had no defense except a fabricated one.

My colleague thus seems to be warring, not with what reasonable courts consider to be adequate defense assistance, but with his personal views as to "present conditions" and "the system rather than the attorney." This statement explains in a large measure the weird result that his majority opinion would bring about in this case—the freeing of an admittedly guilty defendant—for the failure to investigate a *fabricated* defense which was not even suggested by the defendant until the trial started.

Freeing guilty defendants on non-legal grounds is also basically what my writing colleague advocates under the name of "Jury Nullification." Thus, in *United States v. Barker*, 168 U.S.App.D.C. 312, 514 F.2d 208, *cert. denied*, 421 U.S. 1013, 95 S.Ct. 2420, 44 L.Ed.2d 682 (1975), he stated in his separate opinion:

> [T]he defendants should not be precluded from asserting their *invalid* defense to the jury. . . . In a previous opinion, I have indicated that jury nullification is a permissible escape valve and should be forthrightly recognized as such.

168 U.S.App.D.C. at 340–41, 514 F.2d at 236–37 (emphasis added). What he is attempting is thus to create illegal "escape valves" for guilty defendants. In the case referred to, in a dissent, he argued that "the jury should be told of its power to *nullify the law* . . . ." *United States v. Dougherty*, 154 U.S.App.D.C. 76, 102, 473 F.2d 1113, 1139 (1972) (emphasis added). The majority thought otherwise. Such lawless suggestion was again rejected in *United States v. Gorham*, 173 U.S.App.D.C. 139, 150–152, 523 F.2d 1088, 1097–1099 (1975), with a citation to Justice Harlan's opinion in *Sparf and Hansen v. United States*, 156 U.S. 51, 106, 15 S.Ct. 273, 39 L.Ed. 343 (1895). My colleague's proposal for jury nullification is that juries should be instructed by the judge that they need not return verdicts on the law or the evidence—thus denying any semblance of due process or equal protection of the law by a form of jury anarchy.

Basically I part company from my colleagues in their holding that what it considers to be ineffective assistance of counsel may be grounded in a failure to *assist the accused in fabricating a defense.*

The risk foreseen by Judge Waddy has been realized.

I deny that any lawyer has an obligation to investigate in order to create or assist such a fabrication and no appellate court with its eyes open to such a result should reverse a conviction on such grounds. Ethics alone should prevent it. That by declining to do so the lawyer might also prevent his client from committing perjury would of course be a beneficial but necessarily secondary result. In this case further investigation was not necessary because defense counsel already had adequate infor-

mation. He had been in the case from the very beginning. Judge Waddy, after trying the case initially, and conducting the extensive remand hearing, also clearly perceived on the remand what was involved *in this case* and likewise stated that defense counsel owed no duty to assist the defendant to fabricate a defense. I agree completely with his statement of the law and with his analysis as to what the suggestions of the majority here actually add up to.

The majority say they cannot agree with the trial court's finding that defense counsel raised the only defense—but they point to no valid defense. All that is present here is an admittedly *fabricated defense.* I submit this is an insufficient showing upon which to base a conclusion that the trial court's finding was clearly erroneous, and the majority does not make this finding which is required to support its reversal.[9a]

In his opinion, juries may replace Congress and legislate as they go.

Such opinions demonstrate a disturbing reluctance to apply the law when it results in the conviction of guilty defendants. The proper place to advance such theories is in the legislative branch of Government, or on the political hustings, by advocating that the Constitution be amended to provide for "non-due process" or "unequal protection of the law." What my colleague overlooks is that the public has some right to have the guilty convicted. The true rule is that innocence should not suffer or guilt escape. No country in the world sets up so many protections for those charged with crime as does this nation and we can well do without shifting to the Government an impossible burden which would "presume" every convicted defendant was prejudiced if fanciful and overly speculative grounds could be conjured up, not by the defendant, but by two judges of an *appellate* court who, under the guise of enforcing reasonable assistance of counsel, are actually attacking "the [entire] system" for some unspecified social grievance they have against it.

My colleague's grievance seems to be that "defendants accused of street crimes," Georgetown Article, *supra*, at 812, too often plead guilty because of the "cop-out-bar" and "plea-hungry judges." *Id.* at 813. Thus, lawyers and Judges are denounced because *defendants plead guilty* to Grand Jury indictments. This name-calling is directed indiscriminately at "regulars," "uptown lawyers" and "public defenders," *id.* at 814, and by specific mention includes the bar of the District of Columbia. *Id.* at 813. He nowhere acknowledges that *more* than reasonable competence of trial counsel is assured in the U.S. District Court for the

District of Columbia because all appointed counsel are picked from a carefully selected list of defense counsel who are approved by all the judges of the United States District Court, and the list is monitored continuously.

Shifting the burden of proof from the defendants will relieve them of the necessity of proving prejudice and thus open the door for the reversal of convictions, as here, in order *sub silentio* to permit defendants to assert "their *invalid* defense to the jury." *Supra.* This is not a proper objective under our system of laws.

**9a.** My position on interviewing the witnesses referred to in footnote 43 of the majority opinion is that Decoster's counsel in connection with the preliminary hearing and thereafter had already become familiar with the facts surrounding the robbery from most of the people involved. As for the alleged witnesses in the hotel and bar, they were never sufficiently identified, as to who they were or what concrete relevant testimony they might testify to, so as to conclude that their testimony would be of any consequence in the trial. I have already pointed out that the desk clerk in the so-called hotel was unable to view Decoster's activities at any place where they might be material.

I agree that every counsel is under an obligation to investigate non-fabricated defenses and I also agree with Judge Waddy's finding that the only defense for Decoster here was to put the Government to its proof, *i. e.*, that there was no non-fabricated defense and none has been shown. No prejudice results from a failure to investigate a fabricated defense. We know now on the basis of Decoster's admission at sentencing that he was guilty, and from the entire record it appears to me that his counsel came to the same conclusion following the pre-

## THE BURDEN TO DEMONSTRATE PREJUDICE

The facts of this case prove, and the majority opinion does not disprove, that a *truthful* defense would not have resulted from any further investigation. This conclusion is compelled by appellant's subsequent admission of guilt. In addition to the lack of any substantial factual basis for the majority opinion concluding that lack of prejudice was not shown, the majority also contorted and changed the law. The linchpin of the majority reasoning is:

DeCoster I teaches that once appellant discharges his burden of showing a substantial violation of one of counsel's duties, the burden shifts to the Government to establish that the *constitutional* violation was harmless. (Emphasis added)

Majority opinion, p. —— of 199 U.S.App. D.C., p. 310 of 624 F.2d. From this quotation one can see how quickly the "guidelines" are converted into "duties" and result in almost instantaneous "constitutional violation[s]." What the majority does is to make a failure to comply with some feature of the guidelines into a *prima facie* constitutional violation. The "substantial violation" which triggered this quick metamorphosis, according to the majority was the

liminary hearing and the receipt of the letter from Decoster which admitted that he was fighting with the victim at the time of the robbery. To this evidence counsel also was able to rely on the guilty pleas to robbery by *both* of the men that Decoster admitted being with and fighting the victim with them.

As also stated in the text of my opinion, it is my view of the evidence that the testimony on remand by Decoster's counsel that the text of the majority opinion, and footnote 43 therein, relies upon, as indicating a failure to interview certain witnesses, referred to the period of time *immediately before trial* and should not be interpreted as indicating that counsel *never* discussed the case with the necessary witnesses when he first entered the case some three years and nine months (3¾ years) before when he conducted the proceedings for *all* the defendants in the preliminary hearing.

10. There is no showing in this record that Decoster claimed before trial "not to have been there." *Cf.*, majority opinion, p.—— of 199 U.S.App.D.C., p. 307 of 624 F.2d. In this respect the majority opinion errs. In fact, in Government Exhibit 2, a letter from Decoster

" . . . total failure to conduct (*Id.* p. —— of 199 U.S.App.D.C., p. 310 of 624 F.2d) . . . a full investigation . . to support the defense theory [the alibi defense presented at trial] . . . (*Id.* p. —— of 199 U.S.App.D.C., p. 310 of 624 F.2d)." [10]

The purported reasoning for placing the burden of proof on the Government, which *DeCoster I* asserts, and which the majority attempt to apply here for the first time, lends neither justification nor support to the rule. In attempting to support a new rule shifting the burden of proof the majority opinion in stages: (1) utterly ignores the settled case law in this circuit, ignoring particularly the wisdom of Judges Prettyman and Leventhal and of Judge (now Chief Justice) Burger, (2) overlooks controlling principles on burden of proof which have been set by the Supreme Court and which are anchored in the common law, (3) cites two erroneous perceptions of judicial process as support for the rule, and (4) creates unnecessary constitutional conflicts involving the sixth amendment right to an adversary trial, the independence of counsel under the sixth amendment, the separation of powers, and waiver of the fifth amendment protection against self-incrimination.[11]

to his attorney, he admitted being involved in the yoking affair, and thus his alibi, contrived at the start of his trial, *was obviously known by his lawyer to be a fabrication.* The relevant text of the letter is set out in n.7, *supra.*

11. *DeCoster I* comes on scene not fully thought out and, in attempting to work a shift in the burden of proof of prejudice, it is simply not workable. This is illustrated at note 65 in the Georgetown Article, *supra* n.9: "The question of prejudice is analytically separate from the question of whether the defendant's sixth amendment rights were violated. The "mockery" and "gross incompetence blotting out a substantial defense" tests failed to recognize this distinction by blurring the issue of ineffectiveness with the question of prejudice. *DeCoster*, I have come to realize, makes the same mistake, by stating that if "a defendant shows a substantial violation . . . he has been denied effective representation *unless the government . . . [']can establish lack of prejudice thereby.'* Coles v. Peyton, 389 F.2d 224, 226 (4th Cir. 1968)." *Id.* (emphasis add-

These points are discussed in turn. *They are very important in this case because the majority opinion has not been able to answer any of them.*

## I. THE INCORRECT RULE AND THE CORRECT RESTATEMENT

In *DeCoster I* the majority attempted to relieve future criminal defendants in most situations of all responsibility whatsoever to show prejudice in an ineffectiveness of counsel claim. 487 F.2d at 1204. To accomplish this end, some guidelines for conduct of counsel were proposed, and the opinion states:

> If a defendant shows a substantial violation of any of these requirements he has been denied effective representation unless the government, "on which is cast the burden of proof once a violation of these precepts is shown, can establish lack of prejudice thereby." *Coles v. Peyton,* 389 F.2d 224, 226 (4th Cir. 1968) [*cert. denied,* 393 U.S. 849, 89 S.Ct. 80, 21 L.Ed.2d 120 (1968)].

*Id.,* footnote omitted.

Thus by *DeCoster I,* proof on the entire issue of prejudice in future cases, where any one of the asserted standards is violated, is placed upon the Government, to prove the negative—"lack of prejudice." Why should *the Government* be required to prove this when its conduct has not been improper, when the evidence, if it exists, to support the charge, is peculiarly available to the accused, and particularly when the alleged inadequate representation was partially caused by the defendant? The majority contends that this should be done in *all*

cases in order to avoid penalizing a defendant for his counsel's failures. However, it is not penalizing the defendant where he is required to prove that he was substantially prejudiced by his counsel's improper representation.

In my dissent in *DeCoster I* I concurred generally in the standards of performance for defense counsel outlined in the majority opinion only on the assumption that they would act as general guidelines, and took issue with the stated attempt to shift the burden of proof of prejudice in future cases. The rule as attempted to be applied here is pernicious and should not be accorded a foothold.

My view is that under the law of this circuit the burden of proving prejudice is clearly upon the criminal defendant in most cases, and as stated by Judge Craven in his dissent in *Coles, supra,*

> the burden of showing [proceeding to show] lack of prejudice falls on the state when, *but only when,* the petitioner has shown a set of facts that demonstrate prejudice to his defense, inherently or otherwise.

389 F.2d at 230 (emphasis in original). The assertion in the majority opinion that, "This case falls squarely within the [inherent prejudice cases] . . . " ignores the facts here present. This is not a case where counsel had insufficient time to consult with the defendant,[12] where there was an obvious conflict of interest,[13] or where the court denied the defendant his right to confer with his counsel.[14] Here, every alleged failing relates to a subjective decision made with sufficient time, without conflict of in-

---

ed). A nonprejudicial denial of effective assistance need not result in reversal, but the analysis should be distinct."

The bench and bar should be spared another continuing attempt to sustain an undeveloped prejudiced attack on "the system." *Id.* at 823.

**12.** *Garland v. Cox,* 472 F.2d 875 (4th Cir.), *cert. denied sub nom. Slayton v. Garland,* 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973) (the court described it as a weak presumption in any event); *Martin v. Virginia,* 365 F.2d 549 (4th Cir. 1966); both cases cited at p. —— of 199 U.S.App.D.C., p. 309 of 624 F.2d n.33, *supra.*

**13.** *Glasser v. United States,* 315 U.S. 60, 76, 62 S.Ct. 457, 86 L.Ed. 680 (1942). From the contradictory duties to different clients the conflict of interest was apparent. No inquiry into particular judgments was made; *Castillo v. Estelle,* 504 F.2d 1243, 1245 (5th Cir. 1975); cases cited at p. —— of 199 U.S.App.D.C., p. 309 of 624 F.2d, n. 34, *supra.*

**14.** *Geders v. United States,* 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976); cited at p. —— of 199 U.S.App.D.C., p. 309 of 624 F.2d, n. 35, *supra.*

terest and with ample opportunity to consult. Prejudice is not inherent or obvious and must be proved. It is too much to say that any given omission or act universally entails prejudice. Each defendant *on the facts of his own case, except in exceptional circumstances must show actual prejudice to his cause.* Such evidence, if it exists, is normally more available to him than to the Government and he should carry through and prove his case rather than having the burden shifted to the Government on a mere showing of some slight effect on his defense, as the majority holds.

## II. THE SETTLED CASE LAW IN THIS CIRCUIT

A. *The Cases of this Circuit and the Reasoning of DeCoster I*

The crux of *DeCoster I* is its threshold attempt to justify reopening the question of *whether or not a defendant must show prejudice in making an ineffectiveness of counsel claim.* The opinion does this by deliberately interweaving a wholly separate issue. The separate issue is the desirability of some standards by which to gauge performance of counsel. This all takes place at 177 U.S.App.D.C. 330–331, 487 F.2d 1201–02:

The first major ineffectiveness case in this Circuit was *Jones v. Huff,* 80 U.S. App.D.C. 254, 152 F.2d 14 (1945). Applying a due process-fundamental fairness approach, we held the standard to be whether counsel's incompetence rendered the trial a "farce and a mockery." In *Bruce v. United States,* 126 U.S.App.D.C. 336, 379 F.2d 113 (1967), we reconsidered *Jones* and held that the "farce and mockery" language was "not to be taken literally, but rather as a vivid description of the principle that the accused has a heavy burden in showing requisite unfairness." The rule announced in *Bruce* required a defendant to prove:

both that there has been gross incompetence of counsel and that this has in effect blotted out the essence of a substantial defense . . . [126 U.S. App.D.C. at 339–340], 379 F.2d at 116–117.

In *Bruce,* the claim of ineffective assistance arose on collateral attack. *In several cases since then, when the ineffectiveness issue was raised on direct appeal, the court has silently ignored the Bruce requirement that the defendant has a "heavy burden" to show prejudice, implying that a different test was applicable on direct appeal. United States v. Hammonds,* 138 U.S.App.D.C. 166, 425 F.2d 597 (1970); *Matthews v. United States,* 145 U.S.App.D.C. 323, 449 F.2d 985 (1971). Indeed, in *Bruce* itself the court pointed out that "a more powerful showing of inadequacy is necessary to sustain a collateral attack than to warrant an order for a new trial either by the District Court or by this court on direct appeal." [126 U.S.App.D.C. at 340], 379 F.2d at 117; *accord Scott v. United States,* 138 U.S.App.D.C. 339, 427 F.2d 609 (1970). *Since these decisions leave uncertain the correct standard to be applied when the question of ineffectiveness is raised on direct appeal, we now address that issue.*

(Emphasis added, footnotes omitted.)

This circuit has *not* departed from the rule that the *defendant* must show prejudice. The law on that point is *not* "uncertain." It was only the question of standards for the performance of defense counsel that was open. *Bruce* was written by Judge Leventhal. Although a collateral attack case, it expressly held that defendants must show prejudice:

But that services were rendered and that there is not the flavor of gross inattention to a client's interest does not necessarily dispose of the case. A claim of ineffective assistance of counsel might be made out if the wishes of the appellant were in fact diverted by clearly erroneous legal advice and he was substantially prejudiced thereby. *Turning to the question of prejudice,* we find the record barren of any substantial showing on this crucial point. *Appellant* made a bare assertion of innocence, *but he has not come forward with any evidence that his admissions to Judge Sirica are not accurate.*

126 U.S.App.D.C. at 344, 379 F.2d at 121 (emphasis added). Later, in *Matthews v. United States*, 145 U.S.App.D.C. 323, 449 F.2d 985 (1971), a *direct appeal* case, Judge Leventhal, concurring, wrote:

> I have taken the trouble of outlining the prejudice I think occurred, because I am by no means of the view, as suggested in the Petition for Rehearing, that in these cases no possibility of prejudice need be shown. Where defendant has not been provided with counsel, that fact in and of itself establishes the need for reversal without regard to any other possibility of prejudice. *Glasser v. United States*, 315 U.S. 60, 76, 62 S.Ct. 457, 86 L.Ed. 680 (1942), but when the claim is posed in terms of ineffective assistance of counsel, then I think the ineffectiveness has to be measured in terms of whether the attorney has in effect blotted out the substance of a defense, *Bruce v. United States*, 126 U.S.App.D.C. 336, 340, 379 F.2d 113, 117 (1967).

145 U.S.App.D.C. at 332, 449 F.2d at 994 (emphasis added.) More importantly, the disposition in *Matthews* rested explicitly and squarely on *United States v. Hammonds*, 138 U.S.App.D.C. 166, 425 F.2d 597 (1970), a *direct appeal* case. In *Matthews*, Judge Fahy, writing for himself and Judge Wright, stated:

> The petition of appellant Matthews for rehearing has led us to reconsider our affirmance of his convictions. *In United States v. Hammonds*, 138 U.S.App.D.C. 166, 425 F.2d 597 (1970), *involving a similar problem of ineffective assistance of counsel, the court reversed Hammonds' convictions because of constitutional error there found.* In that case as in this the conduct of the same counsel was involved, and the same kind of casual summation to the jury occurred. Moreover, the evidence of guilt in Hammonds was no less strong than the evidence of guilt in Matthews' case.

145 U.S.App.D.C. at 330, 449 F.2d at 992. *Hammonds*, a *direct appeal* case, expressly follows the earlier case law in this circuit, which holds that the *defendant* must show prejudice:

At the outset we recognize that cases involving ineffective assistance of counsel "raise questions of extreme difficulty in the administration of justice." *Jones v. Huff*, 80 U.S.App.D.C. 254 [255], 152 F.2d 14, 15 (1945). "The burden on the Appellant to establish his claim of ineffective assistance of counsel is heavy. * * * The question * * * is whether his representation was so ineffective that Appellant was denied a fair trial." *Harried v. United States*, 128 U.S.App.D.C. 330 [333–334], 389 F.2d 281, 284–285 (1967). However, it requires a less "powerful showing of inadequacy" to sustain *appellant's burden* on direct appeal than is required on collateral attack. *Bruce v. United States*, 126 U.S.App.D.C. 336, 340, 379 F.2d 113, 117 (1967).

*United States v. Hammonds*, 138 U.S.App. D.C. at 169, 425 F.2d at 600 (emphasis added, footnote omitted). *Hammonds* concludes:

> Appellant has sustained *his burden* of establishing his claim that he was deprived of his constitutional right to effective assistance of counsel.

*Id.* at 173, 425 F.2d at 604.

Although defendant's burden in these direct appeal cases is less than the burden in collateral attacks, the defendant must *nevertheless show prejudice.* That has never been in question. The test reproduced *supra* from *Hammonds* relies on *Harried*, and of course *Hammonds* in turn governed *Matthews*. *Harried* was a *direct appeal* case. In *Harried*, then-Judge Burger wrote:

> The *burden on the Appellant* to establish his claim of ineffective assistance of counsel is heavy. See *Bruce v. United States* [126 U.S.App.D.C. 336], 379 F.2d 113 (1967); *Mitchell v. United States*, 104 U.S.App.D.C. 57, 259 F.2d 787, cert. denied, 358 U.S. 850, 79 S.Ct. 81, 3 L.Ed.2d 86 (1958).

128 U.S.App.D.C. at 333–334, 389 F.2d at 284–85 (emphasis added). In setting this test, the *Harried* excerpt relied on *Mitchell*, in which Judge Prettyman, writing for himself and then-Judge Burger, wrote:

A convicted person cannot bring about a judicial hearing upon and determination of the trial competence of defense counsel by making allegations which, either on their face or after initial testing for verity, fail to indicate a lack of skill so great that the accused in realistic fact had not a fair trial. An accused cannot bring about a judicial evaluation of the quality of a defense; *he is entitled only to allege and show that the proceeding was not a fair trial.*

104 U.S.App.D.C. at 63–64, 259 F.2d at 793–94 (emphasis added). Although *Mitchell* is a collateral attack case, it is obvious from *Hammonds, Matthews,* and *Harried* and the foregoing language in *Mitchell* and *Bruce* both indicate that the burden is on the defendant to show prejudice in direct appeals as well. Such burden extends to all effectiveness of counsel claims. We made this clear in our approval of the action of the District of Columbia Court of Appeals in *Scott v. United States,* 138 U.S.App.D.C. 339, 427 F.2d 609 (1970):

> The appropriate standard for ineffective assistance of counsel, set forth in *Bruce, supra,* is whether gross incompetence blotted out the essence of a substantial defense.
>
> Moreover, in case of direct appeal the reviewing court takes action appropriate in the interest of justice, even though the problem would not rise to the constitutional dimensions necessary to undo a final judgment on collateral attack. *Dyer v. United States,* 126 U.S.App.D.C. 312, 379 F.2d 89 (1967); see *Bruce,* 126 U.S. App.D.C. at 340, 379 F.2d at 117.
>
> *However, the opinion of the District of Columbia Court of Appeals reveals both*

*that it was aware of the standard in Bruce and that it sought to apply that standard to the facts of this case.*

138 U.S.App.D.C. at 340, 427 F.2d at 610.

*Hammonds, Matthews, Harried, Bruce,* and *Mitchell* are the law in this circuit. They have not been overruled. They continue to be cited with favor, as for example, by Judge Robinson in *United States v. Holiday,* 157 U.S.App.D.C. 140, 142 n. 5, 482 F.2d 729, 731 n. 5 (1973). Other examples of recent favorable citation are by Judge Wright in *United States v. DeLoach,* 164 U.S.App.D.C. 116, 120, 504 F.2d 185, 189 (1974), and Judge Bazelon in *United States v. Butler,* 164 U.S.App.D.C. 151, 155, 504 F.2d 220, 224 (1974).

The majority's insinuation that there is uncertainty in the law of this circuit as to whether or not a *defendant* must show prejudice in effectiveness of counsel cases thus amounts to a gross misstatement. It accordingly becomes clear that the majority opinion is attempting to change the settled case law in this circuit with no reference whatever to the precedents that must properly be overruled before that can be effectively accomplished. Two judges alone cannot do that. An *en banc* court is the only vehicle to accomplish that end.[15] Thus the majority opinion in its attempt for the first time to create a new burden of proof rule in this circuit, contrary to our settled case law, is acting in excess of its authority and its opinion on that point is a nullity. Its attempt to change the rule need not be followed. The majority opinion in no way denies this point.

The majority "incorrectly [interprets] the constitutional requirement of due process" as our panel did when *Agurs* was before it.

**15.** *District of Columbia v. Grimes,* 131 U.S. App.D.C. 360, 367, 404 F.2d 1337, 1343 (1968) (Robinson, J., concurring), and cases cited therein: *Insurance Agents' Int'l Union v. NLRB,* 104 U.S.App.D.C. 218, 260 F.2d 736 (1958), *aff'd* 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960); *Polisnik v. United States,* 104 U.S.App.D.C. 136, 137, 259 F.2d 951, 952 (1958); *Mallory v. United States,* 104 U.S.App. D.C. 71, 259 F.2d 801 (1958); *Davis v. Peerless Inc. Co.,* 103 U.S.App.D.C. 125, 127, 255 F.2d 534, 536 (1958); *Thompson v. Thompson,* 100 U.S.App.D.C. 285, 286, 244 F.2d 374, 375 (1957). *See also District of Columbia v. Washington Post Co.,* 98 U.S.App.D.C. 304, 235 F.2d 531, *cert. denied,* 352 U.S. 912, 77 S.Ct. 147, 1 L.Ed.2d 118 (1956) and *District of Columbia v. Grimes, supra* at 370, 404 F.2d at 1347 (McGowan, J., dissenting). This is particularly true since the bulk of the affected cases are less than ten years old, and so are certainly recent. *District of Columbia v. Grimes* and *Insurance Agents' Int'l Union v. NLRB, supra.*

Thereafter the Supreme Court in *Agurs* held that the failure of counsel to obtain the criminal record of the murder victim does not demonstrate ineffectiveness because such evidence *would not create a reasonable doubt of guilt.* 427 U.S. at 102 n. 5, 96 S.Ct. 2392. The same is true here. *There is no showing or claim that any truthful evidence exists that would create a reasonable doubt of guilt.* Certainly the fabricated alibi does not meet the due process standard. The reversal here is thus contrary to *Agurs, supra.*

It is true that some statement of standards for a lawyer's professional work are helpful here, and the foregoing cases support that proposition. But the same cases are the direct case law in this circuit for the proposition that the burden is on the defendant to show prejudice. The cases cited *supra* leave no uncertainty on that point.

There is incontrovertible reasoning in our case law that *DeCoster I* blindly attempts to ignore. The majority in *DeCoster I* predicated its statement on burden of proof with illogic that callously disregards the trust of the reader and the principles of *stare decisis.* And the assertions in the majority opinion that this is a dissenting opinion and so was Judge Craven's opinion in *Coles, supra,* are not an adequate refutation of the reasoning which those opinions embody.

### B. *United States v. Pinkney*

An eloquent rejection of the factual reasoning of the majority here and of the proposition that the burden is on the Government, and not the movant, to show prejudice is found in *United States v. Pinkney,* 177 U.S.App.D.C. 423, 543 F.2d 908 (1976). In *Pinkney,* Judge Robinson, with Judges Wright and C. Stanley Blair concurring, examines a set of alleged errors and omissions of counsel, which are of the same nature as those alleged in this case, namely, failure to discuss a material matter with his client, or to inquire whether certain asserted "grave allegations of the Governments allocution memorandum were true" (at 428, 429, 543 F.2d at 913, 914). The opinion by

Judge Robinson nevertheless *rejects* Pinkney's claim of ineffective assistance of counsel, *flatly holding that a DeCoster I motion is a motion for a new trial, in which the defendant bears the same obligation to show prejudice to his cause as in any other new trial motion.*

### 1. The Facts and Reasoning of *Pinkney*

In *Pinkney,* appellant, convicted of distributing heroin, claimed ineffective assistance of counsel at sentencing:

> The Government's allocution memorandum was served on appellant's counsel a week ahead of sentencing, but appellant asserts that counsel never discussed the contents of the memorandum with him. He also complains of counsel's failure to dispute the allegation, made in the memorandum, that appellant was a party to the District's drug traffic.

At 428, 543 F.2d at 913 (footnotes omitted).

Judge Robinson introduces his *ratio decidendi* by surveying certain preliminary factors:

> As previously stated, a motion for resentencing charging ineffective assistance of counsel when appellant was sentenced was rejected by the District Court, but we perceive no basis upon which that ruling could now be upset. In the first place, since appellant did not prosecute an appeal from the ruling on the motion, our jurisdiction to entertain the point is, to say the least, not clear. And, in view of the sentencing judge's specification of his reasons for denying the motion, it is equally unclear whether the allocution memorandum played a significant part in the sentencing decision. *We need not pass on these aspects of the case, however, because for even additional reasons the District Court must be affirmed.*

*Id.* at 430, 543 F.2d at 915 (emphasis added) (footnotes omitted).

It should be noted that, although uncertain as to the extent of the trial court's reliance on the allocution, the *Pinkney* court itself relied significantly on the allocution:

> The evidence adduced at appellant's trial strongly indicated that he was engaged

in wholesaling narcotics. *And, the information conveyed by the Government's allocution memorandum cast appellant in that role positively.*

*Id.* at 427, 543 F.2d at 912 (emphasis added) (footnote omitted).

We refer not only to profitable drug-selling reflected by the trial transcript *and the Government's allocution memorandum* but also to a statement by appellant, communicated to the court in the presentence report, indicating that he was receiving $80 per week in unemployment compensation when the alleged offenses transpired.

*Id.* at 428 n. 30, 543 F.2d at 913 n. 30 (emphasis added).

Judge Robinson then goes on to present his *ratio decidendi:*

Our *DeCoster* decision plainly envisioned a motion bolstered by affidavit at its key points, an expectation emanating from the procedural vehicle which *DeCoster* pressed into service as a record-implementing device. *The vehicle, we said, was a motion for a new trial, obviously one presenting new evidence in the sense of evidence outside the record—in other words, a new-trial motion based on newly discovered evidence. An essential characteristic of such a motion is a disclosure of evidence portraying the movant's claim materially and resolutely, and evincing a capability of mounting a serious challenge.* By the same token, a motion charging ineffective assistance of counsel must set forth *evidence* upon which the elements of a constitutionally deficient performance might properly be found.

Appellant's motion did not meet these wholesome requirements. There was no affidavit supporting the motion, nor was the motion otherwise verified. There was only the bare statement that sentencing counsel did not confer with appellant on the charge in the Government's allocution memorandum that appellant was a cog in the local drug-distributing machinery. The absence of substantiation therefor is the better assessed in conjunction with *appellant's failure to*

*raise the claim in his postsentence letter to the sentencing judge, and in his present counsel's unexplained omission to advance it earlier than he did.* Moreover, while insisting upon a further opportunity to dispute the drug-involvement allegations of the Government's memorandum, *appellant's motion gave no indication as to the evidence,* if any, by which he would undertake an effort at refutation.

*Id.* at 431–432, 543 F.2d at 916–917 (emphasis added) (footnotes omitted).

2. Counsel's Performance in *Pinkney*

The glaring fact in the foregoing extract from *Pinkney* is that both appellant and counsel failed to timely advance the claim of ineffective assistance, and that, in filing the motion, counsel failed to supply the court with particulars. The *Pinkney* majority declines to conform to the temper of *DeCoster I* and find that the untimely and insufficient filing is *itself* ineffective assistance of counsel.

But under the highly suppositive reasoning of the majority in this case, the potential revelations on remand and the untimely motion of counsel *a fortiori* require the simple remedy of inquiry on remand. Reversal was not in issue in *Pinkney*—simply a remand to find out the substance of a pleaded claim. In *DeCoster I*, of course, *there was no claim at all.* This court raised the issue of effective assistance *sua sponte. Supra,* pp. ——–—— of 199 U.S.App. D.C., pp. 300–301 of 624 F.2d. If this court can allow the appellate speculation indulged in this case to require *reversal*, then certainly possible revelations as to Pinkney's participation in District of Columbia drug traffic could be sought on a *remand.*

Given the indistinguishable factual posture of *Pinkney* and of this case, the obvious recourse for the *Pinkney* court was to invoke the hearing remedy of *DeCoster I*, thereby compelling the government to prove that Pinkney was not prejudiced by the alleged omissions of counsel.

But Judge Robinson forthrightly abjures the type of speculation that the majority here calls for:

*As an appellate court, our adjudicatory authority extends only to questions amply grounded in the record.*

*Id.* at 430, 543 F.2d at 915 (emphasis added) (footnote omitted). The *coup de grace* to the mode of fanciful factual analysis which Judge Bazelon's opinion would hereby seek to impose is that the refusal of the court in *Pinkney* to set aside the conviction turned on the conclusion—

> "that counsel's alleged derelictions [had not] *frustrated* appellant's opportunity to present his side of the controversy," *id.* at 429, 543 F.2d at 914.

### 3. The Burden of Defendant to Show Prejudice

The crux of Judge Robinson's *Pinkney* analysis is his holding that *an ineffective assistance of counsel claim is a motion for a new trial and is subject to the settled legal standards for such motions:*

> The vehicle [for relief in ineffective assistance of counsel cases], we said, was a motion for a new trial . . . . An essential characteristic of such a motion is a disclosure of evidence portraying the movant's claim materially . . . evincing a capability of mounting a serious challenge.

*Id.* at 431, 543 F.2d at 916.

*Each of the cases cited for this proposition unambiguously requires that defendant show prejudice in his motion.* Judge Robinson cites:

> *Newsome v. Smyth,* 261 F.2d 452, 454 (4th Cir. 1958), *cert. denied,* 359 U.S. 969, 79 S.Ct. 883, 3 L.Ed.2d 837 (1959); *United States v. Frame,* 454 F.2d 1136, 1138 (9th Cir.), *cert. denied,* 406 U.S. 925, 92 S.Ct. 1794, 32 L.Ed.2d 126 (1972); *United States v. Norman,* 402 F.2d 73, 78 (9th Cir. 1968), *cert. denied,* 397 U.S. 938, 90 S.Ct. 949, 25 L.Ed.2d 119 (1970); *Dansby v. United States,* 291 F.Supp. 790, 794 (S.D.N.Y.1968).

*Id.* at n. 58.

In *Dansby* we find:

> Motions for a new trial are not favored and should be granted only with great caution. *The burden of proving the necessity for a new trial is on the petitioner. He must satisfy the court that the jury might have reached a different result without the challenged testimony, or that had the subsequent testimony been presented at the trial it would have "probably" produced a different result.*

291 F.Supp. at 794 (emphasis added) (footnote omitted). My colleagues completely gloss over these requirements.

*Norman* states that a factual basis there alleged for a new trial is insufficient because ". . . that fact would not have undermined the Government's case in the least." 402 F.2d at 78. Neither would the *fabricated* defense which the majority contends Decoster's counsel was required to investigate.

*Frame* flatly states:

> Turning to the merits, we hold that the motion for new trial was properly denied. *No showing was made of possible prejudice from the alleged conflict. See Davidson v. Cupp,* 446 F.2d 642 (9th Cir. 1971), and cases cited.

454 F.2d at 1138 (emphasis added). Nor does the majority point to any prejudice to Decoster here.

*Newsome* tells us:

> Having had a full trial, the defendant clearly is not entitled to a retrial upon the basis of an unsupported statement that he would like additional time to produce unidentified witnesses whose possible testimony was not disclosed.

261 F.2d at 454.

In his footnote 59, Judge Robinson notes:

> Our conclusion in this regard in no way impinges upon the rule, which we readily reaffirm, that once a *substantial violation of counsel's duties is shown,* the Government's burden is to demonstrate lack of prejudice therefrom.

(Emphasis added). But he omits mention of absolving defendant of the initial duty to show *prejudice*—because no such absolution is possible. To show a "substantial violation of counsel's duties," prejudice must be shown—otherwise the violation would not be substantial. By its own pre-

sentation of the cases *Pinkney* reiterates that defendant *must* show *prejudice* before *any* obligation of going forward can fall upon the Government. That is the issue in the present case. The remand proceeding is not in issue, and the value of the ABA standards for conduct of counsel is not in issue, nor is the issue the standard announced in *DeCoster I* as to the duty of counsel to furnish reasonably adequate assistance to the accused. The issue is simply whether this court honors the settled case law that the movants for a new trial must show prejudice.

The validity of Judge Robinson's analysis is unassailable. In *DeCoster* cases, defendant lacks a "substantial" claim and one that is "consequential," unless the defendant first show substantial prejudice. Whether one calls it harm or prejudice, the result is the same and the burden rests initially upon the defendant to prove prejudice. That is the clear holding of all the cases in this court and this does not amount to an acceptance of *DeCoster I* or *II* (Majority op. p. —— of 199 U.S.App.D.C., p. 310 of 624 F.2d). As in all cases, if the proponent proves his case, prejudice here, the burden of proceeding then shifts to the other party

to disprove that fact—but not before prejudice has been proved. To the extent that the majority in *DeCoster* would absolve the defendant from the initial obligation to prove prejudice it does not conform to the law as stated heretofore and hereafter.

## III. PRINCIPLES CONTROLLING THE ALLOCATION OF BURDEN OF PROOF ON PREJUDICE

The settled law in this circuit on the responsibility of defendant to show prejudice in effectiveness of counsel cases reflects controlling principles enunciated by the Supreme Court and anchored in the common law.

### A. *Principles Set by the Supreme Court*

The majority in *DeCoster I* adopts the legally unsupported assertion in *Coles v. Peyton* that once certain acts or omissions by counsel are shown, the case for ineffective assistance of counsel must prevail unless the Government, "*on which is cast the burden of proof once a violation of these precepts is shown,* can establish lack of prejudice thereby." 389 F.2d at 226, 159 U.S.App.D.C. at 333, 487 F.2d at 1204 (emphasis added).[16]

This assertion conflicts with the rule evident in holdings by the Supreme Court.

---

**16.** The majority opinion in *Coles v. Peyton*, 389 F.2d 224 (4th Cir.), *cert. denied*, 393 U.S. 849, 89 S.Ct. 80, 21 L.Ed.2d 120 (1968), is unconvincing in several respects. It fails to reply to, or even deal with, the apparently convincing answers that the dissent in that case sets forth as replies to what the majority opinion claims are defects in counsel's representation of his client, to wit: (1) the date counsel *actually* began to represent the accused, (2) the defendant's admission to the counsel at trial, and the finding by the state court, that defendant *did* have intercourse with the prosecutrix (it was thus unnecessary to explain that penetration was an element of the crime), (3) the lack of any substantial point in not interviewing a witness who only "heard" a disturbance and screams at a distance in the nighttime, (4) that there was no foundation for asserting that counsel was delinquent in not investigating the male companion the accused alleged was with the prosecutrix because the accused never gave his lawyer any leads or suggestions as to where he could be found or who he was, and (5) that an investigation of the reputation of the prosecutrix for chastity was never made at trial or in connection with the federal appeal, because no

possible witnesses were ever suggested. A defense lawyer is not clairvoyant, nor can he divine witnesses where none exist.

On the law side, *no judicial authority or reason whatsoever is cited for the switch in the burden of proof.* Nor are any factors pertinent to the access to admissible evidence cited to require or justify the switch in the normal burden of proof. *Coles* is thus contrary to both law and logic. In justice to *Coles* however, and to distinguish it somewhat from *DeCoster*, half of the *alleged* violations in *Coles* did involve action, or alleged inaction, by the state, *i. e.*, the alleged failure promptly to appoint defense counsel and to afford defense counsel a reasonable opportunity to defend his client. Since this new burden of proof theory was launched in 1968, no subsequent Fourth Circuit case has applied it. *Jackson v. Cox*, 435 F.2d 1089, 1093 (4th Cir. 1970) refuses to apply it in a case where defense counsel failed to locate and subpoena an unknown witness where there was no showing, even if he could be found, that he might provide a defense. Those facts are substantially what we have in *DeCoster*. Also in *Hall v. United States*, 410 F.2d 653, 662 (4th Cir. 1969), the case was decided against the

For example, defendant must show prejudice in claims based on the sixth amendment right to an impartial jury and the fifth amendment right to due process. Exceptions to the rule of showing actual prejudice are made in those instances in which *defendant* shows that he is the victim of acts that are inherently prejudicial, as opposed to acts that are *actually* prejudicial. A factor to be considered also is whether the Government in any way participated in causing the counsel to be ineffective. But regardless of whether it is actual or inherent prejudice that is alleged, it is *defendant* who must show prejudice. In *Murphy v. Florida*, 421 U.S. 794, 803, 95 S.Ct. 2031, 2038, 44 L.Ed.2d 589 (1975), the Court held:

> Petitioner has failed to show that the setting of the trial was inherently prejudicial or that the jury selection process of which he complains permits an inference of actual prejudice.

(Emphasis added). The allocation of the burden of proof in *Murphy* poses the same questions that are raised by the *DeCoster I* majority. It is true that the burden in *Murphy* requires a defendant to bear a fact-producing responsibility in his own cause. 159 U.S.App.D.C. at 333, 487 F.2d at 1204. Also, it is true that circumstances can be described in which the alleged infringement of the right obscures the evidence of the infringement itself. *Id.* But the general rule stands. The courts can provide *counsel to defendant* to uncover prejudice, no matter how obscured, but it is *defendant* who must show prejudice. With regard to the sixth amendment issue of effectiveness of counsel, there is no possible reason for holding that the rule that defendant show prejudice mysteriously discontinues.

Thus, the majority in *DeCoster I* and here must be assuming that prejudice to the defendant is inherent in the acts or omissions proposed as guidelines in assessing counsel's performance. Neither in *DeCoster I* nor here has there been a showing of inherent prejudice, much less actual preju-

dice. The position of the majority must be that violation of their precepts constitutes inherent prejudice in any case whatsoever, as occurred in *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), where there was no representation at all.

The analysis thus devolves into the question of whether "substantial" deviation from the majority's precepts, 159 U.S.App. D.C. at 333, 487 F.2d at 1204, ipso facto rises to the level of the fundamental constitutional deprivation inherent in, say, complete denial of the assistance of counsel. In a phrase, is deviation from the precepts equivalent to inherent prejudice? If it is not, then prejudice, actual or inherent, must be shown *by each defendant on the facts of the defendant's own case.*

The precepts listed in *DeCoster I* are:

*In General* —Counsel should be guided by the American Bar Association Standards for the Defense Function. They represent the legal profession's own articulation of guidelines for the defense of criminal cases.

*Specifically* —(1) Counsel should confer with his client without delay and as often as necessary to elicit matters of defense, or to ascertain that potential defenses are unavailable. Counsel should discuss fully potential strategies and tactical choices with his client. (2) Counsel should promptly advise his client of his rights and take all actions necessary to preserve them. Many rights can only be protected by prompt legal action. The Supreme Court has, for example, recognized the attorney's role in protecting the client's privilege against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694] (1966), and rights at a line-up, *United States v. Wade*, 388 U.S. 218, 227 [87 S.Ct. 1926, 18 L.Ed.2d 1149] (1967). Counsel should also be concerned with the accused's right to be released from custody pending trial, and be prepared, where appropriate, to

---

defendant without any reference to the burden of proof being on the Government. *See also, United States v. Peterson* (No. 75–1056, 4th Cir., July 9, 1975). Maybe this is another ex-

ample of bad law being made by a hard case on the facts, *i. e.*, the 25-year sentence imposed by the Hustings Court.

make motions for a pre-trial psychiatric examination or for the suppression of evidence.

(3) Counsel must conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed. The Supreme Court has noted that the adversary system requires that "all available defenses are raised" so that the government is put to its proof. This means that in most cases a defense attorney, or his agent, should interview not only his own witnesses but also those that the government intends to call, when they are accessible. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. And, of course, the duty to investigate also requires adequate legal research.

159 U.S.App.D.C. at 332–33, 487 F.2d at 1203–04 (footnotes omitted).

The very generality of these standards prevents their use as conclusive indicators of constitutional prejudice for each and every effectiveness of counsel case. Their relation to prejudice to a defendant's cause turns on the facts of the case in question. The majority in *DeCoster I* reminds us, with regard to the ABA standards incorporated into the foregoing precepts:

While the Standards claim that they are *not intended "as criteria for judicial evaluation of effectiveness,"* [citation omitted], they certainly are relevant guideposts in this largely uncharted area. 159 U.S.App.D.C. at 332 n. 25, 487 F.2d at 1203 n. 25 (emphasis added). This is one of the mistakes the majority makes. They now place more weight on the standards than their authors intended them to bear. As here, they attempt to have them serve as much more than "relevant guideposts." [17]

The key to ineffectiveness of counsel, per the majority in *DeCoster I* is "substantial" violation of the precepts. Now we are told here in *Decoster II* that "substantial" means "consequential" (Majority opinion, p. —— of 199 U.S.App.D.C., p. 309 of 624 F.2d). What an exercise in elementary semantics. What my colleagues are trying to do is to skate around the "prejudicial" requirement and make it appear as though they have invented a new standard. But their discovery in reality merely adds up to a failure to recognize that when they are talking about "substantial" and "consequential" they are doing nothing more than describing essential ingredients of "prejudice." To have prejudice the causative factor must be "substantial" and sufficiently related to the result in a causal relationship so that the result may correctly be con-

17. The majority violates the intent of the drafters in attempting to apply the general guidelines set forth in the *Standards Relating to the Administration of Criminal Justice (American Bar Association)* § 4.1 (1974), as though the standards were a penal statute and an absolute "duty" of counsel. Those who wrote the *Standards* indicated that the standards of § 4.1, since a violation thereof was not characterized as "unprofessional," were "intended to serve as *guides* to honorable practice." *Id.* at 64 (emphasis added). They were never intended to be applied in the overly strict manner which the majority here attempts.

While these standards may prove useful to courts in this respect, it should be emphasized that *the Committee has not proposed them as a set of per se rules applicable to post-conviction procedures.* The standards have been drawn with their primary impact on the conduct of prosecutors and defense counsel in mind. The larger considerations involved in a determination of whether the conduct of a prosecutor or defense lawyer

was such that a conviction should be overturned are beyond the scope of the Committee's work.

*Id.* at 65 (Emphasis added). The majority are thus guilty of the same error that Justice Blackmun in his chambers opinion found in the Nebraska trial court's adoption of the Nebraska Bar-Press Guidelines for Disclosure and Reporting of Information Relating to Imminent or Pending Criminal Litigation in *Nebraska Press Assn. v. Stuart*, 423 U.S. 1327, 96 S.Ct. 251, 46 L.Ed.2d 237 (1975):

Without rehearsing the description of those guidelines set forth in my prior opinion, it is evident that they constitute a "voluntary code" which was not intended to be mandatory. Indeed, the word "guidelines" itself so indicates. They are merely suggestive and, accordingly, are necessarily vague.

*Id.* at 1330, 96 S.Ct. at 254. Section 4.1 of the ABA Standards, too, is just a guide and was never intended to operate in conjunction with what is equivalent to a penal presumption.

sidered a consequence of that factor, i. e., "consequential." Actually, "substantial" and "consequential" in the abstract, and divorced from "prejudice," as my colleagues apparently try to isolate them, are meaningless. They are merely adjectives standing alone. Error that is just "substantial" and not "prejudicial" is of no moment. And error that is "consequential" (and what error is not a consequence of some causative factor?), without being prejudicial, is immaterial. Thus, to be relevant at all, the neglect must be of sufficient substance so that it may be found to be both a consequence of the alleged failure and prejudicial.

The facts here, as well as in *Coles*, show that a great deal turns on the actual facts of each case. The factors discussed *supra* at pp. ——— ——— of 199 U.S.App.D.C., pp. 314–321 of 624 F.2d and in Judge Craven's review of the facts in *Coles*, 389 F.2d at 228–30, demonstrate that the facts of neither case admit of a summary finding of prejudice. Substance requires prejudice that is consequential, and the majority here cannot beg the question by legislating a new task for the prosecution. The terms "substantial" and "consequential" are an admission by the *DeCoster I* majority that the effectiveness question and the meaning of the majority's own precepts *must* be settled on a case-by-case basis, on the facts of each case. Since that is so, it is true that the precepts are not universally dispositive factors, such as providing counsel in the first place, that foreclose any need to show prejudice. Therefore, the case here falls into that category identified by the Supreme Court as *requiring defendant* to show either actual or inherent prejudice. It follows immediately that Judge Craven's rule in *Coles* is correct:

> the burden of showing lack of prejudice falls on the state when, *but only when*, the petitioner has shown a set of facts that demonstrate prejudice to his defense, *inherently or otherwise*.

389 F.2d at 230 (latter emphasis added).

B. *The Application of Chapman v. California*

This sets in stark relief the majority's manipulation of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The majority write:

> *Chapman* holds that *if a defendant's constitutional rights were violated*, his conviction must be reversed unless the Government "prove[s] beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."
> . . . we hold that harmlessness be established beyond a reasonable doubt.

Majority opinion, p. —— of 199 U.S.App. D.C., p. 311 of 624 F.2d (emphasis added). But *Chapman* was dealing with a claim of harmless error *after a substantial constitutional violation had been found*. Here, the existence of constitutional error *is* the issue, and the majority has presented neither facts nor law to establish that *any* constitutional right of defendant has been violated at all, particularly his sixth amendment counsel right.

What the majority does here is skip the requirement that the defendant first prove a substantial constitutional violation and, upon the appellate court's *sua sponte* assertion that the ABA standards were not conformed to, imposes upon the Government the unprecedented burden to prove beyond a reasonable doubt that the assumed error was harmless. The defendant should first be required to prove a constitutional violation that substantially prejudiced him. In fact *Chapman* specifically refused to hold "that all federal constitutional errors, regardless of the facts and circumstances, must always be deemed [to be] harmful." 386 U.S. at 21–22, 87 S.Ct. at 827. The majority opinion relies upon the statement in *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828 (1967)

> that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.

But in holding that this rule is applicable here the majority opinion does not fairly consider the hesitating and qualifying steps that Justice Black took before he made that remark, and which may fairly be considered

as qualifying that statement. The *Chapman* opinion concludes:

There is little, if any, difference between our statement in *Fahy v. Connecticut,* 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 about "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction" and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.

386 U.S. at 24, 87 S.Ct. at 828. So, while the earlier statement is clearly appropriate where a constitutional violation is clear, the *Fahy* qualification is more appropriate to situations, such as exists here, where the existence, extent and effect of the alleged constitutional violation have not been proved. Applying the *Fahy* refinement to the facts here would require proof by the defendant that "there is a reasonable possibility that the [alleged inadequate representation] . . . might have contributed to the conviction . . . ." The defendant made no such claim and in view of the jury's guilty verdict, his admission of facts in his letter to his lawyer (n. 7, *supra*), and the clear implications from his in-court statement when he was sentenced (p. 24, 87 S.Ct. p. 828 *supra*), his guilt is certain beyond all doubt—not just a reasonable doubt. Thus, there is no "*reasonable* possibility that the [alleged inadequate assistance of counsel] . . . might have contributed to the conviction"—unless of course one would advocate the sporting theory of justice in which perjury might prevail and an acquittal be thereby obtained. But, as Justice Douglas remarked in *Brady v. Maryland,* 373 U.S. 83, 90, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), this is not a permissible consideration. Thus, even if it be assumed, or presumed, that "federal constitutional error" existed, the harmless error standard of *Chapman* has been satisfied.

### C. *Principles of the Common Law*

This circuit has recently succinctly stated the common law on burden of proof in civil cases:

Although a *plaintiff generally carries the burden of persuasion* on each element of his cause of action, special circumstances may lead a court to shift the burden of persuasion to the defendant on some part of the claim. One special circumstance commonly accepted is that the burden will be shifted where the material necessary to prove or disprove an element "lies particularly within the knowledge" of the defendant.

*Nader v. Allegheny Airlines, Inc.,* 167 U.S. App.D.C. 350, 361, 512 F.2d 527, 538 (1975), *rev'd on other grounds,* 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976) (citations omitted). *Decoster* is a criminal case, but, as we have held, it is not a denial of due process to place on a defendant the burden of proving a claim that is separate from the elements of a crime charged. *United States v. Greene,* 160 U.S.App.D.C. 21, 31–32, 489 F.2d 1145, 1155–56 (1973), *cert. denied,* 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 190 (1974). Thus, the common law fact-finding principles in *Nader* govern this case.

The comparison with *Nader* is illuminating. In *Decoster* the person *asserting the claim is also the person with the access to practically all the important facts that are relevant to proving prejudice.* In *Decoster* the twin policies of placing the burden of proof on the person pressing the claim and of placing the burden of proof on the person with particular access to the facts are *both* satisfied by holding that Decoster is required first to show prejudice.

There is no conflict in the common law principles here. Those principles direct that defendant make a showing of prejudice. Moreover, the Supreme Court has set constitutional standards that require defendant here to show prejudice. The relevance of these principles to this case was stated in the dissenting opinions in *DeCoster I* and in *Coles.* In *DeCoster I* my dissent stated:

In addition, I do not concur in the conclusion that the burden in such cases to prove non-prejudice shifts to the Government. Such proof is usually more within the ability of the accused, if such evidence exists at all, and it would place an unfair burden on the Government to impose that task upon it. For instance

the accused could frustrate the Government's effort in many instances merely by claiming his privilege against disclosing some facts on the ground that they might incriminate him.

159 U.S.App.D.C. at 334, 487 F.2d at 1205. And in *Coles* Judge Craven wrote:

Switching the burden of proof does not make these startling defenses true but it does put upon the state the exceedingly awkward, if not unbearable, burden of proving the negative. And it is not suggested that the state can prove the negative of such matters more easily than petitioner can prove the positive—the usual reason for switching the burden. Nor do these matters, in my opinion, fall within the category of constitutional defects that must be deemed inherently prejudicial because (1) we intuitively sense prejudice, and (2) the extent of it is simply not practically susceptible to proof, such as (a) failure to have counsel assigned, (b) appointment of counsel followed immediately by trial, (c) division of responsibility among an entire bar (what's everyone's responsibility is no one's responsibility). Except in such situations, and others of like kind, it is still true that "in most cases involving claims of due process deprivations we require a showing of identifiable prejudice to the accused." *Estes v. State of Texas,* 381 U.S. 532, 542, 85 S.Ct. 1628, 1632, 1633, 14 L.Ed.2d 543 (1965).

389 F.2d at 230 (footnotes omitted).

Where the Supreme Court has set constitutional standards that require defendant here to show prejudice, and where the common law fact-finding rules direct the same result, it is obviously incorrect to relieve defendant of the responsibility to show prejudice, particularly when the proof of that fact, if it exists, is peculiarly available to him.

## IV. THE PURPORTED JUSTIFICATION IN DeCOSTER I FOR SHIFTING THE BURDEN OF PROOF

In attempting to justify placing the burden of proof on the Government in certain cases *DeCoster I* states:

Two factors justify this requirement. First, in our constitutionally prescribed adversary system the burden is on the government to prove guilt. A requirement that the defendant show prejudice, on the other hand, shifts the burden to him and makes him establish the likelihood of his innocence. It is no answer to say that the appellant has already had a trial in which the government was put to its proof because the heart of his *complaint* is that the absence of the effective assistance of counsel has deprived him of a full adversary trial. (Emphasis added). [Thus, the majority, in the proceeding which is supposed to determine whether counsel has been effective, switches the traditional burden of proof, *in advance* of a determination of that issue, on the ground that what the "complaint" only alleges has already been proved. This perversion of logic by an appellate court is unbelievable.]

Second, proof of prejudice may well be absent from the record precisely because counsel has been ineffective. For example, when counsel fails to conduct an investigation, the record may not indicate which witnesses he could have called, or defenses he could have raised.

159 U.S.App.D.C. at 333, 487 F.2d at 1204 (footnote omitted).

With respect to both these points the obvious truth is that a defendant is entitled to engage counsel, or obtain court-appointed counsel in *direct appeal* cases (the very cases on which my colleagues bottom their analysis) to develop whatever facts may lie in his favor. The fact of earlier constitutional ineffectiveness of counsel can only follow from the fact of prejudice to defendant's cause. If the consequences of the performance of his counsel do not indicate substantial injury to defendant, he is not to obtain redress. The constitutional requirement of reasonably adequate counsel is not to be used as a shield for criminal behavior.

## V. THE CONSTITUTIONAL CONFLICTS

The rule in *DeCoster I* causes constitutional conflicts which are unnecessary and which should therefore be avoided.

## A. *The Conflicts*

*DeCoster I* states that it is based explicitly on concern for the adversary process:

Consistent with this recognition the Court has continued to repeat that the purpose of counsel is to "preserve the adversary process" and that counsel must act "in the role of an active advocate in behalf of his client."

159 U.S.App.D.C. at 331, 487 F.2d at 1202 (footnotes omitted).

Counsel must conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed. The Supreme Court has noted that the adversary system requires that "all available defenses are raised" so that the government is put to its proof.

*Id.* at 333, 487 F.2d at 1204 (footnote omitted).

Two factors justify this requirement. First, in our constitutionally prescribed adversary system the burden is on the government to prove guilt. . . . It is no answer to say that the appellant has already had a trial in which the government was put to its proof because the heart of his complaint is that the absence of the effective assistance of counsel has deprived him of a full adversary trial.

*Id.*

It is necessary to be explicit and realistic about what would happen to the adversary process if the burden of proof were shifted to the Government as *DeCoster I* suggests and as the majority here attempts. As the government loses cases through an inability to meet the generally unfair burden of being required to prove a negative "lack of prejudice," prosecutors will increasingly, and justifiably, attempt to protect guilty verdicts by seeking to monitor the decisions and activities of defense counsel in order to build a record showing why certain decisions were proper. The majority opinion encourages, if it does not require, that prosecutors look over the shoulder of defense counsel in all his activities. They will also be required to tailor their prosecutions so that they will not eventually be forced to bear an extremely difficult burden of proving a negative with respect to the conduct of an opposing counsel. In certain trial situations it is highly likely that the prosecutor might, at times, move the court to alter a defense lawyer's decisions. This would inevitably interfere with the right of both parties, the Government and the defendant, to a truly adversary trial.

As Judge Prettyman wrote in *Mitchell*, with respect to the burden the *DeCoster I* type of rule would place on a judge:

Moreover the constitutional right of an accused to the assistance of counsel might well be destroyed if counsel's selections upon tactical problems were supervised by a judge. The accused is entitled to the trial judgment of his counsel, not the tactical opinions of the judge. Surely a judge should not share the confidences shared by client and counsel. An accused bound to tactical decisions approved by a judge would not get the due process of law we have heretofore known. And how absurd it would be for a trial judge to opine that such-and-such a course was ineffective or incompetent because it persuaded him (the judge) to decide thus-and-so adversely to the accused.

259 F.2d at 793. Since this is true with respect to judicial supervision of defense counsel, it is *a fortiori* true of prosecutorial supervision or surveillance of defense counsel. The majority assert that they will not "second guess" defense counsel (Majority opinion, p. —— of 199 U.S.App.D.C., p. 307 of 624 F.2d), but then they do exactly that when they reject a reasonable interpretation of his actions (*id.*, nn. 5, 23) and resolve all speculative doubts against him with extravagant adverse conclusions (*id.*, n. 23, pp. ———— of 199 U.S.App.D.C., pp. 307–309 of 624 F.2d).

Placing the burden on the Government to prove that the defendant's counsel was *not* ineffective or inadequate wars with the sixth amendment right to an adversary trial, and for that reason the attempt to shift the burden cannot be sustained. Moreover, *DeCoster I* is also inconsistent facially: in seeking to assure the effectiveness of counsel, it undermines the very freedom of ac-

tion on which such counsel relies. To the extent that the majority opinion in this case holds that defense counsel must investigate to support a fabricated, *untruthful* defense against counsel's conscience and better judgment, it strikes at the lawyer's independence and integrity. These qualities must be preserved if we are to have a truly adversary system and a practicing bar with a high standard of ethics.

No lawyer should ever be required to investigate to support a fabricated defense. In his 1975 Sonnett Lecture at Fordham University, Justice Widgery encapsulated what is properly required of an advocate:

> [T]he trial lawyer must be . . . independent in mind and in fact—he must be able to do what his conscience tells him is right without fear of antagonizing the court or being overborne by his client. Finally, he must have integrity in the pursuit of justice, recognizing his responsibility to the court and his opponent, and rejecting alike the desire to win at all costs and the temptation to take an unfair advantage of such pieces of forensic luck which come his way.[18]

There are many inherent difficulties that would arise if the burden of proof were placed on the Government to prove that defense counsel did not inadequately represent a defendant. First of all, preparation to assume that burden would require the prosecutor to order an investigation into what for the prosecution has heretofore in most instances been a completely prohibited area—the confidential relationship between a criminal defendant and his counsel—and it would be the Government's investigative arm, the FBI or the police,[19] that would be ordered to make the necessary investigation. While there may be cases where an FBI or police investigation into a lawyer's representation of a defendant in a criminal case would be appropriate, as where de-

fense counsel allegedly committed some criminal offense in his representation of his client, if the burden of disproving prejudice were shifted to the prosecution, as my colleagues would compel, the majority of such investigations would be required to probe in depth into confidential communications and relations between the defendant and his lawyer. A particular target of such investigations would be admissions and statements as to guilt that the defendant may have made to his lawyer. Can defense disclose these privileged communications? In such an inquiry the interests of former defense counsel would then become adverse to those of his former client. Any evidence the lawyer may have been furnished by his client, or otherwise obtained while he was representing the accused, which bore on the question of guilt, would be fairly producible if the defendant was attacking his counsel.

But what of a situation, such as we have here, where two appellate judges raised the issue without informing the defendant or advising him of the privileged disclosures that might be compelled? If the defendant made the motion he would open the door to such inquiry by the prosecutor, the defendant himself would always be a prime target for interrogation, and his exercise of his fifth amendment rights might conflict with an adequate investigation—as possibly in this case—where it appears that appellant apparently committed perjury in the trial of the case.[20] Defense counsel himself might face the same hazard. If the entire relationship between the defendant and his counsel were not thus opened up for searching investigation and interrogation, then the effect of the rule here sought to be applied by the majority would be to shift the burden of proof away from the side that is normally in the best position to produce the most relevant evidence (the defendant) and to deny or seriously restrict the Government in its access to what in

---

**18.** Rt. Hon. Lord Widgery, Ford Chief Justice of England, *"The Compleat Advocate,"* 43 Fordham L.Rev. 909, 912 (1975), Fifth Annual John F. Sonnett Memorial Lecture, January 7, 1975.

**19.** In appropriate cases the FBI or Police would be replaced by the Secret Service, the Intelli-

gence Division of the IRS, the Postal Inspectors or the investigative arm of other agencies upon which Congress has conferred investigative jurisdiction in various cases.

**20.** *See* pp. ——, —— of 199 U.S.App.D.C., pp. 315, 316 of 624 F.2d, *supra.*

most cases would be the best evidence to meet the burden that is being placed upon it. Such result would be grossly unfair, as it would in a great many cases place practically an impossible burden on the Government. It would impose a penalty on the Government for the alleged deficiencies of counsel for the accused.

Thus both the accused and his counsel, if they do not exercise the fifth amendment guarantee against self-incrimination, would be thoroughly interrogated by the Government investigators and, upon a proper showing, the papers and records of accused and counsel could be subpoenaed,[21] search warrants could obviously be issued for relevant evidence, and wiretaps possibly authorized by court order. Evidence thus obtained would be used in an attempt to sustain the unfair burden of proof to disprove prejudice that my colleagues would place on the Government, and might be used as the basis for additional prosecutions of either the defendant or his lawyer, or both, or to add strength to the Government's case if a retrial eventuated.

It seems apparent that the majority has not fully thought through some of the consequences of their attempt to shift the burden of proof to the prosecutor in these cases. Instead, they leave those problems to the future. This is the same siren song that we have heard before with disastrous results. It is my belief that a judge who presents a program to radically change the law in an important particular should demonstrate that his proposal would work fairly and reasonably in actual practice. My colleagues dissent from this principle.

To require the Government in a *post hoc* (second guessing) proceeding to justify the legal activities of defense counsel would require Government investigators to go to extreme and unreasonable ends. The original and subsequent investigative suggestions made by the majority here prove this point (*supra*, n. 1).

The situation here would become typical and appellate defense counsel would be found "ineffective", in this Court, if they did not pursue the largely unreasonable second-guessing speculative patterns which my colleagues have conjured up in this case. And what we have seen here is only the *beginning* of this defense, the effect of which is to try the defense *lawyer* in a second trial.

Once the accused is convicted, the practice would be for a friendly appellate court to exercise its imagination as to speculative witnesses and defenses. If the lawyer is "convicted" in the second trial, then there would ordinarily be a third trial to retry the accused if the case against him were not dismissed. If the pattern the majority here would establish became the applicable rule of law, practically every guilty defendant would have a second defense—post trial—based on speculative evidence, imaginary witnesses, and other excursions into fantasy. Long-established rules imposing the burden of proof on the contending party would be violated. A proposed rule fraught with such dire consequences should not be imposed. If such were the law, defending accused criminals in the jurisdiction of this appellate court would be a hazardous occupation insofar as one's professional reputation were concerned. In the district court we already have had one libel case for $2 million arising out of an accusation by subsequent appellate counsel that prior defense counsel had ineffectively represented his client at trial.

This is not to say that a defendant in an appropriate case has no relief. He does. The trial judge can appoint *new counsel* for defendant. The judge, in supervising the trial, can and should provide defendant with competent counsel. But when this court attempts to transfer to the prosecution the responsibility for, and burden of, proving that the performance of defense

---

**21.** *United States v. Nobles*, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975). The defense investigator's report relating to his interview with a particular witness, previously delivered to defense counsel, must be furnished to the prosecution for inspection at the completion of the investigator's testimony which related to the interview covered in the report. *Contra, United States v. Wright*, 160 U.S.App.D.C. 57, 489 F.2d 1181 (1973).

counsel did not prejudice defendant, as the majority here attempts to do,[22] an even greater constitutional violation is established, for the rule would shift a constitutional obligation which cannot be shifted:

> Upon the *trial judge* rests the duty of seeing that the trial is conducted with solicitude for the essential rights of the accused. . . . The trial court should protect the right of an accused to have the assistance of counsel.

*Glasser v. United States*, 315 U.S. 60, 71, 62 S.Ct. 457, 465, 86 L.Ed. 680 (1942) (emphasis added).

The executive branch is the prosecutor. While it must be solicitous of the rights of defendants, it is not defense counsel, and *this court* cannot shift to the executive branch that which is fundamentally the constitutional duty of the judiciary. The judiciary *can* appoint counsel to represent defendants, and the legislature can provide for the appointment and payment of counsel for indigents in order to provide *defense* lawyers. But, unless the Government is somehow involved in the inadequate performance of defense counsel, it is the *defense lawyers* selected by the defendants or appointed by the court who must develop and carry the proof of showing the inadequacy of predecessor counsel. The adversary system by its very nature does not permit the placement of that obligation upon the prosecutor. The United States attorney cannot be both prosecutor and defense counsel, and the complexity of the oversight problem makes it undesirable that he be so charged in every case, upon pain of reversing convictions of admittedly guilty defendants.

Finally, if the majority here persist in burdening the prosecution with the complete inquiry on prejudice, then, given the legitimate investigative steps the prosecution must then undertake, defendant's act of invoking a claim of ineffective assistance of counsel may constitute a *waiver of defendant's fifth amendment guarantee against self-incrimination and of the confidentiality of his attorney-client relationship.* The Supreme Court has recently reminded us that such privileges can be waived, and in so doing reminded us of the importance of the very independence of adversary counsel that the majority here so fervently undermines. In *Maness v. Meyers*, 419 U.S. 449, 95 S.Ct. 584, 42 L.Ed.2d 574 (1974), the Court, in holding that an attorney could not be held in contempt for advising his client to exercise his guarantee against self-incrimination wrote:

> A layman may not be aware of the precise scope, the nuances, and boundaries of his Fifth Amendment privilege. *It is not a self-executing mechanism; it can be affirmatively waived,* or lost by not asserting it in a timely fashion. If performance of a lawyer's duty to advise a client that a privilege is available exposes a lawyer to the threat of contempt for giving honest advice it is hardly debatable that some advocates may *lose their zeal for forthrightness and independence.*

419 U.S. at 466, 95 S.Ct. at 595 (footnotes omitted). The Court goes on 419 U.S. at 467–68, 95 S.Ct. at 596, to quote Mr. Chief Justice Fuller, speaking for the Court in *In re Watts*, 190 U.S. 1, 29, 23 S.Ct. 718, 47 L.Ed. 933 (1903):

> In the ordinary case of advice to clients, if an attorney acts in good faith and in the honest belief that his advice is well founded and in the just interests of his client, he cannot be held liable for error in judgment. *The preservation of the independence of the bar is too vital to the*

---

**22.** The reference in the majority opinion to a three step "inquiry," including whether the violation was "prejudicial" (Majority opinion, p. —— of 199 U.S.App.D.C., p. 305 of 624 F.2d), should not raise any false hopes that the majority places that burden of proving prejudice on the defendant. Subsequently, on pp. —— – —— of 199 U.S.App.D.C., pp. 309–310 of

624 F.2d, they take the first two steps on the run and adroitly switch the burden to the Government "even if an investigation would not have produced a scintilla of evidence favorable to the defense . . . ." (Majority opinion, p. —— of 199 U.S.App.D.C., p. 310 of 624 F.2d).

*due administration of justice to allow of the application of any other general rule.* (Emphasis added.)

### B. *The Conflicts Are Unnecessary*

There are cases in which certain constitutional guarantees conflict with others. In this case the majority seeks to create and apply a burden of proof rule that sets the right to adequate assistance of counsel against the adversary guarantees of the sixth amendment, the independence of counsel, the sanctity of the attorney-client relationship as protected by the sixth amendment, the separation of powers, and the defendant's fifth amendment guarantees against self-incrimination.

Adjudication among these conflicting constitutional provisions should not be undertaken where it is unnecessary to do so. *Ashwander v. Valley Authority*, 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). The conflicts in *DeCoster* are needless. They should, and easily can, be avoided by keeping the burden to show prejudice on defendant and using successor counsel to assist defendant in carrying the burden in normal cases.

### CONCLUSION

The rule switching the burden of proof that the majority attempted to fashion in *DeCoster I*, and to apply here, must be repudiated. The law in this circuit clearly places the burden of proving prejudice upon the defendant. *Bruce v. United States, Mitchell v. United States, Harried v. United*

States, *United States v. Hammond, Matthews v. United States, supra.* It is also highly unreasonable to force this circuit to embark on a regular practice of requiring defense counsel to function as investigators and search for non-existent witnesses to support fabricated defenses that are conjured up by defendants on the day of trial. Judge Craven's dissent in *Coles*, which is in accord with the case law in this circuit, sets forth the proper rule, and it is supported by cited judicial authority, which is not true of the majority opinion in that case.

*DeCoster I* represents a bold attempt to change the law on the burden of proof under the guise of exploring the subject of standards for counsel. The ABA standards speak for themselves. Their strength does not depend on being reprinted in the F.2d reporters, and it is specious to attempt to justify the change in the law by referring to the poverty of most criminal defendants (Majority opinion, p. —— of 199 U.S.App. D.C., p. 305 of 624 F.2d). There is nothing here to indicate that Decoster's financial condition in any way caused him not to receive a fair trial and so the poverty argument is an injudicial appeal to passion and prejudice. Today, under the Criminal Justice Act, most defendants are as well, if not better, represented than the Government. Moreover, the interests of the poor lie on both the defense *and* the people's—the government's—sides in criminal cases.[23] The burden of proof dictum in *DeCoster I* *should therefore be rejected entirely, and the* underlying conviction affirmed. To

---

**23.** The majority attempt to make it appear that they are fighting for "equal justice" for the poor. However, they confine their benefaction to undeserving criminals who are poor and ignore the deserving victims who are also poor—and victimized by the criminal depredations of small groups of vicious criminals who prey largely on the poor sector. To this end they copy the statement from *Griffin v. Illinois*, 351 U.S. 12, 19, 76 S.Ct. 585, 591, 100 L.Ed. 891 (1956) that: "There can be no equal justice where the kind of trial a man gets depends on the amount of money he has." This is a simplistic attempt to raise a false issue and one not presented by the facts of this case. That a defendant may not be rich does not give him a right to use perjured testimony in his defense.

A rich man does not have that right and neither does a poor man. Likewise no defendant, be he rich or poor, has a right to have his conviction set aside because his lawyer did not investigate to obtain facts in support of a fabricated defense. What my writing colleague is attempting to do is to impose his personal social philosophy that the courts are "wreaking vengeance" when they impose sentences on defendants such as Decoster. *Bazelon, To "Establish Justice" and "Insure Domestic Tranquility,"* 61 A.B.A.J. 1060, 1062 (1975). It is just as wrong for a judge to use his individual social philosophy to *acquit* a defendant as it would be to exercise that individual philosophy to *convict* an accused person.

switch the burden of proof scorns both the law and logic. To do so in the manner the majority suggests in effect collapses the standard into the remedy.

For the foregoing reasons, from this attempt, without any showing of prejudice, *and without producing a single witness that would testify to a single fact that would be beneficial to Decoster*, to set aside the jury's finding of guilty, which was concurred in twice by the trial judge, and admitted by the accused appellant, I respectfully dissent. It is unthinkable for this court to require counsel at the outset of a criminal trial to investigate every possible defense that might be fabricated.